ORIGINAL

1   ROBERT A. BUSH (SBN 65357)
    rbush@BushGottlieb.com
2   IRA L. GOTTLIEB (SBN 103236)
    igottlieb@BushGottlieb.com
3   JASON WOJCIECHOWSKI (SBN 263911)
    jasonw@BushGottlieb.com
4   BUSH GOTTLIEB SINGER LÓPEZ
    KOHANSKI ADELSTEIN & DICKINSON
5   A Law Corporation
    500 North Central Avenue, Suite 800
6   Glendale, California 91203-3345
    Telephone: (818) 973-3200
7   Facsimile: (818) 973-3201

8   Attorneys for Defendant Screen Actors
    Guild – American Federation of
9   Television and Radio Artists

                    FILED
            CLERK, U.S. DISTRICT COURT

                  OCT 30 2013

            CENTRAL DISTRICT OF CALIFORNIA
            BY                        DEPUTY

10                  UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  BERNADETTE PAULEY, an            CASE NO.   CV13-08011-R
14  individual, and THOMAS CLARK, an            (CWx)
    individual, on behalf of themselves and
15  all others similarly situated,    NOTICE OF REMOVAL

16                  Plaintiffs,

17        vs.

18  CF ENTERTAINMENT, a California
    corporation; COMICS UNLEASHED
19  PRODUCTIONS, INC., a California
    corporation; ENTERTAINMENT
20  STUDIOS, INC., a California
    corporation; BYRON ALLEN FOLKS,
21  an individual; SCREEN ACTORS
    GUILD – AMERICAN FEDERATION
22  OF TELEVISION AND RADIO
    ARTISTS, a California corporation; and
23  DOES 2 through 100 inclusive,

24                  Defendants.

25

26  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

27  CENTRAL DISTRICT OF CALIFORNIA:

28

PAID
OCT 3 0 2013

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

Defendant Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA" or "Defendant") gives notice of the removal of this action from the Superior Court of the State of California for the County of Los Angeles, pursuant to 28 U.S.C. § 1446. Defendant alleges as follows:

1.      The jurisdiction of this court is invoked pursuant to 28 U.S.C. sections 1331 and 1441.

2.      On or about October 1, 2013, Plaintiffs Bernadette Pauley and Thomas Clark ("Plaintiffs") filed a Second Amended Complaint in the above-captioned matter in the Superior Court of the State of California for the County of Los Angeles, Case Number BC498061. A true and correct copy of the Second Amended Complaint, Summons, and Minutes of Telephonic Conference are attached hereto and incorporated by reference as Exhibit A. All other documents filed with the Superior Court are attached hereto and incorporated by reference as Exhibit B, with the exception of the following which are listed on the Superior Court's docket but are unavailable:

a.      Notice of Related Cases filed January 31, 2013

b.      First Amended Complaint filed February 6, 2013

c.      Initial Status Conference Order filed February 7, 2013

d.      Proofs of Service/Summons regarding Comics Unleashed Productions, Inc., CF Entertainment, and Entertainment Studios, Inc., all filed March 1, 2013

e.      Joint Initial Status Conference Class Action Response Statement filed April 3, 2013

3.      Defendant SAG-AFTRA was served with the Second Amended Complaint, Summons, and Minutes of Telephonic Conference on or about October 3, 2013. Defendant SAG-AFTRA was not served with any other documents in this case.

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

4.      Plaintiffs in their Second Amended Complaint allege that they were members of the American Federation of Television and Radio Artists ("AFTRA"), a predecessor of SAG-AFTRA, and employees of CF Entertainment, Entertainment Studios, Inc., Comics Unleashed Productions, Inc., and Byron Allen Folks (collectively, the "Employer Defendants"). Plaintiffs allege that the Employer Defendants were alter egos and joint employers of Plaintiffs. Defendant SAG-AFTRA is informed and believed and thereon alleges that at least one of the Employer Defendants was a signatory to a collective bargaining agreement with AFTRA (the "CBA").

5.      AFTRA was the exclusive bargaining representative for employees within the bargaining unit whose terms and conditions of employment are governed by the CBA. The relationships among the collective bargaining parties and member employees, and the duties, if any, owed by SAG-AFTRA to the employees it represents for contract administration purposes, are governed in the United States by the National Labor Relations Act, 29 U.S.C. § 141, *et seq.*, and the collective bargaining agreement.

6.      This action against SAG-AFTRA arises under the federally established duty of fair representation and federal labor law, and therefore may be removed to this Court.

7.      Specifically, Plaintiffs claim that the union breached its duty of fair representation in the handling of a grievance concerning the right of Plaintiffs to certain payments allegedly owed to them by the Employer Defendants under the CBA. (Second Amended Complaint ¶ 1, page 2, lines 15–21; ¶ 2, page 2, lines 25–26; ¶¶ 80–83, page 16, lines 1–16.) This claim is removable because it is a claim over which this Court may exercise original jurisdiction within the meaning of 28 U.S.C. § 1441(a). *See, e.g., Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1047–48 (9th Cir. 1987); *Madison v. Painters Local 729*, 132 F. Supp. 2d 1244, 1258–59 (C.D. Cal. 2000); *BIW Deceived v. Local S6, Industrial Union of Marine and*

1  *Shipbuilding Workers of America*, 132 F.3d 824, 831 (1st Cir. 1997); *Richardson v.*

2  *Steelworkers*, 864 F.2d 1162, 1169 (5th Cir. 1989). *See also United Steelworkers v.*

3  *Rawson*, 495 U.S. 362, 368 (1990); *Hardine v. Office & Prof'l Employees Int'l*

4  *Union*, 475 Fed. App'x 103, 106 (9th Cir. 2012) (Bea, J., concurring).

5         8.     Thus, this Court has original jurisdiction over this action pursuant to 28

6  U.S.C. § 1331, and thus the action is removable to this Court pursuant to 28 U.S.C.

7  § 1441(a).

8         9.     This Notice of Removal is timely in that it is filed within 30 days of the

9  first receipt of a copy of the Second Amended Complaint by Defendant SAG-

10  AFTRA. *See* 28 U.S.C. § 1446(b)(3).

11       10.     All other defendants who have been served with Summons and

12  Complaint join in this Notice of Removal.

13  DATED: October 29, 2013          ROBERT A. BUSH

                                IRA L. GOTTLIEB

14                                JASON WOJCIECHOWSKI

15                                BUSH GOTTLIEB SINGER LÓPEZ

                              KOHANSKI ADELSTEIN & DICKINSON

16                                A Law Corporation

17

18

19               By: _____

20                       IRA L. GOTTLIEB

21               Attorneys for Defendant Screen Actors Guild –

             American Federation of Television and Radio

22               Artists

23

24

25

26

27

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

# EXHIBIT A

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 01 2013

Sherri R. Carter, Executive Officer/Clerk
By: Tanaya Lewis, Deputy

CONFORMED COPY
ORIGINAL FILED
Los Angeles Superior Court

OCT 01 2013

Sherri R. Carter, Executive Officer/Clerk
By: Tanaya Lewis, Deputy

1  | LAW OFFICES OF MATTHEW J. MATERN
2  | MATTHEW J. MATERN, SBN 159798
   | Email: matthewjmatern.mlg@gmail.com
3  | TAGORE O. SUBRAMANIAM, SBN 280126
   | Email: tagore.mlg@gmail.com
4  | 3655 Torrance Boulevard, Suite 315
   | Torrance, California 90503
5  | Tel: (424) 247-1172
   | Fax: (424) 247-1173
6  |
7  | Attorneys for Plaintiffs, Bernadette Pauley and Thomas Clark,
   | on behalf of themselves and all others similarly situated.
8  |
9  | SUPERIOR COURT OF THE STATE OF CALIFORNIA
   |
10 | FOR THE COUNTY OF LOS ANGELES
11 |
12 | BERNADETTE PAULEY, an individual,   Case No. BC498061
   | THOMAS CLARK, an individual, on
13 | behalf of themselves and all others   [Assigned to Hon. Kenneth Freeman]
   | similarly situated,
14 |                                      CLASS ACTION          BY FAX
15 |            Plaintiffs,              SECOND AMENDED COMPLAINT FOR:
16 |       vs.                           1. Breach of Contract
17 | CF ENTERTAINMENT, a California       2. Failure to Indemnify Employees for
   | corporation; COMICS UNLEASHED           Necessary Expenditures
18 | PRODUCTIONS, INC., a California       3. Failure to Provide Accurate Itemized
   | corporation; ENTERTAINMENT               Statements to Employees
19 | STUDIOS, INC., a California           4. Failure to Pay All Wages Due
   | corporation; BYRON ALLEN FOLKS,       5. Unfair Business Practices
20 | an individual; SCREEN ACTORS          6. Fraud and Intentional Deceit
   | GUILD - AMERICAN FEDERATION           7. Fraud by Concealment
21 | OF TELEVISION AND RADIO               8. Negligent Misrepresentation
   | ARTISTS, a California corporation; and 9. Breach of Duty of Fair
22 | DOES 2 through 100 inclusive,            Representation
23 |
   |            Defendants.              REPRESENTATIVE ACTION
24 |
   |                                     10. Representative Action for Civil
25 |                                         Penalties
26 |
   |                                     DEMAND FOR JURY TRIAL
27 |
28 |

-1-

SECOND AMENDED COMPLAINT

1    Plaintiffs Bernadette Pauley and Thomas Clark, on behalf of themselves and all others

2   similarly situated, hereby submit the following class action complaint.  Upon personal

3   knowledge as to their own acts and status, and upon information and belief as to all other

4   matters, Plaintiffs allege as follows:

5                            **NATURE OF THE ACTION**

6    1.   Plaintiffs and over one hundred other actors and comedians worked for Defendants

    Comics Unleashed Productions, Inc., Entertainment Studios, Inc., CF Entertainment, and

7   Byron Allen Folks (collectively "Defendants") on the syndicated television show

8   Comedy.TV in approximately May and August of 2009 pursuant to a standardized union

9   engagement contract providing each actor with residual payments for subsequent airings of

10  each episode.  While working on the show, Plaintiffs and putative class members were

11  subjected to repeated violations of the California Labor Code.  Subsequent to its production,

    the show Comedy.TV went on to become tremendously successful catapulting its creator

12  Byron Allen Folks to celebrity status.  Standing on the shoulders of the shows' success,

13  Defendant Byron Allen Folks and his affiliate corporate entities have become the largest

14  independent producer/distributor of first-run syndicated television programming for broadcast

15  television stations.  To date, Plaintiffs and putative class members have not been paid for

16  residual payments as required by their engagement contracts, despite repeatedly complaining

17  to Defendants CF Entertainment, Comics Unleashed Productions, Inc., Entertainment

    Studios, Inc., and Byron Allen Folks. Moreover Plaintiffs and putative class members

18  routinely informed their union the Screen Actors Guild – American Federation of Television

19  and Radio Artists of their failure to receive residual payments. Despite being aware of the

20  merits of Plaintiffs' and putative class members' grievances, Plaintiffs' union arbitrary failed

21  to process its member's grievances in a timely and reasonable manner.

22   2.   Plaintiffs bring this lawsuit, on behalf of themselves and all other similarly situated

23  individuals, alleging claims for breach of contract, failure to indemnify for necessary

24  expenditures, failure to provide itemized statements, failure to pay all wages due, unfair

25  business practices, fraud and intentional deceit, fraud by concealment, negligent

    misrepresentation, breach of duty of fair representation, unfair business practices, and a

26  representative action for civil penalties.

27  ///

28

-2-

**SECOND AMENDED COMPLAINT**

## JURISDICTION AND VENUE

3.   This Court has personal jurisdiction over Defendants because they are residents of and/or doing business in the State of California.  Venue is proper because most of Defendants' wrongful acts and omissions occurred in the County of Los Angeles.

## PLAINTIFFS

4.   Plaintiff, Bernadette Pauley (hereafter sometimes referred to as "Pauley") is a female resident of the State of California.  At all relevant times herein, Pauley was employed by Defendants CF Entertainment, Entertainment Studios, Inc., Comics Unleashed Productions, Inc., and Byron Allen Folks. Additionally, at all relevant times Plaintiff Pauley was a member of the American Federation of Radio and Television Artists which would later merge to become Defendant Screen Actors Guild – American Federation of Television and Radio Artists.

5.   Plaintiff, Thomas Clark (hereafter sometimes referred to as "Clark") is a male resident of the State of California.  At all relevant times herein, Clark was employed by Defendants CF Entertainment, Entertainment Studios, Inc., Comics Unleashed Productions, Inc., and Byron Allen Folks.  Additionally, at all relevant times Plaintiff Clark was a member of the American Federation of Radio and Television Artists which would later merge to become Defendant Screen Actors Guild – American Federation of Television and Radio Artists.

6.   Class Plaintiffs are actors and comedians who worked for Defendants and their affiliates on the show Comedy.TV pursuant to a contract granting residual payments for the (4) years preceding the filing of this action, and continuing while this action is pending (the "class period").  Plaintiffs reserve the right to name additional class representatives.

## DEFENDANTS

7.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon alleges that CF Entertainment is, and at all times relevant hereto was, a California corporation organized and existing under the laws of the State of California.  Plaintiff is further informed and believes, and thereon alleges, that CF Entertainment is authorized to conduct business, and does conduct business, in the State of California.

8.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon alleges that Entertainment Studios, Inc. (hereafter "Entertainment Studios") is, and at all times relevant hereto was, a California corporation organized and existing under the laws of

-3-

1  the State of California.  Plaintiff is further informed and believes, and thereon alleges, that

2  Entertainment Studios is authorized to conduct business in the State of California, and does

3  conduct business, in the State of California.

4         9.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

5  alleges that Comics Unleashed Productions, Inc. (hereafter "Comics Unleashed Productions")

6  is and at all times relevant hereto was, a California corporation organized and existing under

7  the laws of the State of California.  Plaintiff is further informed and believes, and thereon

8  alleges, that Comics Unleashed Productions is authorized to conduct business, and does

9  conduct business, in the State of California.

10        10.   Plaintiffs are informed and believe, and based upon such information and belief,

11  allege that Defendant Byron Allen Folks (hereafter "Folks") is an individual and resident of

12  the State of California.   At all relevant times herein, Mr. Folks was the owner, founder,

13  managing agent, and officer of Defendants CF Entertainment, Entertainment Studios, and

14  Comics Unleashed Productions.  At all relevant times, Folks either directly or indirectly

15  employed or exercised control over the wages, hours, and working conditions of Plaintiffs

16  and putative class members.

17        11.   At all relevant times alleged herein, Plaintiffs are informed and believe, and

18  thereon alleges that the Screen Actors Guild – American Federation of Television and Radio

19  Artists (hereafter "AFTRA") is, and at all times relevant hereto was, a corporation whose

20  principal place of business is in CA.  Plaintiff is further informed and believes, and thereon

21  alleges, that AFTRA is authorized to conduct business in the State of California.

22  Additionally, at all relevant times AFTRA was the union for Plaintiffs and putative class

23  members.

24        12.   Upon information and belief, Defendants CF Entertainment, Comics

25  Unleashed Productions, Entertainment Studios, Folks, and Does 1-100 improperly dominated

26  and disregarded the separate corporate forms of one another, commingling funds and other

27  assets; failing to separate the corporate funds; diverting the corporate funds or assets to

28  unauthorized non corporate uses; treating the corporate assets as their own; failing to obtain

authority to issue stock; holding out to third parties that they might be personally liable for

debts of one another; failing to maintain adequate corporate records and minutes; maintaining

sole ownership or a majority of the stock of one another; hiring employees for both personal

and corporate uses; failing to adequately capitalize one another; using one another as a mere

-4-

SECOND AMENDED COMPLAINT

1  shell, instrumentality, or conduit for a single venture; concealing and misrepresenting the

2  identity of the responsible ownership and financial interest; disregarding legal formalities and

3  failing to keep an arm's length relationship among related entities; using one another to

4  procure labor, services or merchandise for another person or entity; diverting corporate assets

5  to another person or entity; contracting with another with the intent to use one another as a

6  shield to personal liability; using one another as a subterfuge for illegal activities; and using

   one another to transfer existing personal liability of another person or entity.

7      13.  The true names and capacities of Defendants Does 1 through 100, inclusive, are

8  unknown to Plaintiffs at this time, and Plaintiffs therefore sue such Defendants under

9  fictitious names.  Plaintiffs are informed and believe, and thereon allege, that each Defendant

10 designated as a Doe is highly responsible in some manner for the events and happenings

   referred to herein, and legally cause the injuries and damages alleged in this Complaint.

11 Plaintiff will seek leave of the court to amend this Complaint to allege their true names and

12 capacities when ascertained.  Defendants CF Entertainment, Entertainment Studios, Comics

13 Unleashed Productions, Inc. and Byron Allen Folks were the alter ego of each other and/or

14 engaged in an integrated enterprise with each other.  Additionally, all of the Defendants were

15 joint employers of the Plaintiffs.

16     14.  Plaintiffs are informed and believe and thereon allege, that each and every

17 Defendant was the authorized agent, principal, partner, joint venturer, and guarantor, actual or

   ostensible, of the other Defendants and had full authority to do as alleged herein, unless

18 alleged otherwise.  Furthermore, each and every Defendant was operating within the course

19 and scope of their agency, actual or ostensible, or as principal, partner, joint venturer, and

20 guarantor, with the other Defendants during the course of events described herein unless

21 alleged otherwise.

22     15.  As a direct and proximate result of the unlawful actions of Defendants, Plaintiff

23 and putative class members have suffered and continue to suffer from loss of earnings in

   amounts as yet unascertained, but subject to proof at trial, and within the jurisdiction of this

24 Court.

25                              **STATEMENT OF FACTS**

26     16.  Plaintiffs, Bernadette Pauley and Thomas Clark are actors and comedians who

27 were hired to work on the television show Comedy.TV in approximately May and August of

28 2009.  The show was produced by Comics Unleashed Productions, Inc. the alter-ego,

-5-
SECOND AMENDED COMPLAINT

1 | integrated enterprise, and subsidiary of Defendants CF Entertainment, Entertainment Studios,

2 | and Byron Allen Folks.

3 |     17.  Comedy.TV was an episodic television show consisting of between 14 and 26

4 | episodes.  Each episode starred approximately 7 stand-up comedians and one host.  Plaintiffs

5 | estimate a minimum of 112 actors and comedians were cast in Comedy.TV, many of whom

6 | have gone on to have successful careers, such as Whitney Cummings (creator of the NBC and

7 | CBS shows *Whitney* and *2 Broke Girls*), Steve Byrne (star of the TBS sitcom *Sullivan and Son*), Tom Cotter (finalist of *America's Got Talent*), and Felipe Esparza (winner of the

8 | television show *Last Comic Standing*).

9 |     18.  Plaintiff Pauley hosted four episodes of Comedy.TV.  Plaintiff Clark performed as

10 | a stand-up comedian on one of the episodes.  Plaintiffs and the other cast members signed

11 | standardized AFTRA engagement contracts entitling them to immediate monetary

12 | compensation and contingent residual payments for subsequent airings of each episode under

either the AFTRA National Code of Fair Practice Network Television Broadcasting or an

13 | applicable AFTRA Basic Cable Agreement (depending on the mode of distribution).  In

14 | exchange, Plaintiffs and the other cast members agreed to perform on the show.

15 |     19.  In the course of their employment, Plaintiffs and the other cast members incurred

16 | necessary expenditures in the discharge of their duties.  In some instances these expenditures

included but were not limited to the cost of air travel, hotel accommodations, car rentals,

17 | wardrobe expenses, and gas required to travel to and from locations.  To date, Defendants

18 | have failed to indemnify Plaintiffs for these necessary expenditures.

19 |     20.  Subsequent to the taping of Comedy.TV, the show went on to have tremendous

20 | success airing repeatedly on major television networks in both foreign and domestic markets,

21 | where it continues to air to this day.  Additionally, the show has aired and continues to be

made available on a variety of digital media outlets including but not limited to Netflix,

22 | Verizon Fios, itunes, the digital subscription service SmartTV.com, as well as paid youtube

23 | channels and digital networks owned by Defendants.  Standing on the shoulders of the shows'

24 | achievement, Defendant Byron Allen Folks and his affiliate corporate entities have been

25 | catapulted to celebrity status and enjoyed great success.  Such achievements were recently

26 | profiled on the television show *The Insider*.  Using his earnings from the show Comedy.TV,

27 | Mr. Folks recently purchased a home in Beverly Hills, CA valued at approximately seventeen

28 | million dollars.

-6-

**SECOND AMENDED COMPLAINT**

21. On numerous occasions Plaintiffs and putative class members have reached out to Defendants CF Entertainment, Entertainment Studios, Comics Unleashed Productions, Inc. and Byron Allen Folks in an effort to recover their residual payments. However, these inquiries were met with delay and evasion.

22. In addition, between May 2009 and the present, Plaintiffs and putative class members emailed, called, and corresponded with AFTRA representatives countless number of times to inform them of their grievances.

23. Some union representatives stated they would inquire with Defendants as to the status of these residual payments, only to ultimately ignore and evade follow up messages from Plaintiffs and putative class members.

24. Other representatives acknowledged that Defendants CF Entertainment, Comics Unleashed Productions, Byron Allen Folks, and Entertainment Studios owed Plaintiffs and putative class members compensation but insisted that such Defendants were being uncooperative as if there was no other recourse or grievance procedure that could be initiated.

25. One performer who worked on the show Comics Unleashed which was also produced by Defendants CF Entertainment, Comics Unleashed Productions, Byron Allen Folks, and Entertainment Studios was told by a senior AFTRA representative that Defendants paid residuals pursuant to an "honor system."

26. Some performers including Plaintiffs were told that checks would come in the mail, but ultimately were left unsatisfied when these checks failed to arrive.

27. On numerous occasions Plaintiffs and putative class members expressed their frustration with AFTRA's failure to respond and process their grievances, yet no action was taken.

28. Perhaps most egregious is that on at least two separate occasions AFTRA representatives suggested to Plaintiffs that they may not be owed residuals, despite the fact that internal emails and documents produced by AFTRA reveal that AFTRA was aware that episodes were airing on a weekly if not daily basis all over the country, that AFTRA had knowledge that nearly all of the performers had not been paid residuals, and that Defendants were ignoring AFTRA inquiries.

29. When Plaintiff Clark inquired with AFTRA as early as July 2010, he was falsely told by AFTRA union representatives that he was not entitled to residual payments at that

-7-
SECOND AMENDED COMPLAINT

1 time. On one of the many occasions when Plaintiff Pauley inquired with AFTRA she too was

2 falsely told by union representatives that she may not owed residual payments.

3      30. Ultimately, Plaintiffs were forced to initiate the current litigation in order to receive

4 their lawfully entitled compensation, and mitigate any prejudice that may have resulted by

AFTRA's failure to file a grievance within the time period prescribed in the applicable

5 collective bargaining agreement.

6      31. Moreover, Plaintiffs are informed an believe that Defendants CF Entertainment,

7 Comics Unleashed Productions, Entertainment Studios, and Byron Allen Folks have engaged

8 in a pervasive, deceptive, and fraudulent practice of misrepresenting, including but not

9 limited to, the number of episodes in existence for Comedy.TV and the number of times each

episode has aired, downloaded, played, re-played, and/or been distributed, in addition to other

10 facts, in an effort to reduce the amount of payments, including but not limited to residual

11 payments, owed to Plaintiffs and putative class members. To date, Plaintiffs and putative

12 class members have not been paid their residual fees as required under their contract, despite

13 the fact that Comedy.TV continues to enjoy widespread circulation on various networks and

14 distribution channels. Defendants CF Entertainment, Comics Unleashed Productions,

15 Entertainment Studios, and Byron Allen Folks continue to profit from the show's enormous

16 success.

### INJURIES TO PLAINTIFFS

17      32. As a direct and proximate result of the foregoing unlawful and malicious acts of

18 Defendants, Plaintiffs and putative class members have suffered monetary damage, past lost

19 profits, future lost profits, loss of prejudgment interest, consequential damages, unpaid

20 wages, unreimbursed expenses, and unpaid residual payments.

### CLASS ACTION ALLEGATIONS

21      33. This action is appropriately suited for a Class Action because:

22          a.   The potential class is a significant number. Plaintiffs are informed and

23               believe that the class includes at least 112 actors and comedians which

24               performed on the show Comedy.TV. Joinder of all putative class members

25               individually would be impractical.

26          b.   This action involves common questions of law and fact to the potential

27               class because the action centers on contracts using a standardized language

28               entitling Plaintiffs and putative class members to residual payments.

-8-

SECOND AMENDED COMPLAINT

Moreover, this action focuses on Defendants' systematic course of illegal employment practices and policies, which was applied to all putative class members in violation of state common law, the California Labor Code, and the California Business and Professions Code.

   c.  The claims of named Plaintiffs are typical of the class because Defendants subjected all putative class members to identical contractual violations, as well as violations of the California Labor Code and Business and Professions Code.

   d.  The named Plaintiffs are able to fairly and adequately protect the interests of all members of the class because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them. Moreover, named Plaintiffs' counsel will fairly and adequately represent the named Plaintiff and the class.

<u>Class Action Complaint</u>

<u>FIRST CAUSE OF ACTION</u>

**Breach of Contract**

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

34. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 33.

35. Plaintiffs and class members entered into standardized union engagement contracts with Defendants where Plaintiffs would work on the show Comedy.TV and in exchange Defendants would, in addition to other things, pay Plaintiffs an upfront monetary cost and provide each Plaintiff with a residual payment for each episode that subsequently aired.

36. Plaintiffs and putative class members did all or substantially all of the things that were required of them under their contracts.

37. All conditions required by the contract for Defendants' performance had either occurred or been excused.

38. Despite repeated attempts on the part of Plaintiffs to inquire as to the status of residual payments, Defendants have failed to properly pay Plaintiffs and putative class members residual payments for subsequent airings as required under the contract. Moreover, Defendants have acted in bad faith either misrepresenting to Plaintiffs the status of their

-9-

SECOND AMENDED COMPLAINT

payments, failing to return Plaintiffs' phone calls, and at times lying to Plaintiffs as to when their payments would be received.  Such conduct unfairly interfered with Plaintiffs' right to receive the benefits of the contract.

39.  The amount of money due to Plaintiffs from Defendants is unknown and cannot be ascertained without an accounting from Defendants off all subsequent airings of the television show Comedy.TV.

40.  As a result of Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiffs and putative class members have suffered monetary damage, consequential damage, past lost profits, future damage, and harm subject to proof at trial.  Plaintiffs and putative class members seek prejudgment interest, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Failure to Indemnify Employees for Necessary Expenditures

### [Cal. Labor Code § 2802]

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

41.  Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 40.

42.  Labor Code § 2802(a) requires an employer to indemnify an employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer.

43.  During the class period, Defendants have knowingly and willfully failed to indemnify Plaintiffs and class members for all business expenses and/or losses incurred in direct consequence of the discharge of their duties while working under the direction of Defendants.

44.  As a proximate result of Defendants' unlawful actions and omissions, Plaintiffs and class members have been damaged in an amount according to proof at trial, and seek reimbursement of all necessary expenditures, plus interest thereon pursuant to Labor Code § 2802(b).  Additionally, class members are entitled to all available statutory penalties and an award of costs, expenses, and reasonable attorneys' fees, including those provided in Labor Code § 2802(c), as well as all other available remedies.

///

-10-

SECOND AMENDED COMPLAINT

### THIRD CAUSE OF ACTION

**Failure to Provide Accurate Itemized Statements to Employees**

**[Cal. Labor Code §§ 226; and 226.3]**

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

45.   Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 44.

46.   During the class period, as part of their illegal payroll policies and practices to deprive their non-exempt employees all wages earned and due, Defendants knowingly and intentionally failed to provide their non-exempt employees with accurate wage statements as required by Labor Code § 226.

47.   As a proximate result of Defendants unlawful actions and omissions, Plaintiffs and putative class members have been damaged in an amount according to proof at trial, and seek all wages earned and due, plus interest thereon.  Additionally, Plaintiffs and putative class members are entitled to all available statutory penalties, including but not limited to civil penalties pursuant to Labor Code §§ 226.3, and an award of costs, expenses, and reasonable attorneys' fees, including those provided in Labor Code § 226(e), as well as all other available remedies.

### FOURTH CAUSE OF ACTION

**Failure to Pay All Wages Due**

**[Cal. Labor Code §§ 201, 202, 203]**

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

48.   Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 47.

49.   Pursuant to California Labor Code §§ 201, 202, and 203, upon former employee Plaintiffs' respective dates of discharge or quitting, Defendants were required to pay Plaintiffs all earned wages.  Pursuant to California § 202, Defendants were required to pay all wages due to a quitting employee who did not provide 72-hour notice no later than 72 hours

-11-

1  after an employee quits his or her employment.  At the time of all former employee Plaintiffs'

2  respective termination and quitting dates, former employee Plaintiffs had unpaid wages.  In

3  violation of Labor Code §§ 201, 202 and 203, Defendants failed to pay each former employee

4  Plaintiff any of the amount of wages due and owing him or her, in amounts to be proven at

5  the time of trial, but in excess of the jurisdiction of this Court.

6      50.  Defendants' failure to pay former employee Plaintiffs and putative class members

7  the respective wages due and owing them was willful, as Defendants were apprised of the

8  wages due, and a demand was made for payment of all wages due.

9      51.  Defendants' failure to pay former employee Plaintiffs and putative class members

10  all wages due was done with the wrongful and deliberate intention of injuring Plaintiffs and

11  putative class members, from improper motives amounting to malice, and in conscious

12  disregard of Plaintiffs' rights.

13      52.  Defendants' willful failure to pay Plaintiffs the wages due and owing each of them

14  constitutes violations of Labor Code §§ 201, 202 and 203, which provides that an employee's

15  wages will continue as a penalty for up to thirty (30) days from the time the wages were due.

16  Therefore, Plaintiffs are each entitled to penalties, attorneys' fees, expenses and costs

17  incurred in this action.

18                  **FIFTH CAUSE OF ACTION**

19                  **Unfair Business Practices**

20      **[California Business and Professions Code §§ 17200-17208]**

21    **(Plaintiffs and Class Members against all Defendants, and Does 2 through 100)**

22      53.  Plaintiffs incorporate herein by specific reference as though fully set forth the
allegations in paragraphs 1 through 52.

23      54.  By violating the foregoing statutes and regulations, breaching Plaintiffs' and

24  putative class members' contracts, and engaging in the aforementioned conduct, Defendants'

25  acts constitute unfair and unlawful business practices under California Business and

26  Professions Code §§ 17200, et seq.

27

28

-12-
SECOND AMENDED COMPLAINT

55. Defendants' violations of California contract and employment laws constitute a business practice because they were done repeatedly over a significant period of time, and in a systematic manner to the detriment of Plaintiffs and putative class members.

56. For the four (4) years preceding the filing of this action, Plaintiffs and putative class members request restitution of all monies to be disgorged from Defendants in an amount according to proof at time of trial, but in excess of the jurisdiction of this Court.

## SIXTH CAUSE OF ACTION

### Fraud and Intentional Deceit

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

57. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 56.

58. Plaintiffs are informed an believe that Defendants CF Entertainment, Comics Unleashed Productions, Entertainment Studios, and Byron Allen Folks have engaged in pervasive, deceptive, and fraudulent practices of affirmatively misrepresenting including but not limited to the number of episodes in existence for Comedy.TV and the number of times each episode has aired, downloaded, played, re-played, and/or been distributed, in addition to other facts, in an effort to reduce the amount of payments, including but not limited to residual payments, owed to Plaintiffs and putative class members.

59. These misrepresentations were made by officers and/or directors or they were authorized and/or ratified by officers and/or directors of Defendants.

60. Such misrepresentations were false and of a material nature.

61. Defendants made these misrepresentations with knowledge of their falsity or recklessly and without regard for their truth, with the intent that Plaintiffs and putative class members would rely on these misrepresentation.

62. Plaintiffs and putative class members reasonably relied on these misrepresentations and their reliance was a substantial factor in causing Plaintiff and putative class members harm.

63. As a proximate cause of Defendants misrepresentations, Plaintiffs and putative class members have suffered monetary damage, consequential damage, past lost profits, future damage, lost wages, unreimbursed expenses, unpaid residual payments, and harm

-13-

SECOND AMENDED COMPLAINT

1   subject to proof at trial. Plaintiffs and putative class members seek prejudgment interest,

2   punitive damages, and reasonable attorneys' fees.

3   ### SEVENTH CAUSE OF ACTION

4   ### Fraud by Concealment

5   **(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

6   64.  Plaintiffs incorporate herein by specific reference as though fully set forth the

7   allegations in paragraphs 1 through 63.

8   65.  Plaintiffs are informed an believe that Defendants CF Entertainment, Comics

9   Unleashed Productions, Entertainment Studios, and Byron Allen Folks  intentionally failed to

10   disclose  including but not limited to the number of episodes in existence for Comedy.TV and

    the number of times each episode has aired, downloaded, played, replayed, and/or been

11   distributed, in addition to other facts which were concealed in an effort to reduce the amount

12   of payments, including but not limited to residual payments, owed to Plaintiffs and putative

13   class members.

14   66.  These facts were known only to Defendants, and Plaintiffs and putative class

15   members could not have discovered them.

16   67.  Plaintiffs and putative class members did not know of these concealed facts.

    68.  Defendants intended to deceive Plaintiffs and putative class members by

17   concealing these facts.

18   69.  Such fraudulent concealments were made by officers and/or directors or they were

19   authorized and/or ratified by officers and/or directors of Defendants.

20   70.  Plaintiffs and putative class members reasonably relied on Defendants' deception

21   and concealment and their reliance was a substantial factor in causing Plaintiff and putative

22   class members harm.

23   71.  As a proximate cause of Defendants misrepresentations, Plaintiffs and putative

    class members have suffered monetary damage, consequential damage, past lost profits,

24   future damage, lost wages, unreimbursed expenses, unpaid residual payments, and harm

25   subject to proof at trial. Plaintiffs and putative class members seek prejudgment interest,

26   punitive damages, and reasonable attorneys' fees.

27   ///

28   ///

-14-

SECOND AMENDED COMPLAINT

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

**(Plaintiffs and Class Members against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

72. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 71.

73. Plaintiffs are informed an believe that Defendants CF Entertainment, Comics Unleashed Productions, Entertainment Studios, and Byron Allen Folks have engaged in pervasive, deceptive, and fraudulent practices of affirmatively misrepresenting including but not limited to the number of episodes in existence for Comedy.TV and the number of times each episode has aired, downloaded, played, re-played, and/or been distributed, in addition to other facts, in an effort to reduce the amount of payments, including but not limited to residual payments, owed to Plaintiffs and putative class members.

74. These misrepresentations were made by officers and/or directors or they were authorized and/or ratified by officers and/or directors of Defendants.

75. Such misrepresentations were false and of a material nature.

76. Although Defendants may have known or honestly believed that such representations were true, Defendants had no reasonable grounds for believing such representations were true when they were made.

77. Defendants made these misrepresentations with the intent that Plaintiffs and putative class members would rely on these misrepresentations.

78. Plaintiffs and putative class members reasonably relied on these misrepresentations and their reliance was a substantial factor in causing Plaintiffs and putative class members harm.

79. As a proximate cause of Defendants misrepresentations, Plaintiffs and putative class members have suffered monetary damage, consequential damage, past lost profits, future damage, lost wages, unreimbursed expenses, unpaid residual payments, and harm subject to proof at trial. Plaintiffs and putative class members seek prejudgment interest, punitive damages, and reasonable attorneys' fees.

///
///
///

-15-
SECOND AMENDED COMPLAINT

**NINTH CAUSE OF ACTION**

**Breach of Duty of Fair Representation/Failure to Adequately Represent**

**(Plaintiffs and Class Members against AFTRA, and Does 2 through 100)**

80. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 79.

81. AFTRA owed Plaintiff's and putative class members a duty of fair representation.

82. AFTRA breached its duty to fairly represent Plaintiffs and putative class members by arbitrarily and/or in bad faith ignoring a meritorious grievance or processing it in a perfunctory fashion. Plaintiffs and putative class members informed AFTRA of their meritorious grievance. Acting arbitrarily and/or in bad faith AFTRA failed to process the grievance in a timely manner, thereby allowing portions of the time limit mandated by the applicable collective bargaining agreement to expire and ultimately prejudicing Plaintiffs and putative class members.

83. As a result of AFTRA's breach, Plaintiffs and putative class members have suffered harm in the form of monetary damages, compensatory damages, past lost profits, future damages, unpaid wages, unreimbursed expenses, unpaid residual payments, and harm subject to proof at trial. Plaintiffs and putative class members seek prejudgment interest, punitive damages, and reasonable attorneys' fees.

**REPRESENTATIVE ACTION**

**TENTH CAUSE OF ACTION**

**Representative Action for Civil Penalties**

**(California Labor Code §§ 2698-2699.5)**

**(Plaintiffs and Aggrieved Employees against CF Entertainment, Comics Unleashed Productions, Entertainment Studios, Inc., Byron Allen Folks, and Does 2 through 100)**

84. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 84 with exception to the allegations concerning class action designation, paragraph 33 (A-D).

85. Pursuant to California Labor Code sections 2698-2699.5, Plaintiffs are entitled to collect civil penalties from Defendants in a representative action for the California Labor Code violations set forth above. Plaintiffs are aggrieved employees and seek to collect civil penalties on behalf of the State of California for Defendants violations of California Labor Code including, but not limited to, sections 201, 202, 203, 221, 226, 226.7, 227.3, 512, 558,

-16-

**SECOND AMENDED COMPLAINT**

1   1174, 1194, 1197, 1197.1 and 2802, which include, but are not limited to, penalties under

2   Labor Code sections 2699, 210, 225.5, 226.3, 558, 1174.5 and 1197.1.

3       86.  Plaintiffs have given written notice by certified mail to the Labor and Workforce

4   Development Agency of the specific Labor Code provisions alleged to have been violated,

    including the facts and theories to support the alleged violations.

5       87.  Plaintiffs have complied with the requirements set forth in California Labor Code

6   section 2699.3.

7

8   **WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated,

9   respectfully pray for relief against Defendants as follows:

10      a.  For certification of the action as a class action on behalf of the proposed class and
            subclasses;

11      b.  For an order appointing Plaintiffs as class and subclass representatives, and Plaintiffs'

12          counsel as counsel for the class and subclasses;

13      c.  For compensatory damages;

14      d.  For consequential damages, past lost profits, and future lost profits;

15      e.  For punitive damages;

16      f.  For preliminary and permanent injunction enjoining Defendant AFTRA from failing

17          to process grievances in a timely manner and to release all sums due to class members
            held by AFTRA;

18      g.  For unpaid wages, residuals payments, and damages stemming from AFTRA's failure

19          to process Plaintiffs and putative class members' grievances in a timely manner.

20      h.  For back wages, reimbursement, and/or restitution of all monies due to Plaintiffs and

21          disgorged profits from the unlawful business practices of Defendants;

22      i.  For actual and statutory damages and/or penalties pursuant to Labor Code § 226(e);

        j.  For all penalties authorized under Labor Code § 2699;

23      k.  For a preliminary and permanent injunction enjoining Defendants from violating the

24          relevant provisions of the Labor Code and common law causes of action, and

25          requiring Defendants to cease and desist from engaging in the unlawful acts and

26          unlawful business practices complained of herein;

27      l.  For waiting time penalties pursuant to Labor Code § 203;

28      m.  For statutory penalties according to proof;

-17-
SECOND AMENDED COMPLAINT

n. For interest on the unpaid wages at 10% per annum pursuant to Labor Code §§ 218.6, 2802, California Civil Code §§ 3278, 3288, and/or any other applicable provision providing for pre-judgment interest;

o. For reasonable attorney's fees and costs including but not limited to those provided by Labor Code §§ 2699, 2802, 226(e), Civil Code § 1021.5, and any other applicable provision providing for attorney's fees and costs.

p. For declaratory judgment;

q. For such other and further relief that the Court may deem just and proper.

DATED: September 30, 2013                Respectfully submitted,

                                        LAW OFFICES OF MATTHEW J. MATERN

                                        By:
                                             Matthew J. Matern
                                             Tagore O. Subramaniam
                                             Attorneys for Plaintiffs,
                                             Bernadette Pauley and Thomas Clarke, on
                                             behalf of themselves and all others similarly
                                             situated.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial with respect to all issues triable of right by jury.

DATED: September 30 2013                 Respectfully submitted,

                                        LAW OFFICES OF MATTHEW J. MATERN

                                        By:
                                             Matthew J. Matern
                                             Tagore O. Subramaniam
                                             Attorneys for Plaintiffs,
                                             Bernadette Pauley and Thomas Clarke, on
                                             behalf of themselves and all others similarly
                                             situated.

-18-
SECOND AMENDED COMPLAINT

1

## PROOF OF SERVICE

2

    I am employed in the County of Los Angeles, State of California. I am over the age of
3
eighteen (18) years and not a party to the within action. My business address is 3655 Torrance
Boulevard, Suite 315, Torrance, California 90503.

4

    On October 1, 2013, I served the document described as:
5

## SECOND AMENDED COMPLAINT
6

    By electronic service (via electronic filing service provider) – electronically transmitting
7
the documents listed above to Case Anywhere, an electronic filing service provider, at
8
www.caseanywhere.com pursuant to the Court's Order Authorizing Electronic in the matter of
*Bernadette Pauley v. CF Entertainment, et al.*, LASC Case No. BC498061 mandating electronic
9
service. The transmission(s) was reported as complete and without error to the addresses as
stated on the attached service list.
10

11

| Ivy Kagan Bierman, Esq. | Attorneys for Defendants  CF |
| Email: ibierman@loeb.com | ENTERTAINMENT; COMICS |
| Ramon Ramirez, Esq. | UNLEASHED PRODUCTIONS, INC.; |
| Email: rramirez@loeb.com | ENTERTAINMENT STUDIOS, INC.; and |
| LOEB & LOEB LLP | BYRON ALLEN FOLKS |
| 10100 Santa Monica Boulevard, Suite 2200 | |
| Los Angeles, California 90067 | |
| Telephone: 310.282.2000 | |
| Facsimile: 310.282.2200 | |

12

13

14

15

16

17

    I declare under penalty of perjury under the laws of the State of California that the above
18
is true and correct.

19

    Executed on October 1, 2013 at Torrance, California.
20

21

22

Dana Joudi
23

24

25

26

27

28

PROOF OF SERVICE

**CORRECTED**

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

CONFORMED COPY
*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 01 2013

Sherri R. Carter, Executive Officer/Clerk
By: Tanaya Lewis, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

CF ENTERTAINMENT, a California corporation; COMICS
UNLEASHED PRODUCTIONS, INC., a California corporation

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

BERNADETTE PAULEY, an individual; THOMAS CLARK, an
individual; on behalf of themselves and all others similarly situated

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles Superior Court<br>111 N. Hill Street<br>Los Angeles, California 90012 | **CASE NUMBER:** *(Número del Caso):*<br>BC498061 |

BY -AX

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Matthew J. Matern, 3655 Torrance Boulevard, Suite 315, Torrance, California 90503

| DATE:<br>*(Fecha)* | OCT 01 2013 SHERRI R. CARTER | Clerk, by<br>*(Secretario)* | T. Lewis | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
   SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a California corporation
3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**CORRECTED** SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Exhibit A, Page 24

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bernadette Pauley and Thomas Clark v. CF Entertainment | BC498061 |

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[ ] Plaintiff   [✓] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

ENTERTAINMENT STUDIOS, INC., a California corporation; BYRON ALLEN FOLKS, an individual; SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a California corporation; and DOES 2 through 100 inclusive

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to *CORRECTED SUMMONS*

Exhibit A, Page 25

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 09/24/13                                                    DEPT.  310

HONORABLE  KENNETH R. FREEMAN   JUDGE   R. ARRAIGA         DEPUTY CLERK

HONORABLE                      JUDGE PRO TEM                 ELECTRONIC RECORDING MONITOR
#8
              M. WEBB, C.A.   Deputy Sheriff   NONE              Reporter

| | | | |
|---|---|---|---|
| 3:30 pm | BC498061 | Plaintiff Counsel | MATTHEW MATERN Via Telephone |
| | BERNADETTE PAULEY ET AL VS CF ENTERTAINMENT ET AL ** | Defendant Counsel | IVY KAGAN BIERMAN Via Telephone RAMON RAMIREZ Via Telephone |
| | Related to BC498021 Complex 2/7/13 | | |

NATURE OF PROCEEDINGS:

TELEPHONIC CONFERENCE;

The Telephonic Conference is held.

The parties stipulate to Plaintiff's Motion to Amend.

Plaintiff is to file an Amended Complaint within seven
(7) days from this date.

The Court will allow a Motion to be filed with respect
to Plaintiff's subpoena directed at Screen Actor'S
Guild.

The Status Conference and Petition to Compel
Arbitration set for October 2, 2013 is advanced this
date and continued to December 2, 2013 at 2:00 pm
in Department 310.

A copy of this Minute Order is served on parties via
posting on the Case Anywhere website.

                    Page   1 of  1   DEPT.  310

                                        MINUTES ENTERED
                                        09/24/13
                                        COUNTY CLERK

# EXHIBIT B

A6024
900LA
DEPT# ~~322~~ 310
(HON. KENNETH FREEMAN)

1   **LAW OFFICES OF MATTHEW J. MATERN**
2   MATTHEW J. MATERN, SBN 159798
    Email: matthewjmatern@gmail.com
3   TAGORE O. SUBRAMANIAM, SBN 280126
    Email: tagore.subramaniam@gmail.com
4   3655 Torrance Boulevard, Suite 315
    Torrance, California 90503
5   Tel: (424) 247-1172
6   Fax: (424) 247-1173

**FILED**
Los Angeles Superior Court

DEC 21 2012

JOHN A. CLARKE, CLERK

BY DAWN ALEXANDER, DEPUTY

7   Attorneys for Plaintiffs, Bernadette Pauley and Thomas Clark,
    on behalf of themselves and all others similarly situated.

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 FOR THE COUNTY OF LOS ANGELES

11

12   BERNADETTE PAULEY, an individual,
    THOMAS CLARK, an individual, on
13   behalf of themselves and all others
    similarly situated,
14

15            Plaintiffs,

16       vs.

17

18   CF ENTERTAINMENT, a California
    corporation; COMICS UNLEASHED
19   PRODUCTIONS, INC., a California
    corporation; ENTERTAINMENT
20   STUDIOS, INC., a California
    corporation; BYRON ALLEN FOLKS,
21   an individual; and DOES 1 through 100
    inclusive,
22

23           Defendants.

24

Case No.   **BC 49 80 6 1**

**CLASS ACTION**

COMPLAINT FOR:

1. **Breach of Contract**
2. **Failure to Indemnify Employees for Necessary Expenditures**
3. **Failure to Provide Accurate Itemized Statements to Employees**
4. **Failure to Pay All Wages Due**
5. **Unfair Business Practices**

**DEMAND FOR JURY TRIAL**

25

26     Plaintiffs Bernadette Pauley and Thomas Clark, on behalf of themselves and all others
27   similarly situated, hereby submit the following class action complaint. Upon personal
    knowledge as to their own acts and status, and upon information and belief as to all other
28   matters, Plaintiffs allege as follows:

-1-

CLASS ACTION COMPLAINT

## NATURE OF THE ACTION

1.   Plaintiffs and over one hundred other actors and comedians worked for Defendants Comics Unleashed Productions, Inc., Entertainment Studios, Inc., CF Entertainment, and Byron Allen Folks (collectively "Defendants") on the syndicated television show Comics.TV pursuant to a standardized contract providing each actor with a residual payment for subsequent airings of each episode. While working on the show, Plaintiffs were subject to repeated violations of the California Labor Code. Subsequent to its production, the show Comics.TV went on to become tremendously successful catapulting its creator Byron Allen Folks to celebrity status. Standing on the shoulders of the shows' success, Defendant Byron Allen Folks and his affiliate corporate entities have become the largest independent producer/distributor of first-run syndicated television programming for broadcast television stations. To date, Plaintiffs and putative class members have not been reimbursed for residual payments pursuant to the contract.

2.   Plaintiffs bring this lawsuit, on behalf of themselves and all other similarly situated individuals, alleging claims for breach of contract, failure to indemnify for necessary expenditures, failure to provide itemized statements, failure to pay all wages due, and unfair business practices.

## JURISDICTION AND VENUE

3.   This Court has personal jurisdiction over Defendants because they are residents of and/or doing business in the State of California. Venue is proper because most of Defendants' wrongful acts and omissions occurred in the County of Los Angeles.

## PLAINTIFFS

4.   Plaintiff, Bernadette Pauley (hereafter sometimes referred to as "Pauley") is a female resident of the State of California. At all relevant times herein, Pauley was employed by Defendants CF Entertainment, Entertainment Studios, Inc., Comics Unleashed Productions, Inc., and Byron Allen Folks.

5.   Plaintiff, Thomas Clark (hereafter sometimes referred to as "Clark") is a male resident of the State of California. At all relevant times herein, Clark was employed by Defendants CF Entertainment, Entertainment Studios, Inc., Comics Unleashed Productions, Inc., and Byron Allen Folks.

6.   Class Plaintiffs are actors and comedians who worked for Defendants and their affiliates on the show Comedy.TV pursuant to a contract granting residual payments for the

-2-

CLASS ACTION COMPLAINT

1   (4) years preceding the filing of this action, and continuing while this action is pending (the

2   "class period"). Plaintiffs reserve the right to name additional class representatives.

**DEFENDANTS**

3

4   7.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

alleges that CF Entertainment is, and at all times relevant hereto was, a California corporation

5   organized and existing under the laws of the State of California.  Plaintiff is further informed

6   and believes, and thereon alleges, that CF Entertainment is authorized to conduct business,

7   and does conduct business, in the State of California.

8   8.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

9   alleges that Entertainment Studios, Inc. (hereafter "Entertainment Studios") is, and at all

times relevant hereto was, a California Corporation organized and existing under the laws of

10  the State of California.  Plaintiff is further informed and believes, and thereon alleges, that

11  Entertainment Studios is authorized to conduct business in the State of California.

12  9.   At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

13  alleges that Comics Unleashed Productions, Inc. (hereafter "Comics Unleashed Productions")

14  is and at all times relevant hereto was, a California corporation organized and existing under

15  the laws of the State of California.  Plaintiff is further informed and believes, and thereon

alleges, that Comics Unleashed Productions is authorized to conduct business, and does

16  conduct business, in the State of California.

17  10.  Plaintiffs are informed and believe, and based upon such information and belief,

18  allege that Defendant Byron Allen Folks (hereafter "Folks") is an individual and resident of

19  the State of California.   At all relevant times herein, Mr. Folks was the owner, founder,

20  managing agent, and officer of Defendants CF Entertainment, Entertainment Studios, and

21  Comics Unleashed Productions.  At all relevant times, Folks either directly or indirectly

employed or exercised control over the wages, hours, and working conditions of Plaintiffs

22  and putative class members.

23  11.  Upon information and belief, Defendants CF Entertainment, Entertainment Studios,

24  Folks, Comics Unleashed Productions, and Does 1 through 100 were and are the alter ego,

25  division, affiliate, integrated enterprise, joint employer, subsidiary, parent, principal, related

26  entity, co-conspirator, authorized agent, actual or ostensible partner, joint venturer, and

27  guarantor of each and every other Defendant.

28

-3-
CLASS ACTION COMPLAINT

12. Plaintiff is informed and believes, and thereon alleges that Defendant Comics Unleashed Productions has been and presently is dominated and controlled by Defendants CF Entertainment, Entertainment Studios, Folks, and Does 1-100, and a unity of interest, ownership and control presently exists amongst Defendants Comics Unleashed Productions, CF Entertainment, Entertainment Studios, Folks, and Does 1-100.

13. Plaintiffs are informed and believe, and thereon allege that Defendants CF Entertainment, Entertainment Studios, Folks, and Does 1-100 have improperly managed, controlled, and dominated Defendant Comics Unleashed Productions as their alter egos, agents and instrumentalities.

14. Plaintiffs are informed and believe, and thereon allege that the conduct of Defendants CF Entertainment, Entertainment Studios, Folks, and Does 1-100 in holding all or substantially all of the assets of Comics Unleashed Productions, as their alter egos, agents and/or instrumentalities constitutes abuse of the corporate privilege, through which Defendants CF Entertainment, Entertainment Studios, Folks, and Does 1-100 seek inequitable advantage based on the fiction of separate existence.

15. Defendants CF Entertainment, Entertainment Studios, Folks and Does 1-100 improperly dominated and disregarded the separate corporate forms of Comics Unleashed Productions commingling their assets, human resources and personnel, and failed to adequately capitalize the subsidiaries.

16. The true names and capacities of Defendants Does 1 through 100, inclusive, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue such Defendants under fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated as a Doe is highly responsible in some manner for the events and happenings referred to herein, and legally cause the injuries and damages alleged in this Complaint. Plaintiff will seek leave of the court to amend this Complaint to allege their true names and capacities when ascertained.

17. Plaintiffs are informed and believe and thereon allege, that each and every Defendant was the authorized agent, principal, partner, joint venturer, and guarantor, actual or ostensible, of the other Defendants and had full authority to do as alleged herein, unless alleged otherwise. Furthermore, each and every Defendant was operating within the course and scope of their agency, actual or ostensible, or as principal, partner, joint venturer, and

-4-
CLASS ACTION COMPLAINT

1   guarantor, with the other Defendants during the course of events described herein unless

2   alleged otherwise.

3       18.  As a direct and proximate result of the unlawful actions of Defendants, Plaintiff

4   and putative class members have suffered and continue to suffer from loss of earnings in

    amounts as yet unascertained, but subject to proof at trial, and within the jurisdiction of this

5   Court.

6   **STATEMENT OF FACTS**

7       19.  Plaintiffs, Bernadette Pauley and Thomas Clark are actors and comedians who

8   were hired to work on the television show Comedy.TV produced by Comics Unleashed

9   Productions, Inc. the alter-ego, integrated enterprise, and subsidiary of Defendants CF

    Entertainment, Entertainment Studios, and Byron Allen Folks.

10      20.  Comedy.TV was an episodic television show consisting of approximately fourteen

11  episodes.  Each episode starred approximately 7 stand-up comedians and one host.  In total

12  approximately 112 actors and comedians were cast in Comedy.TV, many of whom have gone

13  on to have successful careers, such as Whitney Cummings (creator of the NBC and CBS

14  shows *Whitney* and *2 Broke Girls*), Steve Byrne (star of the TBS sitcom *Sullivan and Son*),

15  Tom Cotter (finalist of *America's Got Talent*), and Felipe Esparza (winner of the television

16  show *Last Comic Standing*).

17      21.  Plaintiff Pauley hosted four episodes of Comedy.TV.  Plaintiff Clark performed as

18  a stand-up comedian on one of the episodes.  Plaintiffs and the other cast members signed a

    standardized contract entitling them to immediate monetary compensation and contingent

19  residual payments for each episode that subsequently aired.  In exchange, Plaintiffs and the

20  other cast members agreed to perform on the show.

21      22.  In the course of their employment, Plaintiffs and the other cast members incurred

22  necessary expenditures in the discharge of their duties.  In some instances these expenditures

23  included but were not limited to the cost of air travel, hotel accommodations, car rentals,

24  wardrobe expenses, and gas required to travel to and from locations.  To date, Defendants

    have failed to indemnify Plaintiffs for these necessary expenditures.

25      23.  Subsequent to the taping of Comics.TV, the show went on to have tremendous

26  success airing repeatedly on major television networks, where it continues to air to this day.

27  Additionally, the show has aired and continues to be made available on a variety of digital

28  media outlets including but not limited to Netflix, Verizon Fios, and digital programming

-5-
CLASS ACTION COMPLAINT

networks owned by Defendants. Standing on the shoulders of the shows' achievement, Defendant Byron Allen Folks and his affiliate corporate entities have been catapulted to celebrity status and enjoyed great success. Such achievements were recently profiled on the television show *The Insider*.

24. On numerous occasions Plaintiffs reached out to their union and agents of Defendants in an effort to recover their residual payments. Although both the union and Defendants acknowledged that Plaintiffs were entitled to residual payments in communications with Plaintiffs, Defendants responded to Plaintiffs' inquiries with continued delay and evasion. Plaintiffs were forced to initiate the current litigation in order to receive their lawfully entitled compensation.

25. To date, Plaintiffs and putative class members have not been paid their residual fees as required under their contract, despite the fact that Comics.TV continues to enjoy widespread circulation on various networks. Defendants continue to profit from the show's enormous success.

## INJURIES TO PLAINTIFFS

26. As a direct and proximate result of the foregoing unlawful and malicious acts of Defendants, Plaintiffs and putative class members have suffered monetary damage, past lost profits, future lost profits, loss of prejudgment interest, and consequential damages.

## CLASS ACTION ALLEGATIONS

27. This action is appropriately suited for a Class Action because:

    a.  The potential class is a significant number. Plaintiffs are informed and believe that the class includes at least 112 actors and comedians which performed on the show Comics.TV. Joinder of all putative class members individually would be impractical.

    b.  This action involves common questions of law and fact to the potential class because the action centers on contracts using a standardized clause entitling Plaintiffs and putative class members to residual payments. Moreover, this action focuses on Defendants' systematic course of illegal employment practices and policies, which was applied to all putative class members in violation of state common law, the California Labor Code, and the California Business and Professions Code.

-6-

CLASS ACTION COMPLAINT

c.  The claims of named Plaintiffs are typical of the class because Defendants subjected all putative class members to identical contractual violations, as well as violations of the California Labor Code and Business and Professions Code.

d.  The named Plaintiff is able to fairly and adequately protect the interests of all members of the class because it is in his best interest to prosecute the claims alleged herein to obtain full compensation due to him.  Moreover, named Plaintiff's counsel will fairly and adequately represent the named Plaintiff and the class.

**Class Action Complaint**

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**(Plaintiffs and Class Members against all Defendants)**

28.  Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 27.

29.  Plaintiffs and class members entered into a standardized contract with Defendants where Plaintiffs would work on the show Comics.TV and in exchange Defendants would, in addition to other things, pay Plaintiffs an upfront monetary cost and provide each Plaintiff with a residual payment for each episode that subsequently aired.

30.  Plaintiffs and putative class members did all or substantially all of the things that were required of them under their contracts.

31.  All conditions required by the contract for Defendants' performance had either occurred or been excused.

32.  Despite repeated attempts on the part of Plaintiffs to inquire as to the status of residual payments, Defendants have failed to properly pay Plaintiffs and putative class members residual payments for subsequent airings as required under the contract. Moreover, Defendants have acted in bad faith either misrepresenting to Plaintiffs the status of their payments, failing to return Plaintiffs' phone calls, and at times lying to Plaintiffs as to when their payments would be received.  Such conduct unfairly interfered with Plaintiffs' right to receive the benefits of the contract.

-7-

CLASS ACTION COMPLAINT

33. The amount of money due to Plaintiffs from Defendants is unknown and cannot be ascertained without an accounting from Defendants off all subsequent airings of the television show Comics.TV.

34. As a result of Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiffs and putative class members have suffered monetary damage, consequential damage, past lost profits, future damage, and harm subject to proof at trial. Plaintiffs and putative class members seek prejudgment interest, and reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

**Failure to Indemnify Employees for Necessary Expenditures**

**[Cal. Labor Code § 2802]**

**(Plaintiffs and Class Members against all Defendants)**

35. Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 34.

36. Labor Code § 2802(a) requires an employer to indemnify an employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer.

37. During the class period, Defendants have knowingly and willfully failed to indemnify Plaintiffs and class members for all business expenses and/or losses incurred in direct consequence of the discharge of their duties while working under the direction of Defendants.

38. As a proximate result of Defendants' unlawful actions and omissions, Plaintiffs and class members have been damaged in an amount according to proof at trial, and seek reimbursement of all necessary expenditures, plus interest thereon pursuant to Labor Code § 2802(b). Additionally, class members are entitled to all available statutory penalties and an award of costs, expenses, and reasonable attorneys' fees, including those provided in Labor Code § 2802(c), as well as all other available remedies.

///
///
///
///
///

Exhibit B, Page 34

**THIRD CAUSE OF ACTION**

**Failure to Provide Accurate Itemized Statements to Employees**

**[Cal. Labor Code §§ 226; and 226.3]**

**(Plaintiffs and Class Members against all Defendants)**

39.  Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 38.

40.  During the class period, as part of their illegal payroll policies and practices to deprive their non-exempt employees all wages earned and due, Defendants knowingly and intentionally failed to provide their non-exempt employees with accurate wage statements as required by Labor Code § 226.

41.  As a proximate result of Defendants unlawful actions and omissions, Plaintiffs and putative class members have been damaged in an amount according to proof at trial, and seek all wages earned and due, plus interest thereon.  Additionally, Plaintiffs and putative class members are entitled to all available statutory penalties, including but not limited to civil penalties pursuant to Labor Code §§ 226.3, and an award of costs, expenses, and reasonable attorneys' fees, including those provided in Labor Code § 226(e), as well as all other available remedies.

**FOURTH CAUSE OF ACTION**

**Failure to Pay All Wages Due**

**[Cal. Labor Code §§ 201, 202, 203]**

**(Plaintiffs and Class Members against all Defendants)**

42.  Plaintiffs incorporate herein by specific reference as though fully set forth the allegations in paragraphs 1 through 41.

43.  Pursuant to California Labor Code §§ 201, 202, and 203, upon former employee Plaintiffs' respective dates of discharge or quitting, Defendants were required to pay Plaintiffs all earned wages.  Pursuant to California § 202, Defendants were required to pay all wages due to a quitting employee who did not provide 72-hour notice no later than 72 hours after an employee quits his or her employment.  At the time of all former employee Plaintiffs' respective termination and quitting dates, former employee Plaintiffs had unpaid wages.  In violation of Labor Code §§ 201, 202 and 203, Defendants failed to pay each former employee

-9-

1   Plaintiff any of the amount of wages due and owing him or her, in amounts to be proven at

2   the time of trial, but in excess of the jurisdiction of this Court.

3       44.  Defendants' failure to pay former employee Plaintiffs and putative class members

4   the respective wages due and owing them was willful, as Defendants were apprised of the

5   wages due, and a demand was made for payment of all wages due.

6       45.  Defendants' failure to pay former employee Plaintiffs and putative class members

7   all wages due was done with the wrongful and deliberate intention of injuring Plaintiffs and

8   putative class members, from improper motives amounting to malice, and in conscious

9   disregard of Plaintiffs' rights.

10      46.  Defendants' willful failure to pay Plaintiffs the wages due and owing each of them

11  constitutes violations of Labor Code §§ 201, 202 and 203, which provides that an employee's

12  wages will continue as a penalty for up to thirty (30) days from the time the wages were due.

13  Therefore, Plaintiffs are each entitled to penalties, attorneys' fees, expenses and costs

14  incurred in this action.

15                          **FIFTH CAUSE OF ACTION**

16                          **Unfair Business Practices**

17          **[California Business and Professions Code §§ 17200-17208]**

18          **(Plaintiffs and Class Members against all Defendants)**

19      47.  Plaintiffs incorporate herein by specific reference as though fully set forth the
    allegations in paragraphs 1 through 46.

20      48.  By violating the foregoing statutes and regulations, breaching Plaintiffs' and

21  putative class members contracts, and engaging in the aforementioned conduct, Defendants'

22  acts constitute unfair and unlawful business practices under California Business and

23  Professions Code §§ 17200, et seq.

24      49.  Defendants' violations of California contract and employment laws constitute a

25  business practice because they were done repeatedly over a significant period of time, and in

26  a systematic manner to the detriment of Plaintiffs and putative class members.

27      50.  For the four (4) years preceding the filing of this action, Plaintiffs and putative

28  class members request restitution of all monies to be disgorged from Defendants in an
    amount according to proof at time of trial, but in excess of the jurisdiction of this Court.

                                    -10-
                          CLASS ACTION COMPLAINT

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for relief against Defendants as follows:

a. For certification of the action as a class action on behalf of the proposed class and subclasses;

b. For an order appointing Plaintiffs as class and subclass representatives, and Plaintiffs' counsel as counsel for the class and subclasses;

c. For compensatory damages;

d. For consequential damages, past lost profits, and future lost profits;

e. For back wages, reimbursement, and/or restitution of all monies due to Plaintiffs and disgorged profits from the unlawful business practices of Defendants;

f. For actual and statutory damages and/or penalties pursuant to Labor Code § 226(e);

g. For a preliminary and permanent injunction enjoining Defendants from violating the relevant provisions of the Labor Code and common law causes of action, and requiring Defendants to cease and desist from engaging in the unlawful acts and unlawful business practices complained of herein;

h. For waiting time penalties pursuant to Labor Code § 203;

i. For statutory penalties according to proof;

j. For interest on the unpaid wages at 10% per annum pursuant to Labor Code §§ 218.6, 2802, California Civil Code §§ 3278, 3288, and/or any other applicable provision providing for pre-judgment interest;

k. For reasonable attorney's fees and costs including but not limited to those provided by Labor Code §§ 2802, 226(e), Civil Code § 1021.5, and any other applicable provision providing for attorney's fees and costs.

l. For declaratory judgment;

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

-11-
CLASS ACTION COMPLAINT

1    m. For such other and further relief that the Court may deem just and proper.

2

3    DATED: December 20, 2012            Respectfully submitted,

4                                        LAW OFFICES OF MATTHEW J. MATERN

5                                        By: _____

6                                            Matthew J. Matern
7                                            Tagore O. Subramaniam
                                             Attorney for Plaintiffs,
8                                            Bernadette Pauley and Thomas Clarke, on
                                             behalf of themselves and all others similarly
9                                            situated.

10                        **DEMAND FOR JURY TRIAL**

11          Plaintiffs, on behalf of themselves and all others similarly situated,  hereby demand

12   a jury trial with respect to all issues triable of right by jury.

13

14   DATED: December 20, 2012            Respectfully submitted,

15                                        LAW OFFICES OF MATTHEW J. MATERN

16                                        By: _____

17                                            Matthew J. Matern
                                             Tagore O. Subramaniam
18                                           Attorney for Plaintiffs,
                                             Bernadette Pauley and Thomas Clarke, on
19                                           behalpf of themselves and all others similarly
                                             situated.

20

21

22

23

24

25

26

27

28

-12-
_____
CLASS ACTION COMPLAINT

Exhibit B, Page 38

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Matthew J. Matern (SBN159798)<br>Tagore O. Subramaniam, (SBN 280126)<br>3655 Torrance Boulevard, Suite 315<br>Torrance, CA 90503<br>TELEPHONE NO.: (424) 247-1172    FAX NO.: (424) 247-1173<br>ATTORNEY FOR *(Name):* Bernadette Pauley and Thomas Clark | **FILED**<br>Los Angeles Superior Court<br><br>DEC 21 2012<br><br>JOHN A. CLARKE, CLERK<br>BY DAWN ALEXANDER, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: LOS ANGELES, CALIFORNIA 90012
BRANCH NAME: CENTRAL DISTRICT

CASE NAME:
Bernadette Pauley and Thomas Clark v. CF Entertainment, a California

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC498081 |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☑ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):*  Five (5)
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 20, 2012
Tagore O. Subramaniam
_____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

Exhibit B, Page 40

| SHORT TITLE: Bernadette Pauley and Thomas Clark v. CF Entertainment | CASE NUMBER BC 49806 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☑ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 15-20 ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

## CIVIL CASE COVER SHEET ADDENDUM
## AND STATEMENT OF LOCATION

Local Rule 2.0
Page 1 of 4

Exhibit B, Page 41

| SHORT TITLE: Bernadette Pauley and Thomas Clark v. CF Entertainment | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☑ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☑ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

Exhibit B, Page 42

| SHORT TITLE: Bernadette Pauley and Thomas Clark v. CF Entertainment | CASE NUMBER |
| --- | --- |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
| --- | --- | --- | --- |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Exhibit B, Page 43

| SHORT TITLE: Bernadette Pauley and Thomas Clark v. CF Entertainment | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☑1. ☑2. ☑3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>1925 Century Park East 10th Floor<br><br>(May be filed in Central District, Non-BI/PD) |
|---|---|

| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90067 | |
|---|---|---|---|

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Los Angeles___ courthouse in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: ___December 20, 2012___

_(signature)_

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

Exhibit B, Page 44

1   LOEB & LOEB LLP
    IVY KAGAN BIERMAN (SBN 117750)
2   ibierman@loeb.com
    JON DARYANANI (SBN 205149)
3   jdaryanani@loeb.com
    RAMON RAMIREZ (SBN 280772)
4   rramirez@loeb.com
    10100 Santa Monica Blvd., Suite 2200
5   Los Angeles, CA  90067
    Telephone: 310.282.2000
6   Facsimile: 310.282.2200

7   Attorneys for Defendants CF
    Entertainment, et al.

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    FOR THE COUNTY OF LOS ANGELES

11

12   BERNADETTE PAULEY, an individual,    )   Case No.: BC498061
     THOMAS CLARK, an individual, on      )
13   behalf of themselves and all others  )   Assigned to Hon. Kenneth Freeman
     similarly situated,                  )
14                                        )   **CLASS ACTION**
              Plaintiffs,                 )
15                                        )   **NOTICE OF APPEARANCE OF**
         v.                               )   **COUNSEL FOR DEFENDANTS CF**
16                                        )   **ENTERTAINMENT, ET AL.**
     CF ENTERTAINMENT, a California       )
17   corporation; COMICS UNLEASHED        )
     PRODUCTIONS, INC., a California       )
18   corporation; ENTERTAINMENT           )
     STUDIOS, INC., a California corporation; )
19   BYRON ALLEN FOLKS, an individual;    )
     and DOES 1 through 100 inclusive,    )
20                                        )
              Defendants.                 )
21                                        )

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2288707.1
013565-10021

_____ NOTICE OF APPEARANCE _____

FILED
LOS ANGELES SUPERIOR COURT

APR 03 2013

JOHN A. CLARKE, CLERK
BY K. BOWEN, DEPUTY

CITY/CASE:       BC498061
LEA/DEF#:

RECEIPT #: CCW500313059
DATE PAID: 04/03/13   04:28 PM
PAYMENT: $1,435.00   310
RECEIVED:
        CHECK:       $1,435.00
        CASH:            $0.00
        CHANGE:          $0.00
        CARD:            $0.00

Exhibit B, Page 45

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2   PLEASE TAKE NOTICE THAT, defendants CF Entertainment, Comics Unleashed

3   Productions, Inc., Entertainment Studios, Inc. and Byron Allen Folks shall be represented

4   in this matter by Ivy Kagan Bierman, Jon Daryanani and Ramon Ramirez of Loeb & Loeb

5   LLP, 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, CA 90067.

6

7   Dated:   April 3, 2013                    LOEB & LOEB LLP
                                               IVY KAGAN BIERMAN
8                                              JON DARYANANI
                                               RAMON RAMIREZ
9

10                                             By:
11                                                 Ivy Kagan Bierman
                                                   Jon Daryanani
12                                                 Ramon Ramirez
                                                   Attorneys for Defendants
13                                                 CF Entertainment, et al.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2288707.1
013565-10021

2
NOTICE OF APPEARANCE

Exhibit B, Page 46

## PROOF OF SERVICE

1         I, Linda Ehrlich, the undersigned, declare that:

2         I am employed in the County of Los Angeles, State of California, over the age of 18, and

3  not a party to this cause.  My business address is 10100 Santa Monica Boulevard, Suite 2200, Los

4  Angeles, CA  90067.

5         On April 3, 2013, I served a true copy of the **NOTICE OF APPEARANCE OF**

6  **COUNSEL FOR DEFENDANTS CF ENTERTAINMENT, ET AL.,** on the parties in this

7  cause as follows:

8  ☑     (VIA EMAIL) I caused the transmission of the above-named document(s) to the email

9  address set forth below, or on the attached service list.

Matthew J. Matern
(matthewjmatern@gmail.com)
Tagore O. Subramaniam
(tagore.subramaniam@gmail.com)
Law Offices of Matthew J. Matern
3655 Torrance Boulevard, Suite 315
Torrance, California 90503

       I certify that I am employed in the office of a member of the bar of this court at whose direction the service was made.

       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

       Executed on April 3, 2013, at Los Angeles, California.

Linda Ehrlich

LA2289123.1
666666 66666

1

2

3

4

5

6

7

8

9

10

11

12

**FILED**
LOS ANGELES SUPERIOR COURT

APR 10 2013

JOHN A. CLARKE, CLERK

BY ELMER SABALBURO, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

13 | BERNADETTE PAULEY, et al.,        | Case No.:  BC498061
14 |                    Plaintiff(s)
15 | v.                                | ORDER AUTHORIZING ELECTRONIC SERVICE
16 | CF ENTERTAINMENT, et al.,         | Case assigned for all purposes to Judge Kenneth R. Freeman
17 |                    Defendant(s)

18

19

20

21

22     The Court has deemed this matter to be complex litigation within the meaning of the

23  California Standards of Judicial Administration for Complex Litigation Standard 3.10 and

24  California Rules of Court, rules 3.400 et. seq. As such, this is a case that requires specialized

25  management to avoid placing unnecessary burdens on the Court or the litigants, and to keep costs

26  reasonable.

27     Pursuant to Code of Civil Procedure §187 and California Rules of Court, Rules 2.253(a)

28  and 3.751, and the stipulation of the parties, the Court makes this Order to reduce the costs of

1

ORDER AUTHORIZING ELECTRONIC SERVICE

litigation; to facilitate case management, document retrieval, and case organization; and to facilitate communication between Court and counsel in these proceedings.  The Court finds that entry of this Order is necessary for the just, expeditious, and efficient litigation of this Action and that compliance with the terms herein will not result in unnecessary hardship or significant prejudice to any of the parties in this matter.

When a party to this litigation wishes to serve a document to counsel of record, that party shall effectuate service of the document by the procedure set forth in this Order (subject to the exceptions outlined herein):

## I.      CASE ANYWHERE LLC ("CASE ANYWHERE")

1. In order to facilitate case management, document retrieval and case organization, the parties will utilize the services of CASE ANYWHERE and its litigation system (the "System") for providing electronic service, storage and delivery of court-filed and discovery-related documents through a secure website to facilitate expeditious, efficient and economical communication by and amongst counsel.  The Court, at its option, may also use CASE ANYWHERE and its System for these purposes as well to communicate with counsel of record.

## II.     SERVICE ONLY

2. The System shall apply only to the service of documents, and not to their filing. Original documents must still be filed in the traditional manner (i.e., filing the signed original document with the Court), pursuant to the applicable California Rules of Court and Local Rules of such Court.

### III.   SERVICE LIST & SIGN-UP

3. Within five (5) days of this Order, Plaintiff's counsel shall submit to the CASE ANYWHERE representative Wayne Nitti, at support@caseanywhere.com, a complete and current service list of counsel of record for this litigation.  Within five days of this Order, all law firms of record shall provide the following information to CASE ANYWHERE:  (i) firm address; (ii) firm telephone number; (iii) firm facsimile number; (iv) identity of lead attorney(s) for this litigation; (v) list of other firm attorneys to be provided access (if any); (vi) list of firm professional staff to be provided access (if any); (vii) email addresses of all attorneys and professional staff to be provided access; and (viii) list of parties represented.  Firms should also provide the name and address of the individual designated to receive billing invoices.  The above information shall be provided to CASE ANYWHERE by email (support@caseanywhere.com), citing the case title in the subject line; fax (310.564.7701); or mail/overnight courier (CASE ANYWHERE LLC, 1250 Sixth Street, Suite 205, Santa Monica, CA 90401).

### IV.   SERVICE OF DOCUMENTS AND WEBSITE

4. When any counsel of record wishes to serve a document, that counsel shall serve the document according to all the requirements and procedures of this Order.  All references to "document" in this Order shall be interpreted to include any exhibits or attachments to the document and shall include both pleadings and discovery-related documents (such as interrogatories, requests for production, deposition notices, etc.); provided, however, that each attorney shall determine individually whether to utilize the System to serve correspondence or for production of discovery documents, provided large volume productions shall be coordinated with CASE ANYWHERE.

3

Exhibit B, Page 50

5. CASE ANYWHERE shall establish and maintain an Internet website (the "<u>Website</u>") for this litigation.  CASE ANYWHERE will post all documents served by the parties to the Website as provided in this Order and shall serve each document on the parties included on the service list provided to CASE ANYWHERE in accordance with the procedures herein.

6.  Each attorney shall serve each document via electronic transfer of the document file to CASE ANYWHERE via the Internet (either as a word-processing file or a scanned image of the document).  Each attorney shall title each document to identify the type and purpose of each document and the party who is submitting such document.  Each document electronically served pursuant to this Order shall be deemed to have been served under the California Rules of Court.  All documents including attachments or exhibits shall have the attachments and exhibits bookmarked on the pdf documents uploaded to the Case Anywhere website.

7. After CASE ANYWHERE receives a document, CASE ANYWHERE shall convert such document into Adobe Portable Document Format ("<u>PDF</u>") and post it to the Website within one (1) hour of receipt.

8. Within one (1) hour of the time a document is posted to the Website, CASE ANYWHERE shall send an email to all registered users notifying them that the document has been posted to the Website (unless such registered user has declined to receive such email notifications).  The email shall contain hypertext link(s) to the  System.

9. Electronic service shall be complete at the time of transmission, provided any period of notice or any right or duty to do any act or make any response within any period or on a date certain after the service of the document, which time period or date is prescribed by statute or rule of court, shall be extended after service by electronic transmission by two court days, but the

4

ORDER AUTHORIZING ELECTRONIC SERVICE

extension shall not extend the time for filing notice of intention to move for new trial, notice of intention to move to vacate judgment pursuant to Section 663a, or notice of appeal.

10. In the event a document that is to be filed with the Court is rejected by the Court for filing after it has been posted on the Website by CASE ANYWHERE, the rejection was caused by an aspect of the caption of the document, and the party seeking to file the document successfully files it with the Court within two (2) business days of its rejection with revisions to the caption only, then the party filing the document shall promptly submit a notice of successful filing, including the date of the filing and the revised page(s) of the caption, to CASE ANYWHERE for posting on the Website.  In all other circumstances in which a document to be filed with the Court is rejected for filing after CASE ANYWHERE has posted it on the Website, the party that caused the document to be posted shall promptly notify CASE ANYWHERE in writing that the document was rejected by the Court for filing.  CASE ANYWHERE shall cause a permanent notation to be placed on the Website in conjunction with that document memorializing the fact of rejection.

11. All documents posted on the System will be identified by: (a) the name of the serving law firm; (b) the caption(s) of the case(s) to which the document belongs; (c) the title of the document set forth on its caption; and (d) the identity of the party on whose behalf the document is being served.

12. The System shall contain an index of all served documents for the litigation that will be searchable and sortable according to methods that provide useful 24/7 365 days' access to the documents.

13. Access to the System will be limited to registered users.  Registered users will consist of authorized Court personnel, counsel of record and their designated staff members, clients,

ORDER AUTHORIZING ELECTRONIC SERVICE

consultants, and experts.  CASE ANYWHERE will provide each registered user with a user name and password to access the System and the documents served in the litigation.  CASE ANYWHERE personnel will perform all administrative functions for the System, but all initial data, additions, deletions or changes to the service list must be approved by the lead counsel for Plaintiffs and Defendants.  Any disputes regarding initial data, additions, deletions or changes to the service list shall be submitted by CASE ANYWHERE to the Court for resolution.

14. Every pleading, document and instrument served electronically shall bear a facsimile or typographical signature of at least one of the attorneys of record, along with the typed name, address, telephone number and State Bar of California number of such attorney.  Typographical signatures shall be treated exactly as personal signatures for purposes of electronically served documents under the California Rules of Court.  The serving party of any document requiring multiple signatures (e.g., stipulations, joint status reports) must list thereon all the names of other signatories by means of an "s/____" block for each.  By submitting such a document, the serving party certifies that each of the other signatories has expressly agreed to the form and substance of the document and that the serving party has the actual authority to submit the document electronically.  The serving party must maintain any records evidencing this concurrence for subsequent production to the Court if so ordered or for inspection upon request by a party.

15. Any document transmitted to the System shall certify in the Proof of Service that a true and correct copy was electronically served on counsel of record by transmission to CASE ANYWHERE.

16. Until further notice, documents filed under seal ("sealed documents") shall not be served through the System.  Instead, the service of sealed documents shall be made pursuant to the applicable California Rules of Court.

17. CASE ANYWHERE shall have available to counsel of record and the Court a telephone ((800) 884-3163) and e-mail (support@caseanywhere.com) helpline available 365 days a year for the minimum hours of 6:00 a.m. to 9:00 p.m. (PST).

18. Counsel for Plaintiff is ordered to prepare, serve and file within 5 days, a Service List identifying all parties and their counsel which shall include the name of lead and backup attorneys, addresses, including email addresses, and telephone numbers for all counsel. Counsel for Plaintiff is further ordered to serve a copy of this ORDER AUTHORIZING ELECTRONIC SERVICE on all counsel concurrently with service of the Service List.

19. CASE ANYWHERE shall activate the message/bulletin board function for the above entitled case. All attorneys on the service list will automatically have access to the Message Boards and start to receive e-mail notifications of new message board postings. If an attorney does not want to receive the e-mail notifications or wants other staff members to receive e-mail notifications, they are to contact customer support at CASE ANYWHERE (800) 884-3163 or (310) 209-8596.

**IT IS SO ORDERED**.

Dated: April 10, 2013

_____

Kenneth R. Freeman
Judge of the Superior Court

7

ORDER AUTHORIZING ELECTRONIC SERVICE

Exhibit B, Page 54

ORIGINAL

**FILED**
Superior Court of California
County of Los Angeles

JUL 31 2013

John A. Clarke, Executive Officer/Clerk

By _____, Deputy
R. ARRAIGA

CIT/CASE: BC498021
LEA/DEPT

RECEIPT #: CCW520039030
DATE PAID: 07/30/13  04:03 PM
PAYMENT: $20.00      31
RECEIVED:
            CHECK:        $20.00
            CASH:         $0.00
            CHANGE:       $0.00
            CARD:         $0.00

1  LAW OFFICES OF MATTHEW J. MATERN
   MATTHEW J. MATERN, SBN 159798
2  matthewjmatern.mlg@gmail.com
   TAGORE O. SUBRAMANIAM, SBN 280126
3  tagore.mlg@gmail.com
   3655 Torrance Boulevard, Suite 3
4  Torrance, California 90503
   Telephone:   (424) 247-1172
5  Facsimile:   (424) 247-1173

6

7            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                 **FOR THE COUNTY OF LOS ANGELES**
8

9  BERNADETTE PAULEY, an individual,          Case No. BC498061
   THOMAS CLARK, an individual, on
10 behalf of themselves and all others        Hon.  Kenneth Freeman, Dept. 310
   similarly situated,
11
              Plaintiffs,                      **STIPULATION TO CONTINUE**
12                                             **HEARING OF DEFENDANTS' MOTION**
        v.                                     **TO COMPEL ARBITRATION;**
13                                             **[PROPOSED] ORDER HEREWITH**
   CF ENTERTAINMENT, a California
14 corporation; COMICS UNLEASHED
   PRODUCTIONS, INC., a California
15 corporation; ENTERTAINMENT
   STUDIOS, INC., a California corporation;
16 BYRON ALLEN FOLKS, an individual;          **BY FAX**
   and DOES 1 through 100, inclusive,
17
              Defendants.
18

19

20

21         **IT IS HEREBY STIPULATED** by and between Plaintiffs Bernadette Pauley and Thomas

22 Clark ("Plaintiffs"), on the one hand, and Defendants CF Entertainment, Comics Unleashed

23 Productions, Inc., Entertainment Studios, Inc., and Byron Allen Folks ("Defendants"), on the other

24 hand, by and between their respective attorneys, Tagore Subramaniam and Matthew J. Matern, of

25 the Law Offices of Matthew J. Matern, and Ivy Kagan Bierman and Ramon Ramirez of Loeb &

26 Loeb LLP, as follows:

27

28

                                     -1-

1   WHEREAS, a status conference and hearing on Defendants' Motion to Compel

2   Arbitration is currently set for August 23, 2013 at 10:00 a.m (the "Hearing");

3   WHEREAS, the Parties are currently negotiating the terms for a stipulation to arbitrate

4   Plaintiffs claims herein;

5   WHEREAS, Plaintiffs and Defendants agree that it is in the interest of both parties to

6   continue the hearing of Defendant's Motion to Compel Arbitration by 30 days while they

7

8   endeavor to finalize a stipulation to arbitrate Plaintiffs' claims.

9   NOW THEREFORE, Plaintiffs and Defendants stipulate that the August 23, 2013 status

10  conference and hearing on Defendants' Motion to Compel Arbitration should be continued to

11  September 23, 2013 or as soon thereafter as this Court may hear the matter.

12  SO STIPULATED.

13  DATED: July 30, 2013                         LAW OFFICES OF MATTHEW J. MATERN

14

15

16  By: _____

17      Matthew J. Matern, Esq.
        Tagore O. Subramaniam, Esq.

18      Attorneys for Plaintiffs
        BERNADETTE PAULEY

19      THOMAS CLARKE

20

21  DATED: July 30, 2013                         LOEB & LOEB LLP

22

23

24  By: _____
        Ivy Kagan Bierman, Esq.

25      Ramon Ramirez, Esq.

26      Attorneys for Defendants,
        CF ENTERTAINMENT, et al.

27

28

-2-

1

## [PROPOSED] ORDER

2
    Pursuant to Stipulation, good cause having been shown;

3
    IT IS HEREBY ORDERED THAT the hearing on Defendants' Motion to Compel

4
Arbitration will be continued from August 23, 2013 to ~~September~~ October 2, 2013 at 10:00 a.m.

5

6
Dated: 7-31-13

7

8
_____

9
HONORABLE KENNETH FREEMAN
JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

1 | **LAW OFFICES OF MATTHEW J. MATERN**
MATTHEW J. MATERN, SBN 159798
2 | matthewjmatern.mlg@gmail.com
TAGORE O. SUBRAMANIAM, SBN 280126
3 | tagore.mlg@gmail.com
3655 Torrance Boulevard, Suite 315
4 | Torrance, California 90503
Telephone:    (424) 247-1172
5 | Facsimile:    (424) 247-1173

6

7

8

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| BERNADETTE PAULEY, an individual, THOMAS CLARK, an individual, on behalf of themselves and all others similarly situated, | Case No. BC498061 |
| | Hon.  Kenneth Freeman, Dept. 310 |
| Plaintiffs, | |
| v. | **PROOF OF SERVICE** |
| CF ENTERTAINMENT, a California corporation; COMICS UNLEASHED PRODUCTIONS, INC., a California corporation; ENTERTAINMENT STUDIOS, INC., a California corporation; BYRON ALLEN FOLKS, an individual; and DOES 1 through 100, inclusive, | |
| Defendants. | |

-1-

Exhibit B, Page 58

1
2                                  **PROOF OF SERVICE**

3        I am employed in the County of Los Angeles, State of California.  I am over
4  the age of eighteen (18) years and not a party to the within action.  My business
   address is 3655 Torrance Boulevard, Suite 315, Torrance, California 90503.
5
6  On July 30, 2013, I served the document described as:

7      • **STIPULATION TO CONTINUE HEARING ON DEFENDANTS' MOTION
8        TO COMPEL ARBITRATION AND [PROPOSED] ORDER**

9        By electronic service (via electronic filing service provider) – electronically
10 transmitting the documents listed above to Case Anywhere, an electronic filing
   service provider, at www.caseanywhere.com pursuant to the Court's Order
11 Authorizing Electronic in the matter of *Pauley et al. v. CF Entertainment et al.,*
12 LASC BC498061 mandating electronic service.  The transmission(s) was reported
   as complete and without error to the addresses as stated on the attached service list.
13

14
15 | LOEB & LOEB, LLP<br>Ivy Kagan Bierman<br>Ramon Ramirez<br>10100 Santa Monica Boulevard, Suite 2200<br>Los Angeles, CA 90067 | Attorney for Defendants CF Entertainment, Comics Unleashed Productions, Inc., Entertainment Studios, Inc., and Byron Allen Folks. |
16 |---|---|
17

18
19
20
21                                    ___/s/ Tagore Subramanim___
22                                    Tagore Subramaniam
23
24
25
26
27
28

                                        -2-

1    LOEB & LOEB LLP
     IVY KAGAN BIERMAN (SBN 117750)
2    ibierman@loeb.com
     RAMON RAMIREZ (SBN 280772)
3    rramirez@loeb.com
     10100 Santa Monica Blvd., Suite 2200
4    Los Angeles, CA  90067
     Telephone: 310.282.2000
5    Facsimile: 310.282.2200

6    Attorneys for Defendants
     CF ENTERTAINMENT, et al.

7

                        **FILED**
               SUPERIOR COURT OF CALIFORNIA
                  COUNTY OF LOS ANGELES

                    SEP 10 2013

               BY _____, Deputy

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                   FOR THE COUNTY OF LOS ANGELES

11   BERNADETTE PAULEY, an individual,       ) Case No.: BC498061
     THOMAS CLARK, an individual, on         )
12   behalf of themselves and all others     ) Assigned to Hon. Kenneth Freeman
     similarly situated,                     )
13                                           ) Date:      October 2, 2013
14               Plaintiffs,                 ) Time:      10:00 a.m.
                                             ) Dept.:     310
15        v.                                 )
                                             ) **CLASS ACTION**
16   CF ENTERTAINMENT, a California          )
     corporation; COMICS UNLEASHED          ) **DEFENDANTS' NOTICE OF**
17   PRODUCTIONS, INC., a California         ) **MOTION AND MOTION FOR**
     corporation; ENTERTAINMENT             ) **ORDER:**
18   STUDIOS, INC., a California corporation; )
     BYRON ALLEN FOLKS, an individual;      ) **(1) COMPELLING ARBITRATION**
19   and DOES 1 through 100, inclusive,      ) **OF PLAINTIFFS' INDIVIDUAL**
                                             ) **CLAIMS;**
20               Defendants.                 )
                                             ) **(2) DISMISSING CLASS CLAIMS;**
21                                           ) **AND**
                                             )
22                                           ) **(3) DISMISSING PLAINTIFFS'**
                                             ) **INDIVIDUAL CLAIMS OR IN THE**
23                                           ) **ALTERNATIVE, STAYING**
                                             ) **PROCEEDINGS AS TO**
24                                           ) **PLAINTIFFS' INDIVIDUAL**
                                             ) **CLAIMS**
25                                           )

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298200.3
013565-10029

DEFENDANTS' MOTION FOR ORDER COMPELLING ARBITRATION, DISMISSING
CLASS CLAIMS, AND DISMISSING OR STAYING INDIVIDUAL CLAIMS

Exhibit B, Page 60

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    **PLEASE TAKE NOTICE** that, on October 2, 2013 at 10:00 a.m. or as soon

3 thereafter as the matter may be heard, in Department 310 of the above-entitled Court,

4 located at 600 S. Commonwealth Ave., Los Angeles, California 90005, defendants CF

5 Entertainment, Comics Unleashed Productions, Inc., Entertainment Studios, Inc. and

6 Byron Allen Folks (collectively, "Defendants") will and hereby do move the Court for an

7 Order: (1) compelling arbitration of all of plaintiffs Bernadette Pauley's and Thomas

8 Clark's (collectively, "Plaintiffs") individual claims in the above-captioned action; (2)

9 dismissing all of the class claims; and (3) dismissing Plaintiffs' individual claims in their

10 entirety or, in the alternative, staying these proceedings as to Plaintiffs' individual claims

11 pending the completion of arbitration (the "Motion").

12    The Motion is made on the ground that Plaintiffs are required to submit all of their

13 individual claims to final and binding arbitration pursuant to the terms of the collective

14 bargaining agreement negotiated and entered into by Plaintiffs' union and collective

15 bargaining representative, the American Federation of Television and Radio Artists

16 ("AFTRA"). Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*; California Arbitration

17 Act ("CAA"), Cal. Code Civ. Proc. § 1281 *et seq.* The Motion is further made on the

18 ground that all of Plaintiffs' class claims cannot be maintained because Defendants cannot

19 be compelled to arbitrate class claims, as such claims are not expressly provided for in the

20 collective bargaining agreement. *Kinecta Alt. Fin. Solutions, Inc. v. Super. Ct.*, 205 Cal.

21 App. 4th 506, 519 (2012) (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S.

22 662, 130 S. Ct. 1758, 1776 (2010)).

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298200.3
013565-10029

2
DEFENDANTS' MOTION FOR ORDER COMPELLING ARBITRATION, DISMISSING
CLASS CLAIMS, AND DISMISSING OR STAYING INDIVIDUAL CLAIMS

Exhibit B, Page 61

1        The Motion is based on this Notice of Motion and Motion, the Memorandum of

2    Points and Authorities attached hereto, the Declaration of Barry Ilovitch and exhibits

3    thereto, the pleadings, papers and records on file in this action, and such further evidence,

4    argument, and authority as may be presented at the time of hearing on the Motion.

5

6    Dated:   September 10, 2013        LOEB & LOEB LLP

7                                       IVY KAGAN BIERMAN
                                   RAMON RAMIREZ

8

9                            By: _____
                           Ivy Kagan Bierman

10                              Attorneys for Defendants
                           CF ENTERTAINMENT, et al.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298200.3
013565-10029

3

DEFENDANTS' MOTION FOR ORDER COMPELLING ARBITRATION, DISMISSING
CLASS CLAIMS, AND DISMISSING OR STAYING INDIVIDUAL CLAIMS

Exhibit B, Page 62

1  LOEB & LOEB LLP
   IVY KAGAN BIERMAN (SBN 117750)
2  ibierman@loeb.com
   RAMON RAMIREZ (SBN 280772)
3  rramirez@loeb.com
   10100 Santa Monica Blvd., Suite 2200
4  Los Angeles, CA  90067
   Telephone: 310.282.2000
5  Facsimile: 310.282.2200

6  Attorneys for Defendants
   CF ENTERTAINMENT, et al.

7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

SEP 1 0 2013

BY _____, Deputy

8
           SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                  FOR THE COUNTY OF LOS ANGELES
10

11  BERNADETTE PAULEY, an individual,    )  Case No.: BC498061
    THOMAS CLARK, an individual, on      )
12  behalf of themselves and all others  )  Assigned to Hon. Kenneth Freeman
    similarly situated,                  )
13                                       )  Date:     October 2, 2013
              Plaintiffs,                )  Time:     10:00 a.m.
14                                       )  Dept.:    310
         v.                              )
15                                       )  **CLASS ACTION**
    CF ENTERTAINMENT, a California       )
16  corporation; COMICS UNLEASHED        )  **DECLARATION OF BARRY**
    PRODUCTIONS, INC., a California       )  **ILOVITCH IN SUPPORT OF**
17  corporation; ENTERTAINMENT           )  **DEFENDANTS' MOTION FOR**
    STUDIOS, INC., a California corporation; )  **ORDER:**
18  BYRON ALLEN FOLKS, an individual;    )
    and DOES 1 through 100, inclusive,   )  **(1) COMPELLING ARBITRATION**
19                                       )  **OF PLAINTIFFS' INDIVIDUAL**
              Defendants.                )  **CLAIMS;**
20                                       )
                                         )  **(2) DISMISSING CLASS CLAIMS;**
21                                       )  **AND**
                                         )
22                                       )  **(3) DISMISSING PLAINTIFFS'**
                                         )  **INDIVIDUAL CLAIMS OR, IN THE**
23                                       )  **ALTERNATIVE, STAYING**
                                         )  **PROCEEDINGS AS TO**
24                                       )  **PLAINTIFFS' INDIVIDUAL**
                                         )  **CLAIMS**
25                                       )

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298535.2
013565-10029                    DECLARATION OF BARRY ILOVITCH

## **DECLARATION OF BARRY ILOVITCH**

I, BARRY ILOVITCH, declare as follows:

1.      I am the President of Production for defendant Comics Unleashed Productions, Inc.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      I submit this Declaration in support of Defendants' Motion for Order: (1) Compelling Arbitration of Plaintiffs' Individual Claims; (2) Dismissing Class Claims; and (3) Dismissing Plaintiffs' Individual Claims or, in the Alternative, Staying Proceedings as to Plaintiffs' Individual Claims (the "Motion").

3.      As the President of Production, I am familiar with Comics Unleashed Productions, Inc.'s operations.

4.      Comics Unleashed Productions, Inc. is an entertainment production company that produces original programming, including the nationally-syndicated television program Comedy.TV.

5.      Comics Unleashed Productions, Inc. and the American Federation of Television and Radio Artists ("AFTRA") entered into a Basic Cable Agreement, effective as of May 1, 2009, to cover the production of Comedy.TV.  A true and correct copy of the Basic Cable Agreement is attached hereto as **Exhibit "A"**.

6.      Under the Basic Cable Agreement, Comics Unleashed Productions, Inc. was further bound by the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting (the "AFTRA Network Television Code"), a true and correct copy of which is attached hereto as **Exhibit "B"**.

7.      On May 18, 2009, plaintiff Thomas Clark entered into a Standard AFTRA Engagement Contract with Comics Unleashed Productions, Inc. to perform on Comedy.TV, a true and correct copy of which is attached hereto as **Exhibit "C"**.

8.      On August 26, 2009, plaintiff Bernadette Pauley entered into a Standard

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298535.2
013565-10029

2
DECLARATION OF BARRY ILOVITCH

Exhibit B, Page 64

1   AFTRA Engagement Contract with Comics Unleashed Productions, Inc. to perform on

2   Comedy.TV, a true and correct copy of which is attached hereto as **Exhibit "D"**.

        I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

        Executed this _10_ day of September, 2013, at Los Angeles, California.

        BARRY ILOVITCH

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2298535.2
013565-10029

3
DECLARATION OF BARRY ILOVITCH

Exhibit B, Page 65

Exhibit B, Page 66



**American Federation of Television and Radio Artists**
5757 Wilshire Boulevard, 9th Floor
Los Angeles, CA 90036

Branch Of The Associated Actors and Artistes of America
AFL-CIO

David M. Besbris
Director,
Entertainment Programming

Phone: (323) 634-8116
Fax: (323) 634-8177
email: dbesbris@aftra.com

## BASIC CABLE AGREEMENT

**Name of Company:**    Comics Unleashed Productions, Inc.

**Name of Program:**    "Comedy.TV"

**System Exhibited On:** Comedy.tv

**Condition Precedent:**
As a condition precedent to AFTRA entering into this agreement.
Comics Unleashed Productions, Inc. agrees to deliver to AFTRA, or
to a mutually-agreed upon party, on or before close of business
Monday May 18, 2009, a money order or cashier's check in an amount
equal to compensation per stand-up performer of $992, times the
number of performers employed for the first 6 (six) episodes of
"Comedy.TV" plus the applicable contribution to the AFTRA Health
and Retirement Plans of 14.6% of the total gross compensation
payable to each performer. Based on Producer's representation that
Producer intends to produce episodes of the series in groups of
six (6) episodes, Producer shall deliver a money order or
cashier's check in the same manner as set forth herein above, for
each subsequent group of episodes produced on or before the
commencement of performances.

**Scope**

This agreement is between the American Federation of Television
and Radio Artists ("AFTRA") and Production Company ("Producer")
covering the episodes of the non-dramatic series titled
"Comedy.TV" ("Series") intended for exhibition on Comedy.TV, a
premium cable television channel for the term set forth herein.
Except as modified herein, all rates, terms and conditions shall
be of the 2007 – 2010 AFTRA National Code of Fair Practice for
Network Television Broadcasting ("AFTRA Network Television Code"),
which is enclosed herewith and by this reference incorporated
herein. Enclosed is a Letter of Adherence to such AFTRA Television
Code. Please sign the Letter and return with this fully executed
Agreement. Additionally, Producer agrees that in the event of an
order for production of additional episodes of the Series, or
orders for episodes of other series for the premium subscription
service Comedy.TV and/or other channels of Fios which involve
performances of the type traditionally covered by AFTRA, it shall
enter into good faith negotiations with AFTRA re the terms and
conditions for employment on such series.

1.    **TERM**

The term of this Agreement shall be effective May 1, 2009 and will expire on November 15, 2010.  In the event either party has not served appropriate timely notice of termination for the expiration date above, the Agreement shall be extended on a day-to-day basis until sixty (60) days after either party serves written notice of termination on the other; provided, that if AFTRA serves such notice to Producer during the production of the Series, then such sixty (60) day period will be extended with respect to such program only until Producer has completed production of such cable program.

2.    **RECOGNITION**

AFTRA is recognized as the exclusive bargaining agent for all Performers engaged to render services under this Agreement, throughout the United States, its territories and possessions, or anywhere else in the world when the Performers are engaged in the United States by Producer, in production of Material for Basic Cable programs recorded on video tape, digitally or by any other means or methods except recording by motion picture film photography.

3.    **COMPENSATION**

In reliance on Producer's representation that all stand-up performers' performances for any program in the Series shall be done on no more than 1 day, the minimum initial compensation for all performers seen or heard in the Series shall be no less than 80% of the current applicable minimum rate set forth in the AFTRA Network Television Code—e.g. 80% of the Specialty Act rate for all stand-up performers and 80% of the principal rate for the host-- pursuant to the performance category of the artist. All overtime, penalties and the like shall be payable at no less than 100% of the applicable rates contained in the Code.

No services of any performer are excluded from the scope of this Agreement unless specifically waived by AFTRA, or are excluded by the AFTRA Network Television Code, Paragraph 75, People Covered.

4.    **PROGRAM PLAYS**

The initial compensation set forth in Paragraph 3 above shall constitute payment in full for thirty exhibition days over basic cable system, for a period not to exceed one (1) year. For the purpose of this agreement, an exhibition day is a twenty-four (24) hour period, commencing at one second after midnight and ending at midnight.

5.    **PROGRAM PLAY – ADDITIONAL COMPENSATION**

For exhibition days either in excess of thirty (30) or subsequent to one (1) year, Producer shall pay not less than the applicable percentage of the minimum fees referenced in Paragraph 3 above as set forth in Paragraph 73 of the AFTRA Network Television Code.

Exhibit B, Page 68

Upon each payment of this fee, Producer shall have the right to run the program for ten (10) additional exhibition days over one (1) year.

| | | |
|---|---|---|
| Year 2 | 10 exhibitions | 75% |
| Year 3 | 10 exhibitions | 75% |
| Year 4 | 10 exhibitions | 50% |
| Year 5 | 10 exhibitions | 50% |
| Year 6 | 10 exhibitions | 50% |
| Year 7 | 10 exhibitions | 10% |
| Year 8 | 10 exhibitions | |
| and each year thereafter | | 5% |

6.   **SUPPLEMENTAL USE**

Performers must consent in writing, either at the time of employment or at the time of contemplated use, to the exhibition of the Series or release of any program in the Series in any other manner than on the basic cable system referenced above.  Any uses shall be governed by the applicable provision of the AFTRA Network Television Code.  For example:

(i)      exhibition on domestic free television, shall require payment of the applicable replay fees as set forth in Paragraph 73 of the AFTRA Network Television Code based upon not less than 100% of the applicable minimum program fees set forth in such Code, for the first exhibition and any subsequent exhibitions shall comply with such replay formula;

(ii)     exhibition in any "foreign area" as described in Paragraph 73 of AFTRA Network Television Code, requires payment of the applicable replay fees, based upon 100% of the applicable minimum program fee set forth therein;

(iii)    home video cassette distribution requires payment of the applicable percentages set forth in Exhibit D of the AFTRA Network Television Code for such uses;

(iv)     In the event the program is exhibited on any succeeding basic cable network, performers shall be paid not less than 100% of the rates referenced in Paragraph 3 above and all uses and reruns shall be in accordance with Paragraphs 4 and 5 herein;

and

(v)      any other uses of the Series or portions thereof not specified above, including exhibition in New Media, require that performers shall be paid not less than the current (at the time of release or exhibition) applicable minimums pursuant to the applicable AFTRA Code for such use and any other applicable use payments that result therefrom.

7.  **USE RIGHTS**

It is expressly understood and agreed that any and all right to utilize any program in the Series, or portion thereof, other than for the releases described herein shall be subject to and conditioned upon procuring the prior consent of AFTRA and all performers subject to this agreement who are seen and/or heard and AFTRA shall be entitled to injunctive relief in the event such consents are not procured.

In the event Producer does not secure the prior consent of AFTRA and the performers as described in this Paragraph 7 and thereafter utilizes any program in the series or any portion(s) thereof containing performances covered by this Agreement, the terms and applicable conditions of the applicable AFTRA National Code of Fair Practice then in effect, shall apply, except the Producer shall be obligated to pay not less than triple the applicable rates set forth in such Code. Performer may elect not to accept such triple scale and may arbitrate, pursuant to Paragraph 95, Arbitration, of the above referenced Code.

8.  **ARBITRATION**

It is expressly understood and agreed that any dispute between Producer and AFTRA or between Producer and any and all performers under this Agreement, shall be submitted to arbitration in accordance with the provision set forth in Paragraph 95 of the AFTRA Network Television Code.

9.  **HEALTH AND RETIREMENT**

Producer shall make contributions to the AFTRA Health and Retirement Funds and the AFTRA Industry Cooperative Fund (collectively "the Funds") in accordance with the terms of Paragraph 102 and 102A of the 2007 - 2010 AFTRA Code of Fair Practice for Network Television in effect on the effective date of this Agreement in the amount of 14.1% (14.6% effective November 16, 2008 and 15.1% effective November 16, 2009) of the total gross compensation due each Performer. Producer further agrees that should a successor agreement to the 2007-2010 Network Television Code be negotiated during the term of this Agreement, Producer will adopt and conform to any modifications in the AFTRA Health and Retirement provisions of the Network Television Code including, but not limited to, any change in the contributions to any Funds as may be negotiated in such successor Network Television Code.

10.  **AFTRA Television Code**

Except as modified herein, all rates, terms and conditions shall be those of the 2007 - 2010 AFTRA National Code of the Fair Practice for Network Television Broadcasting.

11.  **Better Terms**

Nothing in this Agreement shall be deemed to prevent any performer

from negotiating for and/or obtaining from Producer better rates, terms and conditions than those minimums set forth herein. Effective on and after the date on which this Agreement is executed by Producer and AFTRA, Producer shall furnish a copy of this Agreement to each Performer (or Performer's representative) at the time when producer enters into negotiations with the Performer (or the Performer's representative) for a contract of employment covering the Performer.

12. **Promotional Use**

(i) <u>Series Regulars</u>: Excerpts from a program of not more than two (2) minutes in length containing "series regulars" (defined as performers guaranteed at least six (6) episodes) may be used on Comedy.TV to promote a specific episode or to promote the series generally. A Series Regular may agree in writing at the time of employment, and/or as otherwise set forth in the performer's personal service agreement, to record promotional announcements or trailers which promote the Series without additional compensation therefor, provided the Series Regular performs such services on a day on which he/she is otherwise required to perform on the Series.

(ii) <u>Non Series Regulars</u>: An excerpt from a program in the Series produced hereunder of not more than two (2) minutes in length which contain performers who are not Series Regulars may be used on Comedy.TV channel only to promote the specific program on which the performer appears.

(iii) <u>Services for Original Promotional Material</u>: Except as otherwise provided in Paragraph 12(i) and (ii) herein, any performer rendering services (not in an excerpt) for promotional announcements shall be compensated in accordance with the AFTRA Network Television Code at 100% of the rates set forth therein.

13. **Assumption Agreement/Transfer Of Rights**

Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by the signed Producer hereunder of its rights in any recorded program produced hereunder, Producer shall not be responsible to AFTRA or to any performers for any payments thereafter due with respect to replays, reruns, supplemental markets, foreign, or any other payments due hereunder, if Producer and transferee complies with the Transfer of Rights provision set forth in the AFTRA Network Television Code. In the event such Transfer of Rights Agreement is not entered into and approved by AFTRA, Producer shall remain liable for all reuse, supplemental and all other payments to performers hereunder. Written notice and a copy of the above referenced assumption agreements will be given to AFTRA by Producer within thirty (30) days of each sale, transfer or assignment, license or other disposition of any recorded program which is subject to this code.

## 14. Successorship

This Agreement shall be binding on any and all successors and
assigns of the employer, whether by sale, transfer, merger,
acquisition, consolidation or otherwise. The employer shall make
it a condition of transfer that the successors or assigns shall be
bound by the terms of this Agreement.
After this agreement has been fully executed, an original shall be
returned to the undersigned along with the enclosed Letter of
Adherence.

This Agreement has been entered into on a non-precedential and
non-citable basis.

AFTRA ACCEPTED AND AGREED:

_____
**AFTRA**

_____
**Date**  10-8-09

PRODUCER ACCEPTED AND AGREED:

_____
**Signature**

_____
**Print Name**  WILLIAM ALLEN

_____
**Title**  Owner & CEO

_____
**Date**  6/10/09

_____
**Address**  1975 CENTURY PARK EAST  #1000

_____
**City, State, Zip**  LA CALIF 90067

_____
**Phone Number**  (310) 277-3500

cc:  Zalika Sapp-Weaver; Joan Halpern Weise

Exhibit B, Page 72

**American Federation of Television and Radio Artists**

### Comics Unleashed Productions, Inc. "Comedy.TV"

This will set forth our understanding and agreement, and acknowledge receipt of a copy of:

**2007-2010 AFTRA NETWORK TELEVISION CODE AS MODIFIED BY THE BASIC CABLE**
AFTRA/_____
AGREEMENT, DATED_____

The undersigned wishes to enjoy peaceful and pleasant relations with The American Federation of Television and Radio Artists (AFTRA) and its members and, to that end, in accordance with the uniform practice established by the Industry in its dealings with AFTRA, agrees to be bound by and conform to all terms and conditions specified in said document as if same were fully set forth herein (which document is referred to above). By signing this Letter of Adherence and returning a copy to AFTRA, the undersigned shall be deemed to have executed and agreed to said document. Further, the undersigned represents that it has read and is familiar with all the terms and conditions of said document.

Without limiting the generality of the foregoing, the undersigned agrees to all arbitration provisions of said document. While this Letter of Adherence is in full force and effect, we and AFTRA agree that pending arbitration and award there will be no stoppage of work relating to the dispute under arbitration and the parties agree that all awards rendered shall be binding upon them.

Further, the undersigned agrees to all health and retirement provisions of said document and agrees to be bound by the AFTRA Health and Retirement Funds and ICF Agreements and Declarations of Trust, and abide by and conform to all terms and conditions specified in the aforementioned Trust Agreements, including amendments thereto; and, more specifically, the undersigned hereby appoints the Producer Trustees named therein and/or their successors.

AFTRA reserves the right to review executed Letters of Adherence to determine if that Producer is a bona fide Producer of programming under the Network Code. AFTRA reserves the right to reject the signatory status of any company that is not a legitimate producer of Basic Cable Programming.

We are enclosing two (2) copies of this Letter of Adherence. Kindly complete and sign one copy and return immediately to the AFTRA National Office.

NAME: Byron Folks

TITLE: President /CEO

COMPANY: Comics Unleashed Productions, Inc.

STREET: 1925 Century Park East Suite 1000

CITY & STATE: Los Angeles CA 90067

PHONE NO.: (310) 277-3500

FED. TAX ID NO.: 20-5586288

Very truly yours,

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

Kim Roberts Hedgpeth
National Executive Director

CHECK ONE:  ___ ADV. AGENCY   ___ MUSIC PRODUCER   ___ PUBLIC RELATIONS CO.   ___ F/S/O (OR "LOAN OUT") CORPORATION

___ ADVERTISER   ___ PAYROLL COMPANY   ___ RECORD COMPANY

___ BROADCAST OR CABLE STATION   _X_ PRODUCER   ___ RECORDING STUDIO

Accepted and Approved: _____
Authorized Signature                                Date

Print or Type Name: Byron Folks

anB
6-18-09

AFTRA National
260 Madison Avenue
7th Floor
New York, NY 10016
212.532.0800



www.aftra.com

Exhibit B, Page 73



2007-2010
AFTRA
NATIONAL CODE OF
FAIR PRACTICE FOR NETWORK
TELEVISION BROADCASTING

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS
(AFTRA)

AFTRA
AFL-CIO

Exhibit B, Page 75

# 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING

## TABLE OF CONTENTS

| Paragraph | Subject | Page |
|---|---|---|
| 1. | Length of Contract | 1 |
| 2. | Principal Performers | 1 |
| 2.A. | Dramatic Programs | 1 |
| 2.B. | Non-Dramatic Programs | 1 |
| 3. | Performers Who Speak Five Lines or Less | 3 |
| 4. | Contract Performers and Announcers Off-Camera | 6 |
| 5. | Groups & Choruses | 8 |
| 5.A. | Group Performers | 11 |
| 5.B. | Chorus Singers | 11 |
| 6. | Specialty Acts | 16 |
| 7. | Group Dancers | 16 |
| 8. | Sportscasters | 20 |
| 9. | Background Actors | 21 |
| 9.A. | Live Signature Numbers | 23 |
| | Standard Non-Commercial Openings and Closings and | 27 |
| | Musical Signatures | 27 |
| 10. | Promotional Announcements | 27 |
| 11. | Sustaining Programs | 31 |
| 12. | Rates for Programs in Excess of Two Hours and Morning News Programs | 31 |
| 13. | Periods of Rehearsal and Rates | 32 |
| 14. | Rehearsal Days | 32 |
| 15. | Overtime | 33 |
| 16. | Rest Between Days | 33 |
| 17. | Minimum Daily Call | 34 |
| 18. | Minimum Session | 36 |
| 19. | Guaranteed Days of Employment | 36 |
| 20. | Rehearsal on Strip Programs | 37 |
| 21. | Reading Session | 38 |
| 22. | Rest Periods | 38 |
| 23. | Meal Periods | 39 |
| 24. | Commercial | 39 |
| 25. | Wardrobe, Hairdress, Make-up and Incidental Rehearsal | 39 |
| 26. | Announcers and Performers Who Appear in More Than | 40 |
| | One Commercial Announcement | 42 |
| 27. | Classification of Background Actors in Commercial Announcement | 42 |
| 28. | Live Repeat Program | 42 |
| 29. | Retakes & Recording After Scheduled Final Performance Day | 42 |
| 30. | Preview | 42 |
| 31. | Warm-Up | 43 |
| 32. | After-Show | 43 |
| 33. | Meals | 43 |
| 34. | Contractor for Group Singers or Group Dancers | 44 |
| 35. | Understudies | 44 |
| 36. | Stand-ins and Dance-ins | 45 |
| 37. | Multiple Programs Which are Part Sustaining and Part Commercial | 45 |
| 38. | Notice on Multiple Performances (Cell Hours) | 45 |
| 38.A. | Vacations | 45 |
| 38.B. | Holidays | 46 |
| 39. | Hazardous Performances | 47 |
| 39.A. | Work in Smoke & Hazardous Substances | 47 |
| 40. | Payment for Multiple Sponsorship of Programs | 48 |
| 41. | Commercials on Sustaining Programs | 48 |
| 42. | Remotes | 49 |
| 43. | Compensation for Traveling and Location Work | 49 |

i

| Paragraph | Subject | Page |
|---|---|---|
| 44 | Program Auditions. | 51 |
| 45 | Talent Auditions, Individual Video Tests, and Individual Voice Tests, Calls for Group Dancers. | 51 |
| 46 | Doubling. | 53 |
| 47 | Definition of a Line. | 53 |
| 48 | Definition of Background Actors. | 53 |
| 49 | Cast Credit. | 54 |
| 50 | Costume, Alterations and Nudity. | 54 |
| 51 | Dressing Rooms. | 54 |
| 52 | Minimum Scales. | 55 |
| 53 | Programs on Multiple Stations Commonly Owned. | 55 |
| 54 | Exclusivity. | 55 |
| 54.A | Term Contracts – Serials. | 56 |
| 55 | Engagements. | 57 |
| 56 | Oversale Contracts. | 57 |
| 57 | Additional Services. | 59 |
| 58 | Cancelled Individual Engagements. | 59 |
| 59 | Conceded Programs. | 60 |
| 60 | Postponed Programs. | 60 |
| 61 | Payment. | 60 |
| 62 | Deductions for Social Security and Withholding Taxes. | 62 |
| 63 | Disability Insurance. | 62 |
| 64 | Non-Waiver of Rights. | 64 |
| 64 | Notice on Group Singers, Group Dancers and Announcers. | 64 |
| 65 | Individual Contracts. | 64 |
| 66 | Standard Clause for Individual Contract. | 64 |
| 67 | Standard AFTRA Engagement Contract for Single Television Broadcast and for Multiple Television Broadcasts Within One Calendar Week. | 64 |
| 68 | Stunt Performers. | 65 |
| 68.A | Stunt Coordinators. | 69 |
| 68.B | Supplemental Markets; Pay Television; Basic Cable. | 70 |
| 69 | Programs Covered by Collective Bargaining Agreement. | 71 |
| 70 | Definition of Newsreel Program. | 71 |
| 71 | Recorded Programs Covered by Collective Bargaining Agreement. | 72 |
| 72 | Replay of Recorded Programs. | 72 |
| 73 | Closed Circuit Programs. | 73 |
| 74 | People Covered. | 73 |
| 75 | News Service. | 76 |
| 76 | Children's Programs. | 76 |
| 77 | Waivers. | 77 |
| 78 | Retroactivity. | 79 |
| 79 | Modification of Present Contract. | 81 |
| 80 | Waiver of Cause of Action. | 81 |
| 81 | Individual Contracts Beyond Term of Code. | 82 |
| 82 | Definitions. | 94 |
| 83 | Union Shop. | 94 |
| 84 | AFTRA Rules. | 94 |
| 85 | Admission to Premises. | 95 |
| 86 | Production Memorandum & Remittance Report. | 95 |
| 87 | Use of Recordings for Reference, File, Audition, Trailer or Promotional Purposes. | 96 |
| 88 | Letters of Adherence. | 96 |
| 89 | Producer Bound by Other AFTRA Codes. | 96 |
| 90 | Bond or Certified Check. | 97 |
| 91 | Unfair Producer. | 97 |
| 92 | No-Strike Clause. | 97 |
| 93 | Production Proceeded. | 97 |
| 94 | Grievance and Arbitration. | 97 |
| 95 | Check-Off. | 98 |
| 96 | No Discrimination/Affirmative Action. | 101 |

ii

| Paragraph | Subject | Page |
|---|---|---|
| 97.A | AFTRA Industry Cooperative Fund. | 102 |

| Subject | Page |
|---|---|
| AFTRA Health and Retirement Funds and AFTRA Individual Account Plan. | 107 |
| Cost of Living. | 105 |
| Guidelines – Employment of Minors. | 105 |
| Separability. | 105 |
| Review Board. | 105 |
| Alcoholism and Drug Abuse. | 105 |
| Excess Fees to Struck Stations. | 112 |
| Signatures. | 112 |
| Title of Code. | 113 |

| Exhibit | Subject | Page |
|---|---|---|
| A | Prime Time Supplement. | 114 |
| B | Transfer of Rights. | 115 |
| C | Cost of Living Adjustment. | 115 |
| D | Supplemental Markets. | 117 |
| E | Original Employment Pay TV, Video Disc/Video Cassette Provisions. | 118 |
| F | Stunt Driving Guidelines. | 126 |
| G | Statement - Alcoholism, etc. | 132 |
| H | Paragraph 97 Report (EEO Statistics). | 133 |
| I | Promotional Announcer Session Report. | 135 |

iii

| Sideletter | Subject | Page |
|---|---|---|
| 1 | Re 5KB Upgrading. | 136 |
| 2 | Re Direct Projection. | 137 |
| 3 | Re Par 75A Other Union Contracts. | 138 |
| 4 | Re Par 91 Certified Checks. | 138 |
| 5 | Re Par 92 Notice of Recording Sessions. | 139 |
| 6 | Re Par 102 Health and Retirement Sessions. | 140 |
| 7 | Re Par 103 Health and Retirement Reinstatements. | 141 |
| 8 | Re Dancers' Hazard. | 142 |
| 9 | Re Still Photos. | 144 |
| 10 | Re Singers' Technology Committee. | 144 |
| 11 | Re Physical Disability. | 145 |
| 12 | Re Payroll Systems. | 146 |
| 13 | Re Serials. | 147 |
| 14 | Re Promos For Affiliates. | 148 |
| 15 | Re Warm-Ups. | 149 |
| 16 | Re Edited Down Programs. | 150 |
| 17 | Re Contract Adjustment Committee - Changes in Code Structure. | 151 |
| 18 | Re Reporting of Disabilities. | 152 |
| 19 | Re Excerpts. | 153 |
| 20 | Re Cable Exhibition. | 154 |
| 21 | Re H&R Contributions. | 154 |
| 22 | Re "Major Role Performers". | 155 |
| 23 | Re "Kine Work". | 156 |
| 24 | Re Announcers Promotional Announcements. | 157 |
| 25 | Re Residual Study. | 158 |
| 26 | Re Residual Study. | 159 |
| 27 | Re Rate Protection. | 159 |
| 28 | Re Breakdown Services. | 160 |
| 29 | Re New Media Experiment. | 164 |
| 30 | Re Programs Reused In New Media. | 166 |
| 31 | Re Syndication Sideletter. | 167 |
| 32 | Re Sign Language. | 171 |
| 33 | Re Exhibit H. | 182 |
| 34 | Re Background Actors and Sound Recording Code. | 184 |
| 35 | Re Serial Contracts. | 185 |

| Sidebar | Subject | |
|---|---|---|
| 36 | Re: Daytime Drama Committees | 188 |
| 37 | Re: Moving/News Programs | 189 |
| 38 | Re: Bona Fide Assistant | 189 |
| 39 | Re: Promotional Launch | 190 |
| 40 | Re: Promotional Launch Period | 191 |
| 41 | Exhibitor/Distributor | 191 |
| 42 | Committee on Alternative Digital Broadcast Channels | 192 |
| 43 | Experimental New Media Projects | 193 |
| 44 | Entertainment Jurisdiction | 194 |
| 45 | Vacation Requests | 195 |
| 46 | Use of Personal Vehicles on Serial Programs | 196 |
| 47 | Stunt Coordinators | 197 |
| | Covered Performer | 198 |

Letters
Hiring Executive Statement ... 199
Casting Director Letter ... 200
Schedule of Minimums for Announcer Off-Camera – Multiple Performances in a Calendar Week ... 201
... 202

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS (AFTRA)

(Affiliated with the American Federation of Labor and the Congress of Industrial Organizations)

2007-2010

AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING

RATE SCHEDULE AND CONDITIONS

1. **LENGTH OF CONTRACT**

November 16, 2007 to November 15, 2010 (both inclusive).

2. **PRINCIPAL PERFORMERS**

A. Dramatic Programs

(1) Performers Subject to Prime Time Supplement:

The Supplement (Exhibit A) attached hereto sets forth provisions applicable to actors and certain other categories of performers on prime time dramatic programs (including situation comedies) covered by this Code as more particularly specified in Exhibit A. All the terms, conditions and provisions of this Code are applicable to such programs, except as specifically modified by Exhibit A.

Any dispute over applicability of Exhibit A shall be determined by a Joint Cooperative Committee consisting of six (6) representatives chosen by the Producers and an equal number of representatives designated by AFTRA.

(2) Other Principal Performers

Program Fees; Rehearsal Hours & Days:

Performers Who Speak More Than Five (5) Lines; Singing and Dancing Soloists and Duos; Announcers-on-Camera Regardless of Lines; Stunt Persons and Puppeteers.

(a) Single Program Performances (other than serials):

(i) Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 | Rehearsal Hours Included | Regular Rehearsal Hours | Rehearsal Days Included | Regular Rehearsal Days | Minimum Daily Call – Hours |
|---|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | $222.00 | $230.00 | $237.00 | $244.00 | 1.5 | 1.5 | | | 1.5 |
| over 5 to 15 min. | 446.00 | 461.00 | 475.00 | 489.00 | 3 | 3 | 1 | 1 | 3 |
| over 15 to 30 min. | 711.00 | 736.00 | 758.00 | 781.00 | 10 | 7 | 2 | 2 | 3 |
| over 30 to 45 min. | 821.00 | 846.00 | 871.00 | 897.00 | 12 | 10 | 3 | 3 | 4* |
| over 45 to 60 min. | 955.00 | 990.00 | 1,020.00 | 1,051.00 | 18 | 12 | 3 | 3 | 4* |
| over 60 to 90 min. | 1,168.00 | 1,209.00 | 1,245.00 | 1,282.00 | 26 | 17 | 4 | 5 | 4* |
| over 90 to 120 min. | 1,409.00 | 1,458.00 | 1,502.00 | 1,547.00 | 34 | 22 | 5 | 6 | 4* |

Effective November 16, 2008, Principal Performers on non-serial dramatic programs, in lieu of receiving initial compensation based upon program fees as

Exhibit B, Page 78

## Page 2

above, shall receive the initial compensation set forth in Exhibit A (which is listed below). All other terms and conditions of employment for such Performers and all provisions regarding re-use of such performances shall be those provided in the AFTRA "front of the book."

| Applicable Rate | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|---|
| Day Rate | $786.00 | $810.00 | | $838.00 |
| Three-Day Rate | $1,987.00 | $2,047.00 | | $2,119.00 |
| Weekly Rate | $2,726.00 | $2,808.00 | | $2,906.00 |

\* For performers only, on shows of one (1) hour or longer, on one camera day, minimum daily call is six (6) hours.

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

(iii) For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

\*\* Multiple performance discounts do not apply.

The program for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

(b) Serials (single program performance and multiple performances in one calendar week)

Minimum session for all rates listed above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

Schedule applicable to performers (excluding announcers) on serials.

(c) Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| \*\*\* 5 minutes or less | $211.00 | $217.00 | $224.00 | $232.00 |
| over 5 to 15 min. | 421.00 | 434.00 | 448.00 | 463.00 |
| over 15 to 30 min. | 631.00 | 650.00 | 666.00 | 680.00 |
| over 30 to 45 min. | 727.00 | 759.00 | 780.00 | 797.00 |
| over 45 to 60 min. | 844.00 | 869.00 | 891.00 | 913.00 |
| over 60 to 90 min. | 1,053.00 | 1,085.00 | 1,122.00 | 1,140.00 |

The program rates listed above for the period on and after November 16, 2008 are the residual calculation purposes only.

## Page 3

(ii) A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears. For each applicable program in which a performer appears, Producer will compare the number of days worked by that performer. If the number of program fees payable to the performer exceeds the number of program fees payable to the performer, the performer, at the rate of $334.00 for performances employed on programs of less than one (1) hour ($460.00 for programs of one (1) hour or longer). The applicable reconciliation period shall be a period of twenty-six (26) weeks for principal performers under item contracts and a period of two (2) weeks for all other principal performers.

(iii) For definitions and conditions applicable to hours and days, see Paragraphs 15, 16 and 43.

B. Non-Dramatic Programs – Program Fees, Rehearsal Hours & Days for Performers Who Speak More Than Five (5) Lines; Singing Soloists and Duos; Announcers-On-Camera Regardless of Lines; Puppeteers; Stunt Persons:

(1) Single Program Performance:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 | Included Rehearsal Hours-Performer | Included Rehearsal Days | Included Rehearsal Days | Regular Rehearsal Days | Minimum Daily Call - Hours |
|---|---|---|---|---|---|---|---|---|---|
| \*\*\* 5 minutes or less | $221.00 | $228.00 | $236.00 | $248.00 | 1.5 | 1 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 441.00 | 456.00 | 470.00 | 484.00 | 3 | 1 | 1 | 1 | 3 |
| over 15 to 30 min. | 725.00 | 751.00 | 770.00 | 797.00 | 10 | 3 | 3 | 3 | 3 |
| over 30 to 45 min. | 813.00 | 841.00 | 866.00 | 892.00 | 12 | 3 | 3 | 3 | 4\* |
| over 45 to 60 min. | 921.00 | 953.00 | 982.00 | 1,011.00 | 18 | 12 | 3 | 4 | 4\* |
| over 60 to 90 min. | 1,165.00 | 1,204.00 | 1,240.00 | 1,277.00 | 26 | 17 | 4 | 5 | 4\* |
| over 90 to 120 min. | 1,402.00 | 1,451.00 | 1,495.00 | 1,540.00 | 34 | 22 | 4 | 6 | 4\* |

\* For performers only, on shows of one (1) hour or longer, on one camera day, minimum daily call is six (6) hours.

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

\*\* Multiple performance discounts do not apply.

The program for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

(2) **Multiple Performances in One (1) Calendar Week:**

Schedule restricted to performers on non-dramatic programs and to announcers or on-camera; restricted to performers in the same show each day within the calendar week.

**Program of 15 minutes or less**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $725.00 | $751.00 | $777.00 | $797.00 | 10 | 2 | 3 |
| 2 | 1,410.00 | 1,452.00 | 1,496.00 | 1,536.00 | 16 | 4 | 3 |
| 3 | 1,561.00 | 1,608.00 | 1,657.00 | 1,717.00 | 17 | 4 | 2 |
| 4 | 1,717.00 | 1,768.00 | 1,821.00 | 1,885.00 | 22 | 6 | 1 |
| 5 | 1,984.00 | 2,043.00 | 2,115.00 | 2,178.00 | 34 | 5 | 0 |

**Program over 15 to 30 minutes**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $813.00 | $841.00 | $866.00 | $886.00 | 18 | 3 | 4 |
| 2 | 1,313.00 | 1,359.00 | 1,400.00 | 1,442.00 | 22 | 4 | 3 |
| 3 | 1,559.00 | 1,614.00 | 1,662.00 | 1,712.00 | 28 | 4 | 3 |
| 4 | 1,875.00 | 1,941.00 | 1,999.00 | 2,059.00 | 28 | 6 | 2 |
| 5 | 2,304.00 | 2,385.00 | 2,457.00 | 2,531.00 | 38 | 7 | 2 |

**Program over 30 to 45 minutes**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $725.00 | $751.00 | $774.00 | $797.00 | 10 | 2 | 3 |
| 2 | 1,410.00 | 1,452.00 | 1,496.00 | 1,536.00 | 16 | 4 | 3 |
| 3 | 1,560.00 | 1,607.00 | 1,667.00 | 1,711.00 | 22 | 4 | 2 |
| 4 | 1,711.00 | 1,762.00 | 1,815.00 | 1,880.00 | 28 | 6 | 1 |
| 5 | 1,994.00 | 2,050.00 | 2,115.00 | 2,178.00 | 34 | 5 | 0 |

**Program over 45 to 60 minutes**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $921.00 | $952.00 | $982.00 | $1,011.00 | 18 | 3 | 4 |
| 2 | 1,462.00 | 1,534.00 | 1,588.00 | 1,627.00 | 22 | 4 | 3 |
| 3 | 1,762.00 | 1,820.00 | 1,877.00 | 1,935.00 | 28 | 4 | 3 |
| 4 | 2,114.00 | 2,188.00 | 2,254.00 | 2,322.00 | 32 | 6 | 2 |
| 5 | 2,598.00 | 2,689.00 | 2,770.00 | 2,853.00 | 38 | 7 | 2 |

4

**Program over 60 to 90 minutes**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $1,606.00 | $1,654.00 | $1,704.00 | $1,755.00 | 26 | 6 | 5 |
| 2 | 2,024.00 | 2,095.00 | 2,158.00 | 2,222.00 | 28 | 5 | 5 |
| 3 | 2,551.00 | 2,640.00 | 2,719.00 | 2,801.00 | 34 | 5 | 4 |
| 4 | 1,735.00 | 1,787.00 | 1,841.00 | — | 36 | 7 | 4 |
| 5 | 3,259.00 | 3,373.00 | 3,474.00 | 3,578.00 | 40 | 7 | 4 |

Extra rehearsal: $20.00 an hour; $25.00 per hour effective November 16, 2008.

**Program over 90 to 120 minutes**

| Performances Per Week | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | $1,402.00 | $1,451.00 | $1,465.00 | $1,540.00 | 34 | 5 | 6 |
| 2 | 1,996.00 | 2,053.00 | 2,115.00 | 2,178.00 | 36 | 6 | 6 |
| 3 | 2,297.00 | 2,367.00 | 2,441.00 | 2,510.00 | 40 | 7 | 6 |
| 4 | 2,970.00 | 3,067.00 | 3,260.00 | 3,260.00 | 40 | 7 | 6 |
| 5 | 3,745.00 | 3,876.00 | 3,992.00 | 4,112.00 | 40 | 7 | 6 |

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

Minimum Session and Minimum Daily Call - Same as per Par. 2.B.(1) for special provisions applicable to strip shows (except serials) see Paragraph 20.

(3) **News Shows - Sixth (6th) or Seventh (7th) performance:**

In the case of news shows only, the following may be applied to the sixth (6th) or seventh (7th) performance in one (1) calendar week of a news on-camera thereof. (covered by the provisions of Par. 75 hereof) and announce-

| Number of Performances | Program Length | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Rehearsal Hours |
|---|---|---|---|---|---|---|---|---|
| 6 | 15 Minutes | $1,721.00 | $1,781.00 | $1,834.00 | $1,889.00 | 25 | | 40 |
| 6 | 30 Minutes | 1,894.00 | 1,960.00 | 2,019.00 | 2,080.00 | 40 | | 40 |
| 6 | 60 Minutes | 2,113.00 | 2,187.00 | 2,253.00 | 2,321.00 | 40 | | 40 |
| 7 | 90 Minutes | 2,752.00 | 2,851.00 | 2,936.00 | 3,024.00 | 40 | | 40 |
| 7 | 120 Minutes | 3,057.00 | 3,164.00 | 3,259.00 | 3,357.00 | 40 | | 40 |
| 7 | 90 Minutes | 3,661.00 | 3,789.00 | 3,902.00 | 4,020.00 | 40 | | 40 |
| 7 | 60 Minutes | 4,087.00 | 4,230.00 | 4,359.00 | 4,488.00 | 40 | | 40 |
| 7 | 30 Minutes | 4,308.00 | 4,459.00 | 4,593.00 | 4,731.00 | 40 | | 40 |
| 7 | 120 Minutes | 4,954.00 | 5,127.00 | 5,281.00 | 5,439.00 | 40 | | 40 |

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

Included rehearsal days, regular rehearsal days, minimum session and minimum daily call - same as for five (5) performances a week in Par. 2.B.(2) except that in the case of programs of fifteen (15) minutes or less there shall be six (6) included rehearsal days for six (6) performances per week and seven (7) included rehearsal days for seven (7) performances per week.

5

C. Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 55):

Performers Who Speak More Than Five (5) Lines; Singers and Dancing Soloists and Duos; Announcers On-Camera Regardless of Lines, Purposes:

(1) Single Program Performance – Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| **5 minutes or less | $335.00 | $347.00 | $357.00 | $368.00 | 1.5 |
| over 5 to 15 min. | 426.00 | 441.00 | 454.00 | 468.00 | 3 |
| over 15 to 30 min. | 514.00 | 532.00 | 548.00 | 564.00 | 5 |
| over 30 to 45 min. | 582.00 | 602.00 | 620.00 | 639.00 | 18 |
| over 60 to 90 min. | 733.00 | 759.00 | 782.00 | 805.00 | 26 |
| over 90 to 120 min. | 882.00 | 912.00 | 940.00 | 968.00 | 34 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

(2) Multiple Performances In One (1) Calendar Week – Same Show:

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

All other terms and conditions set forth in Paragraph 2.B pertaining to programs of the various lengths are applicable and, except as modified in Paragraph 55, all other provisions of this Code apply.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

3.

A. PERFORMERS WHO SPEAK FIVE LINES OR LESS

Single Program Performance (other than serials) – Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 | Included Rehearsal Hours | Included Days | Regular Days | Daily Call |
|---|---|---|---|---|---|---|---|---|
| **5 minutes or less | $134.00 | $139.00 | $143.00 | $147.00 | 1.5 | 1 | 0 | 1.5 |
| over 5 to 15 min. | 267.00 | 276.00 | 284.00 | 293.00 | 3 | 1 | 0 | 3 |
| over 15 to 30 min. | 341.00 | 353.00 | 364.00 | 375.00 | 5 | 1 | 0 | 4 |
| over 30 to 45 min. | 422.00 | 437.00 | 450.00 | 464.00 | 8 | 2 | 0 | 4 |
| over 45 to 60 min. | 479.00 | 496.00 | 511.00 | 526.00 | 10 | 2 | 0 | 4 |
| over 90 to 120 min. | 549.00 | 568.00 | 585.00 | 603.00 | 12 | 2 | 4 | 4 |

Extra rehearsal $20.00 an hour, $25.00 per hour effective November 16, 2008.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

B. Special Rates for Programs on Multiple Stations Commonly Owned (As specified in Paragraph 55):

Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| **5 minutes or less | $85.00 | $88.00 | $90.00 | $92.00 | 1.5 |
| over 5 to 15 min. | 171.00 | 177.00 | 182.00 | 187.00 | 3 |
| over 15 to 30 min. | 221.00 | 229.00 | 236.00 | 243.00 | 5 |
| over 30 to 45 min. | 247.00 | 256.00 | 264.00 | 272.00 | 5 |
| over 45 to 60 min. | 281.00 | 291.00 | 300.00 | 309.00 | 8 |
| over 60 to 90 min. | 341.00 | 353.00 | 364.00 | 375.00 | 10 |
| over 90 to 120 min. | 399.00 | 413.00 | 425.00 | 438.00 | 12 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

All other terms and conditions set forth in Paragraph 3.A, pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 55, all other provisions of this Code apply.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

C. Serials:

(1) Program Fees:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| **5 minutes or less | $117.00 | $121.00 | $124.00 | $127.00 |
| over 5 to 15 min. | 234.00 | 241.00 | 247.00 | 253.00 |
| over 15 to 30 min. | 299.00 | 308.00 | 316.00 | 324.00 |
| over 30 to 45 min. | 326.00 | 336.00 | 344.00 | 353.00 |
| over 45 to 60 min. | 378.00 | 387.00 | 392.00 | 335.00 |
| over 60 to 90 min. | 418.00 | 431.00 | 442.00 | 453.00 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's

6

7

4. **COMMERCIAL PERFORMERS AND ANNOUNCERS OFF-CAMERA**

Announcers and other performers delivering or otherwise participating in commercial announcements (as program announcements, hitch-hikes, cow-catchers, cut-ins or otherwise); these rates are applicable only to services which are broadcast as "live" performances, as described in Par. 73.E. of this Code.

A. **Fees – Commercial Performers:**

(1) Single Separate Announcement or One Single Announcement in Show:

| On-Camera Performers | Rate Effective 11/606 | Rate Effective 11/607 | Rate Effective 11/608 | Rate Effective 11/609 |
|---|---|---|---|---|
| Principal Performers | $621.00 | $645.00 | $662.00 | $682.00 |
| Singers/Dancers/Groups of: | | | | |
| 3 to 5 | 455.00 | 471.00 | 485.00 | 500.00 |
| 6 to 8 | 402.00 | 416.00 | 428.00 | 441.00 |
| 9 or more | 333.00 | 345.00 | 355.00 | 366.00 |

| Off-Camera Performers | Rate Effective 11/606 | Rate Effective 11/607 | Rate Effective 11/608 | Rate Effective 11/609 |
|---|---|---|---|---|
| Principal Performers | $646.00 | $680.00 | $696.00 | $711.00 |
| Singers/Dancers/Groups of: | | | | |
| 3 to 5 | 263.00 | 272.00 | 280.00 | 288.00 |
| 6 to 8 | 228.00 | 236.00 | 243.00 | 250.00 |
| 9 or more | 185.00 | 191.00 | 197.00 | 201.00 |

(2) A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears. For each two (2) week reconciliation period, the Producer will compare the number of days worked by a performer against the number of program fees payable to that performer. If the number of days worked by the performer exceeds the number of program fees payable to the performer for such period, each performer shall be paid for at the rate of $145.00 for each program of less than one (1) hour ($170.00 for programs one (1) hour or longer).

(3) For definitions and conditions applicable to hours and days, see Paragraphs 15, 16, and 43.

8

B. **Program Fees – Announcers Off-Camera (Voice Over):**

(1) More Than Ten (10) Lines – Program Fee:

| Program Length | Rate Effective 11/606 | Rate Effective 11/607 | Rate Effective 11/608 | Rate Effective 11/609 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Cut-Hours |
|---|---|---|---|---|---|---|---|---|
| **5 minutes or less | $125.00 | $127.00 | $131.00 | $135.00 | 1.5 | 1 | 1 | 15 |
| over 5 to 15 min. | 246.00 | 254.00 | 270.00 | | 2 | 1 | 0 | 2 |
| over 15 to 30 min. | 388.00 | 402.00 | 426.00 | | 3 | 1 | 0 | 3 |
| over 30 to 45 min. | 479.00 | 496.00 | 511.00 | 526.00 | 4 | 1 | 1 | 2 |
| over 45 to 60 min. | 543.00 | 562.00 | 579.00 | 596.00 | 5 | 1 | 1 | 2 |
| over 60 to 90 min. | 694.00 | 718.00 | 740.00 | 762.00 | 6 | 2 | 2 | 3 |
| over 90 to 120 min. | 849.00 | 879.00 | 905.00 | 932.00 | | | 3 | 3 |

In all cases, the rate for delivery or participating in delivery of a commercial announcement (regardless of line count) is that set forth in subparagraph (1) and such services are excluded from services covered in subparagraph (2). Included in services covered by subparagraph (2) are such services as openings and closings, lead-ins and lead-outs, billboards, promotional or public service announcements, so long as the aggregate line count is ten (10) or less.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

(2) Single Hitch-Hike or Cow-Catcher:

| Fee Per Announcement | Rate Effective 11/606 | Rate Effective 11/607 | Rate Effective 11/608 | Rate Effective 11/609 |
|---|---|---|---|---|
| | $300.00 | $311.00 | $320.00 | $330.00 |

(3) Single Cut-In:

| Fee Per Announcement | Rate Effective 11/606 | Rate Effective 11/607 | Rate Effective 11/608 | Rate Effective 11/609 |
|---|---|---|---|---|
| | $279.00 | $289.00 | $298.00 | $307.00 |

(4) Cut-ins Defined:

Cut-ins are those announcements inserted on a network program but which are released to a lesser portion of the network (but consisting of more than one station).

9

(2) Ten (10) Lines or Less — Program Fee:

| Program Length | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Call-Hours |
|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | $123.00 | $127.00 | $127.00 | $131.00 | 1 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 245.00 | 254.00 | 254.00 | 262.00 | 2 | 1 | 2 | 1.5 |
| over 15 to 30 min. | 272.00 | 282.00 | 282.00 | 292.00 | 3 | 1 | 3 | 2 |
| over 30 to 45 min. | 287.00 | 297.00 | 306.00 | 315.00 | 4 | 1 | 4 | 3 |
| over 45 to 60 min. | 323.00 | 334.00 | 344.00 | 354.00 | 4 | 1 | 4 | 3 |
| over 60 to 90 min. | 377.00 | 390.00 | 402.00 | 414.00 | 5 | 2 | 5 | 3 |
| over 90 to 120 min. | 436.00 | 451.00 | 465.00 | 479.00 | 6 | 2 | 6 | 3 |

** Multiple performance discounts do not apply.

** The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

(3) Multiple Performances in One (1) Calendar Week, Same Show[1]

Minimum session fee for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

C. Extra Rehearsal:

(1) All performers other than groups, choruses, background actors, hand models and physical demonstrators: $20.00 an hour, $25.00 per hour effective November 16, 2008.

(2) Group Dancers: $20.00 an hour, $25.00 per hour effective November 16, 2008. Chorus Singers: $20.00 an hour, $25.00 per hour effective November 16, 2008.

(3) Background Actors, Hand Models and Physical Demonstrators: $11.00 an hour.

D. See Paragraph 26 for multiple commercials in a program.

[1] See rate sheet at the end of the Code for actual rates for multiple performances in one (1) calendar week, same show.

10

---

5. GROUPS & CHORUSES
(Soloists and Duos receive principal performer's scale)

A. Group Dancers (Three (3) or more Dancers)

(1) Program Fees:

| Program Length | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|---|---|---|
| ** 5 minutes or less | $255.00 | $264.00 | $272.00 | $281.00 | $290.00 | $299.00 |
| over 5 to 15 min. | 512.00 | 530.00 | 546.00 | 564.00 | 582.00 | 600.00 |
| over 15 to 30 min. | 794.00 | 822.00 | 847.00 | 872.00 | 899.00 | 926.00 |
| over 30 to 60 min. | 969.00 | 1,001.00 | 1,025.00 | 1,050.00 | 1,082.00 | 1,114.00 |
| over 60 to 90 min. | 1,101.00 | 1,170.00 | 1,205.00 | 1,240.00 | 1,277.00 | 1,315.00 |
| over 90 to 120 min. | 1,311.00 | 1,357.00 | 1,396.00 | 1,440.00 | | |

| Day Rate | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 |
|---|---|---|---|
| Solo/Duo | $786 | $810 | $838 |
| 3-8 | $688 | $709 | $734 |
| 9+ | $601 | $619 | $641 |
| Rehearsal | $462 | $476 | $493 |

| Weekly Rates | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 |
|---|---|---|---|
| Solo/Duo | $2,525 | $2,601 | $2,692 |
| 3+ | $2,314 | $2,383 | $2,466 |
| 9+ | $2,105 | $2,168 | $2,244 |

Dancers on non-serial dramatic programs

Effective November 16, 2008, Dancers on non-serial dramatic programs, in lieu of receiving initial compensation based upon program fees as above, shall receive the initial compensation set forth in Exhibit A (which is listed below). All other terms and conditions of employment for such Dancers and all conditions regarding re-use of such performances shall be those provided in the AFTRA "front of the book."

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

(2) Rehearsal Hours & Days:

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session Hours | Minimum Daily Call-Hours |
|---|---|---|---|---|---|
| ** 5 minutes or less | 1.5 | | 1 | 1 | 1.5 | 1.5 |
| over 5 to 15 min. | 8 | 2 | 1 | 1 | 3 | 3 |
| over 15 to 30 min. | 19 | 4 | 0 | 3 | 4 |
| over 30 to 60 min. | 29 | 4 | 0 | 3 | 5 |
| over 60 to 90 min. | 35 | 5 | 0 | 3 | 5* |
| over 90 to 120 min. | 35 | 6 | 0 | 3 | 5* |

* Minimum Daily Call is six (6) hours on one (1) camera day for shows of one (1) hour or longer.

** Multiple performance discounts do not apply.

11

(3) The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, seventy-five percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Special Rates for Programs on Multiple Stations Commonly-Owned (As Specified in Paragraph 53):

Program Fees:

| Program Length | Rate Effective 11/1606 | Rate Effective 11/1607 | Rate Effective 11/1608 | Rate Effective 11/1609 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| over 15 to 30 min | $506.00 | $524.00 | $540.00 | $556.00 | 20 |
| over 30 to 60 min | 672.00 | 696.00 | 717.00 | 739.00 | 30 |
| over 60 to 90 min | 751.00 | 777.00 | 800.00 | 824.00 | 36 |
| over 90 to 120 min | 1,199.00 | 1,241.00 | 1,278.00 | 1,316.00 | 36 |

All other terms and conditions set forth in Paragraph 5.A. and 5.C. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

(4) On all Additional Rehearsal Days worked or credited, the Minimum Session and Minimum Daily Call shall be six (6) hours; provided, however, that a meal period of not more than two (2) hours may be given without breaking the session.

In those instances where a Producer or his/her representative is aware at the time dancers are being offered employment that work in excess of six (6) consecutive days may be necessary, the Producer will so inform the dancers prior to engagement of their services.

If there have been recurring cases of scheduling dancers for an excessive number of consecutive days of work, the matter may be referred to the joint AFTRA-Producers Special Committee in an effort to find a mutually acceptable solution to the problem.

(5) For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraph 13-20; except that for dancers who dance, a rehearsal day in a rehearsal hall shall consist of no more than six (6) out of seven (7) consecutive hours, inclusive of meal periods.

(6) No principal performer (as defined in par. 2.B.(1)) or member of a specialty act shall be considered as a member of a dancers' group in determining the appropriate group rate.

(7) Any member of a dancing group who steps out and performs as a soloist or as part of a duo for eight (8) or more consecutive bars shall be paid additional compensation (a step out fee) at the following rates:

| Program Length | Rate Effective 11/1606 | Rate Effective 11/1607 | Rate Effective 11/1608 | Rate Effective 11/1609 |
|---|---|---|---|---|
| 30 Minute Program | $71.00 | $73.00 | $75.00 | $77.00 |
| 60 Minute or Longer Program | 137.00 | 142.00 | 146.00 | 150.00 |

except that any such dancer who steps out and so performs for sixteen (16) or more consecutive bars shall be paid the full principal performer's fee if the amount of such fee is greater than the total of the full group dancer fee including the step out fee as provided above, and any member of a

12

(8) In no event shall any dancer be asked or assigned to rehearse on unsafe floors, or concrete, cement, stone or similar surfaces unless the surface is covered in such a manner as to result in a resilient dancing surface except on "eantem day" when the requirements of resilient dancing surface except make use of such non-resilient surfaces unavoidable.

dancing group who steps out and performs as a member of a smaller group for another percent (100%) fee shall not operate to reduce or reduce the size of the overall group with respect to fees payable to the remainder of the group.

(9) Dancers doing knee work, including rolling, spinning, falling, balancing, the knees, will be permitted to wear knee pads where practicable in rehearsal and performance.

(10) During the 1982 and 1985 negotiations, AFTRA claimed that hazards would be created for dancers who are required to wear masks during dance routines or are required to dance under conditions which may impair sight or breathing (e.g., fog, smoke, fire). The Producers acknowledged that the wearing of a mask may impair visibility, and that there could be situations in which the nature of the mask combined with the situations particular choreography would entitle a dancer to the hazard pay required by Paragraph 5.A.(12) of the TV Network Code. The Producers further acknowledged that, under certain circumstances, dancing under conditions which impair sight or breathing (e.g., fog, smoke, fire), when combined with the requirements of particular choreography also shall entitle a dancer to such hazard pay. This provision will be brought to the attention of the AFTRA-Producers Special Committee provided in Paragraph 5.A.(12) and may be cited in any Special arbitration proceeding brought under that paragraph.

(11) Compensation for group dancers who are required by the Producer to sing or lip sync (i.e., synchronization of lip movements with lyrics) shall be computed in accordance with the applicable rules stated in Paragraph 46 (Doubling). The applicable basic dancer minimum program fee shall be utilized as the base in computing any replay payments and any payments for telecasts in foreign areas which may be due such group dancers.

(12) For performing a hazardous dance routine or other hazardous activity (such as wire flying) in a studio or on location, dancers will be paid $80.00 for each such day; provided that the minimum payment per program shall be not less than $100.00 as provided in Paragraph 39.A. In recognition of unique problems in determining the entitlement of dancers to such additional compensation for hazardous activity, the following procedures will be applicable. If a dancer believes that a dance routine or other activity that the dancer is requested to perform should entitle the dancer to such additional compensation, the matter will be discussed promptly between the AFTRA representative assigned to the program and the Producer or the Producer's designated representative. If the matter cannot be resolved by that on-the-spot discussion, the AFTRA representative will prepare a written description of the specific dance routine or other activity, and other facts pertinent to the claim, which will be confirmed and initialed by the Producer and filed with the local AFTRA Executive Director.

When a number of such claims have been filed, but not less frequently than once each quarter if any claims are on file, the Executive Director

13

will convene a meeting of the AFTRA-Producers Special Committee. There shall be two (2) Special Committees, one (1) in New York City and one (1) in Los Angeles, each consisting of two (2) AFTRA representatives and two (2) representatives of the Producers.

The Committee will review the pending claims and attempt to resolve them. All such resolutions will be based on the specific circumstances involved and will be on a no-precedent basis. If a claim is upheld, the Producer will be notified in writing and must make the required payment to the dancer (by check mailed to the AFTRA Executive Director) within five (5) working days of receipt of the notice to do so. Two (2) panels of arbitrators, each of which is to consist of ten (10) named arbitrators agreed to by the parties, shall be maintained and filed with the American Arbitration Association, one (1) in New York City and one (1) in Los Angeles. Names may be added to or deleted from time to time by mutual agreement. Whenever either Special Committee has at least four (4) of the pending claims which it has been unable to resolve, either AFTRA or the Producer may submit such claims for arbitration under Paragraph 95, with the following special rules being applicable:

(a) There will be a single arbitrator selected from the appropriate panel.

(b) The matter will be presented to the arbitrator by a representative of the Producer and by a representative of AFTRA.

(c) The arbitrator will render an award either granting or denying each claim, with no written opinion.

(d) The arbitrator's award will be on a no-precedent basis and not citeable in any subsequent arbitration proceeding.

(13) Subject to applicable law, if a dancer on whose behalf contributions have been made to the AFTRA Health and Retirement Funds during five (5) of the prior ten (10) years is employed to work on a covered television program as an assistant choreographer, but not as a dancer or in any category covered by the Code, Producer will contribute to the AFTRA Health and Retirement Funds on such dancer's behalf on the basis of the highest compensation received by any group dancer on the program for services as a group dancer. If no individual classified as a dancer under this Code appears on the program, the contribution shall be based on the Group Dancer program fee, pursuant to the length of the program. Such employment shall not be subject to other provisions of the Code.

(14) For non-syndicated non-prime time programs, Producer shall have the option of employing group dancers in accordance with this Subparagraph.[1]

---

[1] Subject to review by the Funds' attorney that this change will not adversely effect the tax exempt status of the Fund or the deductibility of employer contributions.

14

---

(14) In lieu of the provisions of Subparagraphs (1), (3), (4) and (5) above:

(4) Day Rates:

(i) Network Programs:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| Programs Less Than One(1) Hour (one day rate) | $421.00 | $436.00 | $449.00 | $462.00 |
| Programs of One(1) Hour (one day rate) | 751.00 | 777.00 | 800.00 | 824.00 |
| Programs of One(1) Hour or More (two day rate) | | | | |

(ii) Programs on Multiple Stations Commonly Owned:

| Program Length | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| Programs Less Than One(1) Hour (one day rate) | $9.00 | $26.00 | $27.00 | $28.00 |
| Programs of One(1) Hour or More (two day rate) | $51.00 | $54.00 | | $59.00 |

(b) A day shall consist of eight (8) hours exclusive of a one (1) hour meal period.

(c) Hours worked on an additional days shall be paid at the overtime rate with an eight (8) hour minimum call.

(d) Where the rates provided in this Subparagraph (14) are paid, no payment for step-out (Par. 5.A.(7)), hp 3/16 (Par. 5.A.(11)), no doubling (Par. 36), stand-in/dance-in (Par. 36) shall be required.

(e) Producer shall notify the dancer on the basis of employment in advance of the dancer's first performance date.

(15) Producer shall notify AFTRA of the dates and locations of all rehearsals, taping, and time of first rehearsal for dancers one (1) week prior to the first rehearsal, provided dancers such information is known at that time.

(16) Dancers on Awards Programs (in excess of 60 minutes)

| | Rate Effective 11/07 | Rate Effective 11/09 |
|---|---|---|
| Rehearsal Day | $25.00 | $27.00 |
| Camera Day | 65.00 | 67.00 |
| Program/Minimum | 870.00 | 880.00 |

A Rehearsal Day shall consist of 6 hours excluding the meal period. The seventh and eighth hours shall be paid at the Extra Rehearsal rate. A Camera Day shall consist of 8 hours excluding the meal period. Overtime shall be paid at $45.00 per hour.

15

B.

Chorus Singers:

(1) (a) Program Fees - On-Camera:

| Program Length | Number of Performers in Group | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|---|
| *** 5 minutes or less | 3 to 8 | $141.00 | $146.00 | $150.00 | $155.00 |
| | 9 or More | 126.00 | 132.00 | 136.00 | 140.00 |
| over 5 to 15 min. | 3 to 8 | 253.00 | 262.00 | 270.00 | 278.00 |
| | 9 or More | 253.00 | 262.00 | 270.00 | 278.00 |
| over 15 to 30 min. | 3 to 8 | 368.00 | 381.00 | 392.00 | 404.00 |
| | 9 or More | 343.00 | 355.00 | 366.00 | 377.00 |
| over 30 to 60 min. | 3 to 8 | 455.00 | 471.00 | 485.00 | 500.00 |
| | 9 or More | 425.00 | 440.00 | 453.00 | 467.00 |
| over 60 to 90 min. | 3 to 8 | 543.00 | 562.00 | 579.00 | 596.00 |
| | 9 or More | 514.00 | 532.00 | 548.00 | 564.00 |
| over 90 to 120 min. | 3 to 8 | 603.00 | 624.00 | 643.00 | 662.00 |
| | 9 or More | 603.00 | 624.00 | 643.00 | 662.00 |

* On Award Shows, there shall be two (2) Included Days.

** Multiple performance discounts do not apply.

*** On Award Programs in excess of one (1) hour and Prime Time Variety Programs, the minimum call shall be four (4) hours.

(b) Rehearsal Hours & Days:

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session Hours | Minimum Daily Call Hours |
|---|---|---|---|---|---|
| ** 5 minutes or less | 15 | | 1 | 1 | 15 |
| over 5 to 15 min. | 5 | 1 | 1 | 3 | 3 |
| over 15 to 30 min. | 5 | 2 | 2 | 3 | 3 |
| over 30 to 60 min. | 8 | 2 | 3 | 3 | 3 |
| over 60 to 90 min. | 10 | 2 | 3 | 3 | 3 |
| over 90 to 120 min. | 13 | 3* | 6 | 3*** | 3*** |

Extra rehearsal: $20.00 an hour; $25.00 per hour effective November 16, 2008.

(2) (a) Program Fees - Off-Camera:

| Performance Category | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| Solo/Duo | $585.00 | $605.00 | $623.00 | $642.00 |
| Groups of 3 to 8 | 339.00 | 351.00 | 362.00 | 373.00 |
| Groups of 9 or More | 317.00 | 328.00 | 338.00 | 348.00 |

These rates apply to any program length.

16

(b) Off-Camera Singers - Session:

Off-camera singers' fees include a session of up to four (4) hours on any one (1) day for all programs, except on any program where the off-camera singers work with the cast, in which case the length of the program on the air may be added to the allowable hours. Furthermore, on a variety program Special where the singers work with the cast, work on a second day is subject to a three (3) hour minimum call payable at the applicable rehearsal rate. Work on a second day without the cast (or on a third day on a variety program Special where the singers work with or without the cast) shall require the payment of a new session fee for a session of up to four (4) hours.

If a session goes beyond the included hours, overtime shall be paid at the rate of $25.00 per hour for each additional hour, up to and including the eighth (8th) hour worked on the day. Overtime in the ninth (9th) and tenth (10th) hours worked on the day of the session, and for each additional hour in excess of eight (8), overtime shall be paid at the rate of $37.50 per hour. Overtime hours may be computed in quarter (¼) hour segments. Paragraph 14 (Rehearsal Days) shall not apply to off-camera singers.

(c) Off-Camera Singers - Meal Period:

In lieu of Paragraph 23, the following shall apply to off-camera singers: If a session exceeds five (5) hours (plus the length of the program when the singers work with the cast) and a meal period has not already been given, the singers shall receive a meal period of at least one (1) hour. A meal period shall not be considered as time worked or counted toward the length of a session. In the event a meal period is not given as herein required, Producer shall be required to pay, in addition to any other fees, a sum of $25.00 to said performer for each meal period missed.

In the event that a Performer is engaged for both on- and off-camera work on a single day, the Performer shall be paid the higher applicable rate.

(3) (a) Program Fees - On-Camera:

Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):

| Program Length | Number of Performers in Group | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|---|
| over 15 to 30 min. | 3 to 8 | $268.00 | $277.00 | $285.00 | $288.00 |
| | 9 or More | 239.00 | 247.00 | 254.00 | 262.00 |
| over 30 to 60 min. | 3 to 8 | 291.00 | 301.00 | 310.00 | 319.00 |
| | 9 or More | 270.00 | 279.00 | 287.00 | 296.00 |
| over 60 to 90 min. | 3 to 8 | 336.00 | 348.00 | 358.00 | 369.00 |
| | 9 or More | 307.00 | 318.00 | 328.00 | 338.00 |
| over 90 to 120 min. | 3 to 8 | 378.00 | 391.00 | 402.00 | 414.00 |
| | 9 or More | 342.00 | 354.00 | 365.00 | 376.00 |

17

(b) Program Fees - Off-Camera:

| Performance Category | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| Groups of 3 & 8 | $219.00 | $227.00 | $234.00 | $234.00 |
| Groups of 9 or More | 205.00 | 212.00 | 218.00 | 225.00 |

(c) Rehearsal Hours:

All other terms and conditions set forth in Paragraphs 5.B. and 5.C. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

**Singers on non-serial dramatic programs**

Effective November 16, 2008, Singers on non-serial dramatic programs, in lieu of receiving initial compensation based upon program fees as above, shall receive the initial compensation set forth in Exhibit A (which is listed below). All other terms and conditions of employment for such Singers and all conditions regarding re-use of such performance shall be those provided in the AFTRA "front of the book."

**Daily Rates – On Camera**

| | Rate Effective 11/16/08 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|
| Solo and Duo | $849 | $874 | $905 |
| Groups 3-8 | $745 | $767 | $794 |
| Groups 9+ | $650 | $670 | $693 |
| Mouthing 1-16 | $623 | $642 | $664 |
| Mouthing 17+ | $485 | $500 | $518 |

**Daily Rates – Off Camera**

| | Rate Effective 11/16/08 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|
| Solo and Duo | $849 | $874 | $905 |
| Groups 3-8 | $450 | $464 | $480 |
| Groups 9+ | $387 | $399 | $413 |

**3 Day Rates**

| | Rate Effective 11/16/08 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|
| ¾ Hour or 1 Hour Show | $1,987 | $2,047 | $2,119 |
| 1½ Hour or 2 Hour Show | $2,339 | $2,409 | $2,493 |

**Weekly Rates**

| | Rate Effective 11/16/08 | Rate Effective 7/1/09 | Rate Effective 7/1/10 |
|---|---|---|---|
| Solo and Duo | $2,726 | $2,808 | $2,906 |
| Groups 3-8 | $2,500 | $2,575 | $2,665 |
| Groups 9+ | $2,274 | $2,342 | $2,424 |
| "Step Out" (Per day - up to 15 Cumulative bars) | $423 | $436 | $451 |
| Per day - 16 Cumulative bars or detained 1 Hour | $849 | $874 | $905 |
| Contractor 3-8 | $1,248 | $1,285 | $1,330 |
| Contractor 9+ | $2,274 | $2,342 | $2,424 |

(4) When the number of remaining included rehearsal hours is not evenly divisible by the number of hours in the minimum session, the balance may be used as a separate session which may be less than the number of hours

18

in the minimum session, but not less than one (1) hour in length, and must be used consecutively in such separate session.

(5) For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

(6) No principal performer or any member or members of a specialty act shall be considered as a part of the Singers' group in determining the appropriate group rate.

(7) On-Camera - Any singer hired at a group rate who performs on camera as a soloist or a duo for over four (4) consecutive bars but not more than sixteen (16) consecutive bars shall be paid an additional fifty percent (50%) of his total original group fee; if in excess of sixteen (16) consecutive bars, the full principal performer's fee shall apply, and, notwithstanding Paragraph 46.D, the singer in such case shall be subject to the rehearsal hours and days set forth in the schedule below. Any member of a group who performs as a member of a smaller group for over four (4) consecutive bars shall be paid the smaller group fee. Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

Schedule of rehearsal hours and days for group singer upgraded to principal performer rate in accordance with this Paragraph 5.B.(7)(A).

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session Hours | Minimum Daily Call Hours |
|---|---|---|---|---|---|
| 15 minutes or less | 3 | 1 | | 1 | 3 |
| over 15 to 30 min | 8 | 1 | 2 | 2 | 3 |
| over 30 to 60 min | 10 | | 2 | 3 | 3 |
| over 60 to 90 min | 15 | 2 | 5 | 3 | 3 |
| over 90 to 120 min | 18 | 3 | 6 | 3 | 3 |

(B) Off-Camera - Any singer hired at a group rate who performs off-camera as a soloist or a duo for over four (4) consecutive bars but not more than sixteen (16) consecutive bars shall be paid an additional fifty percent (50%) of his total original group fee; if in excess of sixteen (16) consecutive bars, the full solo/duo fee shall apply. Any member of a group who performs as a member of a smaller group for over four (4) consecutive bars shall be paid the smaller group fee. Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

(8) Additional Compensation for Broadcast of Multiple Tracking and Sweetening:

"Multiple tracking" refers to singing the same part two (2) or more times where separate sound tracks are recorded and a composite is made of separate renditions.

"Sweetening" refers to singing different parts or notes recorded at different times where separate sound tracks are made and a composite is made of separate renditions.

For broadcast of multiple tracking and/or sweetening on a program, a group singer shall be entitled to a single payment equal to:

19

(a) fifty percent (50%) of the applicable minimum off-camera program fee, which constitutes payment for unlimited multiple tracking; or

(b) one-hundred percent (100%) of the applicable minimum off-camera program fee, which constitutes payment for unlimited sweetening and unlimited multiple tracking.

No such payment shall be required for:

(i) mechanical over-dubbing where the broadcast includes no composite of separate renditions by the same singer; or

(ii) guide tracks used only for rehearsal and not for broadcast, or

(iii) multiple tracking and sweetening on multiple performances in one (1) calendar week where there is no broadcast of any composite of separate renditions by the same singer.

(9) _____

C. Multiple Performances in One (1) Calendar Week, Same Show:

If the performance of a singer on an incomplete track of a phonograph recording made under the AFTRA Sound Recordings Code is heard on the broadcast of a television program, and that singer has not been engaged as a singer or principal performer on such program, the singer shall be paid a payment equal to the applicable minimum off-camera program fee under this Code, it being understood that (1) no such payment is required if the singer has been engaged as a singer or principal performer on the program, and (2) this payment deals only with the utilization of incomplete tracks and imposes no payment requirements for the utilization of commercial phonograph records on tapes, i.e., those available to the general public.

Included Hours for group dancers on multiple performances in one (1) calendar week shall not exceed forty (40) hours.

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

6. SPECIALTY ACTS

A. A specialty act is any performer or group of performers who render and perform a self-contained theatrical performance with material and theatrical routines of their own (as distinguished from material and routines furnished or provided by the Producer) and which performance has been previously released and/or acted by such specialty act prior to its engagement by the Producer. A specialty act is and shall also be known as a "variety act," a "vaudeville act," and whenever used in connection with television engagements these terms shall be deemed to be synonymous. A "stand-up comedy act" shall be considered a "specialty act" under this paragraph.

B. Program Fees:

| | Rate Effective 11/06/06 | Rate Effective 11/06/07 | Rate Effective 11/06/08 | Rate Effective 11/06/09 |
|---|---|---|---|---|
| 1 Performer* | $1,163.00 | $1,204.00 | $1,240.00 | $1,277.00 |
| 2 Performers | 1,841.00 | 1,905.00 | 1,962.00 | 2,021.00 |
| 3 Performers | 2,332.00 | 2,414.00 | 2,486.00 | 2,561.00 |
| For Each Additional | 80.00 | 60.00 | 60.00 | 639.00 |

Extra rehearsal: $20.00 an hour, $25.00 per hour effective November 16, 2008.

20

* A specialty act by a single performer shall be paid the specialty act rate or the applicable principal performer's rate, whichever is the greater.

C. Above rates include six (6) hours of rehearsal which must be used within two (2) days, one (1) of which shall be the last day of performance. Such two (2) rehearsal days are not required to be consecutive, but must be within the following span.

Program of:
15 minutes or less, within 2 consecutive days
Over 15 to 30 minutes, within 3 consecutive days
Over 30 to 60 minutes, within 5 consecutive days
Over 60 to 90 minutes, within 7 consecutive days
Over 90 to 120 minutes, within 9 consecutive days
Over 120 minutes, within 11 consecutive days

D. Any rehearsal outside of the span or within the span but outside the two (2) aforesaid rehearsal days shall be paid at the overtime rate.

E. Special Rates for Programs on Multiple Stations Commonly-Owned (As Specified in Paragraph 53):

| | Rate Effective 11/06/06 | Rate Effective 11/06/07 | Rate Effective 11/06/08 | Rate Effective 11/06/09 |
|---|---|---|---|---|
| 1 Performer* | $ 687.00 | $ 711.00 | $732.00 | $754.00 |
| 2 Performers | 1,115.00 | 1,154.00 | 1,189.00 | 1,224.00 |
| 3 Performers | 1,449.00 | 1,498.00 | 1,542.00 | 1,587.00 |
| 4 Performers | 1,766.00 | 1,828.00 | 1,883.00 | 1,939.00 |
| For Each Additional | 361.00 | 374.00 | 385.00 | 397.00 |

* A specialty act by a single performer shall be paid the specialty act rate or the applicable principal performer's rate, whichever is the greater.

Included rehearsal hours: 6

All other terms and conditions set forth in this Paragraph 6 pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

7. SPORTSCASTERS

A. Sportscasters and Assistant Sportscasters (color persons) shall be paid no less than the following rates.

B. Sportscasters Fee:

| | Rate Effective 11/06/06 | Rate Effective 11/06/07 | Rate Effective 11/06/08 | Rate Effective 11/06/09 |
|---|---|---|---|---|
| Per Event | $ 770.00 | $884.00 | $882.00 | $855.00 |
| Per Week | 1,988.00 | 2,058.00 | 2,120.00 | 2,184.00 |

The per week rate is included up to seven (7) events or up to one (1) week's broadcasting of the Olympic Games, Pan American Games, Asian Games, Goodwill Games or World University Games.

B. Assistant Sportscasters (Color Persons):

| | Rate Effective 11/06/06 | Rate Effective 11/06/07 | Rate Effective 11/06/08 | Rate Effective 11/06/09 |
|---|---|---|---|---|
| Per Event | $1,267.00 | $1,311.00 | $1,350.00 | $1,391.00 |
| Per Week | 3,217.00 | 3,330.00 | 3,430.00 | 3,535.00 |

21

C. Championship Events:

Championship events are designated as follows:

| | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 |
|---|---|---|---|---|
| Sponsorer | $1,354.00 | $1,401.00 | $1,443.00 | $1,486.00 |
| Assistant Sponsorer | 845.00 | 875.00 | 901.00 | 928.00 |

College Football:

Rose Bowl, Cotton Bowl, Sugar Bowl, Orange Bowl, Gator Bowl, Fiesta Bowl, Senior Bowl/North-South, Blue-Grey and East-West Shrine games.

Professional Football:

National Conference and American Conference playoff games and championship games, Super Bowl, Pro-Bowl and the professional-college All-Star games.

Major League Baseball:

World Series, League Championship Series and All Star Games.

Professional Boxing:

World Championship matches in all weight divisions.

Horseracing:

Kentucky Derby, Belmont Stakes, and the Preakness.

Basketball:

NCAA Final Four, NBA, Championship series, NBA Conference Finals.

Professional Hockey:

NHL Stanley Cup Final Series.

Golf:

U.S. Open Golf Tournament, Masters Golf Tournament, PGA, LPGA, and British Open championships.

Tennis:

U.S. Open Tennis Tournament, Wimbledon Tennis.

D. Major League Baseball Double-Header (other than one scheduled as a result of postponement, which is covered in subparagraphs A. and B. hereof):

E. On extended sports programs of the type of the Olympics, and the Pan American Games, performers who appear or whose voices are heard in no more than three (3) self-contained features of no more than fifteen (15) minutes in the aggregate may be paid $423.00 regardless of the day(s) on which the features are aired during such extended sports programs. In a single day, performers appearing in

| | Rate Effective 11/6/06 | Rate Effective 11/6/07 | Rate Effective 11/6/08 | Rate Effective 11/6/09 |
|---|---|---|---|---|
| Sponsorer | $1,354.00 | $1,401.00 | $1,443.00 | $1,486.00 |
| Assistant Sponsorer | 845.00 | 875.00 | 901.00 | 928.00 |

22

more than three (3) such features or in features that aggregate more than fifteen (15) minutes shall be entitled to the Assistant Sportscaster's rate.

A week means any seven (7) consecutive days. An event is whatever the daily ticket of admission buys, except for the events listed in 7.B. above, in which case an event shall be one (1) day of broadcasting. However, no event covered by subparagraph C. and D. hereof shall be included as an event for purposes of the weekly rate provided in subparagraphs A. and B.

The included rehearsal period for the commercials shall be one (1) hour which must be scheduled within three (3) hours immediately preceding the time of broadcast.

Whenever the services of a spotter or spotters are required, the Producer shall engage such spotter, as his own employee, and shall pay for his services. No deduction therefor shall be made from performer's compensation, whether or not overscale. If the Producer requires the services of a statistician, the latter shall be engaged and paid by the Producer, and his compensation shall not be deducted from the performer's compensation, whether scale or overscale.

A pre-game show (i.e., a show which has the indicia of a separate program and, in the case of a post-game show, the broadcast or the length of which is not dependent on the length of the remaining time period after the event has ended) shall not be considered part of the event, and shall be paid separately based on the length of such pre-or post-game show.

8. BACKGROUND ACTORS

A. Program Fee - Variety:

| Program Length | Rate Effective 11/6/06 | Rate Effective 11/6/08 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Cal-Hours |
|---|---|---|---|---|---|---|
| *** 5 minutes or less | $ 58.00 | $ 59.00 | 1 | 1 | 1 | 15 |
| over 5 to 15 min. | 76.00 | 77.00 | 2 | 1 | 0 | 15 |
| over 15 to 30 min. | 115.00 | 118.00 | 7.5 | 2 | 1 | 2 |
| over 30 to 45 min. | 131.00 | 135.00 | 7.5 | 2 | 1 | 4 |
| over 45 to 60 min. | 146.00 | 150.00 | 8 | 2 | 1 | 4 |
| over 60 to 90 min. | 178.00 | 183.00 | 10 | 2 | 0 | 4 |
| over 90 to 120 min. | 210.00 | 216.00 | 13 | 2 | 0 | 4 |

Extra rehearsal: $11.00 an hour.

B. Special Rates for Variety Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):

| Program Length | Rate Effective 11/6/06 | Rate Effective 11/6/08 | Included Rehearsal Hours |
|---|---|---|---|
| over 15 to 30 min. | $ 72.00 | $74.00 | 7.5 |
| over 30 to 45 min. | 96.00 | 99.00 | 7.5 |
| over 45 to 60 min. | 107.00 | 110.00 | 8 |
| over 60 to 90 min. | 133.00 | 137.00 | 10 |
| over 90 to 120 min. | 155.00 | 160.00 | 13 |

** Multiple performance discounts do not apply.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20; for definition of background actor see Paragraph 48.

23

All other terms and conditions set forth in Paragraph 8.A. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 55, all other provisions of this Code apply.

C. Serials:

(1) Program Fees:

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.

| Program Length | Rate Effective 11/16/05 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|
| **5 minutes or less | $3600 | $3700 | |
| over 5 to 15 min. | 7600 | 7600 | |
| over 15 to 30 min. | 10800 | | |
| over 30 to 45 min. | 11100 | 11100 | |
| over 45 to 60 min. | 12500 | 12800 | |
| over 60 to 90 min. | 14000 | 14000 | |
| | 16900 | 17300 | |

(2) A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears. For each two (2) week reconciliation period, the Producer will compare the number of days worked by a performer against the number of program fees payable to that performer. If the number of days worked by the performer exceeds the number of program fees payable to the performer for such period, each such excess work day shall be paid for at the rate of $68.00 ($70.00 effective November 16, 2008) for performers employed on the program for less than one (1) hour ($90.00 ($92.00 effective November 16, 2008) for programs of one (1) hour or longer).

(3) For definitions and conditions applicable to hours and days, see Paragraphs 15, 16, 43, and 48.

** Multiple performance discounts do not apply.

D. Program Fees - Other Than Serials and Variety:

(1) The rate for background actors engaged on programs other than serials and variety will be as follows:

| Performer Category | Rate Effective 11/16/05 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|
| General Background Actor | $98.00 | $101.00 | $104.00 |
| Special Ability Background Actor | $108.00 | $111.00 | $114.00 |

24

The above rates include eight (8) hours of work.

Overtime: Time-and-one-half, pro rata, after eight (8) hours.

(2) Preference of Employment for Programs Other Than Serials and Variety:

(a) In recognition of the services performed by professional performers, Producer agrees that in the hiring of background actors preference will be given to qualified professional performers where such performers are readily available through registration with in-house casting, or alternative arrangements agreed to in the Producers-Background Actors Cooperative Committee.

(b) It is understood and agreed that it would be impossible to fix accurately the actual damages suffered by AFTRA by reason of a breach by the Producer of the provisions of this Paragraph. It is therefore agreed that, in the absence of any other agreement regarding the Producers-Background Actors Cooperative Committee, the claim shall be referred to the Producers-Background Actors Cooperative Committee and its decision of such dispute shall be final and binding.

(3) For definitions and conditions applicable to hours and days, see Paragraph 16.

E. Special Rates for Large Groups:

(1) Serials:

The program fee, in accordance with the schedule set forth in Paragraph 8.C. above will apply when fewer than twenty (20) background actors are engaged on any program. When twenty (20) or more background actors are engaged on any program per day, all background actors engaged on the program will be paid at twenty percent (20%) less than the existing program fee.

(2) Variety Programs:

The existing program fee will apply when fewer than thirty (30) background actors are engaged on any program. When thirty (30) or more background actors are engaged on any program per day, all background actors engaged on the program will be paid at twenty percent (20%) less than the existing program fee.

(3) For the Purposes of Paragraph 8.E. (1) and (2) above:

With respect to this provision it is agreed that "variety programs" refers to a program which consists principally of various entertainment elements, e.g., comic acts, sketches, and musical numbers. Examples of variety programs, both present and past, are "The Tonight Show," "Saturday Night Live," "Academy Awards," "In Living Color," "Laugh-In," "The Ed Sullivan Show," "Sonny and Cher," "Tim Conway Show," "Dolly Parton Show," and "Star Search."

When determining the number of background actors engaged on each program, the Producer will not count any contest winners, or members of the company's production staff who appear as background actors. The

25

Producer is free to count background actors who are upgraded to a higher category (e.g., five (5) lines-or-less or principal)).

The background actor must be notified at the time of employment of the rate at which he/she is to be employed.

(4) AFTRA will consider granting waivers for background actors in large crowd scenes.

F. Background actors may perform in multiple roles as background actors on the same programs without additional compensation.

G. (1) The Producer of a daytime serial employing ten (10) or more background actors on a single day may use recordings of those background actors made on that day:

(a) in the studio or on location, in up to six (6) episodes, without payment of any additional fees, provided that any background actor appearing in such multiple episodes is paid twice the applicable minimum for the original employment; or

(b) on location only, in an unlimited number of episodes over thirteen (13) weeks, without payment of any additional fees, provided that any background actor appearing in such multiple episodes is paid three (3) times the applicable minimum for the original employment.

(2) The background actor must be notified at the time of employment if these provisions are to be applied.

(3) The minimum applicable to background actors employed pursuant to subparagraph 8.G.(1) shall be the full rate set out in Subparagraph 8.C., without discount. However, those employed under Subparagraph 8.G.(1) may be counted toward the number required for the discount in Subparagraph 8.E.(1).

H. Background Actors who are required to furnish the following shall receive the indicated additional payments which shall not be subject to Health and Retirement contributions:

(1) Pets, Personal Accessories—Allowances per day:

Pets $23.00
Golf Clubs set with bag $12.00
Tennis Racquets $5.50
Luggage (per piece) $5.50 (no additional pay if paid for tennis outfit)
Cameras $5.50
Skis and Poles $12.00

(2) For props not listed above, Background Actors may negotiate a fee at the time of booking.

(3) Autos and other vehicles—Allowances per day

Auto $35.00
Trailer $19.00
Bicycle $12.00
Moped $15.00
Motorcycle $35.00
Police Motorcycle $50.00
Skates/Skateboard $5.50

26

9. **LIVE SIGNATURE NUMBERS**

Per performer including dress rehearsal: $105.00

Extra rehearsal: $11.00 an hour.

9.A. **STANDARD NON-COMMERCIAL OPENINGS AND CLOSINGS AND MUSICAL SIGNATURES**

Any performer (other than an announcer) engaged under a term contract for a series, or any serial performer under a term contract who is guaranteed at least $10,000 per thirteen (13) weeks, may consent to perform (or permit a portion of a prior performance to be used) without additional compensation, in standard openings and closings, bridging material (lead-ins and lead-outs from commercials or lead-ins and lead-outs from the program) and musical signatures for a program broadcast in conjunction with any or all episodes of the program provided that if the performer is under contract to appear on the program; provided that if the performer is required to perform on such services on a day when he is not otherwise required to perform on the program, he shall be paid at least $100.00.

Any other performer (other than an announcer) who performs (or permits a portion of a prior performance to be used) in standard openings and closings, bridging material (lead-ins and lead-outs from commercials or lead-ins and lead-outs from the program) and musical signatures for a program broadcast in conjunction with any episode(s) of a series or serial in which the performer does not otherwise perform may be paid on a per-episode basis or on a per-thirteen (13) week basis. The minimum amount payable on the per-episode basis shall be the applicable minimum program fee.

The minimum amount payable on the thirteen (13) week basis shall be the following rate per performer for each thirteen (13) week period during which such broadcasts occur:

| Performer Category | Rate Effective 11/16/06 | Rate Effective 11/16/07 | Rate Effective 11/16/08 | Rate Effective 11/16/09 |
|---|---|---|---|---|
| On-Camera | $1,502.00 | $1,555.00 | $1,602.00 | $1,650.00 |
| Off-Camera | $1,079.00 | $1,117.00 | $1,151.00 | $1,186.00 |
| Singers—Solo/Duo | $1,079.00 | $1,117.00 | $1,151.00 | $1,186.00 |
| Singers—Group 3 to 8 | $846.00 | $876.00 | $902.00 | $929.00 |
| Singers—Group 9 or More | $734.00 | $760.00 | $783.00 | $807.00 |
| Background Actors | $245.00 | $254.00 | $262.00 | $270.00 |

10. **PROMOTIONAL ANNOUNCEMENTS**

A. (1) When a performer is engaged to perform services in a promotional announcement (i.e., a non-commercial announcement promoting one (1) or more programs, or series on a network, or on a program service, in syndication or on multiple stations commonly owned, or an announcement promoting the network, program service or station on which the program or series is broadcast) the fee shall be as follows:

On-Camera: $314.00 ($323.00 effective November 16, 2008)
Off-Camera: $227.00 ($234.00 effective November 16, 2008)

Off-Camera (value added): $400.00 (effective March 8, 2008)

27

Background Actors: $94.00 ($97.00 effective November 16, 2008) (Such payment shall be in lieu of any additional compensation to the Background Actor pursuant to Paragraph 10).

Different length versions of a promo or network/program service identification constitute separate promotional announcements or identifications.

Said fees shall be for the recording and not more than thirteen (13) weeks of use on a network, on a program service, in syndication, on commonly owned local stations or on network affiliated stations. Reuse in New Media shall also be included in the initial compensation paid for a promotional announcement. Any other use shall be paid for pursuant to the provisions of the applicable AFTRA Code or Contract.

(2) Use on local cable within the same thirteen (13) weeks of use shall require the payment of an additional fee as set forth above.

(3) Eight (8) days' use:     $270.00
    Thirteen (13) weeks' use:     $350.00

(4) A session for off-camera performers shall be two (2) hours in length.

B. (1) A performer engaged to perform services in stand-alone network and program service identifications (hereinafter "id") or cues shall be entitled to payment of the fee and all other terms specified in subparagraph (1), above.

(2) When a performer is engaged to perform services in a radio promotional announcement (i.e., a non-commercial radio announcement promoting one (1) or more television programs, or series on a network, program service in syndication, or on multiple stations commonly owned, or a radio announcement promoting the television network, program service or station on which the program or series is broadcast) the fee shall be as follows:

C. Tags:

(1) A tag is a short change or addition to an existing promotional announcement which may be placed anywhere in the announcement. Tags may only contain information indicating the day, date, time or show title (e.g., tonight, tomorrow, next week, following, or Tuesday), network or program service, but do not change the content of the announcement.

(2) Required payment for each tag is $93.00 for thirteen (13) weeks of use for each announcement to which such tag is added, whether the tag is separately recorded and mechanically edited or the entire announcement is reveal.

Customized Station Tags:

(1) Promos may be customized by appending customized identification containing information which specifies the station call letters, channel, or other means of station identification. These customized tags must be approached to a promotional announcement recorded by the same announcer.

28

(2) Minimum fees for such tags shall be as follows:

Up to 30 tags  -  $50.00 for each tag
31 to 100 tags  -  $35.00 for each tag
over 100 tags  -  $25.00 for each tag

(3) Said fees shall be for the recording and not more than thirteen (13) weeks of use of such tags, during which period they may be attached to any promo recorded by the same announcer.

D. A minimum session fee of $250.00 shall be payable for each session at which tags are recorded, based on a two (2) hour session, however, the minimum session fee may be credited against total payments due for such session.

E. The foregoing provisions applicable to promotional announcements also shall apply to pre-recorded public service announcements provided such public service announcement is no longer than three (3) minutes in length.

F. A performer may agree in writing at the time of his/her employment that he/she may record promotional announcements without additional compensation which promote the program or series for which the performer is under current contract as a series regular.

G. Group singers engaged to record voice tracks for program promotional announcements (i.e., non-commercial announcements not more than three (3) minutes in length promoting one (1) or more network television programs or series) will be employed under the following conditions:

(1) Session Fee:

Each singer will be paid $175.00 for each final recording of each arrangement actually performed during a session, which fee includes unlimited tracking and/or sweetening. In the event no final recording is produced, each singer will nevertheless be paid $175.00. Fees paid pursuant to this subparagraph (1) may be credited against payment of the use fee(s) specified in (2) below. A session shall be three (3) hours in length.

(2) Use Fees:

(a) Before the first use of the promotional announcement(s), Producer shall elect one (1) of the following initial payment alternatives, depending upon the number of different promotional announcements to be made and whether they are made for television use only or for television and radio use.

(i) If the promotional announcements are made for use in TV only:

| No. of Different Promotional Announcements in which Singer's Services are Used | TV Use Only Fee Per Singer | Use Covered By Such Fee | |
|---|---|---|---|
| | | Network TV Weeks of Use | Affiliate TV Weeks of Use |
| Per Announcement | | | |
| 10 | $ 185.00 | 13 | 13 |
| 20 | 1,516.00 | 13 | 13 |
| 30 | 2,526.00 | 15 | 26 |
| 50 | 5,054.00 | 15 | 39 |
| Unlimited | 6,500.00 | 52 | 52 |

29

(ii)  If the promotional announcements are made for use in TV and Radio:

| No. of Different Promotional Announcements in which Singer Services are Used | TV and Radio Use Per Singer | Use Covered By Such Fee | | | |
|---|---|---|---|---|---|
| Per Announcement | | Network TV Weeks of Use | Affiliates TV Weeks of Use | Network Radio Weeks of Use | Affiliates Radio Weeks of Use |
| 10 | $ 212.00 | 13 | 13 | 13 | 13 |
| 20 | 1,744.00 | 13 | 13 | 26 | 26 |
| 30 | 2,906.00 | 15 | 15 | 26 | 26 |
| 50 | 5,811.00 | 15 | 15 | 39 | 39 |
| Unlimited | 8,212.00 | 52 | 52 | 52 | 52 |

The use of voice tracks recorded in sessions (as provided in B.(1) above) that occur more than thirteen (13) weeks after the initial session requires payment of an additional use fee, which Producer shall elect from the initial payment alternatives. The foregoing shall not apply to customized individual station tracks recorded pursuant to subparagraph (4) below.

(iv)  Cycles shall commence with first use. In connection with payment for additional cycles, Producer may elect any one (1) of the payment alternatives provided above.

(v)  Soloists and duos shall receive an additional fifteen percent (15%) of the above rates.

H.  Contractors:

The contractor for the group shall receive a single fee of $53.40 per session.

(1)  Customized Tracks:

Customized tracks produced for individual stations shall be compensated at the rate of $50.00 per track per singer, which shall entitle the station to fifty-two (52) tracks or, if fewer are made, the singer shall be paid a minimum of $200.00.

If a singer is called to make customized tracks on a day on which he is not otherwise engaged on other promotional announcements, Producer shall make not fewer than four (4) tracks or, if fewer are made, the singer shall be paid a minimum of $200.00.

The following shall apply to promotional announcements produced for distribution into syndication (other than first run syndication on a Program Service or Network), including cable.

(1)  The off-camera announcer (off-camera singer) shall receive an initial payment for each promotional announcement, in accordance with the provision of subparagraph I.(A.(10.C.), along with an additional, single aggregate payment of $3,500.00 ($340.00 for an off-camera group singer) for all promotional announcements created for a given episode of a program. Such initial payment shall entitle the producer to one (1) year of syndicated use of the promotional announcement(s).

(2)  The off-camera announcer (off-camera singer) shall receive a payment of $250.00 per episode per year ($225.00 per episode per year for off-camera group singers) for each one (1) year period that the program for which the

30

promotional announcement(s) was recorded remains in syndication. Such payment shall be made at the beginning of each subsequent one (1) year period, unless the original promotional announcement(s) are no longer in use.

(3)  If a Producer of a promotional announcement produces such announcement for distribution into syndication by another entity, the Producer, in its agreement with such other entity, shall specify the payments that are required by this provision and shall include in its agreement with such other entity the following statement:

[Producer] and [Distributor] hereby agree that the off-camera announcer (off-camera singer) shall be a third-party beneficiary of this agreement to the extent that [Distributor] assumes the obligation to make reuse payments due to the off-camera announcer (off-camera singer) pursuant to Section 10.H. of the AFTRA Code, subject to the following:

In order to initiate a third-party beneficiary claim against [Distributor] the off-camera announcer (off-camera singer) or AFTRA, must demonstrate 1) that Producer has failed to make a reuse payment when due; and 2) that a demand was made on the Producer to make the residual payment but such payment was not made.

[Distributor] further agrees that any dispute between [Distributor] and AFTRA or [Distributor] and the off-camera announcer (off-camera singer) shall be resolved according to the Grievance and Arbitration procedures set forth in the National Code of Fair Practice for Network Television Broadcasting.

I.  A sweeper is a transition announcement of seven (7) seconds or less used at the end of reformatted credits. The payment for each sweeper which is not part of another announcement is $125.00 for thirteen (13) weeks of use. A minimum session fee of $250.00 shall be payable for each session at which sweepers are recorded, based on a two (2) hour session, however, the minimum session fee may be credited against total payments due for such session.

11.  SUSTAINING PROGRAMS

Sustaining rate: eighty percent (80%) of above fees.

12.  RATES FOR PROGRAMS IN EXCESS OF TWO HOURS AND MORNING NEWS PROGRAMS

A.  In all programs of more than two (2) hours in length, the fee shall be the applicable two (2) hour rate plus, for each one-half (½) hour or part thereof over and above two (2) hours, a sum equal to the difference between the applicable ninety (90) minute rate and the applicable one hundred-twenty (120) minute rate, provided that in no event shall an announcer's off-camera minimum rate for a sports event (as defined in Paragraph 7) be greater than the minimum fee for a Sportscaster for such sports event.

B.  Rates for Morning News Programs of Two (2) Hours or More

1.  Performer(s) appearing on a morning news program (e.g. "The Today Show," "Good Morning America") for two (2) hours or more may be paid the applicable one (1) hour program fee, subject to the following:

The total time spent being interviewed and actually performing (as distinguished from rehearsing), including any live performance(s), and/or taped (30 minutes), within the same program episode, shall not exceed thirty (30) minutes. This rate may be used only one (1) time during any

31

thirteen (13) week period, for a given performer(s) on any single program. Time between live performances shall count towards the thirty (30) minute limitation.

2. Performer(s) appearing on a morning news program (e.g., "The Today Show,") if more than two (2) hours may be paid the applicable two (2) hour program fee, if the performer(s) does not qualify for the one (1) hour rate in B.1. above, subject to the following:

3. For this rate, such performer(s) may appear one (1) time only during any thirteen (13) week period on any single program and the total show segment(s) in which the performer(s) appears, including any interview(s) and the performance(s), shall not exceed thirty (30) minutes in the aggregate.

Specialty Act, as claimed in this Agreement, appearing on a morning news program of two (2) hours or more may be paid 80% of the applicable Specialty Act rate, based upon the number of performers who appear in such Specialty Act.

### 13. PERIODS OF REHEARSAL AND RATES (NOT APPLICABLE TO SERIALS)

A. Periods of rehearsal are classified as (1) Included Rehearsal Days, (2) Regular Rehearsal Days, and (3) Additional Rehearsal Days.

B. Included Rehearsal Days are the period of consecutive days in which the included rehearsal hours must be used or forfeited. The number of Included Rehearsal Days is the number of Included Rehearsal Days are specified in the fee schedule for each category of performer in Paragraphs 2-8. In the case of the Included Rehearsal Days is the day of broadcast in the case of a live program or the performer's scheduled final performance day in the case of a pre-recorded program. Included rehearsal hours are included in the performance fee. The rate of pay for all other hours of rehearsal on Included Rehearsal Days shall be the applicable extra rehearsal rate except as provided in Paragraphs 14.D., 15 and 16.

C. Regular Rehearsal Days are the period of consecutive days ending the day just prior to the Included Rehearsal Days. The last day of the Regular Rehearsal Days is also the last day of the Guarantee Period provided in Paragraph 19. The number of Regular Rehearsal Days for each category of performer is set forth in Paragraphs 2-8. The rate of pay for all hours of rehearsal on Regular Rehearsal Days shall be the applicable extra rehearsal rate except as provided in Paragraphs 14.D., 15 and 16.

D. Additional Rehearsal Days are the days prior to the beginning of the period of a performer's Regular Rehearsal Days or when no Regular Rehearsal Days are provided in Paragraphs 2-8 prior to the period of this Included Rehearsal Days. The rate of pay for all hours of rehearsal on Additional Rehearsal Days shall be at the rate of time and one-half of the applicable extra rehearsal rate, except as provided in Paragraph 21 for a reading session.

### 14. REHEARSAL DAYS (NOT APPLICABLE TO SERIALS)

A. A rehearsal day shall consist of no more than seven (7) out of eight (8) consecutive hours on any day, inclusive of meal periods, except on one (1) day, which day may be only one (1) camera day (i.e., the performer's scheduled final performance day or one (1) of the two (2) days prior thereto.) On a rehearsal day other than the one (1) camera day, there shall be no more than four (4) consecutive hours of rehearsal in any session.

32

B. On the camera day described in (a) above, the rehearsal day shall consist of no more than nine (9) out of eleven (11) consecutive hours, and there shall be no rehearsal session of more than five (5) consecutive hours on any such day.

C. Whenever the limit for consecutive rehearsal hours in a session is reached in (a) and (b) above, there shall be at least a one (1) hour break before the next session, during which break no rehearsal may be given. However, a meal period of not more than one (1) hour may be given at normal meal periods (as specified in Paragraph 23) prior to reaching such limit, and such meal period shall not be considered as breaking the session so long as the rehearsal resumes immediately after such a meal period.

D. If on an Included Rehearsal Day or Regular Rehearsal Day rehearsal exceeds seven (7) hours or more than four (4) consecutive hours, or, in the case of the said one (1) camera day as described in A. above, rehearsal hours exceed nine (9) hours or more than five (5) consecutive hours, performers shall be paid overtime at the additional rate of one-half (½) the applicable rehearsal fee.

E. A rehearsal day starting on one (1) calendar day and continuing into the following calendar day shall be deemed to be one (1) rehearsal day; namely, the rehearsal day on which it is started.

### 15. OVERTIME

A. Programs Other Than Serials:

In all cases when performers have rehearsed more than forty (40) hours for a program within the period of Included Rehearsal Days plus Regular Rehearsal Days, or forty (40) hours as described in A. above, performers shall be paid for all hours rehearsed beyond such forty (40) hours at the rate of time and one-half (½) the applicable rehearsal rate. However, this shall not require duplicate overtime payment for the same hours.

B. Serials:

(1) Hours Per Day: Each day of work shall consist of the hours of work (exclusive of meal periods) specified below. Overtime at the hourly rates specified below will be paid in minimum increments of one-half (½) hour for all hours worked in any day which exceed the stated hours.

The rates in Column I are applicable to the first two (2) hours of such overtime. The rates in Column II are applicable to the third and each successive hour of such overtime.

#### Principal Performers

| Program Length | Hours Per Day | Overtime Rate Per Hour | |
| --- | --- | --- | --- |
| | | I | II |
| 5 minutes or less | 4 | $26.00 | $47.00 |
| over 5 to 15 min. | 6 | 36.00 | 47.00 |
| over 15 to 30 min. | 8.5 | 51.00 | 67.00 |
| over 30 to 45 min. | 9 | 65.00 | 88.00 |
| over 45 to 60 min. | 9 | 65.00 | 88.00 |
| over 60 to 90 min. | 9 | 65.00 | 88.00 |

33

## Performers Who Speak Five Lines or Less

| Program Length | Hours Per Day | Overtime Rate Per Hour I | II |
|---|---|---|---|
| 5 minutes or less | 4 | $22.00 | $29.00 |
| over 5 to 15 min. | 6 | 22.00 | 29.00 |
| over 15 to 30 min. | 8.5 | 22.00 | 34.00 |
| over 30 to 45 min. | 9 | 26.00 | 34.00 |
| over 45 to 60 min. | 9 | 29.00 | 38.00 |
| over 60 to 90 min. | 9 | 29.00 | 38.00 |

(2) Not applicable to overnight location work, see Paragraph 43.E.

## Background Actors

| Program Length | Hours Per Day | Overtime Rate Per Hour I | II |
|---|---|---|---|
| 5 minutes or less | 4 | $17.00 | $22.00 |
| over 5 to 15 min. | 6 | 17.00 | 22.00 |
| over 15 to 30 min. | 8.5 | 17.00 | 22.00 |
| over 30 to 45 min. | 9 | 17.00 | 22.00 |
| over 45 to 60 min. | 9 | 17.00 | 22.00 |
| over 60 to 90 min. | 9 | 17.00 | 22.00 |

Sixth (6th) or Seventh (7th) Days: With respect to a performer who has worked five (5) days in a given workweek and who is required to work a sixth (6th) or seventh (7th) day in that week, the performer shall be paid for overtime on such sixth (6th) or seventh (7th) day at the applicable overtime rate from Column I above, with a minimum call of four (4) hours, in addition to any performance fee or excess workday payment due, if any. Hours worked in excess of those stated in the "Hours Per Day" column above shall be paid at the applicable overtime rate from Column II above.

(3) This provision is not applicable to overnight location work. For provisions applicable to overnight location work, see Paragraph 43.E.

The rates specified in Column I above shall be applicable to all overtime hours worked during the first six (6) days in a serial program one (1) hour or more in length, the first (3) three months of a new serial program less than one (1) hour in length, the first six (6) weeks after the length of a serial program has been increased, or the first four (4) weeks after a serial program has been moved to a different studio complex. The rates specified in Column II above shall not be applicable in those circumstances.

### 16.   REST BETWEEN DAYS

A.   There shall be a rest period of not less than twelve (12) hours between the end of work on one (1) rehearsal day and the beginning of work on the next rehearsal day, provided that if any performer is required to report to or report to work within such twelve (12) hour period, he shall be paid $15.00 per hour for the four (4) hours between the time he is required to and does report, and the end of such twelve (12) hour period, in addition to the applicable extra rehearsal rate. Such hours shall not be credited against the hours of rehearsal which are included in the minimum rates hereunder.

B.   Serials:

In recognition of the special problems of serial principal performers who appear in successive daily episodes and who under such circumstances have unique

34

problems in memorizing lines and otherwise preparing for such successive episodes:

(1) The amount payable under this Paragraph 16 where applicable shall be multiplied by five (5) for the first two (2) hours and shall be multiplied by six (6) for each additional hour in the case of a serial performer who must memorize lines. Such amounts shall be paid in minimum increments of one (1) hour.

(2) In order to address the major concern that continuous invasions of rest period combined with excessive work hours may adversely affect such a performer's health and career, the parties have further agreed to the following special provision:

(a) In the event that such performer's rest period may be invaded for a second consecutive time in a workweek, he/she may request or be rescheduled so that the invasion of his/her rest period(s) will be eliminated or reduced.

(b) In considering such request, Producer will take into account such concerns and factors as the human needs of the performer, the prior and upcoming schedule of the performer, the impact on others of granting such request, the availability and viability of alternative production methods (e.g., stand-ins), all in context of the needs and budget of the enterprise. In order to grant such request or to otherwise reduce or eliminate rest invasions, the provisions of Paragraph 55.A. shall not apply.

(c) Given the gravity of these matters it is the expectation of the parties that such requests will not be made lightly nor routinely, and that Producer will give good faith consideration to each request. Producer will record all responses to such requests when made in writing and will make such information available to AFTRA before any meeting of the Serials Forum. A claim by either party that these expectations are not being lived up to may be presented for consideration at the next Serials Forum.

(d) If a performer is required to report on at least one (1) hour of the applicable rest period on two (2) consecutive occasions in a workweek, a penalty of $105.00 per hour shall be paid for those hours worked during the second or any subsequent rest period in lieu of the payments otherwise due under (1) above. If the total time worked during such rest periods is four (4) hours or more, the Producer shall pay an additional lump sum penalty of $325.00 for the second such rest period invasion.

(e) Producer may not invade the third consecutive rest period in a workweek of any performer who qualifies for the $105.00 per hour penalty provided for in Paragraph B.(2)(d) above and whose total time worked during such rest periods is four (4) hours or more, unless Producer pays $105.00 per hour for all hours of rest period invasion for which a $105.00 penalty is not already

(f) Producer may not invade the fourth or subsequent consecutive rest period in a workweek of any performer who qualifies for the $105.00 per hour penalty provided for in Paragraph B.(2)(d) above and whose total time worked during such rest periods is four (4) hours or more, unless Producer pays $105.00 per hour for all hours of rest period invasion for which a $105.00 penalty is not already required by Paragraph B.(2)(d) and a lump sum penalty of $350.00 to performer for each such invasion.

35

B. In lieu of subparagraph A above, for serial programs only, the following shall apply:

(1) The period between the time of the performer's first call for the day and the beginning of his first meal period shall not exceed six (6) hours. The first meal period shall include the five (5) minute rest periods required to be given in the hour immediately preceding and the hour immediately following the meal period for a total elapsed time of seventy (70) minutes. Succeeding meal periods shall be one (1) hour and the period between the end of a meal period and the beginning of the next meal period shall not exceed six (6) hours. No work shall be required during a meal period, including, but not limited to make-up, hairdress or wardrobe. If the Producer does not comply with the foregoing meal period requirements, the penalty set forth in subparagraph B.(3) below shall apply.

(2) However, the Producer may provide food, such as coffee and rolls or sandwiches, to performers who have early calls, in which case no deduction shall be made from work time for the time spent eating. In this event, such performer's first meal period may be given at the same time as the rest of the cast without any penalty under this Paragraph 23.B, provided that such first meal period is preceded by a break of at least fifteen (15) minutes sometime prior to the first meal period.

(3) If the Producer does not comply with the provisions of subparagraph B.(1) above with respect to the first meal period, the Producer shall be required to pay a $35.00 penalty to each affected performer.

(4) In the case of a second or succeeding meal period, Producer has the option of proceeding as described in subparagraph A.(2) through (5), above.

(5) Except as provided in subparagraph B.(2) above, meal periods shall not be counted as work time.

24. **COMMERCIAL**

Commercial copy that must be memorized shall be in the hands of the performer at least twenty-four (24) hours preceding air time. If any significant changes or additions are made to copy within the twenty-four (24) hours prior to air time, Producer shall be required to supply an acceptable prompting device or legible cue cards.

25. **WARDROBE, HAIRDRESS, MAKE-UP AND INCIDENTAL REHEARSAL**

A. Wardrobe, Wigs and Appurtenances:

Performers, including background actors, shall not be required to furnish any special wardrobe, special wigs or special appurtenances, except specialty acts or units, which may supply their own wardrobe if so contracted by Producer. Evening clothes (except full dress for male performers) and any apparel which may reasonably be expected to be included in the regular wardrobe of a performer are not special wardrobe, provided, however, that the regular wardrobe of a female performer shall not be deemed to include more than one (1) evening gown. If a performer agrees to Producer's request that he furnish special wardrobe (not including wardrobe which he normally furnishes as part of his professional performance) he shall be paid a fee of $12.00.

B. Wardrobe Hygiene:

All wardrobe and wigs supplied by the Producer shall be in a sanitary condition.

40

C. Wardrobe Maintenance:

Performers, including background actors, supplying personal wardrobe shall receive a wardrobe maintenance fee of $10.00 per garment, except that the fee for formal evening wear and genuine furs (coats, jackets, capes and stoles) shall be $25.00.

In the event the wardrobe furnished by performer is damaged during rehearsal or performance, the Producer will reimburse the performer for the cost of repair provided that repair of such damage is given to a responsible representative of the Producer, such as the Producer, Director, Associate Director, Floor Manager, House Manager, or Facilities Manager, prior to the performer's leaving the studio and only upon submission to the Producer of a paid bill covering the cost of such repairs, but in no event more than the value of the garment. In the event a disagreement arises as to whether the damage was caused as a result of rehearsal or performance, the question shall be arbitrable under the arbitration provisions of this agreement.

"Gross compensation" under Paragraph 102 and Paragraph 102.A. of this Code shall be deemed to include wardrobe maintenance fees.

D. Dance Shoes:

A new pair of standard dance shoes of good quality, such as Champion or Capezio, and properly fitted shall be made available by Producer to each dancer engaged in a program or program series, if the dress rehearsal and/or broadcast format of the program or program series requires the use of standard dance shoes by the dancer. Producer is not required to issue new standard dance shoes for each show in the same program series, but replacement shoes shall be made available as necessary.

E. Incidental Rehearsal:

All performers shall receive credit for one (1) hour rehearsal for each time they are required by the Producer to appear for choosing and/or fitting of wardrobe and/or wigs, if such time is not otherwise being credited as rehearsal time provided that such hour shall be paid or credited at the rate of time and one-half (½) of the applicable extra rehearsal rate if such call is not within the period of Regular or Included Rehearsal Days. Make-up and dressing, including any incidental rehearsal prior to the time, shall be considered rehearsal time. With respect to any costume calls outside the studio, it is understood that in case of a costume call for any group of performers, each call must be staggered in order to avoid unnecessary waiting at the costume studio.

It is agreed that if actual time used in costume fittings is regularly in considerable excess of one (1) hour, an AFTRA deputy will be assigned to keep track of time spent. Utilization by such deputy and consumer, Producer will credit the full time spent. Utilization in posing for publicity photographs designed to give individual publicity for publicity photographs such publicity is within the control of the Producer and shall be no performer's own time, but such time shall not be deemed to include waivers or promotional spots.

F. Extraordinary Prosthetic Make-Up:

Where extraordinary prosthetic make-up is applied to a performer, an individual qualified by training and/or experience with respect to the make-up involved shall apply, or supervise the application of, such prosthetic make-up.

G. Where practicable, at no additional cost to the Producer, complete wardrobe/costumes should be provided to dancers the day before the first dress rehearsal.

41

required by Paragraph B.(2)(a) and a lump sum penalty of $400.00 to performer for each four hours or subsequent invasion.

(2) For purposes of this Paragraph (2), on overnight remote locations the applicable rest period shall be eleven (11) hours, but all other provisions in this Paragraph 16 B. shall apply.

(b) For purposes of avoiding disputes over the facts involved in the application of this Paragraph (2) the Producer shall establish a sign in/sign out procedure for the principal performers on each rehearsal day.

C. The Producer agrees to make a good faith attempt to provide adequate rest between work days.

### 17. MINIMUM DAILY CALL (NOT APPLICABLE TO SERIALS)

A. A performer shall be given the applicable credit or payment for no less than a minimum call on any rehearsal day on which he works.

B. A performer shall be given the applicable credit or payment for no less than a minimum call on each day of his included Rehearsal Days, whether worked or not, which follows his first rehearsal day.

C. A performer shall be given credit or payment for no less than a minimum call for the number of days guaranteed employment within each unit of the Guarantee Period, as set forth in Paragraph 19, whether worked or not.

D. When the number of included rehearsal hours is not evenly divisible by the number of hours in the minimum daily call, the balance may be used on any of the performer's included Rehearsal Days as a separate session, which may be less than the number of hours in the minimum daily call, but not less than one (1) hour in length. The minimum daily call for each category of performer is specified in Paragraphs 2-8. For special provisions applicable to strip programs (other than serials), see Paragraph 20.

### 18. MINIMUM SESSION (NOT APPLICABLE TO SERIALS)

The minimum session, as specified in Paragraphs 2-8, applies to any rehearsal day on which the performer works. Rehearsal time beyond the minimum session shall be consecutive rehearsal hours. Rehearsal time beyond the minimum session shall be computed in half-hour (½) segments for each half-hour (½) or part thereof. For special provisions applicable to strip programs (other than serials), see Paragraph 20.

### GUARANTEED DAYS OF EMPLOYMENT (NOT APPLICABLE TO SERIALS)

A. When a performer's first rehearsal day is scheduled prior to his period of Included Rehearsal Days he shall be entitled to guaranteed days of employment as hereinafter provided in this paragraph.

B. The Guarantee Period is that period of time beginning with a performer's first scheduled day of rehearsal and ending with the day prior to his first Included Rehearsal Day. The Producer guarantees that during the Guarantee Period the performer shall be given the applicable credit or payment for no less than a minimum daily call, whether worked or not, for the number of days of guaranteed employment within each unit as specified in the following schedule:

| Number of Guaranteed Days of Employment | Number of Consecutive Days in Guarantee Period (Unit) |
| --- | --- |
| 5 | 4 |
| 6 | 6 |

If the Guarantee Period is longer than seven (7) days, the guarantee shall be computed in successive seven (7) day units, commencing with the performer's first scheduled day of rehearsal. Producer shall establish a sign in/sign out procedure first scheduled day of rehearsal, except that the last unit (i.e., the one immediately preceding the included Rehearsal Days) may be fewer than seven (7) days. If the last unit has fewer than seven (7) days, the guarantee for such unit shall be computed in accordance with the above schedule and based upon the number of days in the last unit.

| | |
| --- | --- |
| 3 | 4 |
| 3 | 5 |
| 2 | 1 |
| 1 | 1 |
| 1 | 2 |

C. When a performer's Guarantee Period begins more than fourteen (14) days prior to his scheduled final performance day, Producer shall pay the performer week as an advance which shall be credited against the applicable overtime of $50.00 per such payment shall be made not later than Thursday of each week during the period prior to the week in which the final performance day is scheduled.

D. Where a segment is recorded prior to the principal production of the program and where a performer in the segment is also employed in the principal production of the program, the Producer may, in lieu of the above provisions, pay the compensation for the segment at the applicable overtime extra rehearsal rate, with a minimum of four (4) hours (which compensation shall be in addition to the applicable minimum compensation to which he is entitled for other services on the program). In no event, however, shall payment under this subparagraph D be less than ninety dollars ($90.00) for group players and dancers, or less than one hundred and eighty dollars ($180.00) for principal performers. Producer may not require a performer to appear in such segment at a time which conflicts with the bona fide prior commitments of the performer.

Except when the segment is done at the time of one show for another in the series, or except where the performer is under a term contract for the series, Producer must inform performer at the time of employment that he will be utilized in segments some time prior to the principal production. Group Players and Dancers may not record a segment under this clause except while working on another program in the same series.

### 20. REHEARSAL ON STRIP PROGRAMS (OTHER THAN SERIALS)

The provisions of Paragraphs 13-19 apply to performers in strip programs (other than serials) with the following modifications:

A. Minimum Daily Call:

No separate minimum call shall be required for rehearsal of a show in the series immediately before or after the broadcast or pre-recording of a different show in the series.

B. Minimum Session:

Rehearsal (i): Where a rehearsal of a show in a series immediately follows the broadcast or pre-recording of a different show in the series, the minimum rehearsal session shall be one (1) hour for each rehearsal.

Pre-read (ii): Where, on any day, a pre-read of a show in a series immediately follows the broadcast or pre-recording of a different show in the series, the minimum session shall be one (1) hour for a different show in the series, the shows, and shall be two (2) hours for any performer who appears on both show which is broadcast or pre-recorded on such day.

C. **Included Rehearsal Days:**

The period of Included Rehearsal Days may be to split (i.e., such days need not be consecutive) when a Saturday, Sunday or holiday which is not worked intervenes between successive Included Rehearsal Days which are worked for which the performer is given the applicable credit or payment, whether for the day worked or for a different show in the series. When such split occurs, no minimum call shall be applicable to such Saturday, Sunday or holiday which is not worked but, in such cases, a performer shall be given the applicable credit or payment for no less than a minimum call (subject to the exception provided in subparagraph A above) for the day immediately preceding and the day immediately following the intervening day or days not worked.

D. **Guaranteed Days of Employment:**

The provisions of Paragraph 19 shall not apply to performers in running parts on strip programs, nor shall such performer on a strip program when, in addition to his services on such strip program, he also pre-records on that day or records that day on one program or on another program of the same series on which he is otherwise performing; provided, however, that such performer shall be paid for a minimum of four (4) hours at the applicable extra rehearsal rate as a result of such pre-recording of any portion of his applicable program immediately preceding and the day immediately following such other program, which amount may not be credited towards the applicable Guarantee Period for that performance on such other program. Such provisions shall apply to all other programs (including programs commenced when such performer is required to rehearse or to pre-record a portion of a program prior to his scheduled final performance day for that program because of Producer's use to release or record on a day(s) which is outside the normal rehearsal period for that program to meet the convenience or to avoid conflicts or prior commitments of any performer in the cast.

E. **Special Provisions:**

On strip programs of over forty-five (45) to sixty (60) minutes, the included rehearsal hours for principal performers are ten (10) hours, except for new programs (including programs increasing program length to over forty-five (45) to sixty (60) minutes). On new programs, for the first six (6) months only, included hours are eleven (11) hours per program.

21. **READING SESSION**

A. **Programs Other Than Serials:**

Performers may be required to attend a reading session which shall not be more than one (1) hour for a fifteen (15) minute or half-hour (½) program and not more than two (2) hours for an hour (1) program. Such reading session shall be considered as rehearsal time. The minimum call shall not apply to such reading session. The performer's reading session shall be within the period of a Regular or Included Rehearsal Days, as defined in Paragraph 13 of this Code, or within two (2) days prior to the start of his or any other performer's first rehearsal day and such reading session shall be paid for at the applicable rehearsal rate. In no case shall the reading session start the employment Guarantee Period as defined in Paragraph 19 of this Code.

B. **Serials:**

If a performer otherwise works on a day on which the performer participates in a reading session, the hours of the reading session shall be treated as time worked. If a performer is called in for a reading session on a day on which the performer is not otherwise working, the hours for the reading session will be paid for the excess work day rate.

38

subject to the applicable reconciliation formula contained in Paragraph 2.A.(2) (b) or 3.C.(2), or 8.C.(2).

22. **REST PERIODS**

A. There shall be at least a five (5) minute rest period provided during every hour of rehearsal. If a request by the contractor, deputy or authorized AFTRA representative to give such rest period to dancers is ignored or denied by Producer, each dancer shall be paid $5.00 for each such violation of the rest period rule. One notice per rehearsal day per program shall suffice.

B. Specialty acts (physical) shall be required to rehearse their full not more than two (2) times full out in any one (1) day and in no instance shall they be asked to rehearse full out with less than one (1) hour between rehearsals; on programs where only one (1) camera day is scheduled for such programs, specialty acts (physical) may be required to rehearse their full set three (3) times full out on any one (1) hour's rest between the first and second full out and not less than two (2) hours' rest between the second and third full out.

23. **MEAL PERIODS**

A. Meal periods of one (1) hour shall be given at a time as close to normal meal periods (namely) 11 a.m. to 2 p.m. for lunch, 5:30 p.m. to 8 p.m. for dinner, 11 p.m. to 2 a.m. and 6 a.m. to 8:30 a.m.) as the requirements of other participants in the production will permit, but in no case shall the period between the end of lunch and the beginning of dinner exceed six (6) hours. There shall be a twelve (12) minute grace period, which is not a scheduled grace period, prior to the imposition of any meal penalty. Meal periods shall not be considered as time worked. No work shall be required during a meal period, including, but not limited to, make-up, hairdress, or wardrobe.

(1) In the event a first meal period is not given to any performer as herein mentioned, Producer shall be required to pay in addition to any other fees a sum of $25.00 to such performer for such first meal period missed.

(2) In the case of a second or succeeding meal period, Producer has the option of giving a one-half (½) hour meal period, subject to the following additional conditions:

   (a) When such a meal period is given and producer caters a balanced meal, no penalty shall be incurred.

   (b) When such a meal period is given and a balanced meal is not catered, a $27.50 meal period penalty shall be incurred.

(3) If a second or succeeding meal period is not given, a $35.00 missed meal period penalty shall be incurred. The Producer shall continually pay the $35.00 penalty as a surcharge for a practice of refusing to give meal periods to performers on a program and Producer acknowledges its primary obligation to grant meal periods in accordance with the provisions of this paragraph.

The five (5) minute rest periods required to be given in the hour immediately preceding and the hour immediately adjacent to the meal period shall be given cumulatively adjacent to the first meal period so that total elapsed time shall be seventy (70) minutes, and in the case of a half (½) hour subsequent meal period, total elapsed time will be forty (40) minutes. Producer shall furnish meals in the 11 p.m. to 2 a.m. or 6 a.m. to 8:30 a.m. meal period when no restaurant facilities are reasonably available.

39

## 26. ANNOUNCERS AND PERFORMERS WHO APPEAR IN MORE THAN ONE COMMERCIAL ANNOUNCEMENT

A. Announcers and performers (except for background actors, group dancers, group singers, hand models and physical demonstrators) engaged to perform in a commercial announcement which is intended or in more than one (1) commercial announcement on a particular program shall receive payment applicable to all such commercial announcements or their applicable program rate, whichever is the lesser. (For purposes of this paragraph, the applicable program rate for hand models and physical demonstrators shall be the rate applicable to the performers who speak five (5) lines or less as set forth in Paragraph 3.)

B. Group dancers, group singers, background actors, hand models and physical demonstrators engaged to perform in commercial announcements who appear in more than one (1) commercial announcement on a particular program shall receive payment equal to the aggregate of the payments applicable to all such commercial announcements or their applicable program rate, whichever is the lesser.

## 27. CLASSIFICATION OF BACKGROUND ACTORS IN COMMERCIAL ANNOUNCEMENT

A performer, without lines, in a commercial announcement whose face is not shown on camera and who is not otherwise identified, shall be paid the background actor's rate. When a performer whose face is shown is required to demonstrate or illustrate a product or service, as distinguished from merely touching or looking at a product, such performer shall be paid the applicable minimum fee plus payment for any

## 28. LIVE REPEAT PROGRAM

A live repeat program is a repeat performance of a live broadcast transmitted also as a live broadcast to supplement the network as a delayed broadcast, and if such a live repeat broadcast is performed within twenty-four (24) hours after the first telecasting, performer shall receive not less than one-half (½) the applicable minimum fee plus payment for any rehearsal required. In all other cases full fee shall be required.

## 29. RETAKES & RECORDING AFTER SCHEDULED FINAL PERFORMANCE DAY

A. A pre-recorded program or a recording of a live program or a portion thereof may be re-recorded in order to make adjustments or corrections in performance after the date of such re-recording is done not later than sixty (60) days after the performance, provided that such re-recording is done not later than sixty (60) days after the performance, broadcast in the case of a live program or sixty (60) days after the performer's final performance involved in such re-recording. If only a portion of the program is thus re-recorded, and subject to the availability of the performers involved, and the performers involved in such re-recording (but in no event for less than one (1) hour) shall they are called for compensation in half-hour (½) segments for the time for which they are called for such re-recording. If the entire program is thus re-recorded, the performers involved shall be entitled to one-half (½) the applicable minimum program fee and if they are required to re-record, in addition, to compensation in half-hour (½) segments for the time spent in rehearsing at the extra rehearsal rate applicable to their category of employment.

B. In any case where the performer is needed to record beyond his scheduled final performance day (except for re-recording as provided in (A) above) the performer shall be paid for such recording at the rate of time and one-half (½) the applicable

## 30. PREVIEWS

Previews are performances of scheduled broadcasts which are performed before a studio audience prior to broadcast. Previews shall be considered as rehearsal time.

## 31. WARM-UPS

A. A warm-up is planned entertainment for one (1) studio audience of one (1) program (or episode of an episodic program) preceding during the broadcast or dress rehearsal. The total length of such planned external warm-up performance time when the warm-up is one-half (½) of the applicable half-hour (½) fee if the warm-up performance time is thirty (30) minutes or less, but thirty (30) minutes shall be paid at a rate not less than one-half (½) the applicable fifteen (15) minutes, or part thereof, performed. The included hours shall be two (2) hours for a fifteen (15) minute warm-up and four (4) hours for each fifteen (15) and two (2) additional hours for each additional fifteen (15) minute warm-up. Time worked in excess of the included hours or eight (8) hours in one (1) day (including the time when the warm-up performance is required by Producer to be present at the studio) shall be paid for at the extra rehearsal rate. Warm-up programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the applicable warm-up fee shall be paid for each program for which a warm-up is performed. Where a single program is being taped in a day but separate warm-ups are performed for different audiences (such as with "dress" and "air"), the applicable warm-up fee shall be paid for each included hours shall be commensurate with the length of the warm-up for which fees are paid.

B. Participants in warm-ups who are not members of the cast shall receive not less than one-half (½) of the applicable fifteen (15) minute fee for a fifteen (15) minutes or less, one-half (½) of the applicable half-hour (½) fee if the warm-up performance time is thirty (30) minutes but thirty (30) minutes shall be paid in excess of thirty (30) minutes shall be paid at a rate not less than one-half (½) the applicable fifteen (15) minutes, or part thereof. The included hours shall be two (2) hours for each fifteen (15) minutes. However, no warm-up participant may be required to perform for more than forty-five (45) minutes in any sixty (60) minute period.

C. Performers in warm-ups who are members of the regular cast shall receive $50.00 per performer (including announcers), excepting specialty acts who shall perform a specialty act in the warm-up. Where multiple programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the $50.00 shall be paid for each program for which a warm-up is performed.

## 32. AFTER-SHOWS

After-shows are planned entertainments for the studio audience immediately following the broadcast. No after-show may be more than thirty (30) minutes in length. All performers appearing in such after-show, whether in cast or not in cast, shall receive not less than one-half (½) the applicable fifteen (15) minute fee if after-show is fifteen (15) minutes, and one-half (½) the applicable half-hour fee if after-show is thirty (30) minutes.

Exhibit B, Page 99

33. **MODELS**

When a model is required to do special business or is engaged to display or use his or her services as a model, such model shall be paid the applicable fee for the five (5) line or less category.

34. **CONTRACTOR FOR GROUP SINGERS OR GROUP DANCERS**

A. When any member of a dancing group of three (3) or more is requested to give any additional services, such as conducting dancers, arranging choreography for the same program, arranging for auditions, arranging rehearsals, or any other similar or supervisory duties, such person shall be paid the full applicable minimum fee.

B. For every singing group of three (3) or more there shall be a contractor who shall perform any service commonly associated with the services of a contractor or group leader, such as but not limited to contacting singers, pre-rehearsal, coaching or conducting singers, re-arranging or correcting vocal parts, arranging auditions or rehearsal or other similar or supervisory duties. The number of the singing group assigned as contractor shall be paid at least twice the full applicable minimum fee, except that the payment shall be two hundred percent (200%) of the full applicable minimum fee if there are sixteen (16) or more members in the singing group. It shall be the responsibility of the contractor to request a five (5) minute rest period during each hour of work.

C. The contractor of a singing group on any show shall file with the Producer's representative a contractor's time sheet, prepared by the contractor and initialed by the members of the singing group and the Producer's representative, and in addition, the contractor shall deliver to AFTRA promptly upon conclusion of the final performance, but in no event more than twenty-four (24) hours after the broadcast of the show, copies of all such contractor's time sheets for the show.

D. One member of the dancing group shall be deputized by the dancers within the first hour of rehearsal to act as their deputy. All requests for the Producer relating to any matters under this Code shall be made through the deputy. It shall be the responsibility of the deputy to request a five (5) minute rest period during each hour of work, and to file with the Producer's representative a daily time sheet, initialed by the deputy and the Producer's representative, and in addition the deputy shall deliver copies of all deputy's time sheets for the show to AFTRA promptly upon conclusion of the final performance.

35. **UNDERSTUDIES**

A. Anyone performing solely as an understudy shall be paid not less than the minimum program applicable to the category of the performer being understudied. Any such understudy, in excess of the number of rehearsal hours included in said program fee shall be paid at the extra rehearsal rate applicable to the category of the performer being understudied. The number of extra rehearsal hours for which such an understudy shall be paid shall be determined by the extra rehearsal hours worked by the understudy and not by the extra rehearsal hours worked by the performer being understudied.

B. A performer engaged by the company to act as an understudy shall be paid not less than the minimum fee for the part which he is to perform. For such combined fees, the company may require the performer to rehearse the combined number of rehearsal hours included in both fees. Any rehearsal in excess thereof shall be paid once at the higher applicable extra rehearsal rate.

44

36. **STAND-INS AND DANCE-INS**

A. Stand-ins and/or dance-ins are defined as those performers who are engaged by the company to substitute for members of the cast during rehearsal.

B.(1) Stand-ins and/or dance-ins shall not be required to memorize any material or supply any specific wardrobe.

B.(1) Stand-ins and/or dance-ins on non-dramatic programs and daytime serials shall receive $24.00 per hour for the period for which they are called, with a minimum call of one (1) hour per session; provided that the minimum call shall be two (2) consecutive hours per session, (i) for a person who is engaged solely as a stand-in or dance-in and who is not a member of the cast, or (ii) for a person engaged as a stand-in or dance-in on a day on which he does not otherwise perform or rehearse. On Award Programs in excess of one (1) hour, the minimum call shall be four (4) hours and on prime time entertainment programs sixty (60) minutes or longer, the minimum call shall be three (3) hours. In lieu of the above, Producer shall have the option of paying stand-ins and/or dance-ins at the applicable fee provided that the Producer notifies the performer prior to the time the performer starts work on such engagement as dance-in or stand-in that the performer will be classified and paid as understudy.

B.(2) Stand-ins on dramatic programs shall receive $145 per day ($150 effective July 1, 2008, $155 effective July 1, 2009 and $160 effective July 1, 2010) subject to the applicable Exhibit A rules regarding length of the day.

C. If stand-ins and/or dance-ins are required to memorize or learn any material (such as dialogue, choreography, pantomime, or other performing routines), they shall be classified as understudies.

D. No performer during rehearsal shall be permitted to read any part other than his own, unless he is paid the applicable fee set forth in B. above, but persons other than performers may read the part of absent performers.

E. Paragraph 33 (Meal Periods) shall apply to Stand-Ins who work in excess of six (6) hours in a day.

37. **MULTIPLE PROGRAMS WHICH ARE PART SUSTAINING AND PART COMMERCIAL**

If a program is broadcast on a multiple basis (i.e., more than one (1) time a week) the compensation payable to any performer appearing on two (2) or more of such programs shall be the compensation applicable to the commercial program multiple rate if any one of such programs on which the performer appears is commercial.

38. **NOTICE ON MULTIPLE PERFORMANCES**

A. On all regularly scheduled programs such as serials, strip programs and the like, performers having a running part shall be given, not less than two (2) weeks notice of the engagement prior to the first broadcast in the weeks for which the performer is engaged for the multiple performance rates to be applicable. In the event such notice is not given, the performers shall be paid on the single performance basis.

B. In the event performer (who has performed the same role for five (5) consecutive programs on which the role was written in immediately preceding the day for which he was called on less than two (2) weeks notice) accepts another

45

## 38.A. VACATIONS

On regularly scheduled programs such as serials, performers having running parts or who are required to hold themselves available for such programs and to keep their commitments to a vacation of two (2) consecutive fifty-two (52) week period of such programs shall be entitled during each consecutive weeks if employed less than five (5) years or more on the program, three (3) weeks if employed for five (5) years or more on the program. For each vacation taken by a performer, the performer shall be paid or credited with vacation pay in the performer's individual performance rate times the average number of performances per week guaranteed.

If the performer performs the number of episodes per year guaranteed in his contract, such vacation pay shall be in addition to the amount guaranteed for that number of episodes. If the performer performs fewer than the number guaranteed in his contract, the amount allocable to the unperformed episodes may be credited towards such vacation pay, but only if provisions for such crediting are set forth in the performer's individual contract.

If, at the request of the Producer, a performer agrees to change or postpone a vacation period which has been approved by the Producer, the performer shall be reimbursed for any vacation expenditures reasonably attributable to the change in his/her vacation.

Subject to production requirements, producers shall consider the wishes of the performers on a program in scheduling vacation periods, and shall give the performers reasonable advance notice of such vacation period. If the performer gives the Producer at least eight (8) weeks' notice of the dates of his intended vacation, within one (1) week the Producer shall advise the performer whether the requested vacation can be accommodated, consistent with the story line and production requirements. If Producer denies performer's request for vacation, Producer shall, within one (1) week of such denial, supply performer with alternate vacation dates. If such alternate vacation dates are not agreeable to the performer, performer and Producer will, within ninety (90) days, meet and arrange mutually agreeable vacation dates. However, if these alternate vacation dates are not agreeable to all the performers on the program, this paragraph shall not be construed to require scheduling of a performer's vacation at the different time.

46

D. Call Board (Serial Performers Only) – All communications which refer to the cast in general shall be posted on the Call Board. A Call Board shall be maintained in the studio, and the wishes of the performers shall be considered in determining its location. The Call Board shall include a copy of the rundown sheet. Where the information is customarily posted by the Producer in writing, it shall also be posted on the Call Board: video tape or film pre-empted, line-up of the day, call sheets, dressing room assignments, instructions for day players, and background actors (e.g., person to whom they report, daily schedule, location of dressing rooms, make-up and hairdressing schedule), and any other general notices to the cast. All items posted on the Call Board are for general information purposes only and shall in no way obligate the Producer, nor shall the posting constitute official notice to the performer.

C. In the case of pre-recordings, the performer shall be notified in advance of his first scheduled call for the intended broadcast use of the program(s) to be recorded and payment shall be made accordingly pursuant to the provisions of Paragraph 6.1.A.6 of this Code. The applicability of the discounted rates for multiple performances in one (1) calendar week shall be determined by the broadcast use of the recording(s) or the use as cited at the time of the engagement, whichever is greater.

engagement and the Producer engages a substitute to perform in such role because of the unavailability of the original performer to perform, then in such case, the performer originally performing such role may not be replaced in the role over the next ensuing consecutive four (4) weeks during which the role is written in the script.

## 38.B. HOLIDAYS

Any serial performer who works on Christmas Day (December 25), Thanksgiving Day, New Year's Day (January 1), or the fourth holiday as determined below, in addition to the applicable minimum program fee for each day's work, a further payment equal to the applicable minimum program fee set forth above in this Code. No later than December 15 of every year each serial Producer shall designate a fourth holiday for the following year from the following list: Martin Luther King's Birthday, Memorial Day, (fourth Monday in May), July 4, Labor Day, Friday after Thanksgiving Day.

## 39. HAZARDOUS PERFORMANCES

A. No performer shall be required without his consent to take part in hazardous action or working under hazardous conditions. A performer taking part in hazardous action or working under hazardous conditions shall be paid additional compensation of $100.00 per stunt or stunt-related activity. The performer requested to perform a stunt or stunt-related activity shall be afforded the opportunity for prior consultation by the performer with such individual. The parties acknowledge it is not the intention of this Code as a matter of policy that performers employed hereunder are, to the extent possible, not be placed in circumstances hazardous, or dangerous to the individual. This, Paragraph A, shall not apply to specialty acts in the performance of their specialty where the nature of such act is hazardous, or to stunt persons.

B. The performer's consent shall be a requisite precondition to performing stunts or other hazardous activity, and shall be limited to the stunt or activity described to the performer at the time the consent is given. In particular:

(1) Where script or non-script stunts or stunt-related activity is required of a performer by a Producer, an individual qualified by training and/or experience in the planning, setting up and performance of the type of stunt involved, shall be engaged and present on the set. No performer shall be requested to perform a stunt or stunt-related activity without the opportunity for prior consultation by the performer with such individual.

(2) No performer shall be requested to work with an animal which a reasonable person would regard as dangerous in the circumstances, unless an animal handler or trainer qualified by training and/or experience is present. The performer shall have the opportunity to familiarize himself/herself with the animal, with the trainer present, in advance of being required to perform with the animal.

(3) No performer shall be rigged with any type of explosive charge of any nature whatsoever without the use of a qualified special effects person.

(4) Equipment provided by the Producer shall be in suitable repair for safe and proper performance of the stunt. Producers shall exercise care, including prior testing of equipment (breakaway props, etc.) during rehearsal, to avoid injury to the performer. Any Producer who has a studio and is responsible for production facilities (for himself or other producers hereunder) shall post in each studio in use, a panel of qualified physicians (where state law permits) with their names, addresses and telephone numbers who are readily available and on call in case of accident.

Persons involved in the planning and execution of a stunt shall be entitled to inspect any vehicle, mechanical device and/or equipment to be used in the stunt on the day prior to its use, provided it is available. No additional payment shall be due for any such inspection.

C. Producer shall grant all performers engaging in a stunt or non-scripted stunts adequate training time in the use of dangerous props and instruct performers in the use of props where necessary. Time spent in training in the use of props shall

47

be treated as rehearsal time. At no time shall Producer attempt to coerce the performer to engage in a hazardous stunt or action; and Producer shall discourage the performer from taking unreasonable risks.

D. A person qualified under the circumstances to administer medical assistance on an emergency basis shall be present or readily available at all rehearsals and all performances during which hazardous actions or work under hazardous conditions is planned. In the event Producer does not have such qualified person present or readily available, the performer(s) concerned or AFTRA may request that such a person be present or readily available, which request may not be unreasonably denied. AFTRA or the performer(s) may likewise request in certain situations that said qualified person be present and not merely readily available. Any such person will have visible identification.

E. In any instance in which fire is to be used in special effects, adequate fire safety precautions will be taken and, where warranted, an individual(s) qualified in fire control techniques will be present in order to provide for the safety of the performer.

F. Transportation to the nearest medical facility providing emergency services shall be readily available. When hazardous activity involving stunts is planned on location, the nearest emergency medical facility (including capabilities thereof and communication therewith) will be pre-determined in order to assure that transportation to such facility is available at all times during the performances of such work. If warranted by the nature of the stunt activity, the transportation should be capable of accommodating a stretcher and first aid equipment, but need not necessarily be an ambulance.

G. The Producers of entertainment programs and AFTRA agree to cooperate in the distribution of copies of all safety guidelines issued by the Industry-Wide Labor/Management Safety Committee.

## 39.A. WORK IN SMOKE & HAZARDOUS SUBSTANCES

A. All performers shall be given prior notice if work in smoke or hazardous substances is involved. If a performer is not notified, the performer may refuse to perform in smoke or hazardous substances and will nevertheless be paid a program fee or higher guarantee, whichever is greater. However, the above sentence shall not be construed to give the performer the right to refuse other work that day which does not involve smoke or hazardous substances, nor to mean that a performer is entitled to more than one (1) program fee or guarantee for any one (1) day's work. (Paragraph 39, section A., may also apply).

B. Producer shall comply with all Federal and State laws and regulations applicable to the use of substances utilized for the creation of smoke and other effects and the Industry shall cooperate with AFTRA to the end that information concerning such Federal and State laws and regulations is disseminated.

C. The Industry and AFTRA shall meet and, within six (6) months, shall attempt to reach agreement on a list of any substances which shall not be used for the creation of smoke and other effects. The Committee shall also attempt to agree upon the procedures to be followed in the use of permitted substances and guidelines for the maximum exposure time in smoke during any workday, taking into consideration all pertinent factors. The Committee shall meet periodically thereafter, on reasonable notice from either party, to review and update the list of any prohibited substances, the procedures to be used and guidelines to be followed.

48

## 40. PAYMENT FOR MULTIPLE SPONSORSHIP OF PROGRAMS

A. If a program is sponsored by more than one (1) sponsor, the compensation payable to the performer shall be based on the overall length of the program. As soon as any commercial message is incorporated into the program, the performer shall be paid at least the minimum commercial scale applicable to the entire program and no additional payment shall be due when additional commercial messages are incorporated.

B. If any station broadcasts a commercial announcement during any network program or if any network program is offered or made available for sale to sponsors on a local or regional basis; i.e., co-op, participating, the same or similar program which includes cued, or timed, allocations of public service or other announcements, which makes then available to local stations in such a manner as to enable local commercial broadcast local commercial announcements, such a program shall be considered a commercial program subject to all the terms and conditions of this Code.

## 41. COMMERCIALS ON SEGMENTED PROGRAMS

With respect to programs sold in segments, performers rendering services only in the commercial portions of a segment shall be entitled to compensation based on the length of the segment during which they rendered services; in the case of persons rendering such services on two (2) or more segments, for the same employer, the overall length of the program shall govern the minimums which are applicable.

## 42. REMOTES

There shall be no telecast pickups from any theatres, nightclubs, circuses, hotels, studios on location for pictures being made for theatrical use, and other places where such performances may take place, without the consent of the individual performers involved. Such performers shall be entitled to such additional amounts for such release as may be provided in their individual contract of employment or the applicable AFTRA scale, whichever is the higher.

## 43. COMPENSATION FOR TRAVELING AND LOCATION WORK

A. Location Work:

(1) Location Definitions:

Location work means any work requiring transportation to a location away from the Producer's regular broadcast studios.

Base refers to a broadcast studio building or the place where the performer normally works (home base), or the out-of-town hotel or headquarters to which the performer is assigned by the Producer for the duration of his assignment (out-of-town base).

(2) Daily Location Work:

Daily location work means location work on an assignment which does not require performer to stay away from home overnight.

When a performer is scheduled by the Producer to travel from his home on a daily location work assignment, he shall be credited with the time normally required to travel from his home base to such assignment. If such performer is scheduled to return to his home base from such assignment, he shall be credited with a like amount of time for the return to his home.

49

(3) **Overnight location Work:**

Overnight location work means work on an assignment at a location requiring Performer to stay away from home overnight.

On any day in which a Performer travels to or from an overnight location and performs work on the same day, the time spent in such travel, less any meal period, shall be added to the Performer's rehearsal hours.

Any time in excess of thirty (30) minutes required to get from the Performer's out-of-town base to the location or from the location back to the Performer's out-of-town base shall be added to the rehearsal time.

On any non-work day in which a Performer travels to or from an overnight location, performer shall be paid $75.00. On any non-work, non-travel day on an overnight location, the Producer will pay $75.00 (this is not applicable to serials).

Single hotel rooms, if available, will be provided to principal performers. Single hotel rooms, if available, will be provided to dancers if there are six (6) or fewer dancers.

B. **Rehearsal on Location (Not applicable to serials):**

Regular rehearsal fee and conditions shall apply for all time spent in rehearsal on location.

C. **Compensation for Traveling:**

(1) Performer shall be paid $30.00 for each day or part thereof when performer is required to travel more than twenty (20) miles from the broadcast center of New York, Chicago, Los Angeles or Washington D.C. This provision is not applicable to serials.

(2) This payment shall be in addition to first-class transportation and living expenses.

(3) First class transportation shall be provided in all cases. Coach or economy class on jet or turbo prop airplanes or regularly scheduled air lines shall be considered first-class transportation, provided no employee of the Producer represented by any other craft, guild, or union is furnished a higher class of air transportation on the same assignment. However, the provision of the preceding sentence shall be inapplicable to those cases in which the employee was furnished such higher class transportation by virtue of an existing collective bargaining agreement which has not been expired or-been renegotiated by the Producer subsequent to the negotiation of this Code.

(4) If the performer furnishes his own automobile he shall be paid in accordance with company policy, if the company has an established policy, but in no event less than $3.00 per day. If the Company has no established policy, the performer shall be paid thirty cents (30¢) per mile, but in no event less than $3.00 per day.

(5) When a performer is required to travel from home to an assignment on location, or vice versa, if transportation is not provided by Producer, the performer will be reimbursed for the reasonable expense of performer's travel between home and airport (or rail terminal) and hotel (or other destination designated by Producer). This sub-section does not apply to travel by commuter train or subway.

50

D. **Travel Insurance:**

When a performer travels at the request of the Producer in connection with an assignment to perform services for Producer on a program (including on any personal appearances for purposes of program promotion), anywhere inside or outside the continental limits of the United States, the Producer shall provide (at Producer's own cost) a $200,000.00 accidental death and dismemberment insurance policy covering the performer for such travel for the benefit of the performer or such beneficiary as the performer may designate.

E. **Serial Performers:**

All the provisions of this Paragraph 43 apply to serial performers except B. and C.(1). In addition, the following rules shall apply on overnight locations:

(1) Each day of work shall consist of ten (10) hours of work (exclusive of meal periods). Overtime at the applicable rate specified in 15.B.(1) Column I will be paid for the first two (2) hours which exceed ten (10) and at the applicable rate specified in Column II for the third and each successive hour of overtime on the first six (6) days in a given workweek. Hours worked on a seventh (7th) day in a given workweek shall be paid at the applicable overtime rate from Column I, except that those which exceed ten (10) shall be paid at the applicable overtime rate from Column II. These payments shall be in addition to any performance fee or excess workday payment due, if any. There shall be a minimum call of four (4) hours for work on a seventh (7th) day.

(2) Non-work days on overnight location shall be compensated at the rate of $130.00 per day for all principal performers, $105.00 per day for all live-line-or-class performers and $80.00 per day for all background actors.

(3) Travel time on a travel-and-work day shall be considered, and included with, work time for purposes of computing overtime for overnight location work. Travel time on a travel-only day shall not be considered work time; however, a travel-only day shall be paid at one-half (½) day for purposes of calculating the number of excess workdays, if any, to be paid for at the rates set forth respectively in Paragraph 2.A.(2)(b)(b), Paragraph 3.C.(2) or Paragraph 8.C.(2).

44. **PROGRAM AUDITIONS**

Program auditions are performances of programs which are used to determine whether the program shall be broadcast at a future date or time; such auditions may not be shown to the public generally or performed before a studio audience. Program auditions, whether for sustaining or commercial purposes, shall be paid at one-half (½) of the applicable commercial fees for programs of similar length. Rehearsal time beyond the included rehearsal hours shall be paid for at the full applicable rate specified for regular broadcasts.

45. **TALENT AUDITIONS, INDIVIDUAL VIDEO TESTS, AND INDIVIDUAL VOICE TESTS; CALLS FOR GROUP DANCERS**

A. Talent auditions, individual video tests, and individual voice tests are those try-out periods wherein a performer or a package act, or group of performers, is tested for ability, talent, physical attributes and/or suitability for inclusion in a broadcast and for which none of said performers shall be required to pass any special material or spoken lines or act in any special business, except that (i) in a talent audition for commercials, when the field has been narrowed down to not more than three (3) contestants, each of such contestants is permitted memorization of not more than ten (10) lines, or use of cue cards or familiarization with material, without compensation, for the final selection of the audition winner, and (ii) in a talent

51

audition for actors on dramatic programs, when the field for leads or running parts has been narrowed down to not more than three (3) performers, each of such performers is permitted memorization with material or familiarization with material or use of cue cards of up to three (3) minutes, without compensation, for the final selection of the audition winner. There shall be no fee required for this category provided that if the performer shall be required to learn special material or spoken lines or special business other than as permitted in exceptions (i) and (ii) of subparagraph A., the program audition rate set forth in Paragraph 44 of this Code shall be paid, measured in fifteen (15) minute units or the overall length of this program, whichever is less. It is the intention of this clause to afford the opportunity for performers to display their individual talents. This provision shall not be used by Producer to evade the terms of this collective bargaining agreement and the Producer agrees that this individual audition shall be reasonably exercised. If a general notice concerning an audition(s) is sent to talent agents, the same notice will be sent to the local AFTRA office nearest the location where the audition will be held. A joint Industry-AFTRA committee will be established to review matters relating to auditions.

B. Calls for background actors for all types of programs shall be limited to one (1) hour per person. In the event a background actor is called to a second audition or interview for the same show within Los Angeles County he shall be paid $3.00 or transportation expense.

C. With specific reference to group dancers, the producer agrees to give AFTRA timely notice of any audition call, so that AFTRA may notify its members of such call in time to respond to the audition call. In addition with respect to spectaculars, specials or other programs in excess of one (1) hour in length, auditions for group dancers shall be called within twelve (12) weeks prior to the first scheduled rehearsal day. If, after an audition, a dancer is called back for a further audition for a period in excess of two (2) hours, such dancer shall be entitled to the extra rehearsal rate ($20.00 per hour), measured in half-hour (½) increments, for the excess.

D. On dramatic shows only, calls for performers (except background actors) shall be staggered and each performer shall be limited to a call of one (1) hour. If the Producer requires the performer to remain on a call in excess of one (1) hour, the performer shall be entitled to $20.00 per hour, measured in half-hour (½) increments.

E. Professional performers shall be auditioned or tested first in any tryouts for performances covered by this Code.

F. The following provisions are applicable to serial performers in running parts requested to participate in an audition:

(1) If a performer is in a running part is requested to participate in an audition(s) on a day on which the performer otherwise works, the hours of the audition shall be treated as time worked.

(2) If a performer in a running part is requested to participate in an audition(s) on a day on which the performer is not otherwise working, the performer shall be paid:

| Length of Call | Program 30 Minutes or Less | Program 60 Minutes or More |
| --- | --- | --- |
| 4 Hours | $150.00 | $200.00 |
| Over 4 Hours | 300.00 | 400.00 |

Such day shall not be treated as a day worked for purposes of Paragraph 2.A.(2)(b)(ii).

52

---

46. **DOUBLING**

A. No doubling will be permitted the on- or off-camera in the entertainment portion of any dramatic program except upon payment of the full additional applicable fee to any performer who doubles, this sentence shall not be applicable to puppet shows and as set forth in Paragraph 1, below.

B. Multiple doubles are permitted on variety shows or when the program consists of a series of short different episodes such as but not limited to dramatized news broadcasts or historical sequences.

(1) Chorus singers also performing as actors on any variety show shall receive in addition to their fees (as singers) the applicable fifty percent (50%) of the applicable performer's program fee plus the performer's full extra rehearsal rate for any time spent in rehearsing their parts as actors.

(2) Group dancers also performing as actors or chorus singers (including lip sync required by Producer as defined in Paragraph 5.A.(11)), shall be paid the higher of the following two (2) amounts:

(a) To the amount computed in accordance with group dancer rates and conditions add fifty percent (50%) of either the applicable performer (principal performer or five-line-or-less) or chorus singer program fee; provided that (i) if only the five-line-or-less rate is applicable the dancer shall receive in addition to the group dancer rate and conditions fifty percent (50%) of the five-line-or-less program fee plus full extra rehearsal rate for the five-line-or-less category for any time spent in rehearsing that part; or (ii) if both the five-line-or-less and chorus singer rates would be applicable the dancer shall receive in addition to the group dancer rate and conditions fifty percent (50%) of the principal performers' program fee.

(b) The amount computed in accordance with the rates and conditions of the highest applicable category in which the group dancer performs.

(3) Group dancers and chorus singers may perform as background actors without additional compensation.

C. Participation in group noises shall not be considered a double and is permissible without additional compensation.

D. When a performer renders services in more than one (1) category on any program he shall receive not less than the highest applicable fee for any such category.

E. The minimum fee for performers on a program (whether in character or not) who participate in commercial announcements by reading lines shall be the applicable minimum fee for the performance plus the fee applicable to one (1) commercial announcement; but in no event more than one (1) full commercial announcement fee for all commercial announcements. Performers on the program who participate in character in commercial announcements but who do not read any lines shall not receive any compensation in addition to the applicable fee for the performance. The mere mention of the product advertised in the course of the performance shall not be considered participation in a commercial announcement.

F. Producer may have the option of classifying chorus singers as principal performers in which event, such performer automatically comes within all of the working conditions of that particular category.

53

Exhibit B, Page 104

G. If group dancers or chorus singers who are in the body of the program also perform in commercial announcements as singers or dancers, they shall receive (50%) of the commercial announcement fee for each such group singer but for all commercial announcements they shall not be entitled to more than the full fee applicable to group dancers or chorus singers engaged only for participation in commercial announcements.

H. If background actors who are in the body of the program also perform in commercial announcements as background actors, they shall receive for each such commercial announcement applicable to background actors, but in no event more than one (1) such full commercial announcement fee for all commercial announcements.

I. A background actor may perform as a stand-in provided he/she is compensated at not less than the highest applicable fee for either the background actor or stand-in category.

## 47. DEFINITION OF A LINE

A line shall consist of not more than ten (10) words, and part of a line shall be considered a line. It is the intent of the five-line-or-less category to include only those performers who have very minor parts to perform.

## 48. DEFINITION OF BACKGROUND ACTORS

Background actors are those performers who do not speak any lines whatsoever as individuals but who may be heard, singly or in concert, as part of a group or crowd.

The background actor rate shall be applicable for the performance, singly or in concert, of ordinary business including actions, gestures, and facial expressions portraying the background actor's assignment.

A background actor shall be upgraded to the five-lines-or-less category if he or she meets any one of the following three (3) conditions in a scene:

A. is addressed individually by a principal performer;
B. is alone in the scene;
C. speaks individually as part of a group or crowd,

and provided that such background actor receives more than minimal individual direction and portrays a point essential to the story.

A performer engaged as a background actor who is subsequently directed to speak at least one (1) line not as part of a group or crowd shall be paid the applicable principal or five-lines-or-less rate.

## 49. CAST CREDITS

All persons classified as performers who speak more than five (5) lines, announcers at their option, and specialty acts, shall receive cast credit, individual and unit respectively, provided that in no event shall the Producer be required to give more than fifteen (15) (or, in the case of serials, twenty (20)) cast credits on any program and provided further that on programs broadcast more than once a week the Producer shall not be required to give any such performer or act credit more than once during a week. In the case of serials, the Producer shall make a good faith effort to give credits on either Monday or Friday, but if

54

---

instead the credits are given on another day on which the serial is broadcast, it shall not be a violation of this Agreement. Producer agrees to properly administer the requirements of this Code with respect to cast credits. Such cast credits shall not be superimposed over commercial slides. Such individual credits shall be legible and provide character identification in addition to the performer's name. No cast credit identification shall be required when the performer plays himself or when he plays several roles. The Producer shall not be deemed to have breached this provision if cast credit is omitted due to unavoidable contingencies in connection with the broadcast of the program as distinguished from the recording of the program. Cast credit need be given as herein required only for appearances in the entertainment portion of the program (this last sentence is not intended to exclude credit to commercial announcements).

## 50. COSMETIC ALTERATIONS AND NUDITY

If a performer is required to grow a beard or mustache, or to shave his head, the performer shall be paid additional compensation of $35.00. No performer shall be expected to appear nude, except with the performer's consent after the performer has had an opportunity to read the script.

On a serial, in the case where any individual(s) other than performers and key production and creative personnel (as defined below), receives an air credit more often than once in a given week, the cast credit will be given in lieu of other, as often as that individual(s) is given credit. For the purpose of this paragraph, "key production and creative personnel" shall mean Executive Producers, Producers, Associate Producers, Writers, Directors, and individuals responsible for the creative or continued development of the series. This shall not be applicable in a situation where an individual (other than one exempted above) will receive credit more than once a week as a result of an unanticipated change in the programs to be aired in a particular week.

## 51. DRESSING ROOMS

A. Adequate, clean and accessible dressing rooms and toilet facilities shall be provided. Dressing rooms with adequate locks or facilities for locking or checking valuables shall be provided, or in their absence, adequate insurance against loss must be provided. Private or semi-private dressing rooms shall be provided to principal performers where such dressing rooms are available in the studio facility. A quiet area in which to study lines shall be available to performers who are not provided with private or semi-private dressing rooms.

B. Seats shall be available for all performers in the dressing rooms and, during rehearsal, on the stage or in the studio or theatre. Such seats shall be marked "for cast use only" except in rehearsal halls, theatres and studios having accessible audience seating facilities.

C. Adequate space affording complete privacy shall be provided whenever a performer is required to make a complete change in connection with any performance.

D. Facilities for repair of wardrobe used in the performance shall be provided.

E. When dramatic and variety programs go on location, Producer has the obligation to provide and shall provide adequate sanitary facilities. Dressing rooms adequate for comfort, cleanliness, privacy and accessibility shall be provided, taking into consideration the number of performers and the legal and/or logistical difficulties

55

involved, such dressing rooms shall be separate for each gender. Heaters or fans and appropriate protection from the sun shall be provided as needed. The Producer's obligation shall receive full consideration in the Producer's survey of any location site.

At the time the Producer plans to have performers in a dramatic or variety program work on location, the Producer will notify those of the cast concerned and AFTRA. At the time and place designated by the designated representative of AFTRA, the Producer will review with the designated representative of AFTRA, the elements of the location survey with respect to facilities such as dressing rooms, sanitary facilities and facilities for securing valuables. Producer agrees to provide such information as is available at the time the request is made, and to consider AFTRA's recommendations, consistent with the logistics of the location and economic constraints.

## 52. MINIMUM SCALES

Producer agrees that he will make no contract with any performer at terms less favorable to such performer than those contained in this agreement and make no changes or alterations of those provisions without the written consent of AFTRA.

## 53. PROGRAMS ON MULTIPLE STATIONS COMMONLY OWNED

A. Producer may pay the special program rates set forth in this Code on any program which is produced for broadcast on multiple stations commonly owned, provided that such program:

   (1) utilizes the services of two (2) or more actors, comedians, singers, dancers, performers in specialty acts, background actors or puppeteers, and

   (2) satisfies the conditions set forth in subparagraph B. below.

Such special program rates may be paid to all persons covered by this Code who perform in such program. However, the applicable special program rates shall apply to any program covered by this Code which does not satisfy all of the conditions set forth in subdivisions (1) and (2) above.

B. The special program rates referred to in subparagraph A., are applicable to programs whether sustaining or commercial which are broadcast only on stations owned by the same person, firm or corporation, provided that such special rates are limited to programs produced after March 1, 1964. However, if a program produced after that date is part of an existing program series, such special rates shall not be applicable to performers who have previously been engaged for programs in such series.

C. Paragraph 11 (Sustaining Programs) of this Code is not applicable to the special program rates referred to in subparagraph A.

D. In the event Producer broadcasts a program covered by subparagraph A. and B. above, on a television network as defined in Paragraph 71 of this Code rather than on multiple stations commonly owned, each performer shall be paid the difference, if any, between the special program rate and the applicable commercial or sustaining network program rate. The aforesaid payment shall also be made and the program shall be considered a network program for purposes of this Paragraph 53 if such program is broadcast by any television station other than one under the same ownership as the station or stations for which the program was originally produced or broadcast.

E. The replay fee applicable to programs covered by subparagraph A. and B. above on which the performers were paid at the special rates referred to therein shall be

56

## 54. EXCLUSIVITY

With respect to term engagements for dramatic and variety shows and serials, Producer is prohibited from requiring the performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period of the program covered by such engagement; provided, however, that this prohibition shall not apply if the artist's compensation for a thirteen (13) week period is at least $6,500.00 ($8,000.00 for all such compensation for or after November 16, 2008) (or in the case of a serial performer, at least $8,500.00 ($10,500 for all contracts entered into on or after November 16, 2008) for programs of under one (1) hour, $13,000.00 ($15,000 for all contracts entered into on or after November 16, 2008) for programs of one (1) hour or more) or a proportional sum for any longer period of time. This Paragraph is not applicable to multiple performances within one (1) calendar week, except on serials.

## 54.A TERM CONTRACTS - SERIALS

The length of term contracts between the Producer and an actor on a serial program shall be subject to the following limitations upon renewal and cancellation.

A. If the contract is an original agreement for a term of two (2) years or more, any portion of the term extending beyond the initial twelve (12) months must, if cyclical, be in cycles of at least twenty-six (26) weeks each. Any period which is the first or second cycle of any such contract may be adjusted in order to synchronize the performer's contract cycles with those of other performers on the same program. If this adjusted cycle is less than eight (8) weeks in length, it shall not count for the purpose of determining the period after which new cycles must be at least twenty-six (26) weeks; if such adjusted cycle is eight (8) or more weeks in length, it shall be counted for such purpose.

The Producer must specify in the original agreement which cycle, if any, will be adjusted and the specific time period of such adjusted cycle.

B. If the contract is a renewal agreement (i.e., for a term beginning at the end of an earlier term which was not subject to extension or renewal except by mutual agreement) for a term of eighteen (18) months or more, it must, if cyclical, be in cycles of at least twenty-six (26) weeks, irrespective of the length of the original agreement; provided that the initial cycle of any such contract may be made shorter than twenty-six (26) weeks in order to synchronize the performer's contract cycles with those of other performers on the same program.

C. All serial contracts must provide a per episode fee and a guaranteed minimum number of episodes.

With respect to all term contracts divided into cycles of twenty-six (26) weeks or less, in order for a Producer to average a performer's guarantee over a period of up to one year, a Producer's personal service contract must so specify. If such personal service contract does not so specify, the guarantee cannot be averaged over any period of time in excess of the performer's then current cycle, except that if the cycles provided in the first year of the performer's employment contract are less than twenty-six (26) weeks, the first and second cycles may be combined for purposes of averaging the guarantee and the third and fourth cycles may be combined for purposes of averaging, but in no event shall the combined period be more than twenty-six (26) weeks. It is understood that a

57

performer's guarantee may, in any event, be averaged over a cycle (or other guaranteed term) which is in excess of twenty-six (26) weeks. This provision shall be applicable to all contracts entered into or renewed thirty (30) or more days after March 12, 1993.

D. Cancellation of the contract shall require at least four (4) weeks' notice of the cancellation before the end of any cycle (except where cycles of at least twenty-six (26) weeks are required pursuant to A. or B. above, in which case six (6) weeks' notice of cancellation before the end of any such cycle shall be required).

E. Where a performer on a serial program has been employed for more than fifty-two (52) weeks under any one contract or extension or renewal thereof, his individual contract of employment may not be cancelled because of unavoidable absence for a period not in excess of four (4) weeks where such absence is due to illness (including pregnancy) provided, however, that if such illness occurs at a period when Producer has the right to cancel such contract, this provision shall not in any way affect such right.

Except as otherwise provided in subparagraph D. above, the foregoing limitations shall not preclude the Producer from cancelling an actor's term contract by reason of breach of contract, failure or inability to perform, non-performance and the like, program termination, or cessation of production because the program goes off the air.

F. Where notice is required under this Code of cancellation of a term employment contract, such notice shall be given in writing to the party(s) designated in such term contract in time, day or place (with a copy to AFTRA, provided that failure to give a copy to AFTRA shall not be deemed a failure to effectuate such notice.

G. An employment contract (or deal memo reflecting the essentials of the agreement reached) will be delivered to the performer or performer's agent not later than the commencement of the performer's first performance day, except where the circumstances do not allow sufficient time to provide such contract or deal memo. The performer, or performer's agent, will be given a reasonable opportunity to review such contract or deal memo before being required to sign.

At the time of scheduling the first performance under a performer's individual contract, the Producer shall inform the performer of the date of the beginning and of the end of each cycle of such contract, subject to adjustment as permitted by cycle adjustment provisions set forth in such contract.

H. The Producer shall use either the first day of the work-week of the performer's first air date or production date, as the case may be, as the basis for determining cycles for purposes of calculating performers' guarantees, and except as otherwise specified in the performer's individual contract, the guarantee of each performer on a particular serial shall be calculated on a basis consistent with the policy, practice or procedure established by the Producer with respect to performers on that serial.

No individual contract under this Code shall permit the Producer to change at will the date used as the basis for calculating a performer's guarantee pursuant to the preceding sentence. Nothing in this paragraph shall be construed to affect any obligation with respect to time of payment, (or any existing waivers specifically agreed to by AFTRA and Producer prior to November 16, 1991).

If a performer is signed to a term agreement of one (1) year or longer in duration and performer relocates his/her residence to accept the employment, performer must be provided with a one (1) way coach airline ticket back to the point from which the performer relocated or, at the option of the performer, the cash equivalent of such ticket, if performer's employment is terminated before the end of his/her first year of employment.

58

55. ENGAGEMENTS

A. Each performer shall have specific notice of the part to be played, place of rehearsal, number of guaranteed days of employment, if any, and not later than the first reading session (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session), the rehearsal schedule (times and dates) scheduled for such performers having running parts or who are required to hold themselves available for such programs shall be given schedules showing days off and place of reporting to work at least seven (7) days in advance. In addition, in the case of a live broadcast, each performer shall have specific notice of the date of broadcast (scheduled final performance day), time and place of broadcast, and time of live re-broadcast, if any. In the case of a pre-recorded program, each performer shall have specific notice of his scheduled final performance day.

On Serials, the Producer recognizes the importance of providing the cast with scripts sufficiently in advance to allow the performers to memorize their lines; prompting devices will be provided where scripts are not made available to performers at least seventy-two (72) hours prior to their calls.

B. The total number of hours and the total number of days of work, as shown on the rehearsal schedule, shall not be reduced. However, the time of any rehearsal may be changed to another time if the performer is given twenty-four (24) hours notice of such change in time or day, and any place of rehearsal may be changed to another place in the same city on reasonable notice; provided that any such change in time, day or place does not conflict with any bona fide engagement contracted for by the performer prior to the giving of such notice.

C. Producer agrees that he has notice of AFTRA's rule concerning abuse of "ready to go" calls.

D. A performer engaged as a principal performer in a running part may not be downgraded.

56. OVERSCALE CONTRACTS

A. Any artist who is engaged to perform services at scale, or under terms or conditions over and above the minimum scales, terms or conditions provided for in this Code and nevertheless have the protection and benefit of all other provisions and conditions of this Code and, provided, further, that any artist for any engagement is above the minimum specified herein, additional services at applicable minimum fees for such engagement may, except as otherwise specified in this Code, be credited by the Producer up to the full amount of the compensation paid to such artist if there is a specific provision to such effect in the artist's written contract, or if in the case of a verbal engagement, it is specifically agreed at the time the verbal engagement is entered into that the sponsor or Producer is entitled to such credit provided however, that late payment penalties may not be credited against overscale compensation; further provided, that wardrobe fees may be credited only against that portion of paid or guaranteed overscale compensation which exceeds one hundred-twenty percent (120%) of scale.

Notwithstanding the foregoing, for performers, except those under contract as series or program regulars, engaged to perform services at less than $2,500.00 per program, the sponsor or Producer shall specify in the performer's written contract the particular terms of compensation that shall be credited against the performer's overscale compensation. The preceding sentence shall be applicable to contracts entered into after June 10, 1993, and shall not apply to serials.

59

B.  With respect to oversale artists who are engaged for $950.00 ($1,500.00 for all contracts the original term of which begins on or after November 16, 2008) or less per program, the Producer may require for the contract price the maximum number of rehearsal hours that the Producer may require per the contract price shall be specified by the Producer at the time the engagement is confirmed; and any rehearsal hours used in excess thereof shall be paid for at the applicable rehearsal rate, and such payment shall be in addition to the contract price. In the event the subparagraph A, against the artist's overscale compensation, and may not be credited under his full contract price, and in that event may credit the Producer be entitled to engagement was originally confirmed, the artist shall nevertheless be entitled to Producer fails to use all the rehearsal hours so specified by him at the time the under subparagraph B, shall be calculated on the basis of the rehearsal hours actually used. This subparagraph B shall not apply to contracts having a non-cancellable term of thirteen (13) weeks or more.

**57.  ADDITIONAL SERVICES**

No service of the performer is contracted for except as specified herein. This paragraph is not intended to prevent the performer from contracting for services of a kind not covered by this agreement by individual contract as such rates of pay and under such conditions as the performer and the performer shall agree, subject only to the fact that it shall not be in conflict with this agreement.

C.  With respect to serial performers under an individual contract which may be over and above the minimum terms and conditions specified herein, payments under this Code for the following specified items may not be credited against any portion of a performer's compensation: fees, meal period penalties, overtime (including sixth and seventh day payments), short turnaround payments, travel payments, cosmetic alteration fees, hazardous performance payments, and doubling fees.

**58.  CANCELLED INDIVIDUAL ENGAGEMENTS**

In the event the performer's engagement for the program is cancelled, Producer agrees, nevertheless, to pay the performer in full for all contracted time, as herein specified, except where cancellation is for gross insubordination or misconduct. Producer agrees that after the engagement is made, the risk of performer's incompetence is assumed by him.

**59.  CANCELLED PROGRAMS**

A.  If the recording of a program, or broadcast in the case of a live program is prevented by governmental regulation or order, or by a strike, or by the failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of said broadcasting facilities due to causes beyond the reasonable control of said Producer (such as the collapse of a transmitter due to structural defects), the Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case the Producer shall reimburse the performer for all out of pocket costs necessarily incurred in connection with such program. In addition, the performer shall be paid the full applicable rehearsal time for all hours released prior to notice of cancellation.

B.  The same consequences shall ensue if the program time is preempted by a Presidential broadcast, a news emergency or the release of a special news event and notice of cancellation for such purpose is given the performer promptly upon such notice having been received by the Producer.

C.  If a substantial portion of a program or an element essential to the program is not shown because a program is interrupted for any of the reasons cited in subparagraph A, and B, above, the network or station(s) whose broadcast of such

60

program was interrupted shall be entitled to rebroadcast the interrupted program in its entirety within a thirty (30) day period following the interrupted broadcast without incurring any additional payment to any performers in that program.

D.  If a lawful strike should prevent or interrupt the production of a program covered by this Code, any performer on the program (other than a star performer) who is bound to Producer by an exclusive term agreement may accept other work during such strike; provided that such performer shall be and remain subject to immediate recall by the Producer.

E.  The following provision is not applicable to serials:

When the production of a program is prevented, suspended or postponed by reason of the illness of a series regular, the Producer shall have the right to suspend the services of all series regulars and series non-regulars, for the duration of the production which gave rise to such suspension; provided, however, such suspension shall not exceed five (5) consecutive production days.

The series regulars shall be paid a day's salary for each day or part thereof the performer is required and actually reports to work prior to such suspension if production which commences upon the conclusion of the suspension is on the same program other than the one for which the suspension was called, the days the series regular is required and actually reports to work prior to such suspension shall be added to the days worked after the production is recommenced for purposes of calculating the series regulars' work time on that program.

The series non-regulars shall be paid a day's salary for each day or part thereof the performer is required and actually reports to work prior to such suspension provided that production which commences upon the conclusion of the suspension is on the same program for which the suspension was called, the days the series regular is required and actually reports to work prior to such suspension shall be added to the days worked after the production is recommenced for purposes of calculating the series regulars' work time on that program.

If production on the suspension is on a different program, and/or if a series non-regular has a bona fide professional commitment which conflicts with the resumption of his/her services on the program, the series non-regular shall be deemed terminated and shall be compensated for a cancelled individual engagement as provided in Paragraph 58.

Any guaranteed employment for a series regular under his/her personal services agreement may be extended by the period of such suspension by giving written notice to such effect not later than the date of resumption of production following such suspension, unless the performer has a bona fide prior professional commitment which would conflict with such extension.

F.  Producer agrees that a specific reference to Paragraph 59, "Force Majeure, Suspended or Cancelled Programs," shall be included in all contract performer personal service agreements entered into after April 11, 1993).

Where the engagement is cancelled or prevented for any reason other than those stated in subparagraphs A, or B, or E, above, or where insufficient advance notice has been given under subparagraphs A, or B, above, the Producer shall pay the performer his/her full contract price for the program so cancelled or prevented.

61

Exhibit B, Page 108

## 60. POSTPONED PROGRAMS

### A. Applicable to Non-Serials:

If a postponed recording of a program or broadcast in the case of a live program involves a change in the call of the performer to another day, the producer of such program shall not be required to pay a performer for such postponement provided: (1) the performer has been given notice of the postponement at least forty-eight (48) hours prior to the time the performer's scheduled call, and (2) the performer is notified within fourteen (14) business days from the notice of the postponement of the date to which the performance is to be rescheduled. In the event that a recording of a program or broadcast in the case of a live program is postponed to a later hour of the same broadcast day (such change not having been made known to the performer twenty-four (24) hours in advance), then the hours intervening between the originally scheduled time for the performance and the time of the actual performance, shall be considered as a delayed rehearsal time. In the event that the postponed call conflicts with performer's *bona fide* prior professional commitments, the original call shall be considered as a cancelled individual engagement for which he/she shall be paid pursuant to Paragraph 58. However, in the event that the performer declines to perform on the rescheduled date for his/her *bona fide* prior professional individual engagement, the producer shall be relieved of any obligation for the rescheduled date for performance date. Subject to the above provisions, the change of a performance from a live to a pre-recorded basis shall not be deemed to be a cancelled program. If a program is postponed more than once, payment to the performer must be made pursuant to Paragraph 58.

### B. Applicable To Serials:

Where the recording of a program or broadcast or portion of a program or broadcast for which a performer is engaged is postponed, the postponed engagement shall be counted as an additional day.

## 61. PAYMENT

### A.

Except as otherwise provided in this Paragraph A, and in the advance payment provisions of Paragraph 19.C., payment to all performers shall be made not later than Thursday after the week during which such performance engagement took place or in the case of a pre-recorded program, after time of final rendition of physical services. For this purpose, the workweek shall end at the close of business on Saturday. The minimum then shall be net to the performer and no deductions whatsoever (except for state and local withholdings as are required or authorized by law). Payment shall be made directly to the performer unless written authorization to some other person, with a copy of such authorization to be delivered to AFTRA by performer. Not later than the date of first rehearsal, the Producer shall furnish a W-4 form (and, at the performer's request, a non-resident state income tax form if such forms are issued and available to the Producer) to each performer who has not previously filed such form with the Producer. The performer shall complete and return said form promptly to the Producer. If a performer under a term contract for thirteen (13) weeks or longer so requests, Producer shall pay such performer one-thirteenth (1/13th) of the performer's thirteen (13) week guarantee each week, and make any adjustment or additional payments that may be necessary at the end of the cycle. Payment to term contract performers in accordance with the preceding sentence shall constitute timely payment.

### B.

Penalty for Late Payment: In the event Producer fails to make timely payment, as provided in the preceding subparagraph A, the following penalty payments shall be added to the compensation due and payable to whichever performer for each day (beginning with the day following the date of default) on which payment remains not made or received:

$5.00 for each day

up to a maximum penalty payment of $150.00 (30 days); thereafter the penalty payment shall cease, unless AFTRA or the performer serves or has served upon the designated representative of the Producer (if no specific representative is designated, the management official of the Producer who is AFTRA's regular contact) by certified mail, return receipt requested, a notice that the default continues, in which event the penalty shall resume on receipt of such notice and shall continue until payment is made, provided, further, however, that Saturdays, Sundays and legal holidays which Producer observes shall not be counted when the performer fails to furnish W-4 form promptly, or when the performer having been furnished an engagement contract has failed to furnish the signed contract promptly, or when there is a *bona fide* dispute as to compensation.

### C.

All required payments of additional compensation for replays and foreign uses, unless included with or in the payment made pursuant to subparagraph A, above, shall be made to AFTRA, payable to the order of the performer entitled thereto, or to a person designated in accordance with subparagraph A. Compliance as to a person designated in accordance with subparagraph A. AFTRA shall promptly forward each such check, and not be liable to the performer, or to a person designated in accordance with subparagraph A. If Producer fails to make payment for replays within thirty (30) days after the time specified in Paragraph 73.B., or for foreign use within the time specified in Paragraph 73.F.(2)(e) but thereafter makes payment within thirty (30) days after such payment became due, Producer shall be liable for a penalty of five percent (5%) of the overdue amount which sum shall be added to the compensation due and payable to the performer. If payment is not made within thirty (30) days after such payment became overdue, for each additional month of five percent (5%) (based on the amount of one-hundred percent (100%) (5%) penalty on which such thirty (30) pay period Producer shall remain liable for such five percent (5%) penalty, but shall not be liable for any further penalty unless and until he receives written notice that a payment is more than thirty (30) days overdue, in which event he shall be liable for an additional penalty each month of five percent (5%) (based on the amount of the compensation which then became overdue) up to a maximum penalty of one-hundred percent (100%) of the amount originally due and payable to the performer. The penalties set forth in this subparagraph shall not be invoked or payable when the penalty has failed to furnish the signed contract promptly or when the performer, having been furnished an engagement contract on or before thirty (30) days, fails to return the signed contract promptly, or when there is a *bona fide* dispute as to compensation.

### D.

To the extent practicable, payments to performers shall be accompanied by a breakdown of the earnings included in the payment. With regard to earnings for which a breakdown is not provided, for a reasonable period of time the Producer shall make earnings breakdown information available to the individual performers upon request.

For unemployment insurance purposes, the Producer will supply performers with the employer of record's name, address, state identification number (if any) and, upon request, dates worked and whether the payment is for residuals.

62

63

62. **DEDUCTIONS FOR SOCIAL SECURITY AND WITHHOLDING TAXES**

Social Security and withholding taxes shall be deducted from all employees covered by this Code regardless of whether they are part-time or full time, staff or freelance employees.

63. **DISABILITY INSURANCE**

In states which have state disability insurance laws requiring deductions, such deductions shall be noted on the checks or statements given to the performer. The check or statement should also include the employer's name or registration number in those states where unemployment insurance laws require that such information be given to the employee by the employer.

64. **NON-WAIVER OF RIGHTS**

The acceptance by a member of AFTRA, for any work or services under this Agreement, of payment or other consideration, shall in no way operate as a waiver of any rights deemed a waiver by such AFTRA member, which AFTRA member is entitled to receive at such AFTRA member's rights either as a release or discharge by him, subject to this Agreement, for additional compensation or of this contractual rights. Releases, discharges, notations on checks, cancellations, etc., and similar devices which may operate as waivers or releases shall be null and void to the extent provided for above unless such AFTRA prior written approval is first had and obtained.

65. **NOTICE ON GROUP SINGERS, GROUP DANCERS AND ANNOUNCERS**

Any individual member (not under contract) of a singing or dancing group, or an announcer, who has appeared on six (6) or more consecutive programs shall receive at least two (2) weeks' written notice of discharge except for cause. However, any member who auditions for a program, as a member of a group, shall, in the event that said group is accepted for the program, be considered to be a member of said group and may not be discharged without justifiable cause such as inability to discharge by him. Additions to the remain on the program for a period of thirteen (13) weeks, whichever is less.

66. **INDIVIDUAL CONTRACTS**

Notice of this agreement will be given to AFTRA members, and they will contract subject thereto, and as to such Producers who either sign this agreement or signify their intention to abide thereby, the member will sign contracts subject to the fulfillment of all obligations of such Producer hereunder. In the event that the AFTRA National Office requests a copy of the personal contract of a performer, the Company will supply such contract to the AFTRA National Office when requested on a selective basis provided that it receives assurances from the AFTRA National Office that it has a *bona fide* need for such contract on a particular program in connection with a potential grievance, for this purpose.

67. **STANDARD CLAUSE FOR INDIVIDUAL CONTRACT**

Every contract (whether written or oral) between Producers under this Code and any Artist must contain and shall be deemed to contain the following clause:

1. "Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed by all parties hereto:

   That they are bound by all the terms and provisions of the applicable AFTRA Code of Fair Practice for Network Television Broadcasting, including payment of Supplemental Market fees. Should there be any inconsistency between this contract and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation or conditions provided

64

---

for in this agreement which are more favorable to members of AFTRA than the terms, compensation and conditions provided for in said Code of Fair Practice.

2. That the performer is covered by the provisions of Paragraph 102 of said Code entitled 'AFTRA Health and Retirement Funds' and Paragraph 102A entitled 'AFTRA Industry Cooperative Fund.'

3. That the performer is or will become a member of AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS in good standing, subject to and in accordance with Paragraph 84 of said Code of Fair Practice.

4. All disputes and controversies of every kind and nature arising out of or in connection with this contract shall be determined by arbitration in accordance with the procedure and provisions of the AFTRA Code of Fair Practice for Network Television Broadcasting.

68. **STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK**

Every engagement for a single television broadcast or for multiple television broadcasts within one (1) calendar week shall, if in writing, be on the following standard form of contract, and if oral, shall be deemed to be on such standard form. Additions to the standard form must be in favorable to the performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code.

**STANDARD TERMS AND CONDITIONS**

1. Performer shall render Performer's services in connection with this engagement to the best of Performer's ability, and subject to Producer's direction. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer will refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and leads into and out of such commercial inserts.

2. The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies, may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

(a) Performer shall indemnify Producer, the sponsors and their advertising agencies, the network, and all stations in the program against any and all claims, damages, liabilities, costs and expenses (including reasonable attorney's fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith, Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. The fact that a program is pre-recorded and subject to editing shall in no way alter the respective indemnities set forth herein or in any way alter the respective responsibilities of Performer or Producer for anything said or done in connection with any program. Each party will give the other prompt notice of any such claims and/or of legal proceedings and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

65

(b) If this Agreement requires, as an express additional proviso, that Performer furnish materials (herein called "required materials") in connection with performance hereunder, Performer shall furnish all such required materials to Producer at such time prior to performance as Producer may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this Agreement under the heading "Additions," be and remain the property of the Performer.

3. In full payment for Performer's services and the rights and privileges granted to Producer hereunder, Producer shall pay Performer the compensation herein specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to produce or broadcast the program or to use Performer's services or materials, if any.

4. The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean any recording or recordings made whether before or during a broadcast transmission, by mechanical or electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereafter devised. All recordings, as between Producer and Performer shall be the Producer's sole property, but shall be subject to the restrictions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing. Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) to make adjustments necessitated by mechanical failures, or adjustments or corrections in performances after the date of performance, provided that such re-recording is done not later than seven (7) days after the broadcast in the case of a live program or seven (7) days after the date Performer's final performance day in the case of a pre-recorded program, and at a time which does not conflict with Performer's other bona fide commitments, and provided, further, that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said AFTRA Code.

5. If the recording of the program, or broadcast in the case of a live program hereunder is prevented by government regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond the reasonable control of the Producer (such as the collapse of the transmitter due to structural defects), Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented, provided that in such case the Producer shall reimburse Performer for all out of pocket costs necessarily incurred in connection with such program. In addition Performer shall be paid the full applicable rehearsal rate for all hours released prior to notice of cancellation. The same consequences shall ensue if the program time is preempted by a Presidential broadcast, a news emergency or the telecast of a special news event and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer. Where the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6. Producer is prohibited from requiring Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if Performer's compensation for this engagement shall be $1,500.00 or more.

7. Notwithstanding any provision in this agreement to the contrary it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable AFTRA Code of Fair Practice for Television Broadcasting, including payment of Supplemental Market fees. Should there be any inconsistency between this Agreement and the said Code of Fair Practice, the said Code compensation, or conditions provided for in this provision shall effect terms, shall prevail; but nothing in this provision shall affect terms, compensation or conditions provided for in this Agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b) That Performer is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Health and Retirement Fund" and Paragraph 102-A, entitled "AFTRA Industry Cooperative Fund."

(c) That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the Union Shop provision of said Code of Fair Practice.

(d) All disputes and controversies of every kind and nature arising out of or in connection with this agreement shall be determined by arbitration with the procedure and provisions of the said AFTRA Code of Fair Practice.

(e) Producers will recognize that it is AFTRA's intent to assure that its members receive from Producer or any of its agents or creditors, treatment befitting the professional character and nature of its members.

8. This Agreement, when executed by Performer and Producer, shall constitute the entire understanding between them, and shall be construed according to the laws of the State of _____ , applicable to contracts fully performed therein.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA AND ARE NOT PART OF STANDARD FORM

## STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK

Between _____ hereinafter called "Performer,"
and _____ Dated: _____
_____ hereinafter called "Producer,"

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played.

TITLE OF PROGRAM: _____

TYPE OF PROGRAM: Sustaining ( )   Commercial ( )   Closed Circuit ( )

SPONSOR (if commercial): _____

NUMBER OF GUARANTEED DAYS OF EMPLOYMENT: _____
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE*: _____

SCHEDULED FINAL PERFORMANCE DAY: _____

AFTRA CLASSIFICATION: _____

PART TO BE PLAYED: _____

COMPENSATION: _____

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: _____
(if Par. 56B of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

_____          By _____
Performer                                              (PRODUCER)

_____
Telephone Number

_____
Social Security Number

Note: Attach rehearsal schedule or deliver to Performer not later than the first reading session, (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session).

* Subject to change in accordance with AFTRA Code.

68

---

## STANDARD AFTRA ENGAGEMENT CONTRACT FOR STUNT PERFORMERS FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK

Between (Name and Address) _____ Dated: _____
called "Stunt Performer," and, _____ hereinafter
_____ hereinafter called "Producer,"

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the stunt(s) to be performed:

TITLE OF PROGRAM: _____ EPISODE #: _____

TYPE OF PROGRAM: _____

DATES: _____

LOCATION: _____

STUNT(S) TO BE PERFORMED: _____

AFTRA CLASSIFICATION: PRINCIPAL PERFORMER

COMPENSATION: _____

STUNT ADJUSTMENT(S) (if applicable): _____

ADDITIONAL TERMS AND CONDITIONS (e.g., equipment): _____

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any, except for stunt adjustment(s) (if applicable), payment for which is agreed upon after the stunt is performed.

_____          By _____
Stunt Performer                                     (PRODUCER)

_____
Telephone Number

_____
Social Security Number
Corporate Tax ID Number, if any

69

Exhibit B, Page 112

## 68.A. STUNT PERFORMERS

**A. Additional Stunt Work:**

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.

(1) Changes required prior to performance. If such required change occurs prior to the taping or televising of the stunt, the stunt performer shall advise the Producer before the stunt in question is taped or televised if the performer wishes to negotiate additional compensation for the additional work required. Such negotiation may occur either before or after the performance of the stunt; however it is expressly agreed that the production shall not be delayed for the purpose of first determining the compensation for the stunt.

(2) Changes required during performance. If the Producer requires such a change during the taping or televising of a stunt, the stunt performer shall advise the Producer at the earliest reasonable time after completion of such stunt that he wishes to negotiate additional compensation for the additional work and shall have the right to so negotiate such additional compensation after the stunt is taped or televised.

**B. Stunt Performers - Sanitary Wardrobe:**

Stunt performers shall not be required to wear wardrobe that has not been properly cleaned after prior use by another person.

**C. Protection of Stunt Performer Safety:**

(1) All reasonable requests and requirements for safety equipment in connection with performance of stunts shall be complied with by Producer or Producer's representative on the set or location.

(2) Equipment provided by Producer, for example, autos, cycles, wagons, etc. shall be in suitable repair for the safe and proper performance of the stunt.

(3) If there is a change in a planned stunt which makes it substantially more dangerous, the stunt performer may refuse to perform the stunt as changed.

## 68.B. STUNT COORDINATORS

(1) Dramatic Programs (other than serials). The terms and conditions of employment for stunt coordinators employed on dramatic programs other than serials shall be those applicable to stunt coordinators employed under "H" deal contracts" as set forth in Exhibit A.

(2) Serial Programs. A Producer shall make contributions to the AFTRA Health and Retirement Funds pursuant to Paragraph 102 based on the stunt coordinator's individually negotiated salary for such work. This paragraph shall not require the application of any other provision of the Code to stunt coordinators.

70

## 69. SUPPLEMENTAL MARKETS: PAY TELEVISION; BASIC CABLE

**A. Supplemental Markets:**

The rights of Producer in television programs produced under this Code shall include the right to exhibit such programs in Supplemental Markets, subject to the provisions of the AFTRA Supplemental Markets Agreement, Exhibit D.

**B. Pay Television:**

The provisions applicable to the engagement of performers by Producer to perform on programs produced under this Code for initial release on Pay Television are set forth in Exhibit E (Pay Television, Video Disc/Videocassette provisions).

"Pay Television" (also known as Pay Cable), as used in this Code, means exhibition on a home-type television screen by means of telecast, cable, closed circuit or CATV where substantially all systems to which the program is licensed meet the following tests:

(1) Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(2) Where the subscriber pays for each program he selects (except that a program he selects for which only a token charge is made shall not be considered a Pay Television program); and/or

(3) Where the subscriber pays a fee for an encoded telecast or telecast which fee is a major charge relative to other fees paid for encoded telecasts. It is expressly understood that "Pay Television" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

**C. Basic Cable:**

Paragraph 69(c) of the 1979-82 Agreement contained the following provision:

"If Producer desires to engage performers to perform on any program produced primarily for release on more than one Basic Cable system (as distinguished from a program produced for Pay Television, as defined in subparagraph (b) of this Paragraph 69), Producer will give AFTRA notice of such desire not later than sixty (60) days prior to the date upon which it intends to engage such performers. AFTRA and Producer shall thereafter meet and bargain in good faith for the purpose of agreeing upon terms and conditions of employment and compensation for performers engaged by the Company to perform on such programs, and if no agreement is reached between Producer and AFTRA with respect thereto within sixty (60) days after commencement of negotiations, and if Producer then reaffirms its intention to produce such a program, then AFTRA may, upon sixty (60) days written notice to Producer, instruct its members to refuse to perform services on such programs."

Pursuant to the requirements of that provision, Producer and AFTRA met. The negotiations are continuing. Pending agreement, all rights expressed therein remain in effect.

It is expressly understood that "Basic Cable" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

71

**70. PROGRAMS COVERED BY COLLECTIVE BARGAINING AGREEMENT**

   A.  This Agreement covers live network television programs originating in New York, Chicago, Los Angeles and Washington, D.C., recorded programs used to supplement live broadcasts, film sequences made especially for the entertainment portion of a live program, and any other program produced or recorded as provided in Paragraph 72 hereof.

   B.  This Code shall apply to Traveling Shows, as the term is generally understood in the industry, which normally originate at one of the production centers covered by this Code, regardless of the point of origination of the broadcast. This Code also shall apply to all persons covered by this Code on sports broadcasts produced by a signatory to this Code or to the letters of adherence and broadcast on the network regardless of the point of origination of the broadcast.

   C.  When a program is produced or co-produced by a signatory to this Code or the letters of adherence for broadcast to the network but said program originates at a point other than New York, Chicago, Los Angeles or Washington, D.C., the terms and conditions of this Code (except the provisions of Paragraph 84 hereof, when inapplicable under the Labor Management Relations Act, 1947, as amended) shall nevertheless apply to such network program. Excluded from the coverage of the preceding sentence are programs (but not cut-ins or feeds to other programs other than news inserts which are covered by the provisions of Paragraph 75 of this Code) in the field of news and public affairs, except to the extent that participation in such programs may be covered by the staff newsperson's agreement. "Remote" originations of events (such as a rodeo or sportscar race) which by their nature feature persons who are not performers within the meaning of this Code and which as a matter of course occur in the locality from which the broadcast originates; religious programs broadcast in connection with observance of particular religious holidays.

   AFTRA agrees to consider and grant (when warranted) waivers of the provisions of this subparagraph C. for network program originations in special circumstances.

**71. DEFINITION OF NETWORK PROGRAM**

   A network television program is one which is broadcast over two (2) or more television stations in the United States, its territories and possessions and Canada except programs broadcast on regional networks now existing or hereafter formed. The provisions of this Code are applicable to all network television programs originating in New York, Chicago and Los Angeles which are produced or recorded by means of any electronic video equipment (including a combination electronic and motion picture or "slave" camera) used either in connection with live broadcasting or in connection with recorders, video tape recorders, disc recorders, kinescope, audio tape recorders, video tape recorders, wire recorders, disc recorders and any other apparatus now or hereafter developed which is used to transmit, transfer or record light or sound for immediate or eventual conversion into electrical energy. (Excluded from the foregoing are programs recorded solely by motion picture camera not in connection with a ready broadcast or a live telecast.) The foregoing provisions of this paragraph shall not limit or restrict, or be limited or restricted by anything contained in Paragraph 70 of this Code.

**72. RECORDED PROGRAMS COVERED BY COLLECTIVE BARGAINING AGREEMENT**

   The parties hereto hereby confirm the terms and provisions of the "Clarification of 1954-56 AFTRA Code" (herein called "Clarification Agreement") which provides that said Clarification Agreement is also applicable to this Code, and that all of the terms and provisions of this Code are applicable to network television programs originating in New York, Chicago and Los Angeles which are produced or recorded by means of any electronic video equipment (including a combination electronic and motion picture or "slave" camera) used either in connection with live broadcasting or in connection with recorders, video tape recorders, disc recorders, wire, tape, kinescope, audio tape recorders, video tape recorders, wire recorders, disc recorders and any other apparatus now or hereafter developed which is used to transmit, transfer or record light or sound for immediate or eventual conversion into electrical energy. (Excluded from the foregoing are programs recorded solely by motion picture camera not in connection with a ready broadcast or a live telecast.) The foregoing provisions of this paragraph shall not limit or restrict, or be limited or restricted by anything contained in Paragraph 70 of this Code.

72

---

**73. REPLAY OF RECORDED PROGRAMS**

   A.  With respect to programs produced prior to March 1, 1956, the terms and conditions of Paragraph 72 of the 1954-56 AFTRA Code of Fair Practice for Network Television Broadcasting shall apply, and said Paragraph 72 shall remain in full force and effect with respect to such programs.

   B.  With respect to programs produced on and after March 1, 1956, the parties hereto hereby confirm the terms and provisions of said Clarification Agreement as follows:

   Recordings: Producer shall have the right, within sixty (60) days of the original telecast, whether live or prerecorded, to supplement the network (as "network" is defined in Paragraph 71 of this Code) by means of recordings in any area where the program has not been previously broadcast, without additional payment to the performers. A program shall be deemed to be "live" broadcast more than sixty (60) days after the original telecast, except as otherwise expressly permitted for syndication pursuant to subparagraph C. hereof. A program shall be deemed to be replayed if broadcast within and sixty (60) days in any area where the original telecast was shown.

   Each additional broadcast in any area where the program has previously been broadcast shall be considered an additional replay. Compensation for replays shall be not less than the amounts set forth below:

   (1)  **First and Second Network Replays (i.e., Replays Over a National Television Network Whether or Not in Prime Time):**

     (a)  For the first network replay, performer shall be paid seventy-five percent (75%) of the applicable basic minimum program fee plus the percentage set forth below of the performer's additional rehearsal and doubling fees for the program;

     (b)  For the second network replay, performer shall be paid on the same basis as set forth under (a) above for the first network replay of such program.

   (2)  **All Other Replays:**

   For all replays not covered in (1)(a) and (b) above, performer shall be paid the percentage set forth below of the applicable basic minimum program fee:

First replay              75%
Second replay          75%
Third replay              50%
Fourth replay          50%
Fifth replay              50%
Sixth reply               10%
Seventh and each additional replay   5% each

   (3)  **Reality Based Programs:**

   With respect to programs with reality based formats utilizing reenactments, the producer may: (1) recombine previously telecast segments from programs in the same series; (2) create from such previously telecast segments either an edited-down program or a recombined and edited program of not less than thirty (30) minutes

73

Exhibit B, Page 114

duration; and/or (3) combine previously telecast segments with new segments for the same series.

(4) Performers who appear in program segments which are replayed (whether as part of new, recombined, or edited-down programs, or in programs replayed as originally broadcast) shall be paid the following percentages of the applicable minimum program fee for the length of the program in which the segment appears, based upon the program fee in effect as of the date of such program's first telecast:

| | |
|---|---|
| First & Second replay | 50% |
| Third replay | 40% |
| Fourth replay | 30% |
| Fifth, Sixth & Seventh replay | 25% |
| Eighth, Ninth, Tenth & Eleventh replay | 15% |
| Twelfth & Thirteenth replay | 10% |
| Each subsequent replay | 5% |

"Applicable basic minimum program fee," as used in (1), (2) and (3) above, means the basic minimum program fees (or the following percentages of the basic minimum sustaining program fees, in the case of a sustaining replay of a sustaining program) as contained in the AFTRA Code of Fair Practice for Network Television Broadcasting existing at the time of the performance.

Payment of replay fees (either the minimum fees set forth herein or the replay fees set forth in the performer's individual contract, whichever are higher) shall be made by the Producer to performers not later than thirty (30) days after any network broadcast on FBC, the WB or UPN, or one hundred-twenty (120) days after any non-network broadcast, whichever is applicable.

Payment of the applicable fee for a replay shall entitle the Producer to telecast the program once in each area for each run.

Produce shall not be required to make payment of any replay fees to performers engaged to perform solely as walk-ons or background actors as defined herein.

The Producer may, subject to the consent of the performer at the time the original engagement is made, credit overscale payments in excess of twice the full AFTRA minimum fee, including all extra payments for additional rehearsal and doubling, towards amounts due the performer for replays of program recordings under the above schedule, except when a daytime serial program produced hereunder is replayed in network prime time, in which event such crediting shall be limited to the amount of overscale compensation in excess of $2,000.00 per program for a performer on a serial of one (1) hour or more, or $1,500.00 per program for a performer on a serial of less than one (1) hour.

The Producer may, subject to the consent of the performer at the time the original engagement is made, credit overscale payments in excess of twice the full AFTRA minimum fee, including all extra payments for additional rehearsal and doubling, towards amounts due the performer for replays of program produced hereunder; provided, however, that when a daytime serial program produced hereunder is replayed in network prime time, in which event such crediting shall be limited to the amount of overscale compensation in excess of $2,000.00 per program for a performer on a serial of one (1) hour or more, or $1,500.00 per program for a performer on a serial of less than one (1) hour.

In the case of contracts with performers which were executed prior to March 1, 1956, for services to be rendered after said date, the Producer shall be required to secure the performer's agreement, notwithstanding any contractual provision to the contrary, concerning the fees to be paid for the replay of recordings, provided that no such agreement may be for less than the schedule of replay fees set forth above.

The schedule of replay fees set forth above is a schedule of minimum fees, and nothing herein shall be deemed:

(a) to prevent the performer from bargaining for better terms for the performer than those provided herein, or

74

(b) to change or modify contracts containing better replay terms for performers.

(5) Producer agrees to furnish AFTRA with a production memorandum signed by an authorized agent of the Producer on replay of each recording. The production memorandum shall give full and specific information sufficient to permit computation of proper replay fees for all performers concerned. Each production memorandum shall be filed wi... AFTRA within fifteen (15) days after the first broadcast constituting the first or any additional replay.

Upon the sale, transfer, assignment, license, lease, agreement to distribu... or other disposition by Producer of its television rights in any recorded program produced by it under this Code entered into or renewed after notification of this Agreement, Producer shall not be responsible to AFTRA, or to any performers for any payments thereafter due with resp... to replays. Supp... payments shall be... to the ... breach or violation of this Code by such transferee or for a ... if AFTRA approves the financial responsibility of such transferee in writing (which approval shall be not be unreasonably withheld), and if Producer in its agreement with such transferee has included a provision substantially in the form of agreement set forth in the Transfer of Rights provisions of this Code, which are attached hereto as Exhibit B.

Domestic Replay in a Foreign Language – Producer shall have the option of applying the payment provisions in subparagraphs (a), (b) and (c), below to the second and any subsequent broadcast in any domestic area a network television program in a language other than English in lieu of the foregoing provisions of subparagraph 73.B. governing domestic replays in which case such broadcasts shall not be treated as domestic replays.

(a) The Producer will pay for the benefit of the performers on such a program two percent (2%) of the "Distributor's gross receipts" (a... defined in Exhibit D) from such broadcast(s) of such program in language other than English; provided, however, the scale paym... the such performer shall not exceed one and one-half percent (1½%) per performer and shall not exceed one-half percent (½%)... announcer shall not exceed one-half percent (½%) per announc... Health and Retirement contribution shall be paid in addition to such payments.

(b) This two percent (2%) payment shall be for the benefit of all performers on the program, except for background actors. The t... percent (2%) payment shall be distributed pro rata to the principal performers on the basis of a two-to-one ratio: the scale paym... performers against other performers. In the event any performer has individually negotiated with the Producer an individual payment formula for such distribution, his pro rata share shall credited against the payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by the Producer or to AFTRA f... distribution to the performers if the parties may mutually determine. Additionally, a contribution based upon a percentage of the fees payable under this subparagraph shall be made to the AFTRA Health and Retirement Funds. The applicable percenta... shall be the same as the percentage of gross compensation payab... to the AFTRA Health and Retirement Funds under the AFTRA ... Code under which the program was produced.

(c) If any agreement for broadcasts in a language other than English includes more than one (1) program, or includes both rights to...

75

telecast in a language other than English and other rights, the Producer shall make a reasonable allocation for the purpose of determining payments due hereunder.

---

Unless the dubbing is performed outside of the United States, the foregoing option shall only apply if the persons performing the dubbing are paid a rate not less than the applicable minimum session fee in the AFTRA Spanish International Network 1985-1988 Spanish Language Agreement for Television Commercials. The persons who perform the dubbing shall not be entitled to any other payment for use of the program.

(6) Release to Public Television – When a television program produced under this Code is released for broadcast on public broadcasting station(s), Producer shall have the option of paying the replay provisions of this Paragraph 73.B. or of paying the extended broadcast release provided in this Agreement, but not the extended broadcast release provided in that Agreement, or

(b) the applicable program rate under the National AFTRA Public Television Agreement which use shall entitle the Producer to the initial uses provided therein. Further uses shall be subject to the applicable payment provisions of such Agreement.

No use paid for under options (a) or (b) above shall be considered a domestic replay under this Code.

C. Syndicated Programs shall be governed by all the terms, conditions and provisions of Paragraphs 72 and 73 of this Code, except as otherwise expressly provided in this subparagraph C. to wit:

(1) A recorded program which is not broadcast as a network program but has been pre-recorded for syndication on local stations may be played on local non-interconnected stations provided that payment in advance for pre-recording such program shall be made to each performer at not less than the rates, terms and conditions provided in this Code for a network broadcast. Such advance payment shall cover the first play on one or more than one (1) local station in each area. All subsequent replays shall be paid for at the rates and under the conditions provided in subparagraph B. of this Paragraph 73.

(2) With respect to a recorded program which is originally broadcast as a network program, whether live or pre-recorded, such program shall not be deemed to be a replay when first broadcast on local non-interconnected stations in any area where the original telecast was not shown, and only in such areas, provided that such first broadcast occurs within three (3) years after the end of the sixty (60) day period (permitted to supplement the network) after the date of the original release. All other plays shall be deemed to be replays and all such replays and all subsequent replays shall be paid for at the rates under the conditions provided in subparagraph B. of this Paragraph 73.

D. The provisions of this Paragraph 73 shall apply to recordings described in Paragraph 72 and to recordings as defined in Paragraph 68 (Standard Terms and Conditions, Paragraph 4) of this Code as follows:

76

(1) Producer shall have the right to utilize, without additional compensation, excerpts from programs, whether produced under this or any previous AFTRA TV Network Code:

(a) For promotional purposes as provided in Paragraph 88.

(b) Where news programs are utilized in other news programs in accordance with the conditions set forth in Paragraph 75.C. Furthermore, AFTRA will not claim a breach of this or any previous AFTRA Code if Producer without payment of additional compensation uses an excerpt of no more than two (2) minutes in length from any news program or, in a basic news context in a public affairs type program.

(c) As flashbacks (brief scenes from one episode in a series used as part of a story in another episode in a series) provided that a performer in the flashback who is not otherwise engaged to perform services on the program in which the flashback is utilized shall be entitled to one-hundred percent (100%) of the applicable minimum program fee, or if not under contract at the time of such broadcast, one-hundred percent (100%) of his performance fee for the episode used in the flashback.

(d) Where excerpts from different programs are utilized in any program devoted to annual television awards produced under this or any other AFTRA Code, without compensation to the star performers, provided that consent from the star performer is obtained (which consent may be obtained in the performer's individual contract) and further provided that appearing in such excerpt(s) shall be paid an amount equal to the first replay fee based on the minimum program fee of the program from which the excerpt(s) is taken; however, where excerpts from programs are utilized on the annual Emmy Awards (daytime or nighttime), such excerpts may be utilized without compensation to or consent from the performer(s). Further, where excerpt(s) from programs featuring a portion of a current performance or in connection with a lifetime achievement award or the like, are utilized in the Academy Awards, or Tony Awards, such excerpt(s) may be utilized without compensation from the star performer(s), provided that both cases consent from the star performer(s) is obtained (which consent may be obtained in the performer's individual contract).

(e) Where the performance of star performer(s) is utilized in an excerpt which contains no more than one-star performer(s), provided that consent from the star performer is specifically obtained (which consent may be obtained in the performer's individual contract or subsequently) from programs featuring a portion of a current performance run not more than ten (10%) of the program time, or in the case of anniversary shows or personality retrospectives, fifty percent (50%) of the program time.

(f) When used for purposes of recapping the story to date in the context of a serial, multi-part program, episodic series, unit series or anthology; provided, however, that if such recap shall exceed ninety (90) seconds in length when used on a program less than sixty (60) minutes in total length, or exceed one-hundred-eighty (180) minutes or more in length when used on a program of sixty (60) minutes or more in length, Producer shall pay the performer appearing in the excerpt used in the recap in accordance with subparagraph (2) below. When used in a recap in a serial, an

77

(2)      For any use of excerpts, after February 28, 1995, from an entertainment program that is not provided for in subparagraph (1) above, Producer shall pay the performers appearing in such excerpts as follows:

(a)      If the excerpt(s) is used in a program other than a local program, Producer shall pay to each performer appearing in the excerpt(s) the minimum program fee of the program from which the excerpt(s) is taken, or less of such excerpt(s) from a given program the minimum program fee of the program in which the excerpt(s) is used, whichever is higher. If such excerpt(s) is longer than three (3) minutes, Producer shall negotiate the payment for such use with each performer appearing in the excerpt(s) with a minimum payment of the minimum program fee of the program in which the excerpt(s) is used, the program from which the excerpt(s) is used. For subsequent broadcasts of the program (including those in which the minimum program fee paid for the use of the excerpt(s). None of the above payments may be credited against the performer's overscale compensation or individual guarantee. Only excerpts from a single episode are aggregated to measure whether the Producer is required to negotiate the payment for such use with the (3) minutes for purposes of determining whether the Producer is performer(s) appearing in the excerpt(s).

(b)      If the excerpt(s) is used on a local program, Producer shall pay each performer appearing in such excerpt(s) fifty percent (50%) of the payments provided for in subparagraph (2)(a) above.

(3)      Use of an excerpt in accordance with this Paragraph 73.D. shall not be deemed replays of the program(s) from which the excerpt(s) is taken.

(4)      Nothing herein shall require additional payment to a performer in an excerpt(s), if such performer is otherwise engaged to perform services on the program in which the excerpt is utilized.

(5)      The provisions of this Paragraph 73.D. shall apply to compilation programs.

(6)      No compensation shall be payable pursuant to this Paragraph 73.D. to a background actor.

(7)      The production company which actually produces the program containing excerpts requiring payment shall be obligated to make such payment, but if such Producer is not a signatory to this Code, Producer shall remain liable for payments due hereunder.

(8)      In the event that more than seventy-five percent (75%) of a program (except a program produced for pay television or video discs/videocassettes, which is covered by Paragraph 73.D.(10)), consists of excerpts, all performers appearing in the excerpts shall be paid not less than two (2) times the minimum program fee of the program from which the excerpt(s) is taken or two (2) times the minimum program fee of the program in which the excerpt(s) is used, whichever is higher, based upon the performers original performance category. No excerpts from a program may be used

78

under this subparagraph (8), except as set forth below in the second paragraph of this paragraph (8)(a) without the consent of the performers appearing in the excerpts, which consent may be obtained at the time of contemplated use hereunder unless the performer has given prior written consent specifically referring to this subparagraph (8). However, if the Producer has made a *bona fide* attempt to locate the performer and is unable to find the performer, the Producer shall notify AFTRA, and if AFTRA is unable to find the performer within a reasonable time, the Producer may use such excerpt(s) without consent. In the event a performer(s) and the Producer negotiate for such excerpt use and Producer may appeal the reasonableness of such refusal to a committee established by AFTRA's National Board of Directors, and both Producer and the performer shall be bound by the determination of such Committee. None of the above payments may be credited against the performer's overscale compensation or individual guarantee.

Notwithstanding the foregoing, no consent is required for the use of excerpts from episodes of a serial, or, in a program, which consists of seventy-five (75%) or more excerpts, produced for telecast as: (i) a regular or special episode or retrospective program of that series, or (ii) a retrospective program related to a series that is no longer on the air, provided that consent shall be required of specialty acts in variety program excerpts.

(b)      If the excerpts are used on a local program, the Producer shall pay each performer appearing in such excerpts fifty percent (50%) of the payments provided for in subparagraph (8)(a) above.

(c)      As an alternative to obtaining consent as permitted in subparagraph (a) above, the Producer may use the following procedure to obtain the consent of any performer whose appearance is included in the compilation program and to the excerpt(s) in which he or she appears:

(i)      The Producer will send a written consent request by certified mail, return receipt requested, or other means whereby delivery to the performer can be verified, to the performer's last known address on file with the local AFTRA office, or to an address known to the Producer to be more recent. A postage pre-paid, addressed envelope will be enclosed for the performer's response. The Producer will make a good faith effort to send a copy of this consent request to a known agent of the performer, but failure to do so shall not affect the validity of this request.

(ii)     The consent request shall include the following notice to the performer:

"If you fail to respond to this request within fifteen (15) business days of its delivery, the Producer will be deemed to have obtained your consent to use the excerpts for the compilation program, as described in the request."

(iii)    If neither the performer nor an agent acting on behalf of the performer responds within fifteen (15) business days of the request's delivery, the Producer will be deemed to have obtained the performer's consent to use the excerpts for the compilation program(s), as described in the request.

79

(9) Nothing herein shall affect Producer's right to replay in an edited-down program, where editing is required by program time exigencies, provided that all performers who appear in the original program shall be paid their applicable replay fee.

(10) If an excerpt from a program produced for free television under this or any previous Network Television Code is used in a program produced for pay television, video disc/videocassette or basic cable, the provisions of this subparagraph 73.D. shall apply.

(4) In the event more than seventy-five percent (75%) of such a program produced for pay television consists of excerpts, Producer shall pay each performer, irrespective of the number of excerpts in which he/she appears, a single payment of twice the applicable minimum program fee applicable to his/her performance in any program from which an excerpt is in such program for two (2) times the minimum program fee of the program in which the excerpt(s) is used were it produced for free television, whichever is higher, in the event such compilation program is produced solely for video disc/videocassette release, Producer shall pay each performer a single payment of the highest minimum program fee applicable to his/her performance in any program from which an excerpt is being taken, or the minimum program fee of the program in which the excerpt(s) is used were it produced for free television, whichever is higher. Such initial payment shall entitle the Producer to the use set forth in Paragraph 2.B. of Exhibit E of this Code. Additional compensation shall be paid pursuant to the provisions of Paragraphs 3, 5 and 7 of Exhibit E of this Code. None of the above payments may be credited against the performer's overseas compensation or individual guarantee.

No excerpts from a program may be used under this subparagraph (10) without the current consent of the performers appearing in the excerpts unless the performer has given prior written consent specifically referring to so employing the program, as an advance against future Supplemental Market payments provided in Exhibit D; i.e., 4.5% for the first $1,000,000.00 of distributor's gross and 5.4% thereafter. Under such option the producer is prohibited from obtaining the performer's consent at the time of initial employment and must do so only at the time of contemplated use. For this Paragraph (10)(b) only, a performer may consent to the incorporation of one (1) or more performances into one (1) or more videocassette compilation programs at any time other than during initial employment or subsequent contract negotiation provided the material to be used is an excerpt(s) was produced and broadcast prior to the date of consent and provided that the consent agreement shall specify the time period over which such performances were made, the name of the program(s) from which the excerpt(s) are taken, and the number of videocassette compilation programs to be produced. Further, such consent agreement must specifically set forth the above-referenced payment of $150.00 per videocassette compilation program and

(b) **Additional Option for Serials:**

As an additional option, serial producers may release compilation programs to the videocassette market with the payment of $150.00 per performer per videocassette compilation program, as an advance against future Supplemental Market payments, if any, as provided in Exhibit D; i.e., 4.5% for the first $1,000,000.00 of distributor's gross and 5.4% thereafter. Under such option the producer is prohibited from obtaining the performer's consent at the time of initial employment and must do so only at the time of contemplated use.

80

that such payment is an advance against future Supplemental Market payments, if any, as provided in Exhibit D. None of the above payments may be credited against the performer's overseas compensation or individual guarantee.

If AFTRA believes the industry has abused the practices of free distribution of cassettes for promotional purposes the issue may be referred to the Joint Committee.

(c)

(i) If the Producer has made a *bona fide* attempt to locate the performer and is unable to do so, the Producer must notify AFTRA, and if AFTRA is unable to locate the performer within a reasonable time, the Producer may use such excerpts without consent.

(ii) In the event a performer and the Producer negotiate for the use of an excerpt and the performer refuses to grant consent for the use of such excerpt and the Producer may refuse reasonableness of such refusal to a committee established by AFTRA's National Board of Directors, and both the Producer and performer shall be bound by the determination of the Committee.

(iii) As an alternative to obtaining consent as permitted in subparagraph (10)(a) and (b) above, the Producer may use the following procedure to obtain the consent of any performer whose appearance is incidental to the compilation program and to the excerpt(s) in which he or she appears:

A. The Producer will send a written consent request by certified mail, return receipt requested, or other means whereby delivery to the performer can be verified, to the performer's last known address on file with the local AFTRA office, or to an address known to the Producer to be more recent. A postage pre-paid, addressed envelope will be enclosed for the performer's response. The Producer will make a good faith effort to send a copy of this consent request to a known agent of the performer, but failure to do so shall not affect the validity of this request.

B. The consent request shall include the following notice to the performer:

If you fail to respond to this request within fifteen (15) business days of its delivery, the Producer will be deemed to have obtained your consent to use the excerpts for the compilation program(s), as described in the request.

C. If neither the performer nor an agent acting on behalf of the performer responds within fifteen (15) business days of the request's delivery, the Producer will be deemed to have obtained the performer's consent to use the excerpts for the compilation program(s) as described in the request.

(iv) Payment for use of the excerpts described herein shall be made in accordance with the applicable provisions set forth in subparagraph (10)(a) and (b) above.

81

(v) Except as not more than an aggregate of one (1) minute in length from a single compilation videocassette may be used to promote the sale of that videocassette without additional compensation, provided that where multiple videocassettes are being promoted together, each excerpt used is from at least one of the videocassettes being promoted for sale, and provided further that the promotional announcement may not exceed three (3) minutes in length.

E. The provisions of subparagraph B. of this Paragraph 73 shall not apply to recordings of commercial announcements, cue-ins, cue-ins, hitch-hikes and cow-catchers, or other services covered by Paragraph 4 of this Code, and the following shall apply:

When a performer is engaged pursuant to this Code, whether the performance is actually done "live" or is pre-recorded from an audition or rehearsal or in any other manner (so long as the artist's engagement is a "live" performance), payment for commercials (announcements, cue-ins, hitch-hikes, cow-catchers, or otherwise) shall be made pursuant to the provisions of Paragraph 2, 4, 26, 27 and 46 of this Code, as applicable. When such announcement is replayed as part of the program in which it was originally recorded, payment shall be: (1) for performers and chorus singers and dancers paid pursuant to Paragraph 46.G. and H. for the original "live" performance - the applicable payment provided in Paragraphs 46.G. and H. will be made for the commercial announcement services, or the program rate if originally paid, for the commercial replay of the program; (2) for performers, in performances more than the full applicable program rate pursuant to Paragraph 2 or Paragraph 4, as applicable.

In the event such "live" announcement is replayed as a separate announcement, or as part of a program other than that in which it was originally included, payment shall be made pursuant to the provisions of the AFTRA Television Recorded Commercials Contract.

In no event shall the provisions of the AFTRA Television Recorded Commercials Contract be construed as applicable to any announcement referred to in this paragraph unless the individual contract of the performer contains a specific provision so authorizing the additional broadcast use of his services in the announcement and a copy of such contract shall be filed and approved by AFTRA prior to any use under the said Recorded Commercials Contract.

Approval by AFTRA, shall be presumed unless notice to the contrary is given to Producer within eighty-eight (48) hours after receipt of the contract by AFTRA.

F. International Television:

(1) Producer recognizes the jurisdiction of AFTRA over the programs, broadcasts and persons set forth in subparagraphs (a), (b), and (c) below to the extent provided therein.

(a) Subparagraph (2) below shall be applicable to network programs as set forth in Paragraphs 70, 71 and 72 of this Code, which employ talent covered by this Code, when such programs are broadcast on any station located in the "foreign areas" herein described in subparagraph (2)(b) below if one (1) or more of the conditions set forth in (i), (ii) or (iii) below are met:

(i) The foreign broadcast is by satellite, cable or other means now or hereafter developed simultaneously with a broadcast in the United States,

82

or Canada, or the affiliates named in Paragraph 71 (hereinafter referred to as the "domestic areas");

(iii) The program is broadcast and recorded in the domestic area and the recording is delivered to, and broadcast in, the "foreign area."

(b) This subparagraph (1)(b) shall be applicable to programs produced in the United States but not broadcast in the domestic area (being signatories to this Code for releast in the "foreign areas" if such programs meet all the conditions for coverage under Paragraph 70 or 72 of this Code other than the requirement of being a network program as defined in Paragraph 71. This subparagraph (1)(b) is intended to cover such programs if (i) the foreign broadcast takes place simultaneously with the live production in the United States, (ii) the foreign broadcast takes place subsequent to live production in the United States but simultaneously with the recording in the United States for subsequent broadcast in the foreign area, or (iii) the foreign broadcast takes place subsequent to the recording in the United States when a program is recorded either in the domestic area or a "foreign area" and replays in the "foreign area." If such program is subsequently broadcast in the domestic area as a network television program in the domestic area, each such person shall have been applicable if the program had been covered originally by subparagraph (1)(b) above, and Producer may credit toward such payment the amount paid to such person pursuant to this subparagraph (1)(b).

(c) This subparagraph (1)(c) shall be applicable to persons covered by Paragraph 75 of this Code who provide services in the United States by a signatory to the Code and are sent from the United States to a "foreign area" to perform services for a program covered by Paragraph 70 of this Code which is intended for broadcast in a network television program in the domestic area. Such persons shall be covered by the rates and conditions of this Code, including the rates set forth in this subparagraph (2) hereof, if such program is also broadcast in any applicable "foreign area." AFTRA agrees to give waivers in proper cases upon application by the Producer with respect to working conditions on such programs.

(2) This subparagraph (2) shall be applicable to:

(i) programs as set forth in subparagraph (1)(c) above;

(ii) talent covered by the Code who appear in the broadcast of a network program as described in subparagraph (1)(c) above who receive compensation for the original telecast in the United States at the full AFTRA minimum, or in excess of the full AFTRA minimum fee, but not over, 1) twice the full AFTRA minimum fee including all payments for additional rehearsal and doubling, in the case of news, sports or public affairs programs, or 2) $1,600.00 for a thirty (30) minute

83

(iii) serial program, or 3) $2,000.00 for a sixty (60) minute serial program, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than as set forth in 2) and 3) above;

talent covered by the Code who appear in the broadcast of a network program as described in (i) above who receive compensation for the original telecast in the United States in excess of (1) twice the full AFTRA minimum fee including all payments for additional rehearsal and doubling in the case of news, sports or public affairs programs, or 2) $3,600.00 for a thirty (30) minute serial program, or 3) $2,000.00 for a sixty (60) minute serial program, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than as set forth in 2) and 3) above;

(iv) Producer shall not be required to make payment of any additional fees for broadcasts in "foreign areas" to performers engaged to perform solely as background actors as defined herein.

(b) The "foreign areas" involved in this Paragraph 73.F. are:

(i) "The British Isles and Cyprus" (hereinafter referred to as Area 1).

(ii) "Europe" (hereinafter referred to as Area 2).

(iii) "Africa" (hereinafter referred to as Area 3).

(iv) "Asia and Australia" (hereinafter referred to as Area 4).

(v) "The Americas" (hereinafter referred to as Area 5).

For the Purposes of this Paragraph 73.F.:

Area 1 includes: England, Scotland, Wales, Ireland and the Island of Cyprus.

Area 2 includes: All European countries including Iceland, but excluding those countries in Area 1.

Area 3 includes: The entire continent of Africa and adjacent islands including the Island of Madagascar.

Area 4 includes: The continents of Asia and Australia, New Zealand, Japan, the East Indies and all the islands in the Pacific and Indian Oceans (except those adjacent to the continents of Africa, North America and South America).

Area 5 includes: Central America, Mexico, South America, Greenland, the Caribbean Islands and all other islands adjacent to the American continents.

(c) Producer shall have the right to license, authorize, permit, or cause network programs (as described in subparagraph (i)(A)(i) above) to be broadcast by each station located in each of the "foreign areas,"

84

subject to the following payments to the talent described in subparagraph (A)(ii) and (iii) above:

(i) 1. for broadcasts by one (1) or more stations in Area 1, twenty-five percent (25%) of the basic minimum appropriate program fee contained in the Code;

2. for serial programs only, sold on or after March 12, 1993, for broadcast by one (1) or more stations in Area 1, ten percent (10%) of the basic minimum appropriate program fee contained in the Code;

(ii) for broadcasts by one (1) or more stations in Area 2, ten percent (10%) of the basic minimum appropriate program fee contained in the Code;

(iii) for broadcasts by one (1) or more stations in Area 3, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(iv) for broadcasts by one (1) or more stations in Area 4, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(v) for broadcasts by one (1) or more stations in Area 5, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(vi) upon payment of fifty percent (50%) (thirty-five percent (35%) for serial programs only sold on or after March 12, 1993) of the basic minimum appropriate program fee contained in the Code, Producer shall have the right to broadcast network programs in accordance with the provisions of this Paragraph 73.F. in all of the "foreign areas."

(vii) for dramatic programs, other than daytime serials, after performer has received the percentage of the basic minimum appropriate program fee for any Area(s) as provided in (i) through (vi) above, performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of:

1. $365,000 in Distributor's Foreign Gross for one-half (½) hour programs;

2. $730,000 in Distributor's Foreign Gross for one (1) hour programs;

3. $1,860,000 in Distributor's Foreign Gross for programs more than one (1) hour in length but not more than two (2) hours in length;

4. $3,120,000 in Distributor's Foreign Gross for programs more than two (2) hours in length but not more than three (3) hours in length;

5. $4,170,000 in Distributor's Foreign Gross for programs more than three (3) hours in length but not more than four (4) hours length;

85

6. $5,210,000 in Distributor's Foreign Gross for programs more than four (4) hours in length but not more than five (5) hours in length;

7. $6,250,000 in Distributor's Foreign Gross for programs more than five (5) hours in length but not more than six (6) hours in length; and

8. for programs in excess of six (6) hours, the above applicable thresholds will increase proportionately.

(viii) for any non-dramatic program or daytime serial program, after performer has received the percentage of the basic minimum appropriate program fee for any Area(s) as provided in (i) through (vi) above, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of:

1. $182,500 in Distributor's Foreign Gross for one-half (½) hour programs;

2. $365,000 in Distributor's Foreign Gross for one (1) hour programs;

3. $930,000 in Distributor's Foreign Gross for programs more than one (1) hour in length but not more than two (2) hours in length;

4. $1,560,000 in Distributor's Foreign Gross for programs more than two (2) hours in length but not more than three (3) hours in length;

5. $2,083,000 in Distributor's Foreign Gross for programs more than three (3) hours in length but not more than four (4) hours in length;

6. $2,605,000 in Distributor's Foreign Gross for programs more than four (4) hours in length but not more than five (5) hours in length;

7. $3,125,000 in Distributor's Foreign Gross for programs more than five (5) hours in length but not more than six (6) hours in length; and

8. for programs in excess of six (6) hours, the above applicable thresholds will increase proportionately.

(ix) payment of an amount equal to thirty-five percent (35%) of the basic minimum appropriate program fee for payments for foreign basic cable and/or (including any foreign area) payments in (i) - (vi) above) constitutes payment for foreign basic cable, provided, however, that foreign basic cable receipts shall apply to "Distributor's Foreign Gross" for purposes of reaching the thresholds in and determining the amount to which the performers shall be paid pursuant to subparagraphs 1. through 8. of (vii) and (viii) above. Notwithstanding the foregoing, both parties reserve their respective positions regarding the payment of foreign cable residuals under the Area formula under Codes prior to the effective date of the 2001 Code.

86

(x) provided that Producer shall have given written notice to AFTRA of such election prior to the first broadcast in any "foreign area;" and further provided that such election by Producer shall be irrevocable as to that program or series of programs after receipt by AFTRA of such notice as an alternative to the method of payment pursuant to the provisions of this subparagraph 73.F.(2)(x)(i) through (x) above, Producer may elect to make payments for foreign use of a particular program or programs in accordance with Section 18(c) of Exhibit A. However, in lieu of Section 18(c)(4) of Exhibit A, the following provisions shall apply:

1. For dramatic programs, other than daytime serials, after performer has received a total of thirty-five percent (35%) of the basic minimum appropriate program fee, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of the amounts set forth in Subparagraphs 73.F(2)(x)(vii)1. through 8. above.

2. For non-dramatic or daytime serial program, after performer has received a total of thirty-five percent (35%) of the applicable minimum program fee, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of the amounts set forth in Subparagraphs 73.F(2)(x)(viii)1. through 8. above.

3. In order to preserve the status quo in Section 18 of Exhibit A and Paragraph 73.g. of the AFTRA Code, payment of the thirty-five percent (35%) of the applicable minimum under the foreign televising formula continues to constitute payment for foreign basic cable, provided, however, that foreign basic cable receipts shall apply to "Distributor's Foreign Gross" for purposes of reaching the thresholds in and determining the amount the performers shall be paid pursuant to subparagraphs 1. through 8. (vii) and (viii) above.

(xi) For programs that are originally exhibited in more than one (1) part, the applicable threshold levels referred to in subparagraph i. through 8. of (vii) and (viii) above shall be applied to each part of the program as originally exhibited, irrespective of the manner in which the program is exhibited on foreign television.

(xii) The performers shall receive such additional monies, as provided in (vii), (viii), (x)1. and (x)2. above, pursuant to the payment provisions of Exhibit D, Section 9 of the AFTRA Code of Fair Practice for Network Television Broadcasting, except that payment and reporting shall be due every six (6) months or at such other time as may be agreed upon in writing by the parties.

(d) Producer's right under subparagraph 73F.(2)(x) shall be subject to the securing of such specific right in writing from the talent described in subparagraph 73F.(2)(Q)(iii) above, and notifying AFTRA promptly thereof. AFTRA agrees that it will not influence such talent to obtain additional payments for such right, but

87

nothing herein contained shall be deemed to prohibit such talent from negotiations for additional compensation for such right. Nothing herein contained shall be deemed a decrease or prohibit Producer and such talent from agreement to apply or prohibit payments in excess of J.) twice the full AFTRA minimum fee including all payments for additional rehearsal and doubling in the case of news, sports or serial or strip programs, or 2) $1,600.00 for a thirty (30) minute serial program, or 3) $2,400.00 for a sixty (60) minute serial, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than set forth in 2) and 3), above as compensation for such right. Provided that for serial programs produced after February 28, 1992, Producer shall not have the right to credit foreign residual payments against performer's overseas compensation.

(e) Applicable payments shall be made only upon actual broadcast of a network program by a station or stations located in a "foreign area," and shall be made within ninety (90) days following such broadcast. Producer agrees to furnish AFTRA immediately after the execution of this Code with a current list of network programs played in each of the "foreign areas" and on what stations, and to furnish further reports to the same effect every ninety (90) days.

(f) AFTRA agrees that it will not enter into any agreement with any signatory to the AFTRA Code (in good standing) using Producer's facilities which would invalidate the operation of this Agreement.

(g) Payments made hereunder shall be subject to the additional payments required by Paragraph 102 and Paragraph 102.A. of the Code.

(h) Producer agrees that for all recordings (as described in Paragraph (a)(i) above) of shows broadcast in the "foreign areas," from June 18, 1957 until September 1, 1958, payments will be paid to each performer described in Paragraph (a)(ii) above on the same basis as provided in Article 73(d) B.3 of the 1960-63 National Code and Fair Practice for Network Television Broadcasting, provided such performer executes an appropriate release as approved by AFTRA.

(i) Producer agrees that it will not for the purpose of evading any of its obligations under this Paragraph 73.F. sublet or transfer responsibility thereunder to any third person, firm or corporation. In the event that any such third person, firm or corporation, authorized or permitted by Producer to broadcast network programs on any stations in the "foreign areas" engages in any conduct which contravenes any provisions of this Paragraph 73.F., Producer agrees to assume responsibility therefor and, further, to take precautions, including legal measures, if necessary, to prevent such conduct, by any such person, firm or corporation, and to keep AFTRA fully apprised of all steps it has undertaken.

(j) Producer agrees for the purposes of this Paragraph 73.F. only that the stations located in the "foreign areas" are not affiliates of the network regardless of any agreement between the network and said stations, and further that for the purposes of this Paragraph 73.F. only network programs broadcast on said stations do not supplement the network within the meaning of the Code.

(k) Any dubbing with respect to any of the recordings of network programs covered by this Paragraph 73.F. which is done in the United States shall be within AFTRA's jurisdiction, and shall be paid for at the applicable Code rates.

88

(i) It is the intent of the descriptions of Areas 1 to 5 in this Paragraph 73.F. to include the entire world, except as specified below, and it shall be considered as the descriptions of Areas 1 to 5 shall be coextensive with and include every area where an area is not explicitly covered by the descriptions of Areas 1 to 5. Anything to the contrary in this Paragraph 73.F. notwithstanding, the foreign areas (Areas 1 to 5) do not include the countries, territories, possessions and affiliated stations referred to in Paragraph 71 of this Code.

G. In no event shall program openings or closings, or lead-in or lead-outs, be broadcast except as an integral part of the program in which the original "live" performance was rendered.

H. It is agreed that Producer may (1) use or authorize others to use recordings of programs for direct projection exhibition in film festivals and competitions and/or (2) authorize the Armed Forces, clubs or religious, educational or charitable organizations to exhibit such programs (excluding sound recording of a public affairs program for the general public) to use a recording of the program or term of programs within one (1) of Paragraph 75) shall be the applicable network sustaining rates. Producer shall make payments to the AFTRA Health and Retirement Funds in accordance with Paragraph 102 and Paragraph 102.A. of this Code with respect to such performers on such closed circuit programs and, except as otherwise specified provided in this Paragraph 74, all terms and conditions of employment (including rehearsal provisions) in this Code which are applicable to the production of network television programs shall apply to such closed circuit programs. The rights granted in (1) and (2) above shall obtain so long as Producer does not derive profit from such uses and so long as said recordings are not, except with the prior consent of AFTRA, used for direct projection exhibition in any theatre, auditorium or other place if a separate admission fee is charged for such exhibition.

## 74. CLOSED CIRCUIT PROGRAMS

A. When a closed circuit program is produced in New York, Chicago, Los Angeles, or Washington, D.C. and is shown in one (1) of the aforesaid cities and in one (1) or more other cities, or is not shown in any of the aforesaid cities but is shown in two (2) or more other cities, each person who performs therein as talent (within the coverage of Paragraph 75) shall be paid the applicable closed circuit minimum in two (2) or more other cities, each person who performs therein as talent (within the coverage of Paragraph 75) shall be paid the applicable closed circuit minimum.

B. Excluded from this Paragraph 74 are (A) stage performers who appear in a closed circuit program which includes promotion of a merchandise product or service, for which they are or will be starred, and (B) executives of the producer or co-producer of the program or executives of the sponsor of the program.

C. The provisions of Paragraph 73 of this Code shall apply to closed circuit programs hereunder, except that additional closed circuit use in an area where the program has not previously been shown, for which no additional payment is required, shall be limited to a period within thirty (30) days after the original closed circuit showing. In no event shall a closed circuit program be deemed a syndicated program for any purpose.

D. Producer may release or exhibit a closed circuit program hereunder for direct projection purposes before non-paying audiences, upon payment of additional compensation to the performers involved in the amount of forty percent (40%) of the applicable closed circuit minimum for each year of direct projection use commencing with the first such use.

E. When a closed circuit program is produced in New York, Chicago, Los Angeles, or Washington, D.C., and is shown in such producing city only, or is shown in only one (1) other city, at appropriate rate, less than the

89

network sustaining rate, for the talent on such program may be negotiated by the Producer and the AFTRA Local.

F. This Paragraph 74 shall not apply to the closed circuiting of industrial or trade shows.

G. Nothing contained in this Paragraph 74 shall be deemed to prohibit closed circuit showing of recordings of network television programs, or excerpts therefrom, produced under this Code or its predecessor Codes. Nothing in this Paragraph 74 shall apply to film television programs, or excerpts therefrom, used in connection with closed circuit programs. Excerpts shall not include film sequences made especially for the entertainment portion of a closed circuit program.

75. PEOPLE COVERED

A. All persons who perform as talent, e.g., actors; comedians; masters-of-ceremonies; quiz masters; disc jockeys; singers; dancers; announcers (other than staff duties of staff announcers); sportscasters; specialty acts; stunt persons; background actors; puppeteers; reporters and analysis (with the exception of government employees and persons who are engaged occasionally on a single program basis because they are specialists whose regular employment or activity is in a field in which they report, such as college professors and scientists), in the fields of home economics, fashion, farm and rural subjects, and market reports; models; moderators; members of panel who take part in discussion or offering of this agreement shall not apply where format of program requires such persons to participate generally in connection with contests; provided that services of staff newspersons on such panel programs shall be subject to their respective staff agreements.

This Code also applies to all persons other than staff newspersons rendering services in the field of news including but not limited to commentators, analysts and persons who criticize, review and/or comment on the following: books, the fine arts, music, sports, the theater, movies, dance, radio, television, society, and travel; and including persons who perform in live, film, or recorded news inserts in network and/or local news programs. However, management personnel delivering editorials are excluded from the coverage of this Code. Services in the field of news covered by this Code and the preceding subparagraph shall be paid for under the terms, conditions and rates applicable to announcers; provided, however, that

(1) with respect to news or public special events programs, if the program is two (2) hours or less in length, payment shall be made at the rates provided in this Code for the category of the person performing such services; but if the program is more than two (2) hours in length:

(a) payment for services on such program shall be made at the two (2) hour rate plus an additional amount which shall be the subject of individual negotiation, provided that in the case of special events such as political conventions and the like, the Local Executive Director of the appropriate AFTRA Local, or such person as may be designated by the National Executive Director of AFTRA, may, at his discretion, undertake the said individual negotiation on behalf of the AFTRA member involved; or

(b) payment for services in one (1) or more separate portions of the program shall be made for each separate portion as if it were a complete program; or instead, payment shall be in accordance with subdivision (1) above;

90

(e) payment for services on such program by staff newspersons and staff announcers shall be governed by the provisions of their respective staff agreements.

(2) live, film or recorded news inserts originating from New York, Chicago, San Francisco, Los Angeles, or Washington, D.C., of five (5) minutes or less in length broadcast on network news programs of any length shall be paid for at the rate of $150.00 ($155.00 effective November 16, 2009) per person for each such insert, and the foregoing shall be applicable to such news inserts by those persons who criticize, review and/or comment as set forth in the first sentence of the second paragraph of this Paragraph 75.A., whether such insert originates inside or outside the studio from which the program originates. For such $150.00 ($155.00 effective November 16, 2009) payment for any news insert covered by this subparagraph (2) may be used for an unlimited number of broadcasts within twenty-four (24) hours of the original broadcast and for a further payment of $107.00 it may be used for an unlimited number of broadcasts for an additional seven (7) days; and

(3) the program rate, rather than the news insert rate set forth in subparagraph (2) above, shall apply when a news insert is made solely of two (2) or more networks or for each originating broadcast on two (2) or more networks on a program of two (2) hours or less in length as a result of one (1) network making its origination available to another network or to an independent station. Persons covered under this Paragraph 75 who are assigned by the originating network to appear and do so simultaneously on two (2) or more such networks shall be paid an additional twenty-five percent (25%) of the applicable minimum fee for each additional network carrying said programming; and provided, that nothing herein shall apply to any such broadcasts from political conventions. For the purposes of this subparagraph, however, that this program shall be deemed to be simultaneously broadcast if a broadcast on an additional network is within three (3) hours of the broadcast on the originating network.

B. If a person covered under this Paragraph 75 performs services in the field of news at the originating a story (but excluding general news conferences and open interviews) which is the subject of his image appears and that story is made available by the originating and/or another network or to an independent station, such person shall be paid the following amounts when that story is telecast (provided no such individual voice or image occurs or appears in such story) with his voice and/or image by such other network or such independent station:

Fifty percent (50%) of the applicable minimum fee for each other network;

Twenty-five percent (25%) of the applicable minimum fee for each such other independent station, unless made available pursuant to the provisions of Paragraph 76 below; provided, however, that no more than one-hundred percent (100%) of the original applicable minimum fee shall be payable under this Paragraph to any person for a single story. A person who is paid for such story pursuant to the final paragraph of Paragraph 75.A. shall not be entitled also to be paid under this paragraph.

C. Except as otherwise provided in this Code shall be construed as requiring the payment of additional compensation to any person rendering services in the field of news for using an excerpt of five (5) minutes or less from a news program in any other news program; provided, however, that if any such excerpt within a news program is made up wholly of such excerpts the replay percentages set forth in Paragraph 73.B. shall be applicable. When an entire news program (whether or not re-edited) or an excerpt from a news program of more than five (5) minutes in length is replayed and such replay contains the voice and/or image of a person performing services in the field of

91

D. The Producer shall have the right to use *bona fide* amateur programs from time to time, provided that such programs shall not be grouped so as to constitute a series, and shall approve further when the amateur gives the Producer a written statement that he has not previously appeared as an amateur more than once in the then current calendar year.

AFTRA agrees to give a waiver for persons employed for not more than one (1) performance each year during the term of this Agreement, because of reputation acquired in fields other than the amusement field.

E. This Code applies to professional performers appearing as interviewees on entertainment programs (except as set forth in the following Paragraph) and to physical demonstrations on entertainment programs unless the demonstration is incidental to an appearance in an interview capacity. A professional athlete interviewed primarily in connection with his athletic reputation or endeavors is not a professional performer for purposes of this provision. In any event, sports programs, including programs of the type of Wide World of Sports as that program was formatted during the 1979-1980 broadcast season, are not entertainment programs for the purpose of this provision.

This Code shall not apply to a professional performer who appears only as an interviewee, or as a participant in a panel discussion on an entertainment program, provided that the following conditions are satisfied: 1) such professional performer is not widely known as a professional performer in the entertainment field, 2) the performer's appearance is not scripted and the informer in the entertainment performance; 3) there is no exploitation of the performer's name as a performer in the entertainment industry; and 4) the performer does not appear on the same program on a regular basis.

Additionally, Section 75(c) does not apply to star performers who appear as interviewees on talk shows, if their interview concerns a humanitarian cause or topic of special concern to the star performer, and the performer is notified at the time of the engagement that there is no fee for the appearance.

In the case of a star performer appearing as an interviewee on a non-dramatic entertainment program, the applicable minimum payment shall be the principal performer 15-minute program fee provided such interview:

(1) does not involve significantly more time than is reasonable and customary for an engagement of this type (which is usually not more than four (4) hours, exclusive of travel time) and

(2) is primarily in a "Q&A" format.

76. **NEWS SERVICE**

A. Any person rendering services on behalf of Producer in the field of news of the type covered by this Code under Paragraph 75.A. who performs in live, film or recorded news stories not exceeding five (5) minutes in length which originate within the continental limits of the United States and which are made available by

92

Producer for telecast on a non-interconnected basis by two (2) or more stations as part of their local news programs shall be paid by Producer one (1) single payment of $88.00 ($93.00 effective November 16, 2009) or each such news story in which such person is seen or heard, up to a maximum of $176.00 ($181.00 effective November 16, 2009) per day for all news stories made available by Producer on any day, provided:

(1) such person is employed by Producer in New York, Los Angeles, Chicago, San Francisco or Washington, D.C., and said news story originates from such city or originates from another city within the continental limits of the United States when such person is sent to such other city for the purpose of making such origination; or,

(2) such person's employment is otherwise covered under an AFTRA contract with a station if such contract covers services in the field of news.

For the payment made pursuant to this Paragraph 76, Producer may allow each local station either or both of the following: (a) an unlimited number of such telecasts within forty-eight (48) hours after the news story has first been made available by Producer hereunder; (b) one (1) such telecast after such forty-eight (48) hour period but within seven (7) days after the news story has first been made available by Producer.

B. If a news story covered by this Paragraph 76 is broadcast by Producer on a network television program, payments made for such network broadcast may be credited against any payments due under this Paragraph.

C. If Producer assigns an announcer to perform introductions, lead-ins, lead-outs and the like for news stories made available for telecast by local stations, Producer shall not permit any such local station to telecast under the terms of this Paragraph 76.B. the voice or image of such announcer, as distinguished from the voices or images of the persons appearing or heard in such news stories.

D. Producer's total obligation for work which is covered only by this Paragraph 76 shall be to make the payment specified in this Paragraph, the payment to be credited against minimum fee for adults.

77. **CHILDREN'S PROGRAMS**

For purposes of this Code, persons sixteen (16) years of age or under are children, and a program is a children's program if seventy-five percent (75%) of the performers on the program are children.

On children's programs, children may be engaged on terms mutually satisfactory to the Producer and the individuals concerned, subject to applicable payments specified in this Paragraph, provided that professional children, as that term is understood in the industry, shall be paid the applicable minimum fee for adults. AFTRA reserves the right, if children's programs become a problem, to request the Producer to enter into negotiations as specified in Paragraph 102, and for payment to the AFTRA Industry Cooperative Fund as specified in Paragraph 102.A.

Children on adult programs shall receive the minimum applicable for adults.

78. **WAIVERS**

AFTRA will give waivers in proper cases upon application by the Producer to meet any program requirements with respect to working conditions. Minimum fees are not working conditions.

The wages and working conditions set forth herein are the minimum wages and working conditions for the employment of television artists in the categories mentioned above and

93

no waiver of any such wages or working conditions by any artist shall be effective unless the written consent of AFTRA to such waiver is first had and obtained.

### 79. RETROACTIVITY

Because the Producers received notification from AFTRA, within sixty (60) days after March 8, 2008 that the AFTRA Code had been ratified, the monetary terms of the Code shall be retroactive to November 16, 2007, unless a later date is specified.

### 80. MODIFICATION OF PRESENT CONTRACT

The Producer agrees, for the benefit of AFTRA and all performers employed by the Producer, that existing contracts (whether oral or written), with all performers are hereby modified, in accordance herewith, but no terms, wages, or hours now had by any such performers which are more favorable than the terms, wages, or hours herein specified shall be deemed to be modified, except that every existing contract shall be deemed to contain Paragraph 102 of this Code entitled, "AFTRA Health and Retirement Funds" and Paragraph 102A. entitled, "AFTRA Industry Cooperative Fund," with the waiver provision and this provision may not be waived or changed and cannot be used as a credit under Paragraph 56. If there are any other contracts between or among signatories to this agreement or those who signify their intention of abiding thereby, which require performances or work under terms, wages or conditions less favorable to such performers than are provided herein, then, notwithstanding such contracts, it is agreed that this agreement shall, nevertheless, apply for the benefit of all such performers and of AFTRA.

### 81. WAIVER OF CAUSE OF ACTION

For the benefit of all members of AFTRA, and of AFTRA, and of all other persons and organizations, we hereby waive, relinquish and release any and all claims, rights, actions or causes of action, whether at law, equity, arbitration or otherwise, growing out of the failure of any AFTRA member or any other person to render services prior to the execution of this Agreement where such failure was occasioned by AFTRA, the members', or other persons', obedience to a strike call (or picketing in connection therewith) heretofore issued by AFTRA, irrespective of whether the AFTRA member, at the time of such failure, was under contract to render services, or growing out of the issuance of such strike call or the direction of such picketing by AFTRA. The provisions of this paragraph shall survive personally and individually to every member of AFTRA and every other person who so failed to render services.

### 82. INDIVIDUAL CONTRACTS BEYOND TERM OF CODE

We agree that every contract (now or hereafter made) between the undersigned Company and every AFTRA member shall contain and shall be deemed to contain the following clause:

In the event a performer's individual contract is of longer duration than the said AFTRA Code, then, for such period of duration and until a new Code is agreed to, we covenant not to bring or maintain any action or proceedings against you, because you refrain from rendering your services under this contract by reason of any strike or work stoppage (whether partial or complete) called or ordered by AFTRA. In such event we covenant (a) that neither AFTRA nor any of its representatives shall be deemed to have induced you to breach this contract, and (b) that for the direct benefit of AFTRA and its representatives, we will not bring or maintain any action or proceeding against them, or any of them, based upon or arising either out of this contract or out of your failure to render services under this contract. Upon the resumption of work after such strike or stoppage, all the terms and conditions of this contract shall be reinstated for the balance of the term hereof; provided, however, that if a collective bargaining agreement covering work of the type provided for herein is signed by us, you will, from

94

and after the effective date provided for in such Agreement, receive the benefit of any applicable provisions which may be more favorable to you than the terms of this contract. We further agree that your obligations hereunder shall be subject and subordinate to your primary obligation to AFTRA to obey its rules and orders.

The provisions of this Paragraph 82 shall survive the expiration or cancellation of this Agreement as to all such contracts with AFTRA members in existence while this Agreement is in effect.

### 83. DEFINITIONS

Wherever in this Code, the first person (such as we, our, us) is used, it means the Producer. Similarly, the second person (you) means AFTRA. The terms "Producer" and "Company" are used interchangeably.

In the event that said Act is repealed or amended so as to permit a stricter union security clause the above provision shall be deemed amended accordingly. The provisions of this paragraph are subject to said Act.

### 84. UNION SHOP

Until and unless the union security provisions of the Labor Management Relations Act, 1947, are repealed or amended so as to permit a stricter union security clause the following provisions shall apply:

"It is agreed that during the term of this Agreement, we will employ and maintain in our employment only persons covered by this Agreement as are members of the American Federation of Television and Radio Artists in good standing or as shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder or the date of execution of this agreement whichever is the later, and thereafter maintain such membership in good standing as a condition of employment."

American Federation of Television and Radio Artists agrees that it is and will continue to be an open union and that it will keep its membership rolls open and will make available membership all eligible television artists engaged by the Producer. American Federation of Television and Radio Artists agrees not to impose unreasonable entrance fees or dues upon its members and wherever necessary for the Producer's program purposes to qualify members within twenty-four (24) hours after notice from the Producer.

Producer shall notify the AFTRA office no later than the time of hiring or seventy-two (72) hours in advance of the first rehearsal session, whichever is later, of the names of the performers to be used on dramatic and variety programs, except where the circumstances do not allow sufficient time to give such notice. It shall be the duty of the Producer to ascertain if each performer is a member of AFTRA in good standing, subject to the foregoing, by examining the AFTRA membership card of each member of the cast at the first rehearsal session of each performer, and to notify the local AFTRA office of the name of any person failing to present a paid-up membership card. Such notice shall be given to AFTRA immediately following the first rehearsal session, or if the AFTRA office is closed at that time, such notice shall be given to the AFTRA office as soon as feasible on the following work day.

Producer shall send AFTRA on a monthly basis a list of all persons (including their addresses and social security numbers) performing Sportscaster services covered by the AFTRA Network TV Code for such Producer pursuant to a personal services contract. Producer shall also indicate on such monthly list performers (including their addresses and social security numbers) who had personal services contracts during that month and those whose personal services contracts expired during that month. For the sole purpose of notification under this paragraph, Producer shall be the agent for any F/SIO supplying the covered services of a Sportscaster to such Producer.

95

85.

**AFTRA RULES**

Producer agrees that he has notice that the performer, if a member of AFTRA, must obey its rules. Producer admits specifically notice of the rule which requires the member to render services only upon a program where all the performers within AFTRA's jurisdiction are members in good standing of the American Federation of Television and Radio Artists, except as otherwise provided by law. AFTRA agrees that it has no present rules and will make no future rule in derogation of this Agreement.

86.

**ADMISSION TO PREMISES**

Any representative of AFTRA shall be admitted to the premises of the Producer or where the rehearsal or broadcast takes place, at any reasonable time, to check the performance by the Producer of this Agreement, but such checking shall be done so as not to interfere with the conduct of the Producer's business. Producer agrees upon AFTRA's request to furnish a list of all artists appearing on any program.

87.

**PRODUCTION MEMORANDUM & REMITTANCE REPORT**

Producer agrees to furnish AFTRA with a production memorandum and remittance report for each individual program signed by an authorized agent of the Producer. The production memorandum and remittance report shall include the date when the check was issued to the performer and shall give full and specific information, sufficient to permit computation of performer's fee, with respect to the services rendered by the performer during the period paid. Such information shall be furnished when timely in standard form reports which will be promulgated by AFTRA by agreement with representatives of the Broadcasting Industry. Said memorandum shall be filed with AFTRA within five (5) days after the time required for payment to the performer and no later.

88.

**USE OF RECORDINGS FOR REFERENCE, FILE, AUDITION, TRAILER OR PROMOTIONAL PURPOSES**

Recordings may be used for reference, file and private audition for prospective sponsors and their agencies.

A. With the consent of any star performer appearing in the excerpt (which consent may be obtained by a general clause in the performer's contract)

An excerpt from a recording of not more than five (5) minutes in length for television programs less than ninety (90) minutes in length and not more than ten (10) minutes for television programs ninety (90) minutes or more in length, may be used only in television for trailer and promotional purposes for a program, provided that such excerpt may be used at any time before and not more than three (3) years beyond the scheduled broadcast on a particular station or network of the program from which the excerpt was taken, except that:

(1) the time limitation specified above shall be a three (3) year period following the broadcast season in which the program from which the excerpt was taken was broadcast, and/or

(2) except for prior specials or awards programs may be used to promote a current special or awards program.

B. The three (3) year limit shall not apply to the use of such excerpt for any performer performing in a continuing role in a series under a series or term contract.

Such uses shall not be subject to the provisions of Paragraph, 73 of the Code.

96

89.

**LETTERS OF ADHERENCE**

Paragraph 89, Letters of Adherence, was deleted from the 1998-2001 and succeeding Codes. Remaining Paragraphs will retain their existing numbers.

90.

**PRODUCER BOUND BY OTHER AFTRA CODES**

To be bound by this Code, the Producer must sign a Letter of Adherence to the Code. The Producer agrees to abide by, conform to, and to be bound by each and every provision of other Codes and contracts as provided in the Letter of Adherence unless the parties expressly agree otherwise.

91.

**BOND OR CERTIFIED CHECK**

AFTRA reserves the right, in its sole discretion, to require the posting in advance of an adequate bond, cash, or other security. AFTRA, further, reserves the right to require a Producer to make payment by certified check to the performer, delivered to the AFTRA office at twenty-four (24) hours in advance of the first call, or at the first call, to be held in escrow until due and payable under applicable provisions of this Code.

92.

**UNFAIR PRODUCER**

Producer agrees that he has notice that this Code represents the minimum terms and working conditions of performers in live network television, broadcasting. Any Producer who engages bargaining unit performers and who violates any material term or condition of this Code may be regarded as unfair and performers may be instructed not to work for anyone who is unfair. This paragraph is a statement by the Producer that he has notice of the facts stated in this paragraph, and goes no further.

Any Producer who engages bargaining unit performers and who is declared to be unfair by any branch of the Associated Actors and Artistes of America upon action taken by the branch and such Producer may be declared unfair by AFTRA and action may be instructed not to work for any such person. Artists may not be required to take direction from anyone who has been declared unfair under this provision.

93.

**NO-STRIKE CLAUSE**

So long as the Producer performs this Code, AFTRA will not strike against the Producer as to the performers covered by this Code in that work covered by this Code. To the extent AFTRA has agreed not to strike, it will order its members to perform their contracts with the Producer.

Producer shall notify AFTRA of the names of all employees who use the Producer's recording facilities for the purpose of making recordings at least twenty-four (24) hours in advance of each recording session.

94.

**PRODUCTION PROSECUTED**

In the event that the program for which the performer is engaged is complained of and any prosecution, civil or criminal, private or governmental, shall follow, Producer agrees at his expense to defend the performer and to pay all charges and judgments so incurred. This paragraph does not apply to a case where the prosecution is in respect of material furnished by the performer or by any publicly applicable in respect of the authorization of the Producer. There shall be no distinction made between live and pre-recorded programs for the purposes of the application of this paragraph.

85. **AFTRA RULES**

Producer agrees that he has notice that the performer, if a member of AFTRA, must obey its rules. Producer admits specifically notice of the rule which require the AFTRA member to render services only upon a program where all the performers within AFTRA's jurisdiction are members in good standing of the American Federation of Television and Radio Artists, except as otherwise provided by law. AFTRA agrees that it has no present rules and will make no future rule in derogation of this Agreement.

86. **ADMISSION TO PREMISES**

Any representative of AFTRA shall be admitted to the premises of the Producer or where the rehearsal or broadcast takes place, at any reasonable time, including the rehearsal time, by the Producer of this Agreement, but such checking shall be done so as not to interfere with the conduct of the Producer's business. Producer agrees upon AFTRA's request to furnish a list of all artists appearing on any program.

87. **PRODUCTION MEMORANDUM & REMITTANCE REPORT**

Producer agrees to furnish AFTRA with a production memorandum and remittance report for each individual program signed by an authorized agent of the Producer. The production memorandum and remittance report shall include the date when the check was issued to the performer and shall give full and specific information, sufficient to permit computation of performer's fees, with respect to the services rendered by the performer and the gross fees paid. Such information shall be furnished when timely in standard televised and practical form for a program, promulgated by AFTRA by separate memorandum or on the Broadcasting Industry. Said memorandum shall be filed with AFTRA within five (5) days after the time required for payment to the performer and no later.

88. **USE OF RECORDINGS FOR REFERENCE, FILE, AUDITION, TRAILER OR PROMOTIONAL PURPOSES**

Recordings may be used for reference, file and private audition for prospective sponsors and their agencies.

An excerpt from a recording of not more than five (5) minutes in length for television programs less than ninety (90) minutes in length and not more than ten (10) minutes for television programs ninety (90) minutes or more in length, may be used only in television for further promotional purposes for a program, provided that such excerpt is not used at any time before and not more than three (3) years beyond the scheduled broadcast on a particular station or network of the program from which the excerpt was taken, except that:

A. With the consent of star performer appearing in the excerpt (which consent may be obtained by a general clause in the performer's contract):

(1) the time limitation specified above shall be a three (3) year period following the broadcast season in which the program from which the excerpt was taken was broadcast, and/or

(2) excerpts from prior specials or awards programs may be used to promote a current special or awards program.

B. The three (3) year limit shall not apply to the use of such excerpt for any performer performing in a continuing role to a series under a series or term contract.

Such uses shall not be subject to the provisions of Paragraph 73 of the Code.

96

89. **LETTERS OF ADHERENCE**

Paragraph 89, Letters of Adherence, was deleted from the 1998-2001 and succeeding Codes. Remaining Paragraphs will retain their existing numbers.

90. **PRODUCER BOUND BY OTHER AFTRA CODES**

To be bound by this Code, the Producer must sign a Letter of Adherence to the Code. The Producer agrees to abide by, conform to, and be bound by each and every provision of other Codes and contracts as provided in the Letter of Adherence unless the parties expressly agree otherwise.

91. **BOND OR CERTIFIED CHECK**

AFTRA reserves the right, in its sole discretion, to require the posting in advance of an adequate bond, cash, or certified check. If AFTRA also reserves the right to require a Producer to make payment by certified check to the performer, delivered to the AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under applicable provisions of this Code.

92. **UNFAIR PRODUCER**

Producer agrees that he has notice that this Code represents the minimum terms and working conditions for the performer in live network television broadcasting. Any Producer who engages bargaining unit performers and who breaches any material term or condition of this Code may be regarded as unfair and such performers may be instructed not to work for anyone who is unfair. This paragraph is a statement by the Producer that he has notice of the facts stated in this paragraph, and goes no further.

Any Producer who engages bargaining unit performers and who is declared to be unfair by any branch of the Associated Actors and Artistes of America upon action taken by the Associated Actors and Artistes of America by reason of a primary dispute between such branch and such Producer may be declared unfair by AFTRA and artists may be instructed not to work for any such person. Artists may not be required to take direction from anyone who has been declared unfair under this provision.

Producer shall notify AFTRA of the names of all employes who use the Producer's recording facilities for the purpose of making recordings at least twenty-four (24) hours in advance of each recording session.

93. **NO-STRIKE CLAUSE**

So long as the Producer performs this Code, AFTRA will not strike against the Producer as to the performers covered by this Code in the field covered by this Code. To the extent AFTRA has agreed not to strike, it will order its members to perform their contracts with the Producer.

94. **PRODUCTION PROSECUTED**

In the event that the program for which the performer is engaged is complained of and any prosecution, civil or criminal, private or governmental, shall follow, Producer agrees at his expense to defend the performer and to pay all charges and judgments so incurred. This paragraph does not apply to a case where the prosecution is in respect of material furnished by the performer or set as done by the performer without the authorization of the Producer. There shall be no distinction made between live and pre-recorded programs for the purposes of the application of this paragraph.

97

Exhibit B, Page 127

**95.   GRIEVANCE AND ARBITRATION**

All disputes and controversies of every kind and nature whatsoever between any Producer and AFTRA or between any Producer and any member of AFTRA, arising out of or in connection with this Code, and any contract or engagement (whether oral or written, and whether at the minimum terms and conditions of this Code or better) in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Code and/or such contract or engagement, shall be submitted for resolution in accordance with the following grievance and arbitration procedures.

A.   **Time Limits:**

Proceedings for grievance and/or arbitration of a claim must be commenced on or before the earlier of:

(1)   twelve (12) months following the date on which the party bringing the grievance or arbitration proceeding knew or should have known of the facts upon which the claim is based; or

(2)   two (2) years following the date on which the event in dispute occurred.

B.   **Grievance Procedure:**

Within ten (10) working days after the filing of a grievance, authorized representatives of the Producer and AFTRA or (with the written consent of AFTRA) the artist concerned shall discuss and attempt to settle the dispute.

C.   **Arbitration:**

A dispute may be submitted to arbitration at any time twenty (20) or more working days following the filing of a grievance, whether or not a discussion of the grievance under the grievance procedure has occurred, or earlier if it appears that the demand for arbitration would otherwise be untimely under the time limits specified in subparagraph A. Such arbitration shall be conducted under the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association except as otherwise provided herein:

(1)   AFTRA, the Producer concerned, or (with the written consent of AFTRA endorsed upon the demand for arbitration) the artist concerned, may demand such arbitration in writing. The hearing shall be held and the award made by a single AFTRA-Industry Arbitrator, who shall be named in accordance with the provisions of this Paragraph 95.

(2)   In the demand for arbitration, the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

(a)   The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within seven (7) days after the close of the submission of evidence.

- or -

(b)   The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

98

(3)   If one party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph C.(2)(b) of Paragraph 95.

The award of the Arbitrator shall be final and binding upon all parties to the proceeding during the period of this agreement, and judgment upon such award may be entered by any party in the highest court of the forum, state or federal having jurisdiction.

(4)   AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and AFTRA, any party in any proceeding hereunder, any party in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in court following the award shall be promptly filed with AFTRA.

(5)   Nothing herein contained shall be deemed to give the Arbitrator the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Code.

(6)   The three Network Broadcasting Companies (CBS, NBC and ABC) shall be signatory hereto according to behalf of all present and future Signatories to this Code and letters of reference thereto shall:

(a)   Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) the single AFTRA-Industry Arbitrator referred to in subparagraph (1) above (it being understood and agreed that there shall be a different "single AFTRA-Industry Arbitrator" designated in each network center who shall serve as arbitrator in any arbitrable matters arising under this Code), or in the alternative,

(b)   Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) a Panel of Arbitrators for each network center from which there shall be elected (in accordance with the selection procedure set forth below) a single AFTRA-Industry Arbitrator to serve as arbitrator in the network centers in any arbitrable matters arising under this Code.

Whichever method of selecting an Arbitrator is first utilized (i.e., either (6)(a) or (6)(b) above) shall be determinative hereunder.

In the event an Arbitrator (selected pursuant to (6)(a)) is unable to perform his duties for any reason whatsoever the said Broadcasting Companies and AFTRA shall mutually agree upon a successor immediately and if they are unable to so agree then the procedure set forth in Paragraph 95.C.(7) hereof shall become applicable.

Immediately upon serving a demand for arbitration, a copy of the demand shall be filed with the American Arbitration Association, which shall select the single Arbitrator for the hearing in accordance with whether AFTRA and the said Broadcasting

99

Companies have utilized either method (6)(a) or (6)(b) for the designation of the arbitrator.

(7) If the method (6)(b) has been utilized and therefore a Panel of Arbitrators has been selected for each network center then the Arbitrator shall be selected from the Panel named for the network center in which the demand is filed. In any case, both parties shall be notified by the American Arbitration Association of the Arbitrator assigned to their case immediately upon his appointment.

In making selections from the Panel, the American Arbitration Association shall do so in numerical order, and shall appoint the first arbitrator on the Panel who is available. The Arbitrator for the next arbitration shall again be processed in numerical order, commencing with those arbitrators who have been previously appointed, it being the intention that no arbitrator will be appointed more than once (except by virtue of his numerical position on the Panel) unless all those on the Panel who have not served as many times are unavailable for the arbitration in question. Should none of the Arbitrators on the Panel be available for any particular arbitration, such arbitration shall be conducted by a single neutral arbitrator, pursuant in the procedure set forth in subparagraph (7) following, which for this purpose is made a part of this paragraph with the same force and effect as though fully set forth herein.

(e) All of the foregoing provisions of this paragraph 95 shall be effective immediately upon the execution of this Code, but pending only the utilization of either method (6)(a) or (6)(b) for the designation of the arbitrator, and the designation in writing to the American Arbitration Association of the name of the single AFTRA-Industry Arbitrator or the Panel of Arbitrators, the following arbitration provisions shall apply:

AFTRA, the Producer concerned, or (with the consent of AFTRA, the artist concerned), may demand and such arbitration shall be conducted by a single neutral arbitrator shall be selected to resolve the dispute, pursuant to the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association.

In the demand for arbitration, the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

(i) The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator(s). The award of the Arbitrator(s) shall be made within seven (7) days after the close of the submission of evidence.

- or -

(ii) The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

If the party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph C.(7)(b)(ii) of Paragraph 95.

100

The award of the arbitrator shall be final and binding upon all parties to the proceeding during the period of its agreement, and judgment upon the award may be entered by any party in the highest court of the forum, state or federal, having jurisdiction.

(c) The parties agree that the provisions of this Paragraph shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this Agreement and which is therefore arbitrable as set forth above. The arbitration provisions of this agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this Agreement.

(d) AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and AFTRA may do anything which an artist named in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in a court following the award, shall be promptly filed with AFTRA.

(e) Nothing herein contained shall be deemed to give the Arbitrators the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Code.

(8) The Arbitrator(s) in making an award with respect to any claim hereunder may, in the light of all the facts and circumstances involved in connection with such claim, in his or her discretion: (a) make his or her award effective as of the date any payments were first due, but in no event more than two (2) years prior to the date when the written demand for arbitration was served, or (b) make his or her award effective as of the date of the award, or (c) make his or her award effective as of any intermediate date.

## 96. CHECK-OFF

The Producer agrees that, on thirty (30) days written notice from AFTRA, he will deduct for and on account of union membership dues, that percentage of compensation earned by each employee covered under this Agreement for whom there shall be filed with the Producer a written assignment in accordance with Section 302(c) of the Labor Management Relations Act, 1947. The Producer shall commence making such deductions with the first wage payment to be made to each such employee following the giving of such written assignment, and such deductions shall continue thereafter with respect to each and every subsequent wage payment to be made to each such employee during the effective term of his said written assignment.

Within ten (10) days after the end of each month, the Producer shall remit to the Union, by check drawn to the order of American Federation of Television and Radio Artists, the total amount of all deductions made during the said month for all such employees. At the time of such remittance, and together therewith the Producer shall also furnish to the Union, a record covering the names of the employees on whose account such deductions were made, their respective earnings during said month, and the amount of deductions for each such employee during said month.

The Producer agrees that he will cooperate with the Union in order to expedite the procurement by the Union of the written assignments of the employees, as herein required.

101

97.

## NO DISCRIMINATION/AFFIRMATIVE ACTION

A. **Policy:**

Producer agrees not to discriminate against any performer because of race, creed, color, national origin, sex, sexual orientation or disability, in accordance with applicable state and federal law. In accordance with this policy, Producer shall cast performers belonging to all types of roles, including continuing roles, having due regard for the requirements of talent and suitability for the role.

In accordance with the above, AFTRA reaffirms its policy of non-discrimination with respect to admission to membership, and rights of membership and Producer agrees to participate in the Joint Industry-AFTRA Committee established to administer the policies and procedures set forth in the 1963 Joint Statement of Policy. That Policy, as updated to conform to the first paragraph hereof, designed to continue and strengthen the implementation of a long-standing policy against discrimination in the employment of talent, reads as follows:

AFTRA, the employers, producers, networks, stations, advertising agencies, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others, are in agreement that the following policies and procedures will be continued and strengthened in the future:

(1) Discrimination shall not be practiced against any performer, or any applicant for employment as a performer, because of race, creed, color, national origin, sex, sexual orientation or disability, (a) in admission to membership in AFTRA or in the rights and privileges of full membership in AFTRA as established in the AFTRA Constitution, (b) in the publicizing of auditions and interviews, (c) in calling or requesting the appearance of performers for auditions or interviews, (d) in the hiring of performers, in the discharge or replacement of performers, (e) in the staging of a production, or (f) in any other dealings with or treatment of performers.

(2) To word casting notices in such a way as not to discourage minority group members from inquiring, applying or auditioning. Casting notices shall state that Producer is an Equal Opportunity Employer.

(3) When a role being cast depicts a person with a specific disability, the Producer agrees to include that fact in the casting specifications so as to enhance the opportunity for performers with similar disabilities to audition for the role.

(4) When conducting interviews or auditions for casting purposes, representation by an agent or other performers' representatives shall not be a requirement for an audition.

(5) To the extent that any producer keeps files of performers' names, pictures, resumes, etc., there will be no discrimination in keeping of such files on account of race, color, creed, national origin, age, sexual orientation or disability.

(6) To instruct all casting agents and performers' representatives to refer performers without regard to race, creed, color, national origin, age, sexual orientation or disability.

(7) To select applicants for audition, interview and employment, and employ performers on the basis of ability in all roles without regard to race, color, creed, national origin, sex, age, sexual orientation or disability, subject to bona fide job qualifications and requirements.

102

(8) Producer shall cast performers in accordance with the above policy in all types of roles, having due regard for the requirements of, and suitability for, the role, so that, for example, the American Scene may be portrayed realistically. To that end, the American Scene may be portrayed realistically, so that the American Scene will be portrayed by women, minorities, performers with disabilities and seniors in all aspects of society. The parties agree that the producer shall retain its exclusive creative prerogatives. In furtherance of the foregoing, the producer shall make good faith efforts to provide audition opportunities for women, minorities, individuals with physical disabilities and seniors.

(9) Producer shall not use any information contained on INS Form I-9 to discriminate against any performer on the basis of the sex, race, age or national origin and the I-9 form will not be used for this purpose. It is intended, i.e., verifying that an employee may be employed pursuant to applicable Immigration Law and will not be made available for any other purpose.

(10) The signatories to this Statement of Policy are AFTRA, employers, producers, networks, stations, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others. Furthermore, the Policy Statement has been reviewed and agreed to by a committee representing advertisers and agencies employing and using talent in television and radio.

(11) Each signatory Producer agrees to comply with the substantive provision of Title I of the Americans with Disabilities Act of 1990 with respect to performers it may employ under this Code, notwithstanding the fact that the ADA by its own terms otherwise may not apply to any such Producer. The practice known as "painting down" is presumptively improper; the Producers will continue their dialogue with AFTRA, and the stunt community on this issue.

B. **Data:**

(1) Within twenty (20) days after the end of each quarter, Producer will submit to the AFTRA National Office a report on the sex, ethnicity, obvious physical disability, and age of performers employed by Producer under this Agreement on all dramatic programs which it placed into production during such quarter. The report will be submitted on the form attached hereto as Exhibit H, it being understood that a report produced by Producer's own computer data processing system which furnishes the same information as required on such form shall be acceptable. With respect to the information furnished on age, obvious physical disability, and ethnicity, it is recognized that, while Producer shall make reasonable efforts to ascertain such information, subject to any legal restriction applicable thereto, there may be circumstances where Producer will be unable to secure the data or vouch for its accuracy.

(2) The first report to be submitted shall be for the first complete quarter following execution of this Code.

(3) The data which is furnished by Producer in accordance with this subparagraph B shall be for the purpose of facilitating any meeting which may be requested pursuant to subparagraph C, and is in no way intended to abridge the Producer's creative rights in the production of the program.

(4) In the event that Producer fails to submit the report within the time specified above, AFTRA may send a written notice or delinquency to Producer requesting submission of the report within ten (10) working days of receipt of the notice.

103

C.

The reports may be released only to appropriate AFTRA staff and to AFTRA members who will be participating with the Producer pursuant to subparagraph C and shall not be released to others without the express written consent of the Producer except that AFTRA may release aggregated industry-wide information that does not identify individual Producer(s).

If there is a substantial breach of this subparagraph (4) with respect to any individual quarterly report, or in the event there is a dispute as to whether or not a substantial breach has occurred, the matter may be referred to arbitration.

C. Meetings with Producer Representatives:

(1) If the Union or Producer has information which is the basis for a genuine concern that the policies expressed in this Paragraph are being violated, either party may request, on ten (10) days notice, a meeting to discuss any matter relating to discrimination, fair employment, the policy expressed herein, its further implementation, the data submitted or any other matter relevant to equal employment opportunity for performers.

(2) If the Producer has an official with responsibilities for matters involving equal opportunity, the Union's request for a meeting shall be referred to such person who shall then be responsible for arranging the meeting with the appropriate Producer representatives. If the Producer has no such person on staff, the Producer will designate such a person for the purpose of arranging the requested meeting, and the Union will be notified in writing of the person so designated.

(3) Representatives at the Network meetings will include the Company's senior labor relations and programming officials and persons responsible for developing story lines and casting, typically including executive producers, lead writers and, where applicable, casting directors.

(4) The ten (10) day notice may be given at any time but may not be given more often than once each quarter.

(5) A party's alleged failure or refusal to participate in a meeting, as required by this subparagraph 97.C., shall be subject to the grievance and arbitration procedure.

D. The parties agree that in order to promote the casting of performers belonging to all groups in all types of roles in daytime television, the three Networks (ABC, NBC and CBS) shall meet separately with AFTRA at least once per year for the purpose of discussing additional employment of minorities and disabled persons, progress in that area since the last meeting, new opportunities that may be arising, and any other issues relevant to this paragraph of the Code. Additionally, at the request of any individual Producer or AFTRA, such Producer and AFTRA shall meet. A party's alleged failure or refusal to participate in a meeting, as required by this subparagraph 97.D., shall be subject to the grievance and arbitration procedure.

E. Arbitration:

Except as provided in subparagraphs B, C, and D, above, the matters covered in this Paragraph are not subject to the provisions of Paragraph 95.

F. Stunt Performers:

When applicable, and with due regard to the safety of cast, crew and other persons, women and minorities shall be considered for stunt doubling roles and for scripted stunts on a functional nondiscriminatory basis.

104

G.

Producer shall endeavor to cast performers with disabilities for scripted stunts for which they are qualified as well as which due regard for safety, in roles portraying their particular disabilities and as wheelchair stunts or stunts involving the use of other adaptive devices, e.g., crutches, prostheses, etc. The AFTRA Liaison to the Performers with Disabilities Committee is among the resources that can be utilized in ascertaining the availability of such performers.

Where the stunt performer doubles for a role which is identifiable as female and/or Black, Hispanic, Asian Pacific or Native American and the race and/or sex of the double are also identifiable, Producer shall endeavor to cast qualified persons of the same sex and/or race involved. The Producer shall endeavor to identify and recruit qualified minority and female stunt performers prior to the commencement of production.

G. Producer Meeting-Mediation:

Either Producer or AFTRA may submit a dispute under Paragraph 97.A. needs to be discussed. The Producer and Union shall meet within sixty (60) days after receipt by the non-moving party of such written notice, except that the parties may, by mutual agreement, extend such sixty (60) day period. If the meeting is not held due to the failure of the one non-moving party to attend such meeting, the moving party may refer the matter to a non-binding mediation with an independent mediator.

Producer and AFTRA agree to seek funding for the mediation program from the AFTRA Industry Cooperative Fund.

97.A. ALCOHOLISM AND DRUG ABUSE

The signatories to this Code hereby adopt and approve the Statement of Objectives and Principles of AIP-ADA, Inc. the AFTRA-Industry Program for Alcoholism and Drug Abuse, as set forth in Exhibit G, and agree to cooperate with AFTRA and AIP-ADA, in furtherance of such objectives.

98. REVIEW BOARD

The signatories to this Code agree to discuss with AFTRA the formation of a face-finding impartial review board.

99. SEPARABILITY

The parties hereto recognize that from time to time during the course of their bargaining new laws have been enacted with provisions that have remained unclear, and several provisions of this Code declaring established past practices have been readopted in the absence of any known problem; and in the event of this Code in accordance with the requirements of the parties to interpret and apply all in question. It has always been and is the intention requirements of law. To that end we declare that if any provision of this Code is found to be in violation of law, this Code shall be deemed modified or amended accordingly. All terms and conditions of this Code are separable.

100. GUIDELINES – EMPLOYMENT OF MINORS

The parties hereto, recognizing the special situation that arises when minors are employed, have formulated the following guidelines with respect to minors employed under this Code, to ensure that: 1) The performance environment is proper for the minor, and 2) the conditions of employment are not detrimental to the health, education, safety and morals of the minor.

105

It is the intent of this provision that the best interests of the minor be the primary consideration of the parent/guardian and the adults in charge of production, with due regard to the age of the minor.

The term "minor," as used herein, means any performer under the age of eighteen (18) years, except that it shall not include any such performer if (1) the performer has satisfied the compulsory education laws of the state governing the performer's employment, (2) the performer is married, (3) the performer is a member of the Armed Forces, or (4) the performer is legally emancipated, in which case it is agreed that both the Producer and the minor shall comply fully with the legal terms of the minor's emancipation.

A. Interviews and Tests:

Calls for interviews and individual voice and photographic tests, fittings, wardrobe tests, make-up tests, production conferences, publicity and the like for children of school age shall be after school hours, provided such calls are completed prior to 8:00 p.m. Producer shall use his best efforts to assure that calls for such interviews and tests normally shall be limited to one (1) hour. Two (2) adults must be present at and during any such call involving a minor. Calls for actual production shall not be so limited.

B. Engagement:

(1) Producer shall advise the parent/guardian of the terms and conditions of the employment (studio, location, estimated hours, hazardous work, special abilities required, etc.), to the extent they are known, at the time of the hiring.

(2) Prior to the first date of the engagement, parent/guardian shall obtain, complete and submit to the Producer or his representative the appropriate documents required by state and local law related to the employment of the minor. Producer agrees to cooperate with AFTRA in an effort to secure a more efficient handling of the issuance of working permits for children from the N.Y. Society for the Prevention of Cruelty to Children, and the Mayor's Office of the City of New York.

C. Work Hours:

(1) The workday for a minor shall begin no earlier than 5:00 a.m. and shall end no later than 10:00 p.m. on evenings preceding school days. On evenings preceding non-school days the minor's workday shall end no later than 1:00 a.m. on the morning of the non-school days).

(a) Exceptions to "work hours":

(i) Where the Producer has obtained a waiver of the minor's work hours from the applicable state agency, AFTRA will be deemed to have granted an automatic waiver of this provision, in accordance with such state waiver.

(ii) AFTRA agrees to grant Producer's reasonable requests for waivers of the work hours provision.

D. Supervision:

(1) The parent/guardian must be present at all times while a minor is working, and shall have the right, subject to production requirements, to be within sight and sound of the minor. The presence of the parent/guardian will not interfere with the production. The parent/guardian will not bring other minors not engaged by Producer to the studio or location.

106

(2) The parent/guardian will accompany the minor to wardrobe, make-up, hairdressing and dressing room facilities. No dressing room shall be occupied simultaneously by a minor and an adult performer of the opposite sex. This restriction shall not apply to minors under three (3) years old.

(3) Producer will provide a safe and secure place for minors to rest and play. The Producer agrees to supply cots during rehearsal for minor performers.

(4) No minor shall be required to work in a situation which places the child in clear and present danger to life or limb. If a minor believes he or she to be in such a situation after having discussed the matter with his or her guardian or the stunt coordinator, if one is present, then the minor shall not be required to perform in such situation regardless of the validity of his or her belief.

(5) When a Producer designates a minor, Producer must designate one (1) individual on each set to coordinate all matters relating to the welfare of the minor and shall notify the minor's parent/guardian of the name of such individual.

(6) If a minor is at location, the minor must leave the location as soon as reasonably possible following the end of his or her working day.

(7) Guardian, as that term is used in this Section, must be at least eighteen (18) years of age and be the minor's legal guardian or have the written permission of the minor's parent(s) to act as guardian.

(8) Producer will comply with all applicable child labor laws governing the employment of the minor in broadcasting, and will keep a summary of said laws in the production office, if such summary is readily available.

E. Education:

Producer shall use his best efforts to ensure that the minor's education will not be neglected or hampered by the performer's employment and will comply with all applicable education laws.

If a minor is scheduled to work in the studio two (2) or more weekdays in a given week, and on those days his or her work schedule is at least eight (8) hours each day and in a manner which interferes with the performer's attendance at his/her regular school in a manner that precludes the performer from attending school for at least three (3) hours, then Producer shall provide the performer with sufficient study time, in periods of no less than twenty (20) minutes at any one time, so that performers will have had the opportunity to be in school and/or study for a total combined period of three (3) hours on each such day.

Any provision of this Paragraph which is inconsistent and less restrictive than any child labor law or regulation in applicable state or other jurisdiction shall be deemed modified to comply with such laws or regulations.

The provisions of this Paragraph shall prevail over any inconsistent and less restrictive terms contained in any other Paragraphs of this Code which would otherwise be applicable to the employment of the minor, but such terms shall be ineffective only to the extent of such inconsistency without invalidating the remainder of such Paragraphs.

101. COST OF LIVING

Paragraph 101. Cost of Living, was deleted from the 1991-1994 Code. Remaining Paragraphs will retain their existing numbers.

107

## 102. AFTRA HEALTH AND RETIREMENT FUNDS

Section 1.

A. With respect to services performed under this Code on and after November 16, 2007 (including all services such as rehearsal theretofore performed in connection therewith), and with respect to "recordings" produced under this Code and broadcast on and after November 16, 2007, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fourteen percent (14%) (fourteen and one-half percent (14.5%) effective November 16, 2008, and fifteen percent (15%) effective July 1, 2009) of the gross compensation due each performer for such services and/or the use of such "recordings." As used in the preceding sentence, the term "recordings" shall have the meaning given in Paragraphs 70 and 72 of this Code. The Producer's obligation to pay such sum shall apply to the performers' compensation, including talent agent's commission (it being understood that nothing in this Code shall be construed as requiring Producer to pay a talent agent's commission), without any deductions whatsoever, whether pursuant to oral or written contracts entered into prior to, on or after November 16, 1994. (However, this shall not be construed as requiring any duplication of payment made under any previous AFTRA Code.)

Producer's contributions shall be allocated 9.1% to the Health Fund and 4.9% to the Retirement Fund. Effective November 16, 2008, Producer's contributions shall be allocated 9.4% to the Health Fund and 5.1% to the Retirement Fund. Effective November 16, 2009, Producer's contributions shall be allocated 9.8% to the Health Fund and 5.2% to the Retirement Fund.

(1) Dramatic Programs (Including Situation Comedies) Other Than Exhibit A and Serials:

With respect to services performed under this Code on and after November 16, 2007 (including all services such as rehearsal theretofore performed in connection therewith), and with respect to "recordings" produced under this Code and broadcast on and after November 16, 2007, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fourteen percent (14%) (fourteen and one-half percent (14.5%) effective November 16, 2008, and fifteen percent (15%) effective November 16, 2009) of the gross compensation due each performer for such services and/or the use of such recordings. The allocations shall be as set forth in unnumbered subparagraphs two and three above.

Producer's obligation to make health and retirement contributions on gross compensation shall be limited to the following maximum amounts of compensation per performer per program episode on which contributions are due:

| | |
|---|---|
| 30 minute program episode | $15,000 |
| 60 minute program episode | $24,500 |
| 90 minute program episode | $33,000 |
| 120 minute program episode | $40,000 |
| Exclusively payments | $40,000 |

108

### (2) Exhibit A Programs:

With respect to services performed under this Code (including all services such as rehearsal theretofore performed in connection therewith) on Exhibit A programs on and after July 1, 2008 and with respect to "recordings" produced under this Code and broadcast on and after July 1, 2008, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fourteen percent (14%) (fourteen and one-half percent (14.5%) effective November 16, 2008, and fifteen percent (15%) effective July 1, 2009) of the gross compensation due each performer for such services and/or the use of such recordings.

Producer's obligation to make health and retirement contributions on gross compensation shall be limited to the following maximum amounts of compensation per performer per program episode on which contributions are due:

| | |
|---|---|
| 30 minute program episode | $15,000 |
| 60 minute program episode | $24,500 |
| 90 minute program episode | $33,000 |
| 120 minute program episode | $40,000 |
| Exclusively payments | $40,000 |

### (3) Dramatic Serials:

With respect to services performed under this Code (including all services such as rehearsal theretofore performed in connection therewith) on dramatic serials on or after November 16, 2007, and with respect to recordings produced under this Code and broadcast on and after November 16, 2007, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fourteen percent (14%) (fourteen and one-half percent (14.5%) effective November 16, 2008, and fifteen percent (15%) effective November 16, 2009) of the gross compensation due each performer for such services and/or the use of such recordings.

B. In the event the gross compensation paid, due to or become due to a "star performer," on or on his behalf, to any other person, firm or corporation, directly or indirectly, for an engagement under this Code on or after November 16, 2004, is more than twenty-five percent (25%) below the performer's reasonable customary compensation as measured by the average gross compensation paid, due to or become due to the performer or on his behalf, to any other person, firm or corporation, directly or indirectly, by other Producers, with which performer had no relationship, for (i) comparable appearances (excluding "exchanges"), then Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fourteen percent (14%) (fourteen and one-half percent (14.5%) effective November 16, 2008, and fifteen percent (15%) effective November 16, 2009) of the gross compensation due the performer for such services and/or the use of such recordings.

102 A of such reasonable or customary compensation, as measured by the average gross compensation paid during the eighteen (18) month period immediately prior to the instant engagement for the type of comparable appearances shall in no event apply where (i) the foregoing criteria of the average reasonable or customary compensation cannot be met, for the instant engagement; provided, however, that the four (4) comparable appearances on which it has been customary to pay star performers minimum compensation not substantially in excess of minimum, or (ii) there has been a substantial loss in the "marquee value" of the star performer, or (iii) no four (4) comparable appearances have occurred during the eighteen (18) month period immediately prior to the instant engagement of the performer, or (iv) the performer's engagement is only for a "final" appearance. Upon request of Producer, AFTRA shall furnish to Producer such records as can be obtained by AFTRA as are necessary to ascertain the average gross compensation for performer's last four (4) comparable appearances.

C. As used in the preceding paragraph, a "star performer" is a performer whose average gross compensation (excluding "exchanges") for an appearance under this Code measured by his last four (4) comparable appearances (excluding "exchanges"), is more than $1,500.00. A "comparable appearance" is an appearance under this Code or a

109

prior AFTRA Network Television Code on a comparable program. "Exchanges" are those situations where one performer exchanges appearances on each other's programs.

D. The aforementioned sums shall be used solely (1) for the purpose of providing retirement benefits for eligible employees under this Code including, in the discretion of the Trustees, death benefits for beneficiaries of deceased eligible employees, (2) for the purpose of providing health benefits for eligible employees within AFTRA's jurisdiction and, at the discretion of the Trustees, for their families, and (3) for the incidental expenses connected with the establishment and administration of the AFTRA Health and Retirement Funds.

E. With respect to any agreement for the services of a performer ($f/o$ agreement), including services covered by the AFTRA National Code of Fair Practice for Network Television Broadcasting and/or by a "loan-out company" (i.e., a corporation which is controlled by the performer, and furnishes the performer's services to others under an $f/o$ agreement), payments into the AFTRA Health and Retirement Fund (hereinafter "contributions") shall be governed by the following:

(1) In its $f/o$ agreement with the loan-out company, the Producer shall separately state the compensation applicable to services covered by the AFTRA National Code of Fair Practice for Network Television Broadcasting.

(2) If other than AFTRA covered services are involved and an amount is allocated to such other services, the Producer shall notify AFTRA of the amount allocated to the AFTRA covered services. If AFTRA disputes the amount allocated to the other services, the parties will discuss what the appropriate allocation of such compensation between AFTRA and substantial consideration in resolving the dispute to the performer's "customary salary." If, after such discussions, AFTRA does not agree on the appropriate allocation, then either party may submit the matter, as it relates to health and retirement contributions only, to arbitration in accordance with the provisions of this Code.

(3) Contributions shall be based on the amount the Producer pays the loan-out company for furnishing the performer's AFTRA covered services.

(4) Agreements with loan-out companies for covered services of the loaned-out performer which are entered into, on or after the December 23, 1989, shall require that Producer shall make health and retirement contributions directly to the Plan as agent for this purpose for the loan-out company.

(6) Until such time as the Producer implements the direct payment system described in subparagraph (4)(a) above, the loan-out company shall have the obligation to make the contributions; provided, however, that the Producer and the loan-out company may enter into an agreement which provides that the Producer shall pay such contributions directly, to the AFTRA Health and Retirement Fund and notify the AFTRA National Executive Director of such agreement and each payment shall be made by the Producer without notice from AFTRA or the Fund. If the loan-out company does not pay contributions within ten (10) business days

110

following the date they become due, AFTRA or the Plan shall give written notice to the Producer within a reasonable period thereafter and the Producer, as agent for this purpose for the loan-out company, shall pay the contributions within ten (10) business days after receiving such notice.

Section 2.

The AFTRA Health and Retirement Funds shall be Trust Funds and shall be administered under the AFTRA Health and Retirement Funds Agreement and Declaration of Trust, dated November 16, 1954, as amended to date (the "Trust Agreement") which Trust Agreement is hereby ratified and confirmed and is made a part of this Code with the same force and effect as though fully set forth herein. The said Trust Agreement shall provide, among other things:

A. That the AFTRA Health and Retirement Funds be administered by ten (10) Producer Trustees designated by the Producers and ten (10) AFTRA Trustees designated by AFTRA.

B. That AFTRA may, at any time in its discretion on written notice to all the Trustees then in office, appoint a successor or successors for any one (1) or more of the AFTRA Trustees. Written notice shall contain the names of the new Trustees and the names of the families whom they replace. Successors for Producer Trustees may be appointed as provided in the Trust Agreement.

C. That the Trustees shall determine the form, nature, and amount of retirement and health benefits and the rules of eligibility for such benefits, except as otherwise provided in this Agreement. The health benefits shall include in the discretion of the Trustees any one or more of the following benefits (but none other): death, accidental death, dismemberment, disability, dental, wellness, prescription drug, loss of voice, expense, temporary disability, hospitalization, surgical expense, medical

D. That the employers having other collective bargaining agreements with AFTRA may, with the approval of the Trustees, become contributing Producers and parties to the Trust Agreement, and by agreeing to be bound by the Trust Agreement, become Producers thereby appoint as their representatives in the administration of the AFTRA Health and Retirement Funds the Producer Trustees.

E. That the plan of retirement benefits adopted thereunder shall be subject to the approval of the Internal Revenue Service as a qualified plan. If any part of the plan is not approved by the Internal Revenue Service, the plan shall be modified by the Trustees, but such modification, as to the limitations set forth in this agreement, to such form as is approved by the Internal Revenue Service.

F. That no portion of the contribution may be paid or revert to any Producer.

Section 3.

Each Producer shall furnish the Trustees the information pertaining to the names, job classifications, social security numbers and compensation information for all performers covered by this Agreement, together with such other information as may be reasonably required for the proper, low cost and efficient administration of the AP Health and Retirement Funds and the AFTRA IAP. Producer agrees to furnish a remittance report containing such information and to pay to the appropriate AFTRA Health and Retirement Fund office the contribution specified in Section 1 not later than fifteen (15) days following the Thursday (a) after the week during which the performance shall have taken place, or (b) in the case of prescended program after the final rendition of physical services.

111

**Section 4.**

These provisions for the AFTRA Health and Retirement Funds and the AFTRA IAP are in addition to (and not in substitution in whole or in part for) any existing health and/or retirement funds covering any of the performers under this Agreement, and no performer shall lose, in whole or in part, any of his rights or privileges under such other health and/or retirement funds by virtue of receiving or being entitled to receive benefits under the AFTRA Health and Retirement Funds, nor may any payments, rights or privileges available to a performer under the AFTRA Health and Retirement Funds and the AFTRA IAP be credited to any payments, rights, or privileges under any other health and/or retirement funds and vice versa. Nothing in this Paragraph 102 shall preclude the AFTRA Health Fund from applying coordination of benefits and/or subrogation provisions. Nothing in this Paragraph 102 shall preclude actions to comply with the provisions of the Internal Revenue Code applicable to qualified retirement plans.

**Section 5.**

No part of the Producer's contributions or the performer's benefits from the Health and Retirement Plans or, the AFTRA IAP, (a) may be credited against the performer's compensation or against any other benefit or enrollments whatsoever that the performer may be entitled to, no matter what form such other benefits or enrollments may take, or (b) are subject to any talent agency commission, or other deduction, except to the extent that the payment or benefits may be subject to a qualified domestic relations order or other offset or deduction required by law.

**Section 6.**

Contributions shall be allocated sixty-five percent (65%) to the Health Fund and thirty-five per cent (35%) to the Retirement Fund.

**102.A. AFTRA INDUSTRY COOPERATIVE FUND**

The AFTRA Industry Cooperative Fund proceeds are earmarked for the administration of programs intended to benefit performers and to increase awareness of the provisions of the Code.

Funding shall be provided by an employer contribution of one-tenth (1/10) of one percent (.1%) of "gross compensation," as defined in Paragraph 102, Section 1, of this Agreement and subject to the ceilings set forth in Paragraph 102, paid to performers covered under this Agreement.

**EXCESS FEEDS TO STRUCK STATIONS**

Producer agrees that in the event AFTRA performers performing on a station or stations other than the originating stations of New York, Chicago and Los Angeles are on strike, the Producer will not (without the consent of AFTRA) require performers to render services on programs originating at the producer's station or facilities in excess of the number of programs originating at such points which are normally made available to such stations where such excess broadcasting is designed to replace or supplement broadcasts which would, in the absence of such strike, be of local origination at the station where such strike exists. The Producer further agrees that he will not require AFTRA members to perform services for any broadcast station and/or network for the purpose of discharging the functions of persons employed by such broadcast stations and/or network during a labor-management dispute involving such persons.

**SIMULCASTS**

**104.**

Performers whose performance is simulcast shall receive no less than the applicable minimum television scale under this Code plus the applicable minimum radio scale (including one (1) hour of rehearsal if required under the Radio Code) under the

112

---

applicable AFTRA National Code of Fair Practice for Commercial Radio Broadcasting, where the radio broadcast is commercial, or the applicable minimum radio scale set forth in Paragraph 76 of the applicable AFTRA National Sustaining Radio Agreement, where the radio broadcast is sustaining. The hours of rehearsal referred to herein shall be available to the Producer for use. It may be used without reference to the television minimum call if it is used for radio purposes only. A broadcast shall be deemed to be a simulcast if one (1) performance of that broadcast is used for both radio and television broadcasts, whether or not the radio and television broadcasts of that performance are actually simultaneous. Except as otherwise specified herein, all provisions of the said AFTRA Codes shall be applicable to simulcasts.

**105.**

**TITLE OF CODE**

This Code shall be referred to as the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING.

**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS**

By _____    Date _____
    Kim Roberts Hedgpeth
    National Executive Director

**ACCEPTED AND AGREED TO:**

By _____    Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.,
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____    Date _____
    Day Krolik III
    NBC, Inc.

By _____    Date _____
    Harry Isaacs
    CBS Broadcasting Inc.

By _____    Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

113

EXHIBIT A

Exhibit attached to and made a part of the
AFTRA National Code of Fair Practice for Network Television Broadcasting

(July 1, 2008-June 30, 2011)

A producer who signs the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting or a Letter of Adherence thereto agrees to the special terms and conditions set forth in Exhibit A in the employment of performers (as specified herein) in network dramatic television programs produced for prime time, as defined or permitted by the FCC, as well as in programs produced for the CW.

It is understood that this Exhibit A applies only to network prime time dramatic programs (including situation comedies) and to programs produced for the CW and not to variety or other programs and not to "book musicals" which have a primary music emphasis. It applies to actors, background actors, singers, dancers, stuntpersons, stunt coordinators, puppeteers and those pilots performing on such dramatic programs, including actors who, incidental to their dramatic performance, also sing or dance. Except as specifically noted, this Exhibit A does not apply to announcers, the AFTRA Code of Fair Practice for Network Television Broadcasting in its entirety shall apply to all such persons employed on such prime time dramatic programs. The make-over-less rate shall not be used as the make-over rate for dramatic programs under this Exhibit A, except as otherwise provided in the background actors' provisions of this Exhibit A. Actors who work any lines are paid the full actor rates. Off-camera singers performing in standard non-commercial billboards, and standard non-commercial openings, closings, lead-ins to and lead-outs from commercials, bridging lines and musical signatures (theme songs) intended for use in three (3) or more episodes of a designated series of dramatic programs shall be paid pursuant to Exhibit A.

See Separate Exhibit A / CW Supplement Agreement for applicable rates, terms and conditions. Such Supplement Agreement shall be deemed incorporated herein and is otherwise part of the AFTRA National Code of Fair Practice for Network Television Broadcasting.

114

---

EXHIBIT B

2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting

TRANSFER OF RIGHTS

Upon the sale, transfer, assignment, license, lease, or other disposition of this television rights in any recorded program produced by it under this Code entered into or renewed after November 16, 2007 Producer shall not be a party to any transfer or other disposition of such recorded programs whereby AFTRA or to any performers thereafter due with respect to replays, reruns, Supplemental Market Use or foreign telecasting or for a breach or violation of this Code (including distribution), if AFTRA, approves the financial responsibility of such transferee in writing, and Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

"_____

hereby agrees with _____

_____
(insert name of Producer)

_____
(insert name of transferee)

that all recorded programs covered by this agreement are subject to the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting. Transferee hereby agrees for the benefit of AFTRA as representative of the performers affected thereby to make the additional compensation payment to the performers involved and required by said Code for replays, reruns, Supplemental Market Use, or foreign telecasting and all Social Security withholding, unemployment insurance and disability insurance payments required of employers by law with respect to such additional compensation, and any payments required of to the AFTRA Health and Retirement Funds required under the provisions of said Code with respect to such additional compensation, and to comply with the provisions of said Code with respect to the use of such recorded programs and required records and reports. It is expressly understood and agreed that the rights of the performers to telecast such recorded programs shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Code, and AFTRA shall be entitled to injunctive relief, in the event such payments are not made. It is also expressly understood and agreed that any dispute between the transferee and AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code.

Producer agrees to give written notice to AFTRA within thirty (30) days of each sale, transfer or assignment, license or other disposition of any recorded programs which are subject to this Code, and such notice shall specify the name and address of the purchaser, licensee, transferee or assignee, and to deliver to AFTRA a copy of the above referred to assumption agreement.

An inadvertent failure on the part of Producer to comply with any of the provisions of this Exhibit B shall in no event constitute a default by Producer or a breach of the 2007/2010 AFTRA National Code of Fair Practice for Network Television Broadcasting provided that such failure is cured promptly after notice thereof from AFTRA.

Upon delivery of such assumption agreement and on condition that AFTRA approves in writing the financial responsibility of the purchaser, assignee, licensee, or transferee, Producer shall not be further liable for the keeping of any such records or for the payment of such additional compensation for replays, reruns, Supplemental Markets Use, or foreign telecasting, or for contributions to the AFTRA Health and Retirement Funds which are required in connection therewith, it being agreed that the purchaser, assignee, licensee, or transferee, shall solely be liable therefor.

AFTRA agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee, licensee or transferee, it being further agreed that

115

Exhibit B, Page 136

if AFTRA, within twenty-one (21) days of receipt of notice of any such sale, assignment, license or transfer, has not advised Producer that it disapproves the financial responsibility of such purchaser, assignee, licensee or transferee, AFTRA will be deemed to have approved the financial responsibility thereof. In the event AFTRA advises Producer within such twenty-one (21) day period that it disapproves the financial responsibility of any such purchaser, assignee, licensee, or transferee and Producer disputes such disapproval, Producer shall have the right, at its election, to cause to be immediately submitted to arbitration, pursuant to the provisions of Paragraph 95 of such Code, the issue of whether AFTRA has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee, licensee or transferee.

The provisions of this Exhibit B shall not apply with respect to any performer in connection with a replay, rerun, Supplemental Markets Use, or foreign telecast of a recorded program if no part of the performer's performance is used in the replay, rerun, or foreign telecast.

116

**EXHIBIT C**

Exhibit C, Cost of Living Adjustment, was deleted from the 1991-1994 Code. Remaining Exhibits will retain their existing letters.

117

EXHIBIT D

As of November 16, 2001

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, NY 10016

Gentlemen:

The following sets forth our understanding and agreement with respect to television programs produced under the AFTRA National Code of Fair Practice for Network Television Broadcasting (the AFTRA Network Television Broadcasting Code) or a local AFTRA Television Broadcasting Code, which are released in Supplemental Markets.

1. Scope of Agreement:

This agreement shall apply to television programs produced under this or any previous AFTRA Network Television Broadcasting Code or a local AFTRA Television Broadcasting Code (hereinafter referred to as "programs") which are released in Supplemental Markets. The rights of Producer in and to such programs produced under such Codes shall include the right to exhibit such programs in Supplemental Markets (as hereinafter defined) without the Performer's consent subject to any restrictions contained in individual employment contracts of performers in such television programs. However, in case of a television program(s) produced on or after November 16, 1973, Producer must obtain performer's consent for release of program to supplemental markets if the performer, as of December 1994, was:

A. involved in active negotiations regarding consent for such use, and/or

B. the Performer has subsequent to November 15, 1993 and prior to December 19, 1994 specifically denied consent to such Supplemental Market use. Such negotiation and denial of consent must be substantiated by the submission of evidentiary material, and, in any event, all restrictions (other than those contained in individual employment contracts) on post-1973 Supplemental Market use expire on November 15, 1995.

2. Definition of Supplemental Markets

The term "Supplemental Markets," as used in this Agreement, means only: The exhibition of television programs by means of cassettes (to the limited extent provided in subparagraph A. of this paragraph), Pay Television, or Basic Cable or close terms are hereinafter defined in this paragraph, and the exhibition of television programs on any commercial or common carrier such as but not limited to, commercial airlines, trains, ships and buses (referred to herein as "In-Flight"). As used in this Agreement, Supplemental Markets does not include: (i) Distribution of such programs for direct projection or closed circuit exhibition arrangements (but excluding any form of CATV) under arrangements which are covered by the existing Letter Agreement between Producer and AFTRA, or (ii) distribution of the type described in Paragraph 73.H. of the AFTRA Network Television Broadcasting Code, or of any corresponding provision in a local AFTRA Television Broadcasting Code.

A. Cassette:

For the purpose of this Agreement, a cassette is any audio-visual device, including without limitation, cassette, cartridge, disc, phonogram or any other similar or dissimilar audio-visual device now known or hereafter devised, containing a program (recorded on film, disc, tapes or other material) which may be used for exhibition on a home-type television screen. The sale or rental of cassettes for exhibition on a home-type television screen in the home or in other closed circuit use such as in hotel rooms constitutes the "Supplemental Market" for the purpose of this

118

agreement. The foregoing definition does not include the exhibition of a television program by cassette over a television broadcast station or in theatrical exhibition, and no rights to so use are granted to Producer by reason of such exclusion.

B. Pay Television:

"Pay Television" (also known as Pay Cable), as used in this Agreement, means exhibition on a home-type television screen by means of telecast, cable, closed circuit or CATV where substantially all systems to which the program is licensed meet the following tests:

(1) Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(2) Where the subscriber pays for each program he selects (except that a program he selects for which a token charge is made shall not be considered a Pay Television program); and/or

(3) Where the subscriber pays a fee for an encoded telecast or channel which fee is a major charge relative to other charges paid for encoded releases.

It is expressly understood that "Pay Television" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

C. Basic Cable:

"Basic Cable," as used in this Agreement, means one (1) or more basic cable systems which do not meet the definition of Pay Television program) set forth in Paragraph 2.B. of this Exhibit D) and wherein the release on Basic Cable is a separate release and not part of a free television broadcast.

3. Supplemental Market Fees

A. (1) As to each television program within the scope of Paragraph 1 above which was released in Supplemental Markets prior to November 16, 1988, except for renewals of the limited time dramatic programs, Producer will pay for the benefit of the performer in such program two percent (2%) (3.6% with respect to programs for which an agreement to release the program to basic cable was entered into on or after February 28, 1995) of the Distributor's gross receipts in perpetuity (as hereinafter defined) of the Distributor's gross receipts released on cassette on or after November 16, 1988 with respect to programs released on cassette on or after November 16, 1988 the payment shall be two and five-tenths percent (2.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and three percent (3%) of such Distributor's gross receipts over one million dollars ($1,000,000.00) and three percent thereafter. Both the two and five-tenths percent (2.5%) and three percent (3%) of the first one cassette was entered into on or after February 28, 1995. With respect to any other Supplemental Markets release for which an agreement to release a program to except in-flight which will remain at two percent (2%), the payment shall be two percent (2%) (3.6% with respect to programs for which an agreement to release the program into on or after February 28, 1995) to Supplemental Markets was entered into on or after November 16, 1973 and released in Supplemental Markets was entered produced prior to November 16, 1973 and released in Supplemental Markets on or after November 16, 1988, except for those released on

119

cassettes or subject to subdivision (2) below, Producer will pay for the benefit of the performers on such program an amount equal to 3.6% of the Distributor's gross receipts in perpetuity (as hereinafter defined) which amount shall include Health and Retirement contributions. With respect to Distributor's gross receipts from the release to basic cable of the free television programs produced on or after November 16, 1998, pursuant to license agreements entered into on or after November 16, 2001, said percentage shall be 3.6% plus applicable Health and Retirement contributions, in accordance with the provisions of Paragraph 102A. No ICF contributions shall be due in connection with such payments. With respect to programs produced prior to November 16, 1973, which are released on cassette on or after November 16, 1998, the payment shall be four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and five and four-tenths percent (5.4%) thereafter which amounts shall include Health and Retirement contributions.

Such payments shall be for the benefit of all performers on the program, except for background actors. Such payments shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers, however from the period of March 12, 1997 through February 28, 1995 the scale payment due each performer shall not exceed one and five-tenths percent (1.5%) per performer and the scale of one percent (.5%) per announcer.

For programs released after February 28, 1995, the above per performer limitations shall not apply. Notwithstanding the above, on news and public affairs programs, the five-tenths of one percent (.5%) limitation shall apply to that program's announcers only where such announcer is the only performer covered by this Code. The five-tenths of one percent (.5%) limitation shall also apply to ten-lines-or-less, off-camera announcers on other type programs where the announcer is the only performer covered by this Code. In all other circumstances where the off-camera announcer is the only covered performer, a one and five-tenths percent (1.5%) limitation shall apply.

Health and Retirement contributions shall be paid in addition to such payments. In the event any performer has individually negotiated with Producer an individual payment formula for such distribution, his pro-rata share shall be credited against the payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by Producer or to AFTRA for distribution to the performers as the parties may mutually determine.

Additionally, except as expressly provided otherwise above, a contribution based upon a percentage of the Supplemental Markets fee payable under this Paragraph 3.A.(1) shall be made to the AFTRA Health and Retirement Funds. The applicable percentage shall be the same as the percentage of gross compensation payable for that AFTRA Health and Retirement Funds under the AFTRA Code under which the program was produced.

(2) As to a network prime time dramatic program produced on or after July 1, 1985 which was released in Supplemental Markets prior to July 1, 1986, Producer will pay for the benefit of the performers on such program an amount equal to three and sixth-tenths percent (3.6%) of the Distributor's gross receipts in perpetuity (as hereinafter defined). With respect to programs include health and retirement contributions. With respect to programs produced prior to July 1, 1984 released to basic cable on or after July 1, 1989, the payment shall be 7.5% of the Distributor's gross receipts in perpetuity which amount shall include health and retirement contributions, With respect to programs produced on or after July 1, 1984, released to

120

basic cable on or after July 1, 1989, the payment shall be six percent (6%) of the Distributor's gross receipts in perpetuity which amount shall include health and retirement contributions. With respect to Distributor's gross receipts from the release to basic cable of the free television programs produced on or after November 16, 1998, pursuant to license agreements entered into on or after July 1, 2001, said percentage shall be six percent (6%) plus applicable health and retirement contributions, in accordance with provisions of Paragraph 102 of this Agreement. No ICF contributions shall be due in connection with such payments. With respect to prime time dramatic programs produced prior to November 16, 1973, released on cassette on or after July 1, 1986, the payment shall be four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and five and four-tenths percent (5.4%) thereafter. With respect to prime time dramatic programs produced on or after July 1, 1986, the payment for such programs on or after July 1, 1986, the payment shall be 3.6% of such Distributor's gross receipts. Such payments shall be for the benefit of all performers on the program, except for background actors. That portion of the payments which is for background and retirement contributions shall be distributed to the performers in accordance with the distribution formula set forth in subparagraph (1) above.

B. Upon the sale, transfer, assignment, license, lease, Agreement to distribute or other disposition by Producer of its right to exhibit a television program in Supplemental Markets, Producer shall not be responsible to AFTRA or to any performer for payments thereafter due with respect to Supplemental Market use or for a violation of this Agreement by such transferee, if Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

_____
(insert name of transferee)

hereby agrees with _____
(insert name of Producer)

_____ that all recorded

4. **Definition of Distributor's Gross Receipts**

programs covered by this agreement are subject to the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting, including Exhibit D thereof, the AFTRA Supplemental Markets Agreement. Transferee hereby agrees expressly for the benefit of AFTRA as representative of the performers affected hereby to make the additional compensation payments for Supplemental Markets use as subsequently incurred and required by said Agreement and all Social Security, withholding, unemployment insurance and disability insurance payments and other payments required of employers by law with respect to such additional compensation, and all appropriate reports with respect thereto, under the terms of said Agreement, and to be bound by and comply with all of the provisions of said Agreement with respect to the use of such recorded programs and required records and reports. It is expressly understood and agreed that the rights of Transferee to exhibit such recorded programs in Supplemental Markets shall be subject to and conditioned upon the prompt payment by Transferee of the additional compensation as provided in said Agreement, and AFTRA shall be entitled to injunctive relief in the event such payments are not made. It is also understood and agreed that any dispute between the transferee and AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

121

Exhibit B, Page 139

(2)

cassettes or subject to subdivision (2) below, Producer will pay for the benefit of the performers on such program an amount equal to 3.6% of the Distributor's gross receipts in perpetuity which amount shall include Health and Retirement contributions. With respect to Distributor's gross receipts from the release to basic cable of free television programs produced on or after November 16, 1998, pursuant to license agreements entered into on or after November 16, 1998, said percentage shall be 3.6% plus applicable Health and Retirement contributions, in accordance with the provisions of Paragraph 102A. No ICF contributions shall be due in connection with such payments. With respect to programs produced prior to November 16, 1973, which are released on cassette or on or after November 16, 1998, the payment shall be four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and five and four-tenths percent (5.4%) thereafter which amounts shall include Health and Retirement contributions.

Such payments shall be for the benefit of all performers on the program, except for background actors. Such payments shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers, however from the period of March 12, 1993 through February 28, 1995 the scale payment the each performer shall not exceed one and one-tenths percent (1.5%) per performer and the scale payment due to a performer shall not exceed one-tenth percent (.5%) per performer and the scale payment due to off-camera performer covered by this Code. The five-tenths of one percent (.5%) limitation shall apply to ten-lines-or-less, off-camera announces on any other type of program where the off-camera announcer is the only covered performer, a one and four-tenths percent (1.5%) limitation shall apply.

For programs released after February 28, 1995, the above per performer limitations shall not apply. Notwithstanding the above, on news and public affairs programs, the five-tenths of one percent (.5%) limitation shall apply to ten-lines-or-less, off-camera announces only where such announcer is the only performer covered by this Code. On other type programs where the off-camera announcer is the only covered performer, a one and four-tenths percent (1.5%) limitation shall apply.

Health and Retirement contributions shall be paid in addition to such payments. In the event any performer has individually negotiated with Producer an individual payment formula for such distribution, his pro-rata share shall be credited against that payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by the Producer or to AFTRA for distribution to the performers as the parties may mutually determine.

Additionally, except as expressly provided otherwise above, a contribution based upon a percentage of the Supplemental Markets for payable under this Paragraph 3.A.(1) shall be made to the AFTRA Health and Retirement Funds. The applicable percentage shall be the same as the percentage of gross receipts payable to the AFTRA Health and Retirement Funds under the AFTRA Code with respect to which the program was produced.

As to a network prime time dramatic program produced on or after July 1, 1983 which was released in Supplemental Markets prior to July 1, 1996, Producer will pay for the benefit of the performers on such program an amount equal to three and six-tenths percent (3.6%) of the Distributor's gross receipts in perpetuity (as hereinafter defined) which amount shall include health and retirement contributions. With respect to programs produced prior to July 1, 1984 released to basic cable on July 1, 1989, the payment shall be 7.5% of the Distributor's gross receipts in perpetuity which amount shall include health and retirement contributions. With respect to programs produced on or after July 1, 1984, released to

120

B. Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by Producer of its right to exhibit a recorded program in Supplemental Markets, Producer shall not be responsible for any payments for any programs thereafter due with respect to Supplemental Markets where Producer has made additional payments to any other performers affected thereby to make the additional compensation payments for Supplemental Markets as subsequently incurred and required by said Agreement with respect to such additional compensation as required by law with respect to such additional compensation and to make appropriate contributions to the AFTRA Health and Retirement Funds required regarding the rights of transferees to exhibit such recorded programs in Supplemental Markets shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Agreements, and AFTRA shall be entitled to injunctive relief in the event such payments are not made. It is also expressly understood and agreed that any dispute between the transferor and AFTRA, or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

hereby agrees with _____

(insert name of transferee)

_____ that all recorded

programs covered by this agreement are subject to the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting, including Exhibit D thereof, the AFTRA Supplemental Markets Agreement. Transferee hereby agrees responsible for the benefit of AFTRA as representative of the performers affected thereby to make the additional compensation payments for Supplemental Markets as subsequently incurred and required by said Agreement and all Social Security, withholding, unemployment insurance and disability insurance payments and any other payments required of employers by law with respect to such additional compensation and to make appropriate contributions to the AFTRA Health and Retirement Funds required regarding the rights of transferees to exhibit such recorded programs in Supplemental Markets shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Agreements, and AFTRA shall be entitled to injunctive relief in the event such payments are not made. It is also expressly understood and agreed that any dispute between the transferor and AFTRA, or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

4. **Definition of Distributor's Gross Receipts**

121

A.  With respect to network prime time dramatic programs released on cassette on or after July 1, 1986 and all other programs released on cassette on or after November 16, 1985, the "Distributor's gross receipts" is defined as follows:

(1)  If the Producer is the Distributor or the Distributor is owned by or affiliated with the Producer, the "Distributor's gross receipts" derived from the distribution of such program by "cassettes" shall be twenty percent (20%) of the worldwide wholesale receipts derived by the Distributor, in such cases, if the Distributor is also the retailer, a reasonable allocation of the retail gross receipts shall be made as between the Distributor as distributor and the Distributor as retailer, and twenty percent (20%) of the former only shall be deemed to be "Distributor's gross receipts." The reasonableness of such allocation shall be subject to arbitration, and in such arbitration, generally prevailing trade practices in the cassette industry with respect to dealings between non-related companies shall be relevant evidence.

(2)  If the Distributor is not the Producer and is not owned by or affiliated with the Producer, then the "Distributor's gross receipts" shall be one hundred percent (100%) of the fees received by the Producer from licensing the right to distribute such program by cassette.

B.  For all other purposes the term "Distributor's gross receipts" shall mean the worldwide total gross receipts derived by the distributor (who may be the Producer or a distributor licensed by the Producer) from licensing the right to exhibit such program in Supplemental Markets, as defined above.

If the distributor of such program does not distribute such program directly in Supplemental Markets, but employs a sub-distributor to so distribute such program, then the "Distributor's gross receipts" shall be the worldwide total gross receipts derived by such sub-distributor from licensing the right to exhibit such picture in Supplemental Markets. In case of an outright sale of the Supplemental Markets distribution rights for the entire world, or any territory or country, the income derived by the seller from such sale shall not be the Distributor's gross receipts. If the right to distribute pursuant to any such outright sale shall include Supplemental Market exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Producer shall allocate to the Supplemental Markets exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Distributor's gross receipts." In reaching this determination, Producer may consider the current market value of Supplemental Markets exhibition rights in comparable programs.

If AFTRA shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided; and in the event the Arbitrator shall find that said allocation was not reasonable the Producer shall reallocate the fair and reasonable amount to be allocated. If the outright sale includes distribution rights to one (1) program, Producer shall likewise allocate to each such reasonable portion of the sales price of the Supplemental Market rights; and if AFTRA contends that such allocation is not fair and reasonable, the question of whether the price reported by the Producer to AFTRA, as having been received by the Producer on such outright sale is less than the amount actually received by the Producer on such outright sale.

C.  The Distributor's gross receipts shall not include:

122

(1)  Sums realized or held by way of deposit as security, until and unless earned, other than such sums as are non-returnable;

(2)  Rebates, credits or repayments for cassettes returned (and in this connection Producer shall have the right to set up a reasonable reserve for returns);

(3)  Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of such programs or on any monies to be remitted to or by Producer as to such distributor, but these shall not be excluded from Distributor of such other tax receipts by Producer or such Distributor. Nothing in this subparagraph shall exclude net income tax, franchise tax or excess profit tax or similar tax payable by Producer or such Distributor on its net income or for the privilege of doing business;

(4)  Frozen foreign currency until Producer shall either have the right to freely use such foreign currency, or Producer or Distributor has the right to transmit to the United States to Producer or Distributor such foreign currency from the country or territory where it is frozen. If such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the rate of exchange at which such currency was actually transmitted, or if not actually transmitted, then at the prevailing free rate of exchange at the time such right to use or to transmit occurs. Frozen foreign currency shall be deemed to be unblocked on the basis of determining revenue hereunder and other revenue, shall be allocated by local foreign fiscal authorities.

D.  Allocation of Gross Receipts:

If any agreement for distribution in the Supplemental Market includes more than one program, or includes both Supplemental Market and other rights, and Producer's gross receipts are realized from the distribution, Producer shall make a reasonable allocation for the rights and other rights, currently reporting Producer's receipts, in accordance with determining payments due hereunder. If AFTRA contends that such allocation is not reasonable, then such claim may be submitted to arbitration in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association.

5.  Time of Payment and Reports

Payments of any Supplemental Market fees due under this agreement shall be made quarterly on the basis of quarterly statements. Payments shall continue as long as gross receipts are realized from the distribution. Producer shall furnish to AFTRA written quarterly statements showing Producer's gross receipts, in accordance with the foregoing, from distribution in Supplemental Markets. AFTRA shall have the right, at reasonable times, to examine the books and records of Producer insofar as they relate to Producer's gross receipts from distribution in Supplemental Markets.

Producer shall furnish to AFTRA, promptly upon the release of any program to Supplemental Markets, information including the name, length and date of production of the program and a complete program cast list of performers covered by this Agreement, and their social security numbers and a description of the services rendered by each.

Within a reasonable time after the expiration of each calendar quarter but not exceeding sixty (60) days, Producer will furnish or cause to be furnished to AFTRA, a written report showing the gross receipts during the preceding quarter, from the distribution of each such television program hereunder (whether distributed by the Producer or through another Distributor), showing the date of first exhibition in any Supplemental

123

Market, and concurrently with the furnishing of such written report, Producer shall make the payment thereby shown to be due. If the Producer shall fail to pay such additional compensation when and as the same becomes due and payable, the Producer shall pay a late payment penalty of one and one-half percent (1½%) per month on the unpaid balance commencing to accrue from the date of the delinquency.

No such reports need be furnished with respect to any periods during which there were no such gross receipts. An inadvertent failure to comply with the reporting provisions of this subsection shall not constitute a default by the Producer hereunder, provided such failure is cured promptly after notice thereof is received by the Producer from AFTRA.

## Assignment of Rights

It is agreed that the rights of performers to compensation for the Supplemental Markets use of program in accordance with the terms of this Agreement shall not be affected by any sale, assignment, pledge, hypothecation, or other transfer of the recording of the program, or by any attachment, garnishment, bankruptcy, assignment for the benefit of creditors, probate, or any other legal proceeding involving the Producer or his successors in interest. Accordingly, it is expressly agreed that the right of any Producer hereunder to use a recording of any program pursuant to this Agreement is subject to the condition precedent of the payment of all fees required by this Agreement and that:

A. Any person acquiring all or part of the property rights of said Producer in such recording by voluntary assignment shall do so subject to the same conditions precedent; and

B. In the event of any involuntary assignment, whether by operation of law or otherwise, the Producer's rights in such recording shall be deemed personal and non-assignable, and no assignee thereof shall acquire any right to use such recording; provided, however, that AFTRA agrees to permit the assignee in the event of an involuntary assignment, whether by operation of law or otherwise, to exercise all rights hereunder upon payment to the AFTRA performers in the program of all fees that may be due or become due to them hereunder; and further, that the assignee shall be deemed to have full title to said recording upon his executing an agreement with AFTRA whereby said assignee assumes the obligation of the debtor to the AFTRA performers. Producer agrees to incorporate the terms of this paragraph in any transfer of his interest in a recording and to require the same undertaking on behalf of its successors and assigns in interest.

C. The performer shall have the right to apply for and secure an injunction against any Supplemental Markets use of a program containing the performer's services in the event the requirements of this agreement are not satisfied, and more particularly in the event all payments provided for herein (or in the performer's agreement with the Producer) are not made.

## Prior AFTRA Codes and Agreements

Except to the extent that prior Codes have been modified by this Code, nothing in this Agreement shall be construed to vary the terms, provisions, and conditions of any agreement in force as of June 18, 1989 and which concerns the release of a program(s) produced prior to November 16, 1973 in Supplemental Markets.

## Availability of Agreement

This Agreement shall be available to any Producer which produces television programs within the scope of agreement set forth in Paragraph 1 which are released in Supplemental Markets, and except as set forth herein no Producer has any rights whatsoever to use in Supplemental Markets any program heretofore produced under an AFTRA Network Television Code or Local Television Contract.

124

9. ## Term of Agreement

This Agreement shall be effective on the date of execution hereof and shall be coterminous with the 2007-2010 AFTRA Network Television Broadcasting Code.

ACCEPTED AND AGREED TO:

By _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.,
an indirect wholly-owned subsidiary of ABC, Inc.
Date _____

By _____
Day Kovlik III
NBC, Inc.
Date _____

By _____
Harry Isaacs
CBS Broadcasting Inc.
Date _____

By _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code
Date _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
Kim Roberts Hedgpeth
National Executive Director
Date _____

125

**Exhibit E**

(2007-2010 AFTRA Network Television Code)

## ORIGINAL EMPLOYMENT FOR THE PAY TELEVISION, VIDEO DISC/ VIDEO-CASSETTE MARKETS

### Introduction and Scope

These provisions shall apply to the employment of performers on or after July 1, 1986 on entertainment programs of the type historically produced under the 2007-2010 AFTRA Code of Fair Practice for Network Television Broadcasting (hereinafter referred to as the "AFTRA Code") when produced primarily for Pay Television and/or the video disc/videocassette markets.

B. The term "video disc/videocassette" as used in this Exhibit E means program material produced primarily for disc, cassette, cartridge, and the like, which is sold or rented for play on home-type television screens in the home.

C. The term "Pay Television" as used in this Exhibit E shall mean exhibition on a television screen in the home by means of telecast, cable, closed circuit or CATV where substantially all services to which the program is licensed meet the following tests:

(1) Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(2) Where the subscriber pays for each program he selects (except that such program is a token charge relative to other charges made to the subscriber), or, for which only a token charge is made, shall not be considered a Pay Television program); and/or

(3) Where the subscriber pays a fee for an encoded telecast, which fee is a major charge relative to other fees paid for encoded telecasts.

### Initial Compensation and Working Conditions

A. The minimum initial compensation and working conditions applicable to entertainment programs of the type historically produced under the AFTRA Code when produced primarily for the Pay Television and/or video disc/videocassette market shall be the same as:

(1) The minimum applicable rates and working conditions (including the provisions for use of excerpts) contained in Exhibit A of the 2007-2010 AFTRA Code for programs of the following types:

(a) Drama (including situation comedy) of the type produced for prime time television;

(b) Drama of the type produced for theatrical motion pictures; and

(c) Musical programs.

(2) The minimum applicable rates and working conditions (including the provisions for use of excerpts) contained in the 2007-2010 AFTRA Code shall be utilized by the Producer for programs of the type listed below:

(a) Variety programs in the format historically produced for network prime time television, e.g., "The Carol Burnett Show," "The Ed Sullivan Show;"

(b) Television game shows; and

126

(c) Television quiz shows.

(3) The minimum rates and working conditions (including the provisions for use of excerpts) applicable to serials contained in the 2007-2010 AFTRA Code shall apply to multiple times per week television dramatic programs of the type normally done for non-prime time television.

(4) Producer agrees that prior to the employment of any performer in an entertainment program of the type historically produced under the AFTRA Code intended primarily for exhibition in the Pay Television which is not described in subparagraphs (1) through (3) above, Producer shall give at least sixty (60) days' advance notice to AFTRA of such employment. Producer and AFTRA agree to meet within thirty (30) days from receipt of such notice for the purpose of negotiating with respect to the terms and conditions of employment. If no agreement is reached with respect thereto within such sixty (60) day period, AFTRA may, upon a thirty (30) day written notice to Producer, institute a requirement of withhold services with respect to the production of such program. Any dispute between AFTRA and the Producer as to whether such program is included in one of the categories described in subparagraphs (1) through (3) above shall be subject to arbitration under the provisions of this Exhibit E.

B. The initial compensation set forth in this Paragraph 2 shall constitute payment in full for ten (10) exhibition days for a program (with no limit on the number of broadcasts commenced in any calendar day) over a single United States national pay television subscription service to which the program is licensed in the Pay Television Market within a period of one (1) year from the initial exhibition on each such service and for ten (10) exhibition days for a program (with no limit on the number of broadcasts commenced in any calendar day) over all other services in the United States and Canada to which the program is licensed in the Pay Television Market within a period of one (1) year from the initial exhibition on such service. For this purpose, each pay television service, such as HBO/Cinemax/Festival and Showtime/The Movie Channel, shall each be considered a single service. However, pay-owned pay television services, such as (1) of this Paragraph B, the period shall be ten (10) exhibition days in three (3) consecutive holiday seasons:

(1) New Year's Day, Valentine's Day, St. Patrick's Day, Easter, Passover, Independence Day (July 4th), Halloween, Thanksgiving, Hanukah, Christmas.

(2) If a performer is engaged for a holiday program, it shall be so stated in his booking slip, if applicable, and in his contract.

The initial compensation shall also include payment for the first 100,000 net unit sales in the aggregate, in the video disc/videocassette worldwide market.

An exhibition day shall commence at one second after midnight and end at midnight, unless any exhibition of a program shall commence prior to midnight and continue past midnight, in which case the exhibition day shall be deemed to begin when the program commenced.

C. The parties recognize that the March 25, 1982 Supplement to the 1980-1983 AFTRA Code of Fair Practice for Phonograph Recordings and its successors may cover categories of programs not described in Paragraphs 2.A. above and that nothing herein shall preclude any signatory hereof from producing such programs pursuant to such Codes.

127

3.

A. Additional Compensation

(1) Pay Television – For covered programs released in the Pay Television Market:

For exhibition on a single United States national pay television subscription service or other service in the United States and Canada, either in excess of ten (10) or subsequent to one (1) year from the date of the initial exhibition on such service, or for exhibitions on foreign (i.e., other than the United States and Canada) pay television, or for exhibitions on a second or subsequent United States national pay television subscription service, Producer shall pay:

Six percent (6%) (plus Health and Retirement payments in accordance with the 2007-2010 AFTRA Code) of the Distributor's gross receipts as defined in Exhibit D of the 2001-2004 AFTRA Code attributable to those programs on such service, except that in the case of covered programs the cost of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for free television) is four (4) performers or less, the total percentage shall be computed on the basis of one-half percent (½%) per performer. The computation of the number of performers in the cast, for purposes of determining the percentage payable, shall exclude off-camera announcers, provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be one-half (½) of one percent (½%) plus pension and welfare. However, off-camera announcers shall not be excluded from such packages for purposes of determining the rateable distribution provided in Exhibit E, Paragraph 3 hereof.

(2) If any license, whether an initial or subsequent license, for a program on any service covers exhibition days in excess of ten (10), each such day shall be given equal monetary weight in determining the sums subject to the payment described in subparagraph (1) hereof. As an example, if the initial license encompasses seventeen (17) exhibition days, 7/17ths of the sums actually received from such license shall be subject to the appropriate payment under this Paragraph 3. For further example, if a second or subsequent license is for ten (10) days and covers the minimum (9th) through eighteenth (18th) day, 8/10th of the sum actually received from such licenses shall be subject to the appropriate payment under this Paragraph 3.

(3) Where a license covers exhibition days both within and outside the one (1) year limitation set forth in Paragraph 2.B. above, all days shall be given equal monetary weight. For example, if a license is for fourteen (14) days use in eighteen (18) months, and five (5) exhibition days occur after the one (1) year period, each day of exhibition which actually occurs after the license fee shall be given equal monetary weight, and 5/14th of the license fee shall be subject to the appropriate payment under this Exhibit E, Paragraph 3.

(4) The Producer's right to apply contingent compensation against the payments required to be paid to any performer under the 2007-2010 AFTRA Code shall also apply to any payments required herein.

(5) Payments shall be made quarterly.

128

B. Video Disc/Videocassette Market

(1) For sales of a covered program in the video disc/videocassette market, the Producer shall pay:

Six percent (6%) (plus Health and Retirement payments in accordance with the 2007-2010 AFTRA Network Television Code) of the fee or other payment actually received by the Producer from net sales in excess of 100,000 units in the aggregate, except that in the case of covered programs the cost of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for free television) is four (4) performers or less, the total percentage shall be computed on the basis of one-half percent (½%) per performer. The computation of the number of performers in the cast, for purposes of this paragraph only (but not for the purpose of determining rateable distribution provided in Paragraph 3), shall exclude off-camera announcers, provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be one-half (½) on a of one percent (½%) plus pension and welfare.

(2) The term "sales" as used in this paragraph shall refer to both video discs and video cassettes. The term "unit" shall refer to the disc or tape or other device as licensed or released by the Producer for sale or rental. "Net Sales" shall mean the total number of units which are sold or released by the Producer or its distributor for sale and are not returned, or are released by the Producer or to the distributor for rental purposes.

(3) It is recognized that some companies hereunder may act both as producers and as distributors of disc units in covered sales. In such a case, the payments set forth above shall be based on either (i) the fee or other payment received by the subsidiary, division or other department of the company which serves as the production branch from the subsidiary, division or other department of the company which serves as the distribution branch, or (ii) where no separate subsidiary, division, or other department serves as the production branch, a reasonable allocation of gross receipts of the company from covered sales attributable solely to fees or other payments which would be made to a production subsidiary, division or other department if one existed, or would be made to an outside producer. The reasonableness of such allocation in (ii) above, or of the fee or other payment received by the subsidiary, division or other department in (i) above, shall be determined in its license fee payments to outside producers for comparable disc units, or in the absence of such practice, by generally prevailing trade practice in the video disc industry.

(4) The Producer's right to apply contingent compensation against the payments required to be paid to any performer under the 2004-2007 AFTRA Code shall also apply to any payments required herein.

4. Release in Other Media

A. If and when a program produced hereunder, for which the minimum initial compensation is governed by Paragraph 2.A.(1) hereof, is broadcast in free television, Producer shall be obligated to pay to the performers the applicable additional compensation for reuse (e.g., first prime time, network non-prime time, or syndication, as the case may be) provided under Exhibit A of the 2007-2010 AFTRA Code.

B. If and when a program produced hereunder, for which the minimum initial compensation is governed by Paragraph 2.A.(2) or 2.A.(3) of this Exhibit E, is broadcast in free television, Producer shall be obligated to pay to the performers, for the first such broadcast, the applicable first reply fee set forth in the 2007-

129

2010 AFTRA Code for such broadcast, and any subsequent broadcast of such program shall comply with such replay formula.

C. If a program produced hereunder is released in theatrical exhibition, Producer shall be obligated to pay to the performers an additional minimum fee equal to the applicable minimum fee payable under the 2007-2010 AFTRA Code and such program been first exhibited in free television.

D. If a program hereunder is licensed for exhibition on domestic basic cable (other than as a relay for a domestic free television broadcast) the Producer shall pay to AFTRA for rateable distribution to the performers in the cast six percent (6%) (plus health and retirement contributions in accordance with the 2007-2010 AFTRA Network Television Code) of Distributor's gross receipts from such exhibition, subject to the one and one-half percent (1½%) limitation where four (4) or more performers are involved, and subject to the compensation limits set forth in the last two (2) sentences of Paragraph 3.A.(1) hereof.

E. If a program produced hereunder is licensed for exhibition in other Supplemental Markets (such as "in-flight"), the Producer shall pay for such Supplemental Markets use in accordance with the Supplemental Markets formula provided in the 2007-2010 AFTRA Code which would have been applicable to such program had it been produced for free television.

5. Distribution Formula

Sums received by AFTRA hereunder shall be assigned to performers as follows:

Units will be assigned to performers entitled to participate as follows:

A. Time Units

With respect to each performer, units for time worked shall be computed as follows:

Each day = 1/5 unit
Each week = 1 unit

No more than five (5) time units may be credited to any performer.

B. Salary Units

(1) With respect to programs covered by Paragraph 2.A.(1) above:

With respect to each performer, units for total compensation received from the program shall be computed as follows:

(a) Day Performer

Each multiple of daily scale equals one-fifth (1/5) unit. A fraction of daily scale when more than one-half (½) shall be credited as another one-fifth (1/5) unit.

(b) All Other Performers

Each multiple of weekly scale equals one (1) unit. A fraction of a multiple when more than one-half (½) of weekly scale shall be credited as another weekly unit.

(c) No more than ten (10) salary units may be credited to any performer.

130

(2) With respect to programs covered by Paragraphs 2.A.(2) and (3) above:

the program shall be computed as follows:

(a) "Daily scale" shall be determined by dividing the applicable minimum program fee by the applicable number of included days. The multiple of daily scale shall be determined by dividing the total initial compensation received by the performer by the "daily scale." Each multiple of daily scale equals one-fifth (1/5) unit. A fraction of daily scale when more than one-half (½) shall be credited as another one-fifth (1/5) unit.

(b) No more than ten (10) salary units may be credited to any performer.

C. Compensation

Each performer shall be credited with the sum of time and salary units as computed above. All performers' salary units shall be totaled and each performer will receive that rateable proportion of the monies as the performer's number of units bears to the total number of units for the entire cast.

D. Allocation

With respect to such programs made outside of the United States, where part of the cast is composed of performers subject to this Exhibit E and part of the cast is not subject to this Exhibit E, then sums payable hereunder shall be prorated based on the proportion which the salaries payable to the performers subject to this Exhibit E bears to the total performers' salaries for the program.

6. Single Contract

A committee, comprising representatives of AFTRA, SAG and the Producers, shall be established to discuss the formulation of a single contract for product covered hereunder.

7. Late Payment

In the event Producer fails to pay additional compensation as required under Paragraph 3, within ten (10) days from the date of a notice in writing to Producer from AFTRA, a late payment penalty shall accrue at the rate of one percent (1%) per month from the date of such notice.

The foregoing shall not preclude the Producer from recovering an erroneous payment. If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, or if there is a dispute as to the Producer's liability therefor, there will be no late payment charge.

131

## EXHIBIT F

### Stunt Driving Guidelines

1. When a person appears on camera in a program while driving a vehicle and the following conditions are anticipated, such person shall be treated as a stunt performer:

   (a) When any or all wheels will leave the driving surface.

   (b) When tire traction will be broken, e.g., skids, slides, etc.

   (c) Impaired Vision - when the driver's vision will be substantially impaired by:

      (i) Dust

      (ii) Spray (when driving through water, mud, etc.)

      (iii) Blinding lights

      (iv) Restrictive covering of the windshield

      (v) Smoke

      (vi) Any other conditions which will substantially restrict the driver's normal vision.

   (d) If the speed of the vehicle will be greater than normally safe for the conditions of the driving surface, or when other conditions such as obstacles or difficulty of terrain will exist or off-road driving other than normal low-speed driving for which the vehicle was designed will occur.

   (e) When any aircraft, fixed-wing or helicopter, will be flown in close proximity to the vehicle creating hazardous driving conditions.

   (f) When the driver is required to drive in a position substantially different from a normal driving position (for example, when the driver must drive while lying across the seat, or from the back seat).

2. When, for safety reasons, a principal performer is doubled on-camera as a driver or a passenger in a vehicle, the double shall be treated as a stunt performer.

3. Whenever it is anticipated that high speed or close proximity of two (2) or more vehicles will create conditions dangerous to an on-camera performer, such on-camera performer shall be treated as a stunt performer.

132

## EXHIBIT G

### STATEMENT OF OBJECTIVES AND PRINCIPLES

### AFTRA-INDUSTRY PROGRAM FOR ALCOHOLISM AND DRUG ABUSE

1. Alcoholism and drug abuse are diseases for which there is effective treatment and rehabilitation.

2. If an individual with an alcoholism or drug problem submits to modern treatment and rehabilitation techniques, the problem can be arrested in most instances.

3. It is the objective of the Council to further and assist in all efforts to provide direction and assistance to performers in securing effective treatment for alcoholism and drug abuse. To that end, the Council

   (a) Will work with and guide the office which has been established by the AFTRA Health and Retirement Funds to provide assistance and direction to performers who are in need of treatment for alcoholism or drug abuse.

   (b) Will work within the entertainment community to direct appropriate cases to such office.

   (c) Will publicize the efforts of AFTRA and the Industry to make an alcohol and drug abuse treatment and rehabilitation program available to performers and will endeavor to secure the cooperation of the entire entertainment community in this project.

133

## EXHIBIT H

### AFTRA - PARAGRAPH 97 REPORT

PRODUCER _____

ADDRESS _____

TELEPHONE NUMBER _____

PERIOD COVERED (Quarter, Year) _____

PROGRAMS OR PROGRAM SERIES COVERED _____

Titles _____

Number of Episodes _____

| | Principal* | Principals** | Under 5's | Background Actors | | AGE | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Under 40 | 40 or Over | Unknown | Under 5's | Background Actors |
| Male | | | | | | | | | |
| Female | | | | | | | | | |
| Asian/Pacific | | | | | | | | | |
| Black | | | | | | | | | |
| Caucasian | | | | | | | | | |
| Hispanic | | | | | | | | | |
| Native American | | | | | | | | | |
| Other or Unknown | | | | | | | | | |

*  Principals in running parts
** Other Principals

134

---

## EXHIBIT I

**PROMOTIONAL ANNOUNCER SESSION REPORT - NEW YORK**
**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS**
260 MADISON AVENUE, NEW YORK, NY 10016 (212) 532-0800 FAX (212) 545-1238

### PROMO SESSION REPORT

Off-Camera Announcer

(One copy of this form must be filled out and filed with AFTRA within 48 hours of engagement)

Announcer (print): _____ Signatory Producer _____

Session Date: _____ Recording Studio: _____ Address: _____

Network/Distributor: _____ Program/Series _____

Promo Use: (check all that apply)  Television: ☐  Network ☐  Local ☐  Basic Cable ☐  Radio ☐

| Promo Title (Include episode, series, program, service, or motion) | No. of TV Promos | No. of Tags | No. of Customized Tags | No. of Sweeps | Additional use on Basic Cable? (If Yes, indicate no.) | | 1-year License Fee | | Syndication | | No. of Radio Promos |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Yes | No | Yes | No | Yes | No | |
| Promo #1 | | | | | | | | | | | |
| Promo #2 | | | | | | | | | | | |
| Promo #3 | | | | | | | | | | | |
| Promo #4 | | | | | | | | | | | |
| Promo #5 | | | | | | | | | | | |
| Promo #6 | | | | | | | | | | | |
| Promo #7 | | | | | | | | | | | |
| Promo #8 | | | | | | | | | | | |
| Promo #9 | | | | | | | | | | | |
| Promo #10 | | | | | | | | | | | |
| Promo #11 | | | | | | | | | | | |
| Promo #12 | | | | | | | | | | | |
| Totals | | | | | | | | | | | |

Will an Agent's Commission be paid on this session?  Yes ☐  No ☐

Name of Talent Agency: _____

Hours worked: From: _____ To: _____  Announcer's Social Security no.: _____

Producer's signature: _____  Announcer's signature: _____

Announcer's phone no. _____

Exhibit B, Page 147

# SIDELETTER 1

As of November 16, 1994

PRODUCER

Gentlemen:

An individual engaged on a serial in a lesser category may occasionally be upgraded to the principal performer category for a particular episode. Paragraph 55.B. of the AFTRA Network Television Code is not intended to prohibit that elevation of such performer to a lesser category in subsequent episodes of the series, provided that such upgrading and downgrading of the performer occurs only occasionally or infrequently and not as a regular or ordinary practice.

Very truly yours,

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

136

---

# SIDELETTER 2

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Attention National Executive Director

Gentlemen:

This is to confirm our agreement for payment to covered persons who perform in programs covered by the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING, or programs covered by the 2001-2004 AFTRA LOCAL TELEVISION CODES in New York, Chicago, and Los Angeles, when recordings of such programs are leased or licensed for direct projection or closed circuit exhibition before non-paying audiences (but excluding any form of CATV) under arrangements other than those covered by the Code.

This will confirm the results of our negotiation as follows:

(1)   Each such performer upon the first such lease or license will receive twenty percent (20%) of the applicable network minimum program fee, whether such program is a network program or a local program. Such payment shall permit leases or licenses to be made only for the purposes hereinabove set forth during the seven (7) year period following such payment. If the Company desires a renewal of said seven (7) year period, an additional payment of ten percent (10%) of the applicable network minimum program fee shall be paid for each such period, and similar payments shall be made for any subsequent seven (7) year period.

(2)   We will notify you in writing when a lease or license covered by this agreement is executed. Each such lease or license will contain appropriate prohibitions against misuse, which will cover in substance the following:

Licensee will not (i) exhibit the print to a paying audience for such exhibition; (ii) broadcast the print on radio or television, other than closed broadcast to a non-paying audience; (iii) use the print in any manner which may be in violation of federal, state or local law.

(3)   We agree to pay a sum equal to fourteen percent (14%), (14.5% effective November 16, 2008 and 15% effective November 16, 2009) of all the compensation paid to the performers hereunder to the AFTRA Health and Retirement Fund.

(4)   This agreement, unless extended, shall be applicable only to programs made between November 16, 2007 and November 15, 2010 inclusive.

If the above is in accordance with your understanding of our agreement, please sign in the space indicated below.

Very truly yours,

PRODUCER

By _____

ACCEPTED AND AGREED:

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____

137

SIDELETTER 3

As of November 16, 1994

PRODUCER

Gentlemen:

It is understood and agreed that the second unnumbered paragraph of Paragraph 75.A. of the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING does not apply to persons who perform in film news stories subject to Paragraph 76 of the Code, when network television programs, or in film news stories subject to Paragraph 76 of the Code, when this work is covered by a valid union contract provision which was in effect prior to November 16, 1966, and there is no waiver or release of such coverage by such other union.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

138

SIDELETTER 4

As of November 16, 1994

PRODUCER

Gentlemen:

In connection with the portion of Paragraph 91 of the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING, Paragraph 50.I of the 2005 AFTRA TV RECORDED COMMERCIALS CONTRACT, and Paragraph 67 of the 2005-2007 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR COMMERCIAL RADIO BROADCASTING, which provides "AFTRA also reserves the right to require a Producer to make payment by certified check to the performers, delivered to the AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under the applicable provisions of this Code," it is agreed that this is not intended to apply to the Networks, the AMPTP Companies or Affiliated Companies.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

139

Exhibit B, Page 149

SIDELETTER 5

As of November 16, 1994

PRODUCER

Gentlemen:

Paragraph 92 of the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING contains a provision that AFTRA be given twenty-four (24) hours' advance notice of certain recording sessions.

This will confirm our agreement that the foregoing notice provision does not apply to the Networks, the AMPTP Companies or Affiliated Companies.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

---

SIDELETTER 6

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

The following is an agreement between the American Federation of Television and Radio Artists and the Producer (hereinafter individually designated as "company") with respect to recorded excerpts from legitimate stage productions on network television news of public affairs type programs.

1.   It is agreed that if the company records a portion of the performance and/or rehearsal (including dress rehearsal) of a play during its regular rehearsal hours a maximum of three (3) times during the rehearsal period or during the actual performance for use on network television news or public affairs type programs only, no claim will be made under the AFTRA 2007-2010 Code of Fair Practice for Network Television Broadcasting ("Code") in respect thereto so long as the following conditions are met:

     A.   At least twenty-four (24) hours' advance notice of the recording session is given to the cast, and AFTRA is notified not later than forty-eight (48) hours after such session;

     B.   The recorded material does not exceed one-half (½) hour of the rehearsal or performance time;

     C.   No more than two (2) minutes of such recorded material is shown on the television broadcast provided that such two (2) minutes must not contain an entire self-contained number or scene;

     D.   No payments are made by the company to any other personnel employed in the theatrical production; and

     E.   The recorded material is utilized only in connection with reviews, news and feature stories about current theatrical productions, theaters, the theatrical industry and personalities associated with the same.

2.   This agreement is without prejudice to the position of any party and shall be binding only for the term of the current Code.

Very truly yours,

PRODUCER

By _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

Exhibit B, Page 150

SIDELETTER 7

As of November 16, 1994

PRODUCER

Gentlemen:

With respect to Section 4 of Paragraph 102, Section 3, of the 2007-2010 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING, and the applicable Health and Retirement provisions of AFTRA NATIONAL CODE OF FAIR PRACTICE FOR COMMERCIAL RADIO BROADCASTING AND TRANSCRIBED RADIO PROGRAMS, of the AFTRA RADIO RECORDED COMMERCIALS CONTRACT, the AFTRA TV RECORDED COMMERCIALS CONTRACT, and the AFTRA NATIONAL SUSTAINING RADIO AGREEMENT FOR ACTORS AND SINGERS, this is to confirm our agreement that the Networks, the AMPTP Companies or Affiliated Companies may continue to furnish remittance reports and pay contributions in accordance with current practice.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

National Executive Director

142

SIDELETTER 8

Sideletter 8 regarding hazard pay for dancers has been incorporated into Paragraph 5-A. of the Code.

143

SIDELETTER 9

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

It is recognized that the terms and conditions for the use of still photographs of performers on dramatic programs are often included in individual contracts. However, where there is no individual contract or where the individual contract does not contain a provision specifically providing for use of still photographs, AFTRA has been informed that it is the Producer's intention to pay a performer engaged on a dramatic program $25.00 for each episode in which a still photograph(s) is used to portray a point essential to the story, provided the performer does not otherwise appear in the episode. Such payment and use are not covered by any provisions of the Network TV Code.

Very truly yours,

PRODUCER

By _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

144

SIDELETTER 10

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

In recognition of singers' concerns about the impact that computerized equipment such as Emulator, Synclavier, Fairlight, Kurzweil may have on employment of singers, the Producers agree to participate in a joint AFTRA-Industry committee formed to discuss those concerns.

Very truly yours,

PRODUCER

By _____

AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS

By _____

145

SIDELETTER 11

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

This letter will confirm that in the 1991 negotiations, the Producers agreed to AFTRA's proposal to change the term "physical disability" to "disability" based on AFTRA's representation that the former term has become objectionable to part of its membership. It is understood that this change is not substantive and the term "disability" is not intended to have any broader meaning than the term "physical disability" as used in the prior Agreement.

Very truly yours,

PRODUCER

By _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

146

SIDELETTER 12

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

It is recognized that computer payroll systems are by nature highly varied in their sophistication and capacity, and the demands to which the systems are subject vary greatly from Producer to Producer. Producer has agreed to analyze the capabilities of, and demands upon, its payroll system, and if Producer's system is reasonably capable of providing more information regarding payment to the performer than Producer is currently providing, Producer shall discuss with AFTRA priorities concerning which information performers may find most useful.

Very truly yours,

PRODUCER

By _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

147

Exhibit B, Page 153

SIDELETTER 13

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

AFTRA brought to the attention of the serial producers a number of serious concerns involving certain terms and conditions of employment of performers engaged in daytime serial production in both the studio and on remotes. Cited were such items as overtime, short turnaround, hazardous assignment, vacation schedules, and employment of minors. The producers acknowledge that these are matters of concern for them as well.

Since all of these concerns differ in their degree of applicability with respect to each producer and each serial, and because of competitive reasons, AFTRA and the Companies believe that these mutual concerns should continue to be addressed in a different forum, during the term of the contract, on a producer-by-producer basis.

Therefore, in an effort to nurture an ongoing dialogue with respect to these important matters in the period between negotiations, the parties have agreed to hold semi-annual meetings between AFTRA and each producer on a show-by-show basis. Among the broad range of topics to be addressed at each meeting are the issues referred to above in the first paragraph of this sideletter, plus any other issue of mutual concern that may arise during the period of this contract. The meetings will be held at a mutually convenient time, taking into consideration the production requirements of each program. Attending these meetings for each producer will be not only the senior production representatives for each program but also senior representatives of business and labor relations executives. Attending for AFTRA will be its senior representatives at each location, and representative performers at AFTRA's discretion, provided that program requirements permit.

A meeting pursuant to this Sideletter 13 shall be scheduled not later than 120 days from the date of ratification of the new Agreement to discuss the problems of vacation scheduling.

Very truly yours,

PRODUCER

By

AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS

By

148

---

SIDELETTER 14

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Gentlemen:

Producer agrees to notify its licensee(s) producing promotional announcements for affiliates of AFTRA's interest in being competitive in this area of production. Therefore, Producer agrees to send the following letter to its licensee, provided that in consideration of the above commitment AFTRA will not request from the producer the name of said licensee or any of its subcontractors, or to request a copy of said letter.

Dear (licensee):

You have been licensed by (network) to utilize its graphics, music, etc. in the production of promotional announcements for affiliates. AFTRA has expressed a desire to make available to you its national pool of professional singers and to negotiate terms and conditions which it believes to be competitive with those you have been using. We would appreciate your notifying anyone to whom you contract out this work of these facts. If you or your contractor are interested, you may contact AFTRA, at

Very truly yours,

PRODUCER

By

AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS

By

149

SIDELETTER 15

As of November 16, 1994

PRODUCER

Gentlemen:

With respect to Paragraph 31, "Warm-Ups," producers, directors or writers who are members of the regular production staff of the program shall receive a $50.00 fee for performing a warm-up. Where multiple programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the $50.00 shall be paid for each program for which a warm-up is performed.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

150

---

SIDELETTER 16

As of November 16, 2004

PRODUCER

Gentlemen:

With respect to other edited down programs which are not composed of segments from programs with reality based formats, we have agreed to formulate a joint AFTRA Industry Contract Committee which may extend Paragraph 73.B (3), Replay of Reality Based Programs, to programs which do not have reality based formats or do not utilize re-enactments, but which are composed of stand-alone, self contained segments. The committee also has the authority to consider and decide upon Producer proposals regarding conditions to be applied to other edited down programs. The Committee will not unreasonably deny such proposals.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

151

SIDELETTER 17

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

Many of the rules and working conditions of the Code of Fair Practice for Network Television Broadcasting were first formulated at a time when most programs were produced live. AFTRA and the Producers agree that, as a result of subsequent changes in the methods of production, the structure of the Code is now overly complicated.

In recognition of their mutual desire to simplify and streamline certain rules and working conditions of the Code, the parties have agreed to establish a Contract Adjustment Committee. This Committee, consisting of AFTRA representatives and a Producer (including Network) representatives will meet during the term of the Agreement to discuss and consider such changes in the structure of the Code as it deems necessary to achieve these objectives including, for example, changes in provisions concerning overtime, included hours and days, additional rehearsal, guaranteed days, sessions, calls, etc.

The Contract Adjustment Committee shall have the authority to agree upon changes of this nature and to recommend changes to the Producers (including Networks) and AFTRA. If mutually approved, such changes may be implemented during the term of the Agreement.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

---

SIDELETTER 18

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

It is understood and agreed that the parties shall meet within thirty (30) days of February 28, 1995 to promulgate guidelines for consistence in reporting of obvious disabilities. If necessary, the parties agree to obtain the services of a mutually acceptable expert to assist in the promulgation of said guidelines.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

Exhibit B, Page 156

SIDELETTER 19

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

This letter will set forth our understanding and agreement that, during the period November 16, 1994, through February 28, 1995, the use of excerpts subject to Paragraph 73(d)2, shall be governed by the provisions of Paragraph 73(d)2(a) and (b) of the 1991-1994 AFTRA Television Code.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

154

---

SIDELETTER 20

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

In response to your question during the 1994 negotiations, this is to confirm that AFTRA has interpreted Paragraph 88 to encompass cable exhibition and will continue to do so.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

155

Exhibit B, Page 157

SIDELETTER 21

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

The bargaining parties agree to defer further discussion of increased contributions and caps to a Contract Adjustment Committee which must meet during the term of this Agreement. If the Contract Adjustment Committee determines that caps should be implemented in additional areas which may adversely affect the Funds, the committee shall have the right to raise serial caps up to, but in no event more than, $200,000 for half (½) hour programs and $250,000 for one (1) hour programs.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

156

---

SIDELETTER 22

As of November 16, 1994

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Re:   "Major Role Performers" in Episodic Series

Ladies and Gentlemen:

This will confirm the understanding reached in connection with our agreement to a new provision governing series regulars and performers who are classified as "major role performers" on episodic series with respect to replays of FBC dynamic programs. Below you will find language from a sideletter contained in Exhibit A which addresses the definition of "major role performers."

"Under the terms of our agreement, the definition of a "major role performer" is linked to specified forms of credit (i.e., "Guest Star," "Special Guest Star," "Starring," or "Special Appearance By") negotiated by the performer. The original definition proposed by the Screen Actors Guild included performers who received the above-referenced credits "or variations thereof." The parties have agreed to delete the "or variations thereof" language in light of their mutual understanding that the new provision was intended to cover only that class of performers who were traditionally receiving "top of the show" rates in the past. Since the aforementioned credit designations best describe that class, the parties agreed that the "or variations thereof" language was not necessary."

Consistent with the foregoing, the parties reaffirm their intent neither to expand nor diminish the class of "major role performers." To that end, it is agreed that new forms of credit will not be devised as a means of diminishing the number of performers who would otherwise be classified as "major role performers."

Sincerely,

PRODUCER

By _____

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

157

SIDELETTER 23

As of November 16, 1998

PRODUCER

Ladies and Gentlemen:

During the 1998 negotiations, AFTRA proposed to include "knee work" in the definition of "hazardous performance" in Paragraph 5.A.(9) of the Network TV Code. The Parties agree that, under certain circumstances, knee work including rolling, spinning, falling, balancing, hinging, walking, turning, and/or performing a choreographed routine on the knees, could meet the definition of "hazardous performance."

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

National Executive Director

158

---

SIDELETTER 24

As of November 16, 1998

PRODUCER

Ladies and Gentlemen:

During the 1998 negotiations of the AFTRA Network TV Code, AFTRA brought to the attention of the Producers its concerns about the reporting of production by announcers of promotional announcements in New York City.

Accordingly, AFTRA and the Producers have agreed that they will meet on a company-by-company basis and, within ninety (90) days of ratification, will develop and implement a method for providing AFTRA with a record of announcer promotional announcements produced under this Code in New York (Exhibit 1 of the Code). With respect to Producers that produce promotional announcements in Los Angeles, such information shall be reported on a basis comparable to the information currently being provided by such company in Los Angeles.

Very truly yours,

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

National Executive Director

159

SIDELETTER 25

As of November 16, 1998

PRODUCER

Ladies and Gentlemen:

The Parties have agreed that AFTRA will participate in the Residual Study as established in Exhibit A. The Parties agree that the Study shall include dramatic programs and variety shows of the type defined in Paragraph 8.E. The Study may include other program types and the reuse of network TV Code programs on the Internet.

• An industry residual study shall be conducted in accordance with the terms of the following agreement:

This Agreement is made by and between the American Federation of Television and Radio Artists ("AFTRA" or "the Union"), on the one hand, and AMPTP Companies signatory to the National Code of Fair Practice for Network Television Broadcasting and American Broadcasting Companies, Inc., NBC Studios, Inc. and CBS Entertainment ("the three networks"), on the other hand. The AFTRA Code signatory Producers and the three networks are hereinafter referred to individually as "Producer" and collectively as "Producers."

In consideration of the mutual agreements hereinafter contained, the parties hereby agree as follows:

1. Recital

1-1 The 1998 negotiation, AFTRA and the Producers ("the parties") have heretofore negotiated terms for a successor agreement to the 1997 AFTRA National Code of Fair Practice for Network Television Broadcasting. The terms so negotiated call for the parties to conduct a Residual Study ("the Study") jointly with the Screen Actors Guild ("SAG"). The basis on which the Study will be conducted is set forth in this Agreement as well as in the 1998 Producers-AFTRA "Exhibit A" Memorandum of Agreement.

2. Purpose of the Study

2-1 The purpose of the Study is to evaluate:

(i) the revenue received (including barter) and the costs incurred by the Producers in connection with the production, distribution and exhibition of Programs, and the costs incurred by the Producers in connection with program development.

(ii) any other direct or indirect value generated by the exploitation of the Programs, the rights therein, and related rights (e.g., merchandising, current or projected market share, current or projected value of libraries, etc.) to producers or to subsidiaries, parents, affiliates, partners or joint ventures of any Producer.

2-2 for purposes of this Agreement, the word "Program" means daytime dramatic serials, variety programs as defined in Paragraph 8.E.(2) of the Code and entertainment programs other than those programs covered by AFTRA, "Exhibit A," whether or not that television program was actually produced, and whether or not that television program was produced or intended to be produced under the terms of any collective bargaining agreement.

160

2-3 Both parties reserve their positions regarding the relevancy to the Study and to collective bargaining negotiations of any information generated by the Study.

3. Exchange of Information

3-1 The Producers shall provide to an auditor (or auditing firm) selected jointly by the Union and SAG and to an auditor (or auditing firm) selected by the Producers information in the possession and under the control of the Producers regarding revenues and costs incurred by the Producers in connection with the production and distribution of Programs and, pursuant to the terms set forth in Section 3-5 below, other information necessary and relevant to the purposes of the Study which is in the possession of and under the control of the Producers.

3-2 The AMPTP agrees to use its good offices to facilitate the production of information relevant to any of the purposes of the Study which is not in the possession of the Producers, but which is in the possession of other sources, including related companies (e.g., subsidiaries, parents, affiliates, partners or joint ventures).

3-3 As soon as practicable following notification of the Memorandum of Agreement, the parties shall meet for the purpose of identifying what non-public information consistent with the purposes of the Study as outlined above, shall be supplied by the auditor(s) by the Producers and the Union. The parties shall agree upon the scope of the information to be supplied as well as the format in which the information is to be reported. The parties shall also establish a timetable for the submission of such information by the Producers and the Union to the auditor(s) and for submission to the prescribed in Section 3-5 below.

3-4 The parties agree that the reporting and compiling of non-public information in connection with this Study shall be done in a manner so that the origin and source of the information are not identifiable.

3-5 With regard to information regarding a specific Producer and specific program, it is understood that each producer shall report information regarding such Program to the auditor(s) on a "coded" basis - i.e., identifying the Program by number only, not by title and without any indication as to the identity of the producing or distributing entity or entities involved. However, the Producer shall indicate the market for which the program was made or intended to be made and the length and type or projected length and type of the program. The auditor(s) shall total the sums reported to it in each of the categories requested and present that information to the parties on an amalgamated, industry-wide basis. The auditor(s) shall have the right to audit and examine such documents in the possession and under the control of the Producers as are necessary to verify the accuracy and completeness of any data reported by such Producer.

3-6 The auditor(s) shall maintain the confidentiality of any information obtained through this process in accordance with the confidentiality provisions of this Agreement.

3-7 During the course of the Study, the parties shall exchange their preliminary findings and conclusions, and shall meet periodically to discuss the progress and preliminary results of the Study and additional information requests. The parties agree that the Union's and the

The Producers and the Unions will make their industry and market experts available for discussion and dialogue in order to further the evaluation described in Section 2-1 of this Agreement.

161

3-8    The parties shall fully cooperate with one another in securing and sharing any public study, report or analysis relevant to this Study, including but not limited to, annual reports to shareholders, the Veronis annual reports, Kagan reports, Competitive Media Reporting, SEC filings, the Advertiser Syndicated TV Association and the Cable Advertising Bureau.

Producers, auditors, financial analysts or other experts may participate in these meetings.

4.    Restrictions on Use of Non-Public Information

4-1    The parties agree that all non-public information is confidential and proprietary and shall be furnished solely to an auditor selected jointly by the Union and SAG and to an auditor selected by the Producers, each of whom shall execute a confidentiality agreement in a form acceptable to the parties in advance of the submission of information pursuant to this Agreement. The auditor(s) shall not disclose any of such information so submitted to any person or entity, except to the following persons: (i) to financial analyst(s) or other experts selected jointly by the Union and SAG and to financial analyst(s) or other experts selected by the Producers; (ii) to those individuals designated by the parties as necessary to analyze the information, and (iii) to any person to whom the parties mutually agree that such information may be disclosed. Each such person or entity listed above shall execute a confidentiality agreement in a form acceptable to the parties in advance of any disclosure made pursuant to the terms of this Agreement.

4-2    The provisions of the confidentiality agreement required by Section 4-1 above shall not restrict the distribution by the Union of amalgamated or industry-wide statistics which have been compiled from non-public information.

4-3    The restrictions on the use of non-public information and any confidentiality obligations imposed or assumed as a result of this Agreement shall survive the termination of this Agreement.

5.    Negotiation for Changes in Residuals Provisions

The parties will make every effort to complete this study expeditiously. It is the parties' intent to complete the Study on or before January 1, 2000 so that meaningful discussions might conclude before June 30, 2000 regarding the appropriateness of changing the residual provisions in, or adding new residual provisions to, the collective bargaining agreements referred to in the preamble of this Agreement.

6.    Disputes

All disputes regarding production of information pursuant to this Agreement shall be resolved by expedited arbitration before a panel of three arbitrators, one of whom shall be selected jointly by the Union and SAG, one of whom shall be selected by the Producers, and a third selected by mutual agreement of the two arbitrators designated by the parties. Each arbitrator shall have one (1) vote and all disputes shall be resolved by a majority vote of the panel. The panel shall have authority only to require production of information in the possession of and under the control of either the Producers or the Union, consistent with the terms of Sections 3-1 and 3-5 above. For purposes of enforcing the awards of the panel, this Agreement shall be considered a labor agreement under 29 U.S.C. §185.

7.    Expansion or Modification of Study

Theatrical motion pictures are not a subject of this study, but the parties may elect to include them as part of the study. Furthermore, the Union may elect to have

162

the Directors Guild of America, Inc. and/or the Writers Guild of America participate in this Study, subject to the execution of an agreement between each Guild and the Producers relating to their participation in the Study. The parties agree that participation by the DGA and/or the WGA shall not limit the scope of the information to be provided to the Union pursuant to this Agreement.

It is understood that if the Study is expanded to include the DGA and/or the WGA, a single auditor shall be selected by all of the unions for purposes of the Study.

8.    Effective Date of Agreement

This Agreement shall be effective upon ratification by the membership of AFTRA of the 1998 Network TV Code and shall terminate on November 15, 2001.

Very truly yours,

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

Exhibit B, Page 161

SIDELETTER 26

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

Re:     Residual Study

The Producers shall provide to AFTRA, to no later than May 31, 2006, the same information, compiled in the same format, with respect to the 1999-2000, 2000-2001 and 2001-2002 television seasons as was provided to AFTRA pursuant to the Industry Residual Study. The same conditions with respect to use, distribution and confidentiality of such information as applied to the information produced under the Residual Study shall apply to the information with respect to the 1999-2000, 2000-2001 and 2001-2002 television seasons.

In addition, twice during the term of the 2004 Agreement, the Producers will make their industry and market experts available for discussion and dialogue with representatives of AFTRA in order to evaluate the economics of television production and distribution.

The Union may elect to have the Directors Guild of America, Inc. ("DGA") and/or the Writers Guild of America ("WGA") participate in the Study, subject to the execution of an agreement between each Guild and the Producers relating to their participation in the Study. The parties agree that participation by the DGA and/or the WGA shall not limit the scope of the information to be provided to the Union pursuant to this Agreement.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
    Kim Roberts Hedgpeth
    National Executive Director

ACCEPTED AND AGREED TO:

By _____     Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.,
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____     Date _____
    Day Krolik III
    NBC, Inc.

By _____     Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____     Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

164


SIDELETTER 27

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The language in Paragraph 23.A., *Meal Periods*, regarding the twelve (12) minute grace period prior to the imposition of any meal penalty, shall be subject to the same interpretation as applies to programs produced under Exhibit A.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
    Kim Roberts Hedgpeth
    National Executive Director

ACCEPTED AND AGREED TO:

By _____     Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.,
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____     Date _____
    Day Krolik III
    NBC, Inc.

By _____     Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____     Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

165

**SIDELETTER 28**

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The AMPTP, on behalf of AMPTP Companies signatory to the AFTRA Code, agrees to direct Breakdown Services to furnish AFTRA any breakdown in which one (1) or more of the roles being cast depicts a person with a specific disability.

ACCEPTED AND AGREED TO:

By: _____                    AMERICAN FEDERATION OF
J. Nicholas Counter III                                    TELEVISION AND RADIO ARTISTS
On behalf of AMPTP Companies
that are signatories to the 2004 AFTRA Code

                                                                     By _____
                                                                          Kim Roberts Hedgpeth
                                                                          National Executive Director

Date _____                                  Date _____

166

---

**SIDELETTER 29**

**SIDELETTER ON AFTRA NATIONAL CODE OF FAIR PRACTICE
FOR NETWORK TELEVISION BROADCASTING PROGRAMS
MADE FOR NEW MEDIA**

As of March 8, 2008

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Re:   Programs Made for New Media

This Sideletter confirms the understanding of the American Federation of Television and Radio Artists ("AFTRA") and the Producers (collectively "the parties") concerning the application of the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting ("AFTRA Code"), to audio-visual entertainment programs that are made for the Internet, mobile devices or any other "new media" known as of March 8, 2008 (hereinafter "New Media"). With respect to programs intended for initial use on New Media, the parties agree as follows:

The parties recognize that the economics of New Media production are presently uncertain and greater flexibility in terms and conditions of employment is therefore beneficial. If one or more business models develop such that New Media production becomes an economically viable medium, then the parties recognize that future agreements should reflect that fact.

A.   **Jurisdiction**

Jurisdiction over people covered and geographic scope shall be governed by the AFTRA Network TV Code. Jurisdiction over program types shall include those traditionally covered by the AFTRA Network TV Code, excluding news, public affairs, documentary and sports. "New Media Promotional Announcements," as that term is defined herein, shall be covered under the terms of Paragraph D, below.

A "New Media Promotional Announcement" is a promotional announcement of the type traditionally produced under the Network Code intended for initial use in New Media which is (1) for a program or programs made for broadcast television; or (2) to promote a Derivative or Original New Media Production which is covered under this Sideletter. All other promotional announcements intended for initial use in New Media may be covered under the terms of Paragraph D. at the Producer's option.

B.   **Derivative New Media Productions**

A "Derivative New Media Production" ("DNMP") is a production for New Media based on an existing television program that was produced for "traditional" media – e.g., a free television, basic cable, or pay television program (the "Original Production").

1.   **Compensation**

All terms and conditions of employment, including initial compensation and deferred compensation, if any, will be subject to negotiation between the Producer and the individual Performer, except for those provisions of the AFTRA Network TV Code incorporated herein by reference below.   It is understood that Producer and Performer may have negotiated about such terms and conditions in contracts of employment entered into prior to March 8, 2008; if so, the terms and conditions of such contract shall control.   AFTRA agrees that it will not interfere in any such negotiations between the Performer and the Producer.

2.   **Applicable Provisions of the Network Code**

167

Only the following specific provisions of the AFTRA Network TV Code are incorporated herein. To the extent the provisions herein are inconsistent with the Code, the provisions of this sideletter control.

Paragraph 61. Payment

Paragraph 62. Deductions for Social Security and Withholding Taxes

Paragraph 63. Disability Insurance

Paragraph 66. Individual Contracts

Paragraph 83. Definitions

Paragraph 84. Union Shop

Paragraph 86. Admission to Premises

Paragraph 93. No-Strike Clause

Paragraph 94. Production Prosecuted

Paragraph 95. Grievance and Arbitration

Paragraph 97. Subsections A. and E. only. No Discrimination/Affirmative Action

Paragraph 99. Separability

Paragraph 102. AFTRA Health and Retirement

3. **Reuse**

Reuse shall be governed by the New Media Re-Use Sideletter.

4. **Credit**

Principal performers shall be accorded credit if any other person receives credit on the New Media Production. Credits may 'appear in the corner of the screen. "Click-through" credits may be used.

C. **"Experimental New Media Production" (Original Productions Only)**

Coverage shall be at the Producer's option with respect to "Experimental New Media Productions." An "Experimental New Media Production" ("ENMP") is defined as any Original New Media Production (1) for which the actual cost of production is either: (a) $15,000 or less per minute of program material as exhibited, or (b) $300,000 or less per single production as exhibited, or (c) $500,000 or less per series of programs produced for a single order; and (2) does not utilize a "covered" performer.

AFTRA and the Producers agree to meet within sixty (60) days following the ratification of this agreement to discuss specific criteria to be used in determining whether a particular performer would meet the definition of a "covered performer." Criteria to be discussed include the length and type of experience in the entertainment industry and any other criteria that would be relevant in making this determination. AFTRA and the Producers further agree to establish workable procedures for the administration of the agreed-upon criteria.

Until such criteria are determined, the Producers may determine in good faith who is a "covered performer." Upon AFTRA's request, the Producer agrees to discuss any such determination.

The actual cost of the ENMP shall consist of all direct costs actually incurred in connection with the Production. The only costs excluded in determining the actual cost of productions shall be development costs, overhead charges, financing costs (i.e., loan origination fees, legal fees, and interest), contingency of up to ten percent (10%), essential elements insurance, the cost of the completion bond, marketing expenses, contingent payments to talent or other parties which are based on the proceeds derived from the exploitation of the Production and received after recoupment of the negative cost, and delivery items required by sales agents, distributors or sub-distributors (i.e., delivery materials beyond the answer print, NTSC Video Master if the Production is delivered on videotape, or the digital equivalent if the Production is delivered in a digital format).

The terms of Paragraph D. shall apply to any "Experimental New Media Production" which the Producer elects to cover.

D. **Original Serial Dramatic and Non-Dramatic Programs Made for New Media and "New Media Promotional Announcements"**

1. **Compensation**

All terms and conditions of employment, including initial compensation and deferred compensation, if any, for original serial dramatic and non-dramatic programs made to New Media or New Media Promotional Announcements will be subject to negotiation between the Producer and the individual performer, except for those provisions of the AFTRA Network TV Code incorporated herein by reference below. AFTRA agrees that it will not interfere in any such negotiations between the Performer and the Producer.

Terms and conditions for original non-serial dramatic New Media Productions are not covered hereunder, and will instead be negotiated as part of Exhibit A.

2. **Applicable Provisions of the Network Code**

Only the following specific provisions of the AFTRA Network TV Code are incorporated herein. To the extent the provisions herein are inconsistent with the Code, the provisions of this sideletter control.

Paragraph 61. Payment

Paragraph 62. Deductions for Social Security and Withholding Taxes

Paragraph 63. Disability Insurance

Paragraph 66. Individual Contracts

Paragraph 83. Definitions

Paragraph 84. Union Shop

Paragraph 86. Admission to Premises

Paragraph 93. No-Strike Clause

Paragraph 94. Production Prosecuted

Paragraph 95. Grievance and Arbitration

Paragraph 97. Subsections A. and E. only. No discrimination/Affirmative Action

Paragraph 99. Separability

Paragraph 102. AFTRA Health and Retirement

### 3. Reuse

Reuse shall be governed by the New Media Re-Use Sideletter.

### 4. Credit

Principal performers shall be accorded credit if any other person receives credit on the New Media Production. Credit may appear in the corner of the screen. "Click-through" credits may be used.

### E. SUNSET CLAUSE

The parties recognize that this Sideletter is being negotiated at a time when the business models and patterns of usage of programs and other productions in new media are in the process of exploration, experimentation and innovation. Therefore, all provisions of this Sideletter expire on the termination date of the 2007-2010 AFTRA Network TV Code and will be of no force and effect thereafter. No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for reuse of Made for New Media Productions and of television programs in new media to be in effect thereafter.

By: _____  Date _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By: _____  Date _____
Day Krolik III
NBC, Inc.

By: _____  Date _____
Harry Isaacs
CBS Broadcasting Inc.

By: _____  Date _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

ACCEPTED AND AGREED TO:
AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By: _____  Date _____
Kim Roberts Hedgpeth
National Executive Director

---

SIDELETTER 30

March 8, 2008

## SIDELETTER ON EXHIBITION OF AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING PROGRAMS REUSED IN NEW MEDIA

This Sideletter confirms the understanding of the American Federation of Television and Radio Artists ("AFTRA") and the Producers (collectively "the parties") concerning the application of the 2007-2010 AFTRA National Code of Fair Practice for Network Television Broadcasting ("AFTRA Code") to the exhibition of covered entertainment television programs of the type that have traditionally been produced under this or any previous AFTRA Code on or by means of "New Media", as that term is defined in the Sideletter on Programs made for New Media.

### 1. If the Consumer Pays.

A. License for Limited Period or Fixed Number of Exhibitions

When the subscriber pays for the program either on a subscription or per-picture basis, and when the payment is in exchange for the right to view the television program for a fixed or limited period of time or a fixed number of exhibitions, the Producer shall pay to the performer(s) an aggregate sum equal to three and six-tenths percent (3.6%) of the license fee paid by the licensee for the right to exhibit such television program in New Media.[1]

B. Paid Permanent Downloads (aka "Download-to-Own" or "Electronic Sell Through" ("EST"))

The following shall apply to programs first exhibited on or after March 8, 2008:

When the consumer pays for an EST copy of a television program, the Producer shall pay residuals at the rate of 5.4% of 20% of "Distributor's gross," as defined in Paragraph 5 below, on the first 100,000 units and, thereafter, at 10.5% of 20% of "Distributor's gross," as defined in Paragraph 5 below.

Such payments shall be for the benefit of all performers on the program, except for background actors. Such payments shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers; the scale payment shall not exceed one and five-tenths percent (1.5%) per performer; and the scale payment to each off-camera announcer shall not exceed five-tenths of one percent (5%) per announcer.

### 2. Advertiser-Supported Streaming

The following shall apply to the streaming of television programs on a free to the consumer basis on advertiser-supported services transmitted via New Media.

A. With respect to television programs, the production of which commences on or after March 8, 2008:

(1) The Producer shall be entitled to a "streaming window" for a twenty-four (24) consecutive day period for the first season of a television series or for any one-time television program and a seventeen (17) consecutive day

[1] As a bargaining history, this language is based upon the following model: studio licenses to Moviefly the right to transmit the motion picture on the internet to the viewer who pays Moviefly on a subscription or per-picture basis. Such payment would enable the viewer to view the motion picture for a fixed and limited period of time or limited number of exhibitions. For example, if Columbia Pictures, through Columbia-TriStar Home Entertainment, licenses to Moviefly the right to exhibit a Columbia Pictures film, the residuals shall be based upon 100% of the license fee paid by Moviefly to Columbia-TriStar Home Entertainment for such picture.

Exhibit B, Page 165

period for the second and all subsequent seasons of a television series. During the streaming window, the Producer may make a television program available for streaming without payment for such use. The streaming window is the period immediately following the production and prior to and immediately following the initial exhibition of the program on television in any ratio determined by the Producer.

(2) If the Producer desires to stream the television program outside the streaming window, but within one (1) year of the expiration of the streaming window, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television program is available for streaming following the expiration of the streaming window:

(i) In the case of dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the first replay fee applicable to the television program; and

(ii) In the case of non-dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the program fee applicable to the television program.

If the Producer desires to stream the television program for all or any part of the twenty-six (26) consecutive week period immediately following the production, but within one (1) year of the expiration of the streaming window, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television program is available for streaming during such twenty-six (26) consecutive week period:

(i) In the case of dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the first replay fee applicable to the television program; and

(ii) In the case of non-dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the program fee applicable to the television program.

(3) Neither of the aforementioned twenty-six (26) periods shall cover more than one (1) year after the expiration of the streaming window. In the event the streaming of the television program is commenced on a date that does not allow for the full twenty-six (26) consecutive week period of use within the one (1) year of expiration of the streaming window, then the payment for that period shall be prorated in weekly units to cover the shorter use period.

For example, suppose that the Producer streams a television program during the window and does not stream the program again until thirty-nine (39) weeks after the expiration of the window period. Since only thirteen (13) weeks remain within the one (1) year period, a payment of one-half of the payment that would otherwise be due for the twenty-six (26) week streaming period would be payable for streaming during the thirteen (13) week period.

(4) During the streaming window, or during either of the twenty-six (26) consecutive week periods described in Paragraph 2.A.(2) above, the Producer may allow excerpts of those television programs that are being streamed to be used on free to the consumer, advertiser-supported services transmitted via New Media without any additional payment therefor.

(5) Upon expiration of the one (1) year period following expiration of the streaming window, if the Producer desires to stream the television

program, then it shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

B. If the Producer should desire to stream any television program, the production of which commenced prior to March 8, 2008, as to which free television residuals are still payable, then the Producer shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

C. Revenues derived from foreign streaming shall be included in "Distributor's Foreign Gross," as provided in Paragraph 73.F. of the AFTRA Network TV Code.

3.   **Use of Excerpts in New Media**

A. In addition to the use of excerpts permitted in Paragraph 2 above, Company may use an excerpt or excerpts from a television program (other than a news or promotional program of ninety (90) minutes or more in length) in new media for the purpose of promoting the television program, provided that such excerpt(s) does not exceed five (5) minutes in length. Company may use an excerpt or excerpts from a television program ninety (90) minutes or more in length or from a program made for the home video market in new media for the purpose of promoting the program, provided that such excerpt(s) does not exceed ten (10) minutes in length.

B. The following uses of an excerpt or excerpts in new media shall be considered "promotional" and shall require no payment, whether or not the Company receives revenue in connection therewith:

(1) For promotion of the exhibition of a television program on free television, basic cable or pay television, the use of an excerpt shall not require compensation if the excerpt promotes the exhibition and includes "tune in" information. "Tune-in" information means when a program airs or series from which the excerpt is taken. The "tune-in" information may appear on-screen or in a "click-through" format – i.e., accessible through links. It is agreed that the network channel or station "bug" alone does not suffice. It is also understood that the Company is not required to provide the same level of "tune-in" information as is commonly provided in traditional network television promotional announcements.

(2) For promotion of the traditional home video release or any "special edition" home video release of a television program, the use of an excerpt shall not require compensation if the excerpt promotes the home video release and references the availability of the program in home video.

(3) For promotion of a new media exhibition of a television program, the use of an excerpt shall not require compensation if the excerpt promotes the new media exhibition and includes instructions for or a link to the new media platform on which the excerpt appears or a direct link to another website or new media platform where an electronic copy of the program can be rented, purchased, or streamed, and occurs in conjunction with the availability of an electronic copy of the program for rental, purchase, or ad-supported streaming via the Internet or other new media platform.

(4) For "viral" promotion on new media of any use or exhibition of a television program, no payment is required if the excerpt is circulated non-commercially to multiple websites or made available for individuals to circulate. The fact that the viral excerpt is exhibited on a revenue-generating site owned by or affiliated with the Company shall not render this exception inapplicable, provided that the excerpt is released without payment to other sites.

Exhibit B, Page 166

C. The use of excerpts shall not be considered "promotional" within the meaning of subparagraph B. above if the excerpts are used on a new media site which is archival, the contents of several prior seasons of the series and is designed to enable the viewer to search the archive for, to identify and to watch, as distinguished from a new media site which offers excerpts from several prior seasons of a series that are intended as a recap of the events that transpired during those prior seasons or that are intended to promote the exhibition or sale of full episodes of the series from which the excerpts are taken.

D. If the use of an excerpt or excerpts in new media is not within one of the promotional provisions in subparagraph B. above, or if the excerpt(s) used exceed the length limitations set forth in subparagraph A. above:

(1) If the excerpt is from a television program and is used on a free to the consumer platform outside the streaming window, but within one year following expiration of the streaming window, and the use is not otherwise permitted or paid for under subparagraph 2.A. above, the Producer shall pay for such use as follows:

(i) For an excerpt up to two (2) minutes in length, the lesser of $25 or the applicable "new media program fee."

(ii) For an excerpt in excess of two (2) minutes in length but not more than four (4) minutes in length, the lesser of $75 or the applicable "new media program fee."

(iii) For an excerpt in excess of four (4) minutes in length, the applicable "new media program fee."

The "new media program fee" for use of excerpts on free to the consumer platforms is the applicable residual for use of the entire program in new media as provided in Paragraph 2.A. of this Sideletter.

(2) For any other use of an excerpt from a television program on a free to the consumer platform, including the use of excerpts from a television program produced prior to March 8, 2008, the Producer shall pay six percent (6%) of "Distributor's gross," as defined in Paragraph 5 below, for such use.

(3) If an excerpt from a television program is used on a "consumer pay" platform, whether promotional or not, the producer shall pay 3.6% of "Distributor's gross," as defined in Paragraph 5 of this Sideletter, for such use. This formula shall apply to a "hybrid" use where the consumer pays for the excerpt and advertising revenues are also derived by the Producer from such use. Such revenues shall be incorporated in "Distributor's gross."

E. Notwithstanding the foregoing:

(1) If excerpts from the current season of a series and excerpts from past seasons of the series are used together on an ad-supported free to the consumer basis, then the percentage of "Distributor's gross" payment set forth in Paragraph 2.B. of this Sideletter shall apply to all such excerpts.

(2) No payment shall be required for the free to the consumer "non-commercial" promotional use of excerpts more than five (5) minutes for programs less than ninety (90) minutes in length and ten (10) minutes for programs ninety (90) minutes or more in length containing

174

one (1) or more scenes. A "non-commercial" use is a use from which the Company and its Affiliated entities, including, but not limited to, distributors and exhibitors, receive no revenues, including, but not limited to, advertising revenues.

(3) No payment shall be required for free to consumer use of excerpts during the streaming window. If the Company pays the "new media program fee" pursuant to Paragraph 2.A. of this Sideletter, the payment for the use of the entire program in new media shall also constitute payment for the free to the consumer use of any portion thereof in new media during the corresponding time period.

(4) It is understood that the use of an excerpt from a television program or a made-for-home video program shall not require any payment hereunder if the use would not require a payment under the television exception provisions of the AFTRA TV Code.

F. All obligations of the Producer with respect to the use of an excerpt or excerpts under this Paragraph 3 shall be fully satisfied so long as the excerpt(s) meets the promotional requirements set forth herein or the Producer pays the applicable amount set forth herein.

G. New Media Excerpt Use Committee; Moratorium on Grievances and Arbitration Claims

Given the novelty and complexity of the issues regarding the promotional versus non-promotional and commercial versus non-commercial use of excerpts in New Media, the parties agree to establish a Committee to review, discuss and categorize instances of such uses in New Media to assist them in refining their mutual understanding of such uses and AFTRA agrees not to file any grievances or arbitration claims arising out of or relating to a dispute over the use of excerpts in New Media that occurs during the first six months of the 2008 Agreement, provided that all payments as to which there is no bona fide dispute are timely made.

4. REUSE OF MADE FOR NEW MEDIA PRODUCTIONS

A. Derivative New Media Productions

(1) Initial compensation for a Derivative New Media Production shall constitute payment for thirteen (13) weeks of use on all free to the consumer advertiser-supported platforms transmitted via New Media (hereinafter "advertiser-supported platforms"), commencing with the first day that the Derivative New Media Production is available for exhibition on any advertiser-supported platform, and for a separate twenty-six (26) week period of use on any consumer pay new media platform (hereinafter "consumer pay platform"), commencing with the first day that the Derivative New Media Production is available for exhibition on any consumer pay platform.

(2) Use on Advertiser-Supported Platforms Within One Year Following Expiration of the Thirteen Week Period

a. If the Producer desires to use the Derivative New Media Production on advertiser-supported platforms beyond the thirteen (13) week period, but without payment for the thirteen (13) week period, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period of use, commencing with the first

175

day that the Derivative New Media Production is available for use on any advertiser-supported platform following the expiration of the thirteen (13) week period.

  (i)  In the case of dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the first replay fee applicable to a television program of the same length as the derivative program; and

  (ii)  In the case of non-dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the program fee applicable to a television program of the same length as the derivative program.

e.  If the Producer desires to use the Derivative New Media Production on advertiser-supported platforms for all or any part of the twenty-six (26) consecutive week period immediately following the twenty-six (26) consecutive week period described in Paragraph 4.A(2) above, but within one (1) year after expiration of the thirteen (13) week period, then the Producer shall make a residual payment equal to the applicable amount payable under Paragraph 4.A(2) above, as consideration for a twenty-six (26) consecutive week period of use, commencing with the first day that the Derivative New Media Production is available for use during such twenty-six (26) consecutive week period.

f.  Neither of the aforementioned twenty-six (26) consecutive week periods shall cover a period that is more than one (1) year after the expiration of the thirteen (13) consecutive week period. In the event that use of the television program on advertiser-supported platforms is commenced on a date that does not allow for the full twenty-six (26) consecutive week period of use within one (1) year of the expiration of the thirteen (13) consecutive week period, then the payment for that period shall be prorated in weekly units to cover the shorter use period.

For example, suppose that the Producer uses a television program on advertiser-supported platforms during the thirteen (13) consecutive week period and then does not use the program on consecutive week period platforms again until thirty-nine (39) weeks after the expiration of the thirteen (13) consecutive week period. Since only thirteen (13) weeks remain within the one (1) year period, a payment of one-half of the payment that would otherwise be due for the twenty-six (26) consecutive week use period would be payable for use during the remaining thirteen (13) week period.

(3)  <u>Use on Advertiser-Supported Platforms More Than One Year Following Expiration of the Thirteen Week Period</u>

Upon expiration of the one (1) year period following expiration of the thirteen (13) week period, if the Producer desires to use the Derivative New Media Production on advertiser-supported platforms, then it shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

(4)  <u>Use on Consumer Pay Platforms</u>

For use of a Derivative New Media Production on new media platforms for which the consumer pays (e.g., download-to-own, download-to-rent, paid streaming), the Producer shall pay a residual equal to 3.6% of the

176

---

"Distributor's gross," as that term is defined in Paragraph 5 below, attributable to the period beyond the twenty-six (26) week period of use.

(5)  <u>Use in Traditional Media</u>

The Producer shall pay residuals for the use of a Derivative New Media Production in "traditional media" (e.g., free television, basic cable, pay television, home video) as a use under existing AFTRA Network TV Code formulas.

a.  Free Television Exhibition

  (i)  Except with respect to exhibition of dramatic Derivative New Media Productions that exceed fifteen (15) minutes in length in network prime time, residual payments for free television exhibition of Derivative New Media Productions shall be computed as follows:

The new media exhibition of the Derivative New Media Production shall constitute the first run for purposes of calculating residual payments in free television. The residual payment shall be the product of the program fee for a free television program of the same category and multiplied by the percentage applicable to the replay in question.

As an example, suppose a five (5) minute non-dramatic Derivative New Media Production is exhibited for the first time in network prime time. The applicable residual is the program fee used for a non-dramatic program five (5) minutes and under in length exhibited in syndication ($221 as of March 8, 2008). That figure will be multiplied by 75%, the percentage applicable to a second run on a network, for a total residual payment of $166.

b.  Exhibition on Pay Television, on Home Video and on Basic Cable

  (i)  The formula for reruns in network prime time of dramatic Derivative New Media Productions that exceed fifteen (15) minutes in length is as follows: The new media exhibition of the Derivative New Media Production shall constitute the first run for purposes of calculating residual payments for use on free television. The residual payment shall be the applicable residual under the AFTRA Network TV Code for a rerun in network prime time of a free television program of the same type and length as the Derivative New Media Production.

B.  <u>Original New Media Productions</u>

The following shall apply to Original New Media Productions:

(1)  <u>What Initial Compensation Covers</u>

For exhibition on pay television, the Producer shall pay residuals equal to 3.6% of "Distributor's gross" pursuant to Exhibit D., Section 4.B. of the AFTRA Network TV Code. For home video exploitation, the Producer shall pay residuals pursuant to Exhibit D of the AFTRA Network TV Code. For exhibition on basic cable, the Producer shall pay pursuant to Exhibit D of the AFTRA Network

177

**(2)** **Use on Consumer Pay Platforms**

a. No payment shall be due for any use on consumer pay platforms for an Original New Media Production budgeted below $25,000 per minute of actual program material as exhibited.

b. For all uses of an Original New Media Production budgeted at or above $25,000 per minute of actual New Media Production as exhibited on consumer pay platforms (e.g., download-to-own, download-to-rent, paid streaming) beyond the twenty-six (26) week period, the Producer shall pay residual equal to 3.6% of the "Distributor's gross," as that term is defined in Paragraph 5 below, attributable to the period beyond the twenty-six (26) week use period.

c. Paragraph 1 above shall apply to an Original New Media Production initially released on a consumer pay platform which is subsequently released on an advertiser-supported platform or vice versa.

**(3)** **Use in Traditional Media**

The Producer shall pay residuals for the use of an Original New Media Production in "traditional media" (e.g., free television, basic cable, pay television, home video) as a use under existing AFTRA TV Code formulas.

**a.** **Free Television Exhibition**

(i) Except with respect to exhibition of serial-type dramatic Original New Media Productions that exceed fifteen (15) minutes in length in network prime time, residual payments for free television exhibition of Original New Media Productions shall be computed as follows:

The new media exhibition of the Original New Media Production shall constitute the first run for purposes of calculating residual payments in free television. The residual payment shall be the product of the same category and length as the original New Media Production multiplied by the percentage applicable to the replay in question.

(ii) The formula for reruns in network prime time of serial-type dramatic Original New Media Productions that exceed fifteen (15) minutes in length is as follows: The new media exhibition of the Original New Media Production shall constitute the first run for purposes of calculating residual payments for use on free television. The residual payment shall be the amount payable for a rerun in network prime time of a free television program of the same length as the Original New Media Production.

Initial compensation for an Original New Media Production shall constitute payment for a twenty-six (26) period of use on any consumer pay new media platform (hereinafter "consumer pay platform"), commencing with the first day that the Original New Media Production is available on any consumer pay platform, and all uses on free to the consumer advertiser-supported platforms transmitted via New Media (hereinafter "advertiser-supported platforms").

---

b. For exhibition on pay television, the Producer shall pay residuals equal to 3.6% of "Distributor's gross" pursuant to Exhibit D of the AFTRA Network TV Code. For home video exploitation, the Producer shall pay residual pursuant to Exhibit D of the AFTRA Network TV Code. For exhibition on basic cable, Producer shall pay pursuant to Exhibit D of the AFTRA Network TV Code.

**5.** **"DISTRIBUTOR'S GROSS"**

**A.** **Definition**

The term "Distributor's gross," for purposes of all re-uses in new media of television programs made for traditional media and of Original and Derivative New Media Productions (each hereinafter referred to as "such Program"), as defined in Exhibit D of the AFTRA Network TV Code.[1]

When the "Distributor's gross" derived from new media exploitation is received from a related or affiliated entity that acts as the exhibitor/retailer of such Program, then the "Distributor's gross" received by the Producer from the licensing of such rights shall be measured by the exhibitor/retailer's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs, or, if none, then the amounts received by the Producer from unrelated and unaffiliated exhibitors/retailers in arms' length transactions for comparable programs, or, if none, a comparable exhibitor/retailer's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs.

**B.** **Agreements and Data**

On a quarterly basis commencing June 30, 2008, within ten (10) business days after such request, the Producer shall provide for inspection by AFTRA's designated employee or auditor, at Producer's premises where such data is kept, full access[2] to all introduced license, distribution, and other agreements pertaining to new media exploitation of covered programs that were entered into during the immediately preceding quarter.[3] In any subsequent quarterly inspection, the AFTRA's designated employee or auditor may re-inspect any agreements previously inspected and inspect any agreements not previously inspected.

Upon request, in a manner to be mutually agreed upon in good faith, the Producer shall expeditiously provide, or make available, to AFTRA data in its possession or control, or the possession or control of its related distribution entities, regarding the new media exploitation of covered programs, such as number of downloads or streams by source and ad rates.

**C.** **Recordkeeping and Reporting**

Payment for exploitation of covered pictures in new media shall be due sixty (60) days after the end of the quarter in which the "Distributor's gross" from such exploitation is received. The Producer shall accompany such payments with reports regarding the "Distributor's gross" derived from such exploitation, which

---

[1] For sake of clarity, "Distributor's gross" specifically includes advertising revenues when the license, distribution, or other agreement provides for sharing in such revenues.

[2] Full access includes access to all agreements, notwithstanding any confidentiality clause contained therein, and access to all sideletters, exhibits, addenda, and other ancillary documents.

[3] In the initial quarter, the Producer shall also provide AFTRA with access to all said agreements that were entered into between January 1, 2008 and March 30, 2008.

shall be specified by medium and source whenever reasonably possible and will be separated from revenues derived from exploitation of such Programs in traditional media. Along with such payments, the Producer shall provide AFTRA with unredacted copies of all corollary distributor's, sub-distributor's, and exhibitor's statements relating to the reported "Distributor's gross."

Where the Producer allocates revenues between new media rights and other rights in any such Program, among new media rights in multiple such Programs, or otherwise, it shall specify such allocation.

**D.   Confidentiality**

The information provided to AFTRA by the Producer will be treated as confidential and appropriate arrangements will be made to safeguard the confidentiality of that information.

**E.   Reservation of Rights**

With respect to television programs, the Producer has agreed to a separate payment for this use on the Internet because Internet exhibition is at this time outside the primary market. The Producer reserves the right in future negotiations to contend that the pattern of release has changed so that this use constitutes or is a part of the primary market of distribution programs and that, therefore, no additional payment should be made with respect to the exhibition of television programs (including those covered by this Agreement) on the Internet. AFTRA reserves the right in future negotiations to contend to the contrary, and further to assert that regardless of whether other exhibitions are or have become part of the primary market, residual provisions for television programs so exhibited should be improved.

**F.   Other Terms and Conditions**

Except as expressly provided herein, all other terms and conditions of the AFTRA TV Code, including but not limited to Paragraph 95, shall apply; in the event of a conflict, the terms and condition of this Sideletter shall control.

**6.   SUNSET CLAUSE**

The parties recognize that this Sideletter is being negotiated at a time when the business models and patterns of usage of programs and other productions in new media are in the process of exploration, experimentation and innovation. Therefore, all provisions of this Sideletter shall expire on the termination date of the 2007-2010 AFTRA Network TV Code and will be of no force and effect thereafter. No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for reuse of Made for New Media Productions and television programs in new media to be in effect thereafter.

**7.**   The parties further acknowledge that conditions in this area are changing rapidly and that the negotiation for the successor agreement will be based on the conditions that exist and reasonably can be forecast at that time.  For example, the parties acknowledge that with respect to the formula in Paragraph 1 for the electronic sell-through of programs and television programs, the growth of electronic sell-through could adversely impact traditional home video sales. In future negotiations, the parties agree that the criteria to be considered in good faith in determining whether the electronic sell-through residual should be increased or decreased include patterns of cannibalization of the home video market and changes in the Wholesale price.

All payments hereunder made as a percentage of "Distributor's gross" are aggregate payments for all performers who have traditionally been entitled to residuals under the AFTRA Network TV Code.

ACCEPTED AND AGREED TO:

By: _____   Date: _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.,
    an indirect wholly-owned subsidiary of ABC, Inc.

By: _____   Date: _____
    Day Krolik III
    NBC, Inc.

By: _____   Date: _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By: _____   Date: _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By: _____   Date: _____
    Kim Roberts Hedgpeth
    National Executive Director

SIDELETTER 31

SIDELETTER TO PARAGRAPH 73 - FREE TELEVISION RERUNS

As of November 16, 2001

Re:     Experiment in Syndication of Half-Hour Series in Markets Representing 50% or
        Fewer of U.S. Television Households

Reference is made to the provisions of Paragraph 73(B)(2) of the National Code of Fair Practice
for Network Television Broadcasting. During the 2001 negotiations, the Producers expressed a
concern that if a series could only be syndicated in markets representing fifty percent (50%) or
fewer of the U.S. television households, residuals payable pursuant to Paragraph 73(B)(2) and
(3) would render such syndication fiscally unfeasible. The Producers asserted that the payment
of any residuals in such circumstances would benefit both the Producer and the individual
performers since no payments are presently made.

While AFTRA expressed concern that an accommodation might be subject to abuse or otherwise
reduce overall syndication residuals, the parties agreed to an experiment for the term of this
Agreement, to be reviewed by November 14, 2004 to determine its effectiveness and whether or
if it should be extended. In such regard, the Producers agree to provide AFTRA, with license
information at the time of the first payment hereunder together with a detail of markets
covered by the license agreement. If the series is later syndicated in additional markets, the
Producer shall provide AFTRA with a detail of the additional markets at the time of the payment
immediately following such later syndication.

When a half-hour series is syndicated in markets representing in the aggregate fifty percent
(50%) or fewer of U.S. television households, residuals for such series shall be payable at thirty-
seven and one-half percent (37.5%) of the applicable minimum program fee, but shall not
constitute a "run" for purposes of Paragraph 73(B)(2) and (3).

If the series is further syndicated and the aggregate of the markets in which the series is
syndicated exceeds fifty percent (50%) of the U.S. television households, the payments required
pursuant to Paragraph 73(B)(2) and (3) shall be due on any subsequent runs.

This experiment will only apply to series that have not yet been placed into syndication as of
November 15, 2001.

ACCEPTED AND AGREED TO:
AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____ Date _____
   Kim Roberts Hedgpeth
   National Executive Director

By _____ Date _____
   Jeffrey Ruthizer
   American Broadcasting Companies, Inc.,
   an indirect wholly-owned subsidiary of ABC, Inc.

By _____ Date _____
   Day Krolik III
   NBC, Inc.

By _____ Date _____
   Harry Isaacs
   CBS Broadcasting Inc.

By _____ Date _____
   J. Nicholas Counter III
   On behalf of AMPTP Companies
   that are signatories to the 2007 AFTRA Code

182

183

SIDELETTER 32

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

Any performer who signs dialogue on programs using American Sign Language (ASL), International Sign Language, British Sign Language, Finger Spelling, Native American Sign Language or any other sign language recognized by the parties during the term of this Agreement, under circumstances which would qualify said performer as a principal performer, will be considered a principal performer speaking the dialogue, under circumstances which would qualify said performer as a principal performer.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
    Kim Roberts Hedgpeth
    National Executive Director

ACCEPTED AND AGREED TO:

By _____  Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____  Date _____
    Day Krolik III
    NBC, Inc.

By _____  Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____  Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

184

---

SIDELETTER 33

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The parties agree to meet and discuss how the AFTRA Paragraph 97 Report (AFTRA Code Exhibit H) can be revised to provide for reporting information on performers with obvious physical disabilities, as required by Paragraph 97, Section B1. The parties agree that such meeting shall include each party's employment counsel, to facilitate meaningful dialogue on this issue.

The parties agree to convene a meeting to discuss this issue by February 15, 2002.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
    Kim Roberts Hedgpeth
    National Executive Director

ACCEPTED AND AGREED TO:

By _____  Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____  Date _____
    Day Krolik III
    NBC, Inc.

By _____  Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____  Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

185

SIDELETTER 34

As of November 16, 2001

American Federation of Television
and Radio Artists
260 Madison Avenue
New York, New York 10016

Re: "Background Actors and Sound Recordings Code"

Ladies and Gentlemen:

During the 2001 Code negotiations, the bargaining parties agreed to change references to "Background Actors" and references to "Phonograph Code" to "Sound Recordings Code." These changes are non-substantive and result only in a change in nomenclature.

By _____ Date _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _____ Date _____
Day Krolik III
NBC, Inc.

By _____ Date _____
Harry Isaacs
CBS Broadcasting Inc.

By _____ Date _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

ACCEPTED AND AGREED TO:
AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____ Date _____
Kim Roberts Hedgpeth
National Executive Director

186

---

SIDELETTER 35

As of November 16, 2004

PRODUCER

Re: Serial Contracts

Ladies and Gentlemen:

During the 2004-2007 negotiations, AFTRA brought to the attention of the serial Producers the concerns of serial Performers regarding negotiation of new contract terms at the expiration of a cycle during a term contract. The parties had a full discussion on the issue.

As a result of such discussions, the parties have reached an agreement to provide serial Performers a guaranteed minimum period of time for such negotiations. Accordingly, in the event that a Producer wishes to negotiate different terms of employment which could result in a reduction of guaranteed compensation at the beginning of the next cycle within a term contract already in effect (but not at the expiration of a term contract), Producer will provide notice in writing to the party(s) designated in the term contract to receive notice, with a copy to AFTRA; provided that failure to give a copy to AFTRA shall not be deemed a failure to effectuate such notice. Such notice shall be given no later than two weeks prior to the date that the cancellation notice is due.

The foregoing provision shall not preclude the parties from mutually agreeing to negotiate after notice of cancellation has been given, or when a Performer or his/her designated representative initiates a request for negotiation of the type set forth above.

The giving of such notice by Producer shall not prejudice any of the rights of the parties under a Performer's term contract or this Code.

ACCEPTED AND AGREED TO:

By _____ Date _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary
of ABC, Inc.

By _____ Date _____
Harry Isaacs
CBS Broadcasting, Inc.

By _____ Date _____
Wendy Freedman
NBC, Inc.

By _____ Date _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
Kim Roberts Hedgpeth
National Executive Director

187

## SIDELETTER 36

As of November 16, 2004

Re: Daytime Drama Committees

During the 2004-2007 negotiations, the parties agreed to establish Producer / AFTRA Performer Daytime Drama Committees. The parties agreed that such Committees will meet during the term of the Code, on a Producer by Producer basis in the city where the program(s) is (are) produced. At such meetings, each Producer will be represented by senior executives and production management. The Committees will discuss creative and artistic issues affecting daytime drama performers and address ways to improve artistic performances.

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____  Date _____
Kim Roberts Hedgpeth
National Executive Director

By _Jeffrey Ruthizer_____  Date _____
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _Day Krolik III_____  Date _____
NBC, Inc.

By _Harry Isaacs_____  Date _____
CBS Broadcasting, Inc.

By _J. Nicholas Counter III_____  Date _____
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

188

## SIDELETTER 37

As of November 16, 2004

Re: Morning News Programs

PRODUCER

Ladies and Gentlemen:

AFTRA recognizes that certain waivers have previously been granted to Producers of morning news programs, where certain non-professional performance groups affiliated with religious, educational, charitable and other non-profit organizations have been excluded from the scope of this Agreement. AFTRA will not unreasonably deny a waiver to bona fide morning news programs, subject to the following:

(1) Members of the performance group shall be performing their own material or act, not material provided or arranged by the Producer.

(2) The performance group shall not back-up a star performer.

(3) Groups covered by this waiver shall be limited to one (1) appearance on that program within a calendar year.

(4) This waiver shall not apply to groups like the Vienna Boys Choir or Harlem Boys Choir, which are deemed to be professional.

(5) Producer shall notify AFTRA of the intention to utilize the provisions of this Sideletter prior to the appearance of the group on the program, or in no event later than twenty-four (24) hours after such appearance.

(6) Other waivers of this nature shall not unreasonably be denied.

(7) Professional performers who are members of such a group will receive, as a performance fee, payment of the appropriate rate, plus the applicable Health and Retirement contribution.

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____  Date _____
Kim Roberts Hedgpeth
National Executive Director

By _Jeffrey Ruthizer_____  Date _____
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _Day Krolik III_____  Date _____
NBC, Inc.

By _Harry Isaacs_____  Date _____
CBS Broadcasting, Inc

By _J. Nicholas Counter III_____  Date _____
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

189

SIDELETTER 38

As of November 16, 2004

Re: **Bona fide Amateur**

During negotiations for the 2004-2007 National Code of Fair Practice for Network Television Broadcasting, the parties reached the following agreement on a standing waiver to the Agreement:

*Bona fide Amateur* contestants on *bona fide* amateur talent opportunity programs and all reality programs which involve a competition out of which winners are chosen on each program or cycle of programs shall be excluded from this Agreement provided that any such contestant shall be limited to one (1) such cycle of talent programs within one (1) year.

By _____ Date _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.,
an indirect wholly-owned subsidiary of ABC, Inc.

By _____ Date _____
Day Krolik III
NBC, Inc.

By _____ Date _____
Harry Isaacs
CBS Broadcasting, Inc.

By _____ Date _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

ACCEPTED AND AGREED TO:
AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____ Date _____
Kim Roberts Hedgpeth
National Executive Director

---

SIDELETTER 39

As of November 16, 2004

Re: **Sideletter to Paragraph 73 - Promotional Launch Period for Dramatic Programs and Prime Time Variety Programs**

The parties agree to the following for the purpose of encouraging the success of new dramatic and prime time variety free television series produced for a network or The WB or UPN. This shall also apply to Dramatic Programs and Prime Time Variety Programs on MyNetwork and Prime Time Variety Programs on the CW. No residual compensation shall be due to series contract or term contract performers under Paragraph 73(H) or under Exhibit D for the second run (which may be either on free television or basic cable) of the first three (3) episodes broadcast (which may include the pilot) during the first production season, provided the second run occurs within a two (2) month period following the initial exhibition of each program. If such second run is on free television, it shall not constitute a "run" for purposes of Paragraph 73(B) or "release" to basic cable for purposes of Exhibit D of this Agreement. Producer shall be obligated to report any such run to AFTRA as required under this Code notwithstanding the fact that no payment shall be due therefore.

The producer may not utilize this provision at any time after the series has been cancelled.

The parties agree to study the utilization of this provision, at the end of eighteen (18) months. Prior to that time, the parties will agree on the information to be exchanged as part of the study.

ACCEPTED AND AGREED TO:

By _____ Date _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.,
an indirect wholly-owned subsidiary of ABC, Inc.

By _____ Date _____
Day Krolik III
NBC, Inc.

By _____ Date _____
Harry Isaacs
CBS Broadcasting, Inc.

By _____ Date _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____ Date _____
Kim Roberts Hedgpeth,
National Executive Director

SIDELETTER 40

As of March 8, 2008

Re:    Exhibitor / Distributor

During the negotiation of the 2008 AFTRA Network TV Code, AFTRA and the Producers discussed the nature of distribution via new media.  In particular, the Producers compared new media to basic cable distribution.  The Producers stressed that a new media exhibitor might work with a third party in the same way that a cable network, such as FX, works with a MSO's to exhibit programs.  AFTRA acknowledged that it considers new media exhibitors such as hulu.com to be exhibitors, and not distributors, and that situations analogous to the one in basic cable would be treated the same-namely, that the third party would be considered an exhibitor and would not make the initial exhibitor a distributor.

In addition, the parties agree that language in Paragraph 1 of the Sideletter 30, which was changed in the 2008 negotiations, is not a substantive change from the corresponding language that appeared in the same Sideletter in the 2004 TV Code.

By _____
    Kim Roberts Hedgpeth
    National Executive Director

    AMERICAN FEDERATION OF
    TELEVISION AND RADIO ARTISTS

ACCEPTED AND AGREED TO:

By _____    Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____    Date _____
    Day Krolik III
    NBC, Inc.

By _____    Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____    Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

192

SIDELETTER 41

As of March 8, 2008

Re:    Committee on Alternative Digital Broadcast Channels

During the negotiation of the 2007-2010 TV Code, the parties discussed their concerns regarding the reuse of programs on alternative digital broadcast and cable channels.  Following negotiations, the parties will establish an Alternative Digital Broadcast and Cable Channel Committee to address issues related to the reuse of programs on alternative digital broadcast and cable channels.

By _____
    Kim Roberts Hedgpeth
    National Executive Director

    AMERICAN FEDERATION OF
    TELEVISION AND RADIO ARTISTS

ACCEPTED AND AGREED TO:

By _____    Date _____
    Jeffrey Ruthizer
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____    Date _____
    Day Krolik III
    NBC, Inc.

By _____    Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____    Date _____
    J. Nicholas Counter III
    On behalf of AMPTP Companies
    that are signatories to the 2007 AFTRA Code

193

SIDELETTER 42

As of March 8, 2008

Re:   Experimental New Media Projects

During the lengthy discussions during the 2008 negotiations over Made-for New Media Projects, AFTRA expressed the concern of its members that the Producers might use Experimental New Media Projects to circumvent the terms and conditions of the AFTRA TV Code. The Producers assured AFTRA that they do not intend to use such projects as a subterfuge to allow the production of broadcast television programs outside the terms of the AFTRA TV Code.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
     Kim Roberts Hedgpeth
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____
     Jeffrey Ruthizer
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

Date _____

By _____
     Day Krolik III
     NBC, Inc.

Date _____

By _____
     Harry Isaacs
     CBS Broadcasting, Inc.

Date _____

By _____
     J. Nicholas Counter III
     On behalf of AMPTP Companies
     that are signatories to the 2007 AFTRA Code

Date _____

194

---

SIDELETTER 43

As of March 8, 2008

Re:   Entertainment Jurisdiction

This will confirm that during the discussions for the 2007 – 2010 AFTRA Network TV Code the parties discussed the historic past practices concerning AFTRA's jurisdiction over entertainment programs.

The parties confirm that AFTRA has historically covered live or recorded entertainment programs, as discussed in Paragraphs 70 and 72, originating within the continental United States and Alaska and Hawaii.

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
     Kim Roberts Hedgpeth
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____
     Jeffrey Ruthizer
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

Date _____

By _____
     Day Krolik III
     NBC, Inc.

Date _____

By _____
     Harry Isaacs
     CBS Broadcasting, Inc.

Date _____

By _____
     J. Nicholas Counter III
     On behalf of AMPTP Companies
     that are signatories to the 2007 AFTRA Code

Date _____

195

SIDELETTER 44

As of March 8, 2008

Re:   **Vacation Requests**

During the 2008 Code negotiations, the Producers reconfirmed their commitment to serial performers to give good faith consideration to requests for vacation. Additionally, during negotiations, performers emphasized the importance of performers' ability to attend significant family-related events such as weddings and graduations and Producers stated that they will use good faith to accommodate such requests.

Upon request from AFTRA, the serial Producers will meet with AFTRA on a Producer-by-Producer basis to discuss any problems or concerns about such vacation requests.

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
Kim Roberts Hedgpeth
National Executive Director

Date _____

By _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

Date _____

By _____
Day Krolik III
NBC, Inc.

Date _____

By _____
Harry Isaacs
CBS Broadcasting, Inc.

Date _____

By _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

Date _____

---

SIDELETTER 45

As of March 8, 2008

Re:   **Use of Personal Vehicles on Serial Locations**

If a Producer asks a Performer to provide a vehicle to a location to be used in the production (and the Producer and Performer have not otherwise agreed upon a rental fee), the Producer shall pay mileage to and from the location and for related driving on the location. For this purpose only, the term "location" as used herein is meant to include the primary studio location.

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
Kim Roberts Hedgpeth
National Executive Director

Date _____

By _____
Jeffrey Ruthizer
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

Date _____

By _____
Day Krolik III
NBC, Inc.

Date _____

By _____
Harry Isaacs
CBS Broadcasting, Inc.

Date _____

By _____
J. Nicholas Counter III
On behalf of AMPTP Companies
that are signatories to the 2007 AFTRA Code

Date _____

SIDELETTER 46

As of March 8, 2008

Re:   Stunt Coordinators – Paragraph 94

The parties shall create a joint committee to study the application of Paragraph 94, "Production Prosecuted," to the engagement of Stunt Coordinators.

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By
   Kim Roberts Hedgpeth
   National Executive Director
   Date

By
   Jeffrey Ruthizer
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.
   Date

By
   Day Krolik III
   NBC, Inc.
   Date

By
   Harry Isaacs
   CBS Broadcasting, Inc.
   Date

By
   J. Nicholas Counter III
   On behalf of AMPTP Companies
   that are signatories to the 2007 AFTRA Code
   Date

198

---

SIDELETTER 47

As of March 8, 2008

DEFINITION OF A
COVERED PERFORMER IN THE
SIDELETTER ON PROGRAMS MADE FOR NEW MEDIA

A "covered performer" is an individual who has been employed pursuant to the terms of a collective bargaining agreement covering his or her employment as a performer and who meets any of the following criteria:

- has at least two (2) television (including free television, pay television, basic cable or direct-to-video) or theatrical credits;

- has had thirteen (13) weeks of employment as a performer in radio (including satellite radio) in a major market;

- has at least two (2) credits in a professional stage play (e.g., Broadway, Off Broadway, as that term is understood in the live theater industry), under the LORT, COST or CORST contracts or as part of an Equity national tour);

- has been employed as a performer on an audio book or as a royalty artist on a sound recording which has been commercially released by a major label or a *bona fide* independent label; or

- has at least two (2) credits in a professional stage play (e.g., Broadway, Off Broadway, announcer, singer or dancer in a national television or radio commercial, interactive game or non-broadcast/industrial production.

The Producer shall be entitled to rely on the representation of the performer as to whether he or she meets the definition of a "covered performer."

ACCEPTED AND AGREED TO:

AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By
   Kim Roberts Hedgpeth
   National Executive Director
   Date

By
   Jeffrey Ruthizer
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.
   Date

By
   Day Krolik III
   NBC, Inc.
   Date

By
   Harry Isaacs
   CBS Broadcasting, Inc.
   Date

By
   J. Nicholas Counter III
   On behalf of AMPTP Companies
   that are signatories to the 2007 AFTRA Code
   Date

199

Dear [Hiring Executive]:

The Union has made proposals to restrict the employment as performers of active members of the Producer's casting or production staffs, and their friends and relatives, who are not professional performers. The Union maintained that these non-professional individuals substitute for, replace and reduce employment opportunities in all performance categories ("principals," "under -5s," background actors) which are an integral and vital segment of the professional performers' talent pool.

The Union reiterates that (1) too often the hiring of these non-professional performers is done to bestow economic favors rather than for creative reasons; (2) many of these non-professional performers do not intend to become professional performers; and (3) the foregoing represents both an unfair treatment of professional performers and an unwarranted drain upon the economic resources of the AFTRA Health and Retirement Funds.

Without in any way commenting upon the merits of the Union's allegations, the industry does acknowledge the gravity with which the Union addresses this issue, and agrees that professional performers represent a talent pool of considerable importance to the industry's well being.

In addition, and with specific reference to AFTRA's assertion that some Producers hire non-professional performers for the sole purpose of enabling such non-professionals to earn the minimum required to qualify for coverage under the AFTRA Health and Retirement Plans, the industry joins AFTRA in censuring any Producer who does engage in such practice.

Therefore, the Producers have agreed to circulate this statement to their hiring executives on an annual basis.

_____

Sincerely,

[Company]
_____

200

---

Dear [Casting Director]:

When engaged by this Company, casting directors will adhere to the following Company policy:

(1)  A casting director shall not attend or lend his/her name to any acting school, workshop, seminar or like programs which promises a performer a guarantee of employment in exchange for his/her attendance at such program.

(2)  A casting director shall not attend or lend his/her name to any acting school, workshop, seminar or like programs which advertises the specific role(s) or motion picture(s) for which the casting director is currently casting.

(3)  A casting director is prohibited from accepting any fee from a performer in exchange for selection for a specific role or for viewing a performer's showcase performance.

(4)  Casting directors will continue to seek out performers through methods such as granting interviews, accepting submissions from acting schools, attending showcases and utilizing AFTRA resources.

Sincerely,

[Company]
_____

201

# SCHEDULE OF MINIMUMS FOR ANNOUNCERS OFF-CAMERA
## (VOICE OVER) – PARAGRAPH 4.B.(1) AND (2)
## MULTIPLE PERFORMANCES IN A CALENDAR WEEK

## (1) More than Ten Lines

**Rates Effective: November 16, 2006**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $123.00 | $246.00 | $369.00 | $492.00 | $615.00 |
| Over 5 to 15 minutes | 245.00 | 428.00 | 551.00 | 674.00 | 733.00 |
| Over 15 to 30 minutes | 388.00 | 698.00 | 873.00 | 1067.00 | 1166.00 |
| Over 30 to 45 minutes | 479.00 | 839.00 | 1079.00 | 1318.00 | 1459.00 |
| Over 45 to 60 minutes | 543.00 | 949.00 | 1222.00 | 1491.00 | 1628.00 |
| Over 60 to 90 minutes | 694.00 | 1216.00 | 1564.00 | 1911.00 | 2085.00 |
| Over 90 to 120 minutes | 869.00 | 1466.00 | 1911.00 | 2355.00 | 2547.00 |

**Rates Effective: November 16, 2007**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $127.00 | $254.00 | $381.00 | $508.00 | $635.00 |
| Over 5 to 15 minutes | 254.00 | 443.00 | 570.00 | 698.00 | 759.00 |
| Over 15 to 30 minutes | 402.00 | 704.00 | 904.00 | 1104.00 | 1206.00 |
| Over 30 to 45 minutes | 496.00 | 868.00 | 1117.00 | 1364.00 | 1469.00 |
| Over 45 to 60 minutes | 562.00 | 982.00 | 1265.00 | 1543.00 | 1685.00 |
| Over 60 to 90 minutes | 718.00 | 1259.00 | 1619.00 | 1978.00 | 2158.00 |
| Over 90 to 120 minutes | 879.00 | 1538.00 | 1978.00 | 2417.00 | 2636.00 |

**Rates Effective: November 16, 2008**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $131.00 | $262.00 | $393.00 | $524.00 | $655.00 |
| Over 5 to 15 minutes | 262.00 | 456.00 | 587.00 | 719.00 | 782.00 |
| Over 15 to 30 minutes | 414.00 | 725.00 | 931.00 | 1137.00 | 1242.00 |
| Over 30 to 45 minutes | 511.00 | 894.00 | 1151.00 | 1405.00 | 1534.00 |
| Over 45 to 60 minutes | 579.00 | 1011.00 | 1303.00 | 1589.00 | 1736.00 |
| Over 60 to 90 minutes | 740.00 | 1297.00 | 1668.00 | 2037.00 | 2223.00 |
| Over 90 to 120 minutes | 905.00 | 1584.00 | 2037.00 | 2490.00 | 2715.00 |

**Rates Effective: November 16, 2009**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $135.00 | $270.00 | $405.00 | $540.00 | $675.00 |
| Over 5 to 15 minutes | 270.00 | 470.00 | 605.00 | 741.00 | 805.00 |
| Over 15 to 30 minutes | 426.00 | 747.00 | 959.00 | 1171.00 | 1279.00 |
| Over 30 to 45 minutes | 526.00 | 921.00 | 1186.00 | 1447.00 | 1580.00 |
| Over 45 to 60 minutes | 596.00 | 1041.00 | 1342.00 | 1637.00 | 1788.00 |
| Over 60 to 90 minutes | 762.00 | 1336.00 | 1718.00 | 2098.00 | 2290.00 |
| Over 90 to 120 minutes | 932.00 | 1632.00 | 2098.00 | 2565.00 | 2796.00 |

## (2) Ten Lines or Less (Multiple Performances in One Calendar Week)

**Rates Effective: November 16, 2006**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $123.00 | $246.00 | $369.00 | $492.00 | $615.00 |
| Over 5 to 15 minutes | 245.00 | 428.00 | 550.00 | 674.00 | 733.00 |
| Over 15 to 30 minutes | 272.00 | 476.00 | 613.00 | 749.00 | 816.00 |
| Over 30 to 45 minutes | 287.00 | 503.00 | 646.00 | 790.00 | 861.00 |
| Over 45 to 60 minutes | 325.00 | 565.00 | 726.00 | 889.00 | 969.00 |
| Over 60 to 90 minutes | 377.00 | 660.00 | 849.00 | 1038.00 | 1132.00 |
| Over 90 to 120 minutes | 456.00 | 763.00 | 981.00 | 1199.00 | 1308.00 |

**Rates Effective: November 16, 2007**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $127.00 | $254.00 | $381.00 | $508.00 | $635.00 |
| Over 5 to 15 minutes | 254.00 | 443.00 | 569.00 | 698.00 | 759.00 |
| Over 15 to 30 minutes | 282.00 | 493.00 | 634.00 | 775.00 | 845.00 |
| Over 30 to 45 minutes | 297.00 | 521.00 | 669.00 | 818.00 | 891.00 |
| Over 45 to 60 minutes | 334.00 | 585.00 | 751.00 | 920.00 | 1003.00 |
| Over 60 to 90 minutes | 390.00 | 683.00 | 879.00 | 1074.00 | 1172.00 |
| Over 90 to 120 minutes | 451.00 | 790.00 | 1015.00 | 1241.00 | 1354.00 |

**Rates Effective: November 16, 2008**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $131.00 | $262.00 | $393.00 | $524.00 | $655.00 |
| Over 5 to 15 minutes | 262.00 | 456.00 | 586.00 | 719.00 | 782.00 |
| Over 15 to 30 minutes | 290.00 | 508.00 | 653.00 | 798.00 | 870.00 |
| Over 30 to 45 minutes | 306.00 | 537.00 | 689.00 | 843.00 | 918.00 |
| Over 45 to 60 minutes | 344.00 | 603.00 | 774.00 | 948.00 | 1033.00 |
| Over 60 to 90 minutes | 402.00 | 703.00 | 905.00 | 1106.00 | 1207.00 |
| Over 90 to 120 minutes | 465.00 | 814.00 | 1045.00 | 1278.00 | 1395.00 |

**Rates Effective: November 16, 2009**

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| 5 minutes or less | $135.00 | $270.00 | $405.00 | $540.00 | $675.00 |
| Over 5 to 15 minutes | 270.00 | 470.00 | 604.00 | 741.00 | 805.00 |
| Over 15 to 30 minutes | 299.00 | 523.00 | 673.00 | 822.00 | 896.00 |
| Over 30 to 45 minutes | 315.00 | 553.00 | 710.00 | 868.00 | 946.00 |
| Over 45 to 60 minutes | 354.00 | 621.00 | 797.00 | 976.00 | 1064.00 |
| Over 60 to 90 minutes | 414.00 | 724.00 | 932.00 | 1139.00 | 1243.00 |
| Over 90 to 120 minutes | 479.00 | 838.00 | 1076.00 | 1316.00 | 1437.00 |

Exhibit B, Page 181

# ALPHABETICAL INDEX

| Subject | Section | Page |
|---|---|---|
| **A** | | |
| Addition & Trmg. Abuse - Statement of Objective | | |
| of AFTRA-Industry Program | Exhibit G | 133 |
| Alcoholism & Drug Abuse | 97A | 105 |
| Amateur Program | 75D | 92 |
| Announcers | 10 | 27 |
| Announcers Appearing in Multiple Commercials | 26 | 42 |
| Announcers - On-Camera - Non-Dramatic Programs - | | |
| Multiple Performances - Rates, Days and Hours | 23B(2) | 4 |
| nouncers - Notice of Discharge. | 65 | 64 |
| nouncers - Off-Camera | 4 | 8 |
| Announcers - Promo Fees | 10A(1) | 27 |
| Announcers - Protex - Command Station Tags | 10C | 28 |
| Announcers - Protex - Customer | 10A(4) | 28 |
| Announcers - Protex - Length of Session | 10A(6) | 28 |
| Announcers - Protex - Station and Network Identifications. | 10A(6) | 28 |
| Announcers - Promos - Syndication Packages | 10H | 30 |
| Announcers - Promos - Tags | 10B | 28 |
| Announcers - Promos - Tags - Session Fee. | 10D | 29 |
| Announcers - Public Service Announcements | 10E | 29 |
| Announcers - Serials - Standard Non-Commercial | 9A | 27 |
| Openings and Closings and Musical Signatures | 10A(1) | 27 |
| Arbitration. | 95C | 98 |
| Arbitration- AFTRA Party to All Arbitrations Under the Code. | 95C(4) | 99 |
| Arbitration - Authority of the Arbitrator | 95C(5) | 99 |
| Arbitration - Complete Defense to Lawsuit | 95C(2) | 99 |
| Arbitration - Limits on Effective Date of Award. | 95C(8) | 101 |
| Assistant Choreographer - H&R Contribution. | 5A(13) | 14 |
| Auditions | 45 | 51 |
| Auditions - Dramatic Programs | 45D | 52 |
| Auditions - Serials Performers in Running Parts. | 45F | 52 |
| Award Shows - Excerpts of Star Performers. | 73D(3)(4) | 77 |
| **B** | | |
| Background Actor Released Commercial Performers and | | |
| Announcers Off-Camera | 4C | 10 |
| Background Actor Rehearsals - Background Actors. | 8A | 23 |
| Background Actors | 8 | 23 |
| Background Actors - Programs other than Serials and Variety - | | |
| Program Fees, Rehearsal Days & Hours | 82D(1) | 24 |
| Background Actors - Programs other than Serials and Variety - Overtime. | 82D(1) | 24 |
| Background Actors - Auditions (all programs) | 45B. | 52 |
| Background Actors - Definition | 48. | 54 |
| Background Actors - Definition for Purposes of Commercials. | 27. | 42 |
| Background Actors - Doubling as Stand-Ins. | 46I. | 54 |
| Background Actors - Background Actor Rehearsal | 8A. | 23 |
| Background Actors - Preference of Employment - | | |
| Programs other than Serials and Variety | 83D(2) | 24 |
| Background Actors - Program Fees, Rehearsal Days & Hours - | | |
| Variety Programs. | 8A. | 23 |
| Background Actors - Serials. | 8C. | 24 |

| Subject | Section | Page |
|---|---|---|
| Background Actors - Special Rates for Large Groups - Serials and Variety | 8E. | 25 |
| Background Actors - Upgrades | 48. | 54 |
| Background Actors - Use of Recordings. | 8G. | 26 |
| Background Actors - List of Recordings. | 69C. | 71 |
| Basic Cable - Agreement re: New Programs | Exhibit D-2C. | 119 |
| Basic Cable Defined | 91 | 97 |
| Bond or Certified Check. | 61D. | 63 |
| Breakdown of Earnings | Subletter 28. | 166 |
| Breakdown Services - Disability Rate Notification | | |
| **C** | | |
| Calls for Group Dancers | 45 | 51 |
| Cancelled Individual Engagements | Subletter 4. | 201 |
| Cancelled Program - Illness of Series Regular (not applicable to serials) | 59F. | 139 |
| Cancelled Program - Off-Camera | 77 | 93 |
| Cancelled Program | 59 | 61 |
| Cancelled Program - Cancellation Due to Strike. | 59D | 61 |
| Cast Credit | 49 | 54 |
| Casting Directors - Limits | Letter | 201 |
| Certified Checks - Network Exempt From Paragraph 67 | Subletter 4 | 139 |
| Check-Off | 96 | 98 |
| Children's Programs | 77 | 93 |
| Choirs and Choruses on Non-Commercial Religious Programs | 75D. | 92 |
| Chorus Singers - On-Camera. | 5B. | 16 |
| Chorus Singers - Commonly Owned Stations- Program Fees, | | |
| Rehearsal Days & Hours | 5B(1). | 16 |
| Chorus Singers - Doubling. | 5B(2). | 17 |
| Chorus Singers - Off-Camera - Meal Period | 46B. | 53 |
| Chorus Singers - Off-Camera - Session. | 5B(2)(6). | 17 |
| Closed Circuit Programs. | 74 | 89 |
| Commercial Copy. | 24 | 40 |
| Commercial Performers and Announcers Off-Camera - | | |
| Background Actor Released. | 4 | 8 |
| Commercial Performers - Fees. | 4C. | 10 |
| Commercials - Appearances on Multiple Commercials | 4A. | 8 |
| Commercials by Background Actors in a Program. | 26. | 42 |
| Commercials by Singers or Dancers in a Program. | 46G. | 54 |
| Commercials by Performers in a Program. | 46H. | 54 |
| Commercials - Definition of Walk-on and Background Actor. | 27. | 42 |
| Commercials on Segmented Programs. | 41. | 49 |
| Commercials - Background Actor - Variety Programs. | 83. | 55 |
| Commonly Owned Stations - Principal Performers | 5A.(3) | 12 |
| Commonly Owned Stations - Group Dancers. | 2C. | 6 |
| Commonly Owned Stations - Program Replayed on Network. | 53D. | 55 |
| Commonly Owned Stations - Replays. | 53E. | 56 |
| Commonly Owned Stations - Singers - Program Fees, | | |
| Rehearsal Days & Hours | 5B(3). | 17 |
| Commonly Owned Stations - Specialty Acts. | 6E. | 21 |
| Commonly Owned Stations - Under Fives. | 3B. | 7 |
| Compensation for Travelling and Location Work. | 43. | 50 |
| Completion Programs | 73D(8) | 78 |
| Completion Programs - Pay Television. | 73D(10)(6) | 80 |
| Completion Videocassette - Additional Option for Serials. | 73D(10)(6) | 80 |
| Contract Adjustment Committee | Subletter 21. | 155 |
| Contract for Group Singers or Group Dancers | 34. | 44 |
| Cosmetic Alterations and Nudity. | 50. | 55 |
| Crediting - Limits of Crediting Referral | 55B. | 59 |
| Crediting of Overscale. | 56A. | 60 |
| Crediting - Serials. | 56C. | 60 |

Exhibit B, Page 182

| Subject | Section | Page |
|---|---|---|
| Customized Sticker Tags - Promo Announcements | 10C. | 28 |
| Customized Tracks - Singers - Promotional Announcements | 10G(4). | 30 |
| Cycles - Serials - How Determined | 54A.G | 58 |
| **D** | | |
| Dance-Ins | 36. | 45 |
| Dancers - Program Fees, Rehearsal Days & Hours | | |
| For Prime Time Dramatic Programs | 5A. | 11 |
| Dancers - Additional Rehearsal Days. | 5A.(4). | 12 |
| Dancers - Auditions. | 45C. | 52 |
| Dancers - Award Programs | 5A.(10). | 15 |
| Dancers - Commercials & Group. | 34A. | 44 |
| Dancers - Dancing with Made to Hazardous Performance. | Sidelatter 8. | 143 |
| Dancers - Daytime | 34C. | 44 |
| Dancers - Doubling. | 46B. | 53 |
| Dancers - Excess Days | 5A.(9). | 12 |
| Dancers - Hazardous Routine. | 5A.(12). | 13 |
| Dancers - Knee Pads | 5A.(10). | 13 |
| Dancers - Kree Work | 5A.(11). | 13 |
| Dancers - Lip Sync | 5A.(14). | 15 |
| Dancers - Non-Syndicated, Non-Primetime Programs | 6. | 64 |
| Dancers - Notice of Discharge. | 6C. | 64 |
| Dancers - Program Fees, Rehearsal Days & Hours - Group Dancers. | 5A. | 11 |
| Dancers - Safety - Floors | 5A.(8). | 13 |
| Dancers - Shoes | 25D. | 41 |
| Dancers - Step Out Rate. | 5A.(7). | 12 |
| Dancers - For Social Security and Taxes | 62. | 64 |
| Deductions of Liens | 47. | 54 |
| Definition of Basic Cable | 119. | 119 |
| Definition of Diaphram's Gross Receipts - Supplemental Markets. | Exhibit D4. | 122 |
| Definition of Major Role Performer | Sideletter 22. | 157 |
| Definition of Network Program | 71. | 72 |
| Definition of Walk-On & Background Actor | 48. | 54 |
| Definition of Supplemental Markets | Exhibit D-2. | 118 |
| Definition of Employment. | Sideletter 2. | 137 |
| Disability Insurance. | 63. | 64 |
| Disability Role Notification - Breakdown Services. | Sideletter 28. | 166 |
| Discharge - Notice - Announcers, Singers, Dancers. | 6C. | 64 |
| Distributor's Gross Receipts - Allocation | Exhibit D-4 D. | 123 |
| Distributor's Gross Receipts | Exhibit D-4. | 122 |
| Distributor's Gross Receipts - Supplemental Markets. | 46. | 53 |
| Doubling | 46C. | 53 |
| Doubling - Chorus Singers | 46C. | 53 |
| Doubling - Dancers. | 46D. | 53 |
| Dramatic Programs - Auditions | 45D. | 52 |
| Dramatic Programs - Performers Subject to Exhibit A. | 2A.(1). | 1 |
| Dramatic Programs - Program Fees, Rehearsal Days & Hours. | 2A.(2). | 1 |
| Dramatic Programs - Serials - Program Fees, | | |
| Rehearsal Days & Hours - Principals. | 2A.(2)(b)(i). | 2 |
| Dressing Rooms and Facilities - Locations | 51. | 55 |
| Dressing Rooms and Facilities - Number of | 51E. | 55 |
| Drug Abuse & Alcoholism - Statement of | | |
| Objective of AFTRA's Holiday Program | Exhibit G. | 133 |
| Drug Abuse and Alcoholism. | 97A. | 105 |
| **E** | | |
| Engagements. | 55. | 59 |
| Engagements - Notices to be Given. | 55A. | 59 |
| Excerpt of Legitimate Stage Productions For | | |
| News & Public Affairs Programs | Sideletter 6. | 141 |
| Excerpts - Replays. | 73D. | 76 |

206

| Subject | Section | Page |
|---|---|---|
| Excerpts - Replays - Award Shows - Star Performers. | 73D.(1)(4). | 77 |
| Excerpts - Replays - Established Promotional Announcements | 73D.(1)(5). | 77 |
| Excerpts - Replays - For Promotional Purposes. | 73D.(2). | 76 |
| Excerpts - Replays - Payment for Use. | 73D.(1). | 78 |
| Excerpts - Replays - Recaps | 73D.(1)(6). | 78 |
| Excerpts - Replays - Star Performer - Retrospective. | 73D.(1)(9). | 77 |
| Excess Days - Dancers. | 5A.(9). | 12 |
| Excess Fees to Struck Stations. | 10E. | 112 |
| Exclusivity. | 54. | 57 |
| **F** | | |
| Fees - Commercial Performers. | 4A. | 8 |
| Fees For Use of Still Photographs on Dramatic Programs. | Sideletter 9. | 144 |
| Fees - Supplemental Markets | Exhibit D-3 A. | 119 |
| Fees - Dancers - Excess Days. | 73D.(1)(6). | 78 |
| Foreign Replays. | 73D.(1)(6). | 82 |
| Form of AFTRA Performer Contract | 68. | 68 |
| **G** | | |
| Game Shows Contestants. | 75 D. | 92 |
| Grievance and Arbitration | 95. | 98 |
| Grievance and Arbitration - Time Limits. | 95A. | 98 |
| Group Dancers - Additional Rehearsal Days. | 5A.(4). | 12 |
| Group Dancers - Safety - Floors. | 5A.(8). | 13 |
| Group Dancers - Step Out Rate. | 5A.(7). | 12 |
| Group Dancers - Background Actors - Variety and Serials | 8E. | 25 |
| Group Noises. | 46E. | 53 |
| Group Singers - Multiple Tracking and Sweetening. | 5B.(8). | 19 |
| Group Singers - Sched' No. | 5B.(7). | 19 |
| Group Singers - Multiple Performances. | 10G. | 29 |
| Group Singers - Promotional Announcements - Customized Tracks | 10G.(4). | 30 |
| Group and Choruses. | 5. | 11 |
| Guaranteed Days of Employment (not applicable to serials). | 19. | 36 |
| Guaranteed Days of Employment - Strip Programs - (not applicable to serials) | 20D. | 38 |
| **H** | | |
| H&R Contribution - Assistant Choreographer. | 5A.(13). | 14 |
| Hair - Requirement to Grow or Shave. | 50. | 55 |
| Hazardous Performances. | 39. | 47 |
| Hazardous Performances - Dancers Wearing Masks. | Sideletter 8. | 143 |
| Hazardous Performances - Knee Work. | Sideletter 23. | 158 |
| Hazardous Routine - Dancers. | 5A.(12). | 13 |
| Hazardous Substances and Stroke. | 39A. | 48 |
| Health and Retirement Funds. | 102. | 108 |
| Health and Retirement Funds - Exhibit A Programs. | 102 Sec.1 A.(2). | 108 |
| Health and Retirement Funds - IAP. | 102 Sec.3. | 108 |
| Health and Retirement Funds - Situation Correlate (other than Exhibit A). | 102 Sec.1 A.(1). | 108 |
| Health and Retirement Funds - AFTRA ICF. | 102A. | 112 |
| Health and Retirement Funds - For Services Only Corporations. | 102 Sec.1 A.(1). | 108 |
| Health and Retirement Funds - Star Performers. | 102 Sec.1 B. | 110 |
| Health and Retirement Funds - Trustees. | 102 Sec.2. | 111 |
| Holiday Availability Cols. | 55C. | 59 |
| Holidays (social performers only) | 38B. | 47 |

207

Exhibit B, Page 183

**Subject** — **Section** — **Page**

**I**

Incidental Rehearsal — 25E — 41
Incidental Rehearsal Days (not applicable to serials) — 13B — 32
Incidental Rehearsal Days - Step Programs - (not applicable to serials) — 20C — 38
Indemnification of Performer — 94 — 97
Individual Contract - Standard Clause — 67 — 64
Individual Contract - Standard Form — 68 — 64
Individual Contracts — 66 — 68
Individual Contracts Beyond the Term of the Code. — 64 — 68
Industry Residual Study — 82 — 94
International Television — 73F — 160
Interviewees on Entertainment Programs-Rates, Conditions and Exceptions — 73E — 82 — 92

**K**

Knee Pads - Dancers — 5A.(9) — 13
Knee Work - Hazardous Performances. — Sidebar 23 — 158

**L**

Late Payment Penalties — 61B — 63
Length of Contract. — 1 — 1
Letters of Adherence. — 89 — 97
Line Defined. — 47 — 54
Lip Sync - Dancers — 5A.(11) — 13
Lip Synced Program. — 28 — 42
Live Signature Numbers. — 9 — 27
Loan-Out Companies - Health and Retirement Funds. — 102 Sec.I.F. — 110
Location Work. — 43A. — 50
Location Work - Dressing Rooms and Facilities — 51E. — 55

**M**

Major Role Performer - Defined. — Sidebar 22 — 157
Meal Period - Off-Camera Singers — 53C(X6) — 17
Meal Periods. — 23 — 39
Meal Periods - Exhibit A, Interpretation of "12 minute grace period" — Sidebar 27 — 165
Minimum Daily Call (not applicable to serials) — 17 — 36
Minimum Daily Call - Step Programs (not applicable to serials) — 20A — 37
Minimum Session (not applicable to serials) — 18 — 36
Minimum Session - Step Program (not applicable to serials) — 20B — 37
Minors — 100 — 106
Minors - Education. — 100E — 107
Minors - Engagement and Special Working Conditions. — 100B — 106
Minors - Interviews and Tests. — 100A — 106
Minors - Supervision. — 100D — 106
Minors - Work Hours. — 100C — 106
Models. — 33 — 44
Modification of Present Contract — 80 — 94
Multiple Categories of Performances. — 46E — 53
Multiple Commercials — 26 — 42
Multiple Performances - Non-Dramatic Program - Announcers — 23A(2) — 4
Multiple Performances - Group Singers. — 5C — 20
Multiple Performances - Non-Dramatic Program - Principal Performers — 38 — 45
Multiple Performances - Notice. — 43B(3). — 45
Multiple Performances - Off-Camera Program Announcers — 10 — 10
Multiple Programs That are Part Commercial and Part Sustaining. — 37 — 19
Multiple Tracking and Sweetening - Singers. — 5B(8) — 19

**N**

Network Program - Defined — 71 — 72
News Inserts. — 75A(2). — 91
News Inserts and Service - Limit on Applicability — — 138

208

News Inserts - Compilation Program of Inserts — 75A(3) — 91
News Inserts - Compilation Program of Inserts - Replays. — 75C — 91
News Programs - More than Two (2) Hours — — 90
News Service. — 75A(1) — 93
News Shows - Sixth (6th) or Seventh (7th) Performance. — 76 — 93
News - Use of Performance by Another Network or Station. — 23B(3). — 5
No Discrimination/Affirmative Action. — 753 — 91
No Discrimination/Affirmative Action — 97 — 102
No Discrimination/Affirmative Action - Data and Reports Required — 97B — 105
No Discrimination/Affirmative Action - Meetings With
   Producer or Organization. — —
No Discrimination/Affirmative Action - Meetings with serials re: Change. — 97C. — 105
No Discrimination/Affirmative Action - Paragraph 97 Report. — 97D — 105
No Discrimination/Affirmative Action - Policy. — Exhibit H. — 134
No Discrimination/Affirmative Action - Policy. — 97A — 104
No Discrimination/Affirmative Action - Shard Performers. — 97F. — 104
No-Single Clause. — 93 — 97
Non-Dramatic Programs - Program Fees.
   Rehearsal Days & Hours - Single Performances. — 23A(2). — 4
Non-Dramatic Programs - Program Fees.
   Rehearsal Days & Hours - Multiple Performances. — —
Non-Syndicated, Non- Prime Time Programs - Group Dancers. — 5A.(4A) — 3
Non-Waiver of Rights. — 5A.(4A) — 15
Notice on Multiple Performances. — 64 — 64
Notice - Pay for Referenced Guaranteed Days. — 38 — 45
Notification of Reuse. — 55A — 59
Notification of Dates and Conditions of Referrals - Group Dancers. — 5A. — 15
Nudity and Cosmetic Alterations. — 50. — 55

**Q**

Off-Camera Program Announcer - Program Fees.
   Off-Camera Days & Hours. — 4B — 9
Off-Camera Program Announcer - Program Fees.
   Rehearsal Days & Hours - More than Ten (10) Lines. — 4B(1) — 9
Off-Camera Program Announcer - Program Fees.
   Rehearsal Days & Hours - Ten (10) Lines or Less. — 4B(2) — 10
Off-Camera Program Announcer - Program Fees.
   Rehearsal Days & Hours - Multiple Performances. — 4B(2) — 10
Off-Camera Singers - Meal Period — 43(Q) — 10
Off-Camera Singers - Session. — 53C(X6) — 17
Off-Camera Announcers — 53C(X0) — 17
Original Employment for Pay Television or Videocassettes. — 4~ — 8
Original Employment Pay for Television or Videocassettes. — Exhibit F. — 126
Original Agreements Adopted. — 90. — 97
Overscale Contract. — 56. — 59
Overtime - Contracts. — 15. — 33
Overtime - Programs other than Serials and Variety-
   Background Announcer — 8D.(1) — 24
Overtime - Programs Other than Serials — 15A. — 33
Overtime - Serials. — 15B — 33

**P**

Pay Television or Videocassettes - Rates and Terms for
   Original Employment. — Exhibit F. — 126
Pay Television - Right to Exhibit On. — 69B. — 71
Payment. — 61. — 62
Payment - Breakdown of Earnings. — 61D. — 62
Payment - Due Dates. — 61A. — 62
Payment fir Multiple Sponsorship of Program. — 40. — 49
Payment - Penalties for Late Payment. — 61B. — 63
Payment - Replays - Due Dates and Late Payment Penalties — 61C. — 63
Payment - Time of and Reports - Supplemental Matters. — Exhibit D.5. — 123
People Covered. — 75. — 90
People Covered - Amateurs — 75D. — 92

209

| Subject | Section | Page |
|---|---|---|
| People Covered - Game Show Contestants | 75D | 92 |
| People Covered - Interviewees on Entertainment Programs | 75E | 53 |
| Performances in Multiple Categories | 46E | 53 |
| Performers Subject to Exhibit A | 2.A(1) | 1 |
|  | 3 | 6 |
| Performers Who Speak Five Lines or Less | 6 | 62 |
| Postponed Programs - Non-Serials | 60A | 62 |
| Postponed Programs - Serials | 60B | 62 |
| Preemption by President or News Event | 59B | 60 |
| Preference of employment - Programs Other Than Serials and Variety - Background Actors | 8.D(2) | 24 |
| Previews | 30 | 43 |
| Prime Time Network Programs (See Exhibit A Index- below) | Exhibit A | 114 |
| Principal Performers - Inability to Downgrade | 55B | 59 |
| Principal Performers - Dramatic Programs | 2 | 1 |
| Principal Performers - Dramatic Programs | 2A | 1 |
| Principal Performers - Dramatic Programs - Performers Subject to Exhibit A | 2.A(1) | 1 |
| Principal Performers - Dramatic Programs - Program Fees | 2.A(2) | 1 |
| Principal Performers - Non-Dramatic Programs - Program Fees, Rehearsal Days & Hours - Single Performances | 2.B(1) | 3 |
| Principal Performers - Non-Dramatic Programs - Multiple Performances | 2.B | 3 |
| Principal Performers - Non-Serial Dramatic Programs | 2.B(2) | 4 |
| Produce Bona fide Other Codes | 90 | 97 |
| Production Memoranda and Remittance Report | 87 | 96 |
| Production Forecast | 94 | 97 |
| Program Announcer - Program Fees, Rehearsal Days & Hours | 4.B | 8 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - More Than Ten (10) Lines | 4.B | 9 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less | 4.B(2) | 10 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less - Multiple Performances | 4.B(3) | 10 |
| Program Auditions | 44 | 51 |
| Program Owned | 75E | 92 |
| Program Fees - Interviewees on Entertainment Programs | 75E | 92 |
| Program Fees - Standard Non-Commercial Openings and Closings and Musical Signatures | 9A | 27 |
| Program Fees, Rehearsal Days & Hours - Programs, Other Than Serials and Variety - Background Actors | 8.D(1) | 24 |
| Program Fees, Rehearsal Days & Hours - Serials - Principals | 2.A(2)(b) | 2 |
| Program Fees, Rehearsal Days & Hours - Group Dancers | 5.A | 11 |
| Program Fees, Rehearsal Days & Hours - Group Singers | 5 | 11 |
| Program Fees, Rehearsal Days & Hours - Non-Dramatic Program - Multiple Performances - Principals (Other Than Serials) | 2.A(2)(a) | 1 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - Serials | 4.B | 9 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - More Than Ten (10) Lines | 4.B(1) | 9 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - Ten (10) Lines or Less | 4.B(2) | 10 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - Multiple Performances | 4.B(2) | 10 |
| Program Fees, Rehearsal Days & Hours - Dramatic Programs (Other Than Serials) - Principal Performers | 2.A(2) | 1 |
| Program Fees, Rehearsal Days & Hours - Non-Dramatic Programs - Single Performances - Principal Performers | 2.B(1) | 3 |
| Program Fees, Rehearsal Days & Hours - Specialty Acts | 6 | 20 |
| Program Fees, Rehearsal Days & Hours - Sportscaster | 7 | 22 |
| Program Fees, Rehearsal Days & Hours - Single Programs - Under Fives | 3.A | 6 |

210

## R

| Subject | Section | Page |
|---|---|---|
| Radio - Promotional Announcements | 10.A(2) | 28 |
| Reading Session | 21 | 38 |
| Ready to Go Calls | 55D | 59 |
| Recap | 73.D.(1)(i) | 77 |
|  | 2.A.(2)(b)(ii) | 8 |
| Reconciliation Period - Serials - Principal Performers | 3.C(2) | 8 |
| Reconciliation Period - Serials - Under Fives | 8.C(2) | 24 |
| Reconciliation Period - Serials - Background Actors | 7.(2) | 22 |
| Record of Program Covered by Code | 24 | 39 |
| Reduction of Hours/Days on Schedule Not Permitted | 55A | 59 |
| Regular Rehearsal Days (not applicable to serials) | 13.C | 32 |
| Rehearsal Days (not applicable to serials) | 14 | 32 |
| Rehearsal - Ship Departure (not applicable to serials) | 20 | 37 |
| Rehearsals and Rehearsal Rates (not applicable to serials) | 13 | 32 |
| Rehearsals - Limit on Crediting | 56.B | 60 |
| Remote and Report and Production Memwork | 87 | 96 |
| Remakes | 42 | 49 |
| Replays | 73 | 73 |
| Replays - Domestic Replay in Foreign Language | 73.B(5) | 73 |
| Replays | 73.D | 77 |
| Replays - Excerpts | 73.D.(1)(4) | 77 |
| Replays - Excerpts - Award Shows - Star Performers | 73.D.(1)(6) | 77 |
| Replays - Excerpts Flashback | 73.D.(1)(6) | 77 |
| Replays - Excerpts - Sampling for Promotional Purposes | 73.D.(1)(ii) | 76 |
| Replays - Excerpts - Payment for Use | 73.D.(2) | 78 |
| Replays - Excerpts - Retrospective | 73.D.(1)(5) | 77 |
| Replays - Excerpts - Star Performer - Retrospective. | 73.D.(4) | 77 |
| Replays - Fees Applicable | 73.B | 73 |
| Replays - International Television | 73.F | 74 |
| Replays - Payments for Replays on Entire Programs | 73.B | 73 |
| Replays - Programs on Commonly Owned Stations | 53.E | 56 |
| Replays - Replay Based Program Fee | 73.B | 73 |
| Replays - Release to Public Television | 73.B(6) | 76 |
| Replays - Syndication Programs - Additional Terms | 73.C | 76 |
| Re-Recording After Final Performance Date | 29 | 42 |
| Residual Study | Sideletter 25 | 160 |
| Rest Between Days - Serials | 16 | 34 |
| Rest Between Days. | 16G.B | 34 |
| Red Period. | 22 | 39 |
| Resites and Recording after Final Performance Date | 42 | 42 |
| Retroactivity | 79 | 94 |

| Subject | Section | Page |
|---|---|---|
| Programs in Excess of Two (2) Hours | 12 | 31 |
| Programs on Commonly Owned Stations. | 53 | 56 |
| Promotional Announcements | 10 | 28 |
| Promotional Announcements | 10.A | 28 |
| Promotional Announcements - Promo Fees | 10.A(1) | 28 |
| Promotional Announcements - Customized Station Tags | 10.C | 28 |
| Promotional Announcements - Group Singers | 10.G | 29 |
| Promotional Announcements - Length of Session | 10.A(4) | 28 |
| Promotional Announcements - Radio | 10.A(2) | 28 |
| Promotional Announcements - Series Regular | 10.F | 28 |
| Promotional Announcements - Session Report | 10.E | 28 |
| Promotional Announcements - Station and Network Identifications | 10.A(3) | 28 |
| Promotional Announcements - Syndication Packages | 10.H | 30 |
| Promotional Announcements - Tags | 10.I | 31 |
| Promotional Announcements - Sweeps | 10.L | 31 |
| Promotional Announcements - Use of Session Fee | 10.D | 29 |
| Promotional Announcements - Use of Promo on Basic Cable | 10.A(4) | 27 |
| Promotional Uses of Recordings | 88 | 96 |
| Promotional Uses of Recordings - Use on Basic Cable | Sideletter 20 | 155 |
| Public Service Announcements - Announcers | 10.E | 29 |

211

| Subject | Section | Page |
|---|---|---|
| Review Board. | 98 | 105 |
| **S** | | |
| Safety - Pyros - Dancers. | 5.A.(8) | 13 |
| Segregated Programs - Commercials. | 41 | 49 |
| Sperality | 99 | 105 |
| Serial Performers - Travelling and Location Work - Additional Provisions. | 51 | 51 |
| Serials - Additional Option for Completion Videocassettes. | 73.D.(10)(b) | 80 |
| Serials - Anniversary Date - Standard Non-Commercial Openings and Closings and Musical Signatures | 9.A. | 27 |
| Serials - Auditions of Performers in Running Parts. | 45.F. | 52 |
| Serials - Call Board. | 38.D. | 54 |
| Serials - Cast Credit. | 49 | 54 |
| Serials - Completion Programs. | 73.D.(8) | 78 |
| Serials - Crediting. | 56.C. | 60 |
| Serials - Delivery of Dual Menus or Content. | 56.A.F | 58 |
| Serials - Determination of Orders and Guarantees. | 56.A.G | 58 |
| Serials - Exclusivity. | 54 | 57 |
| Serials - Background Actors - Program Fees, Rehearsal Days & Hours | 8.C | 24 |
| Serials - Background Actors - Special Rates for Large Groups. | 8.E | 25 |
| Serials - Foreign Broadcast (non-cable). | 73.F.(2) | 84 |
| Serials - Holidays. | 38.B. | 45 |
| Serials - Length of Original Agreement | 54.A.A | 57 |
| Serials - Length of Renewal Agreement | 54.A.B. | 57 |
| Serials - Meal Period. | 23.B. | 40 |
| Serials - Meetings, Re: Non Discriminatory Casting. | 97.D. | 105 |
| Serials - Notice of Cancellation of Contract. | 54.A.D | 58 |
| Serials - Notice Requirements. | 38 | 45 |
| Serials - Overtime. | 15.B. | 33 |
| Serials - Proposed Programs. | 62 | 63 |
| Serials - Program Fees, Rehearsal Days & Hours - Principals. | 2.A.(20)(a) | 2 |
| Serials - Program Fees, Rehearsal Days & Hours - Under Fives. | 3.C. | 7 |
| Serials - Program Fees, Rehearsal Days & Hours - Background Actors. | 8.C. | 24 |
| Serials - Roofing Session. | 21.B. | 38 |
| Serials - Recaps. | 38 | 38 |
| Serials - Reconciliation Period - Background Actors. | 8.C.(2) | 24 |
| Serials - Reconciliation Period. | 2.A.(20)(a) | 3 |
| Serials - Requirement that Contract Guarantees | 54.A.H | 58 |
| Serials - Requirement that Number of Episodes | | |
| Serials - Requirement that Contract States a Per Episode Fee. | 54.A.C | 57 |
| Serials - Rest Between Days. | 16.B. | 35 |
| Serials - Restriction on Canceling for Absence Due to Illness. | 54.A.E | 58 |
| Serials - Step(s) in Advance. | 55.A | 59 |
| Serials - Sixth (6th) Scene / 7 Days. | 15.B.(2) | 34 |
| Serials - Term Contracts. | 54.A | 58 |
| Serials - Under Fives - Program Fees, Rehearsal Days & Hours. | 3.C. | 7 |
| Serials - Upgrading and Downgrading. | Sideletter 1 | 136 |
| Serials - Vacations. | 38.A. | 45 |
| Session - Off Camera Singers. | 5.B.(2)(e) | 17 |
| Session Fee - Tag - Promo Announcers. | 10.D | 29 |
| Starscreen. | 5.B. | 112 |
| Singers. | 5.B. | 16 |
| Singers - Committee Established Re: Impact of Computational Equipment. | Sideletter 10. | 145 |
| Singers - Commonly Owned (Stations - Program Fees, Rehearsal Days & Hours. | 5.B.(3) | 17 |
| Singers - Commons for Groups. | 34.B | 44 |
| Singers - Doubling. | 4G.B | 53 |
| Singers - Multiple Performance. | 5.C. | 20 |

| Subject | Section | Page |
|---|---|---|
| Singers - Multiple Tracking and Sweetening. | 5.B.(8) | 19 |
| Singers - Non Serial Dramatic Programs. | 5.B.(3) | 19 |
| Singers - Notice of Discharge. | 65 | 64 |
| Singers - Off-Camera - Meal Period. | 5.B.(2)(c) | 17 |
| Singers - Off-Camera - Session. | 5.B.(2)(b) | 17 |
| Singers - Producers to Send Letter to Licensee Recommending AFTRA. | Sideletter 14. | 149 |
| Singers - Program Fees, Rehearsal Days & Hours - On Camera. | 5.B.(1) | 16 |
| Singers - Promotional Announcements. | 10.D. | 29 |
| Singers - Promotional Announcements - Customized Tracks. | 10.D.(4) | 29 |
| Singers - Soloist/Duo. | 5.B.(7) | 19 |
| Singers - Standard Non-Commercial Openings and Closings and Musical Signatures. | 9.A. | 27 |
| Sixth (6th) or Seventh (7th) Day - Serials | 15.B.(2) | 34 |
| Smoke and Hazardous Substances. | 39.A. | 48 |
| Soloist/Duo - Singers. | 6.A.(7) | 19 |
| Specialty Acts. | 6.D. | 20 |
| Specialty Acts - Overtime. | 22.B. | 39 |
| Specialty Acts - Rest Periods - Rehearsals. | 7. | 21 |
| Sportscasters - Extended Programs (i.e., Olympics). | 7.E. | 22 |
| Sportscasters - Pre-Game Shows. | 7.E. | 22 |
| Sportscasters - Spotters and Statisticians. | 7.E. | 22 |
| Standard Clause for Individual Contract. | 67 | 64 |
| Standard Contract. | 68 | 65 |
| Standard Non-Commercial Openings and Closings and Musical Signatures. | 9.A. | 27 |
| Stand-Ins and Dance-Ins. | 36 | 45 |
| Statement of Earnings. | 46.I | 54 |
| Station and Network Identifications - Promo Announcers. | 6.1.D. | 63 |
| Step Out Rate - Dancers. | 5.A.(7) | 13 |
| Still Photographs on Dramatic Programs. | SideAttr 9 | 144 |
| Stunts Prohibited During Term of Code. | 93 | 97 |
| Step Programs - Guaranteed Days of Employment (not applicable to serials). | 20.D | 38 |
| Step Programs - Included Rehearsal Days (not applicable to serials). | 20.C. | 38 |
| Step Programs - Minimum Daily Call (not applicable to serials). | 20.A | 37 |
| Step Programs - Minimum Session (not applicable to serials). | 20.B | 37 |
| Step Programs (More Than 45-60 minutes). | 20.E. | 38 |
| Step Programs - Rehearsal (not applicable to serials). | 20.B | 37 |
| Short Performers. | 20 | 37 |
| Short Performers - Additional Short Work. | 69.A. | 70 |
| Short Performers - No Discrimination/ Alternative Action. | 69.A.A | 70 |
| Short Performers - Safety. | 97.F. | 104 |
| Short Performers - Salary Wardrobe. | 68.A.C | 71 |
| Short Performers - Driving Guidelines. | 69.A.B | 70 |
| Shorts. | Exhibit F. | 132 |
| Supplemental Markets. | 99 | 47 |
| Supplemental Markets - Assignments of Rights. | Exhibit D. | 118 |
| Stock Uses and Excerpts. | Exhibit D-6. | 124 |
| Supplemental Markets - Time of Payment and Reports. | Exhibit D-5. | 123 |
| Supplemental Markets - Allocation of Distributor's Gross Receipts. | Exhibit D-4-D. | 123 |
| Supplemental Markets - Definition of Distributor's Gross Receipts. | Exhibit D-4. | 123 |
| Supplemental Markets - Definitions. | Exhibit D-2. | 118 |
| Supplemental Markets - Fees. | Exhibit D-3. | 119 |
| Supplemental Markets - Right to Exhibit in. | Exhibit D-3-A | 71 |
| Supplemental Markets - Transfer of Rights. | Exhibit D-3-B. | 121 |
| Sustaining Programs. | 11. | 31 |
| Sweeps - Promotional Announcements. | 11. | 31 |
| Sweetening - Singers. | 5.B.(8) | 19 |
| Syndication Package - Promo Announcements | 10.F. | 31 |

Exhibit B, Page 186

| Subject | Section | Page |
|---|---|---|
| **T** | | |
| Tags - Customized Station Promo/Announcers | 10.C. | 28 |
| Tags - Promo/Announces | 10.B. | 28 |
| Tags - Session Fees - Promo/Announcers | 10.D. | 29 |
| Talent Auditions, Video Tests, Calls for Group Dancers | 45. | 51 |
| Term Contracts | 1. | 1 |
| Term Contracts - Serials | 54.A. | 57 |
| Title of Code | 105. | 113 |
| Transfer of Rights | Exhibit B | 115 |
| Travelling | 43. | 49 |
| **U** | | |
| Under Fives | 3. | 6 |
| Under Fives - Program Fees, Rehearsal Days & Hours - Serials | 3.C. | 7 |
| Under Fives - Program Fees, Rehearsal Days & Hours - Single Programs | 3.A. | 6 |
| Under Fives - Reconciliation Period for Serials | 3.C.(2) | 8 |
| Under Fives - Special Rates for Commonly Owned Stations | 3.B. | 7 |
| Universities | 35. | 44 |
| Unfair Producer | 92. | 97 |
| Union Shop | 84. | 95 |
| Upgrades - Background Actors | 48. | 54 |
| Use of Recordings for Reference, Film, Audition, Trailer or Promotional Purposes | 88. | 96 |
| **V** | | |
| Vacations | 38.A. | 45 |
| Variety Programs - Commonly Owned Stations - Program Fees | | |
| Rehearsal Days & Hours - Background Actors | 8.B. | 23 |
| Variety Programs - Program Fees, Rehearsal Days & Hours - Background Actors | 8.A. | 23 |
| Variety Programs - Special Rates for Large Groups - Background Actors | 8.E. | 25 |
| Video Tests | 45. | 51 |
| Voice Over Program/Announcer - Program Fees, Rehearsal Days & Hours | 4.B. | 9 |
| Voice Over Program/Announcer - Program Fees, Rehearsal Days & Hours - More Than Ten (10) Lines | 4.B.(1) | 9 |
| Voice Over Program/Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less | 4.B.(2) | 10 |
| Voice Over Program/Announcer - Program Fees, Rehearsal Days & Hours - Multiple Performances | 4.B.(3) | 10 |
| Voice Tests | 45. | 51 |
| **W** | | |
| Waiver of Cause of Action | 81. | 94 |
| Waivers Limited to Working Conditions | 78. | 93 |
| Walk-Ons - Definition | 48. | 54 |
| Wardrobe, Hairdress, Make-Up & Incidental Rehearsal | 25. | 40 |
| Warm-Ups | 31. | 43 |
| Warm-Ups - Fee for Members of Regular Production Staff (e.g. Writers) | Sidebar 15 | 130 |

214

## STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST
## AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK

Dated:  May 18, 2009

Between ___Tom Clark___ hereinafter called "Performer",

And _Comics Unleashed Productions, Inc.,_ hereinafter called "Producer".

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM:___Comedy.TV_____

TYPE OF PROGRAM: Basic Cable ( )  Sustaining ( )  Commercial ( )  Closed Circuit ( )

SPONSOR (if commercial):_____Various_____

NUMBER of GUARANTEED DAYS OF EMPLOYMENT:___1 day_____
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE*:_____The Broad Stage_____

SCHEDULED FINAL PERFORMANCE DAY:___May 18, 2009_____

AFTRA CLASSIFICATION:_____Specialty Act_____

PART TO BE PLAYED:___self_____

COMPENSATION:_____Scale $992.00_____EPI# _/On4/_____

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION:_____
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

___Tom Clark___
Performer

___310-709-7500___
Telephone Number

___396-74-383C___
Social Security Number

(PRODUCER)

By_____

Note:   Attach rehearsal schedule or deliver to Performer not later than the first reading session, (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session).

*Subject to change in accordance with AFTRA Code.



**STANDARD AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST
AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK**

Dated:    August 26, 2009

Between _Bernadette Pauley_ hereinafter called "Performer",

And Comics Unleashed Productions, Inc., hereinafter called "Producer".

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and in preparation in connection with the part or parts to be played:

TITLE OF PROGRAM:   Comedy.TV

TYPE OF PROGRAM: Basic Cable ( )  Sustaining ( )  Commercial ( )  Closed Circuit ( )

SPONSOR (if commercial):   Various

NUMBER of GUARANTEED DAYS OF EMPLOYMENT:  1 day
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE*:   Broad Stage

SCHEDULED FINAL PERFORMANCE DAY:   August 26, 2009

AFTRA CLASSIFICATION:

PART TO BE PLAYED:  self

COMPENSATION:   Scale 982- EPI# 1008, 1010, 1012, 1014 @

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION:
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

X _____
Performer

X _917-686-2877_
Telephone Number

_017 04 4315_
Social Security Number

(PRODUCER)

By _____

Note:   Attach rehearsal schedule or deliver to Performer not later than the first reading session, (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session).

*Subject to change in accordance with AFTRA Code.

1  LOEB & LOEB LLP
   IVY KAGAN BIERMAN (SBN 117750)
2  ibierman@loeb.com
   RAMON RAMIREZ (SBN 280772)
3  rramirez@loeb.com
   10100 Santa Monica Blvd., Suite 2200
4  Los Angeles, CA 90067
   Telephone: 310.282.2000
5  Facsimile: 310.282.2200

6  Attorneys for Defendants
   CF ENTERTAINMENT, et al.
7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

SEP 10 2013

BY _____, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF LOS ANGELES

10

11  BERNADETTE PAULEY, an individual,      )  Case No.: BC498061
    THOMAS CLARK, an individual, on        )
12  behalf of themselves and all others    )  Assigned to Hon. Kenneth Freeman
    similarly situated,                    )
13                                         )  **CLASS ACTION**
                                           )
14              Plaintiffs,                )
                                           )
15      v.                                 )
                                           )  **PROOF OF SERVICE**
16  CF ENTERTAINMENT, a California         )
    corporation; COMICS UNLEASHED          )
17  PRODUCTIONS, INC., a California         )
    corporation; ENTERTAINMENT             )
18  STUDIOS, INC., a California corporation;)
    BYRON ALLEN FOLKS, an individual;      )
19  and DOES 1 through 100, inclusive,     )
                                           )
20              Defendants.                )
                                           )
21  _____)

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2319189.1
013565-00030                          PROOF OF SERVICE

**PROOF OF SERVICE**

I, Martha Ortiz, the undersigned, declare that:

I am employed in the County of Los Angeles, State of California, over the age of 18, and not a party to this cause. My business address is 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, CA 90067.

On September 10, 2013, I served a true copy of the following documents on the parties in this cause as follows:

**1.  DEFENDANTS' NOTICE OF MOTION AND MOTION FOR ORDER: (1) COMPELLING ARBITRATION OF PLAINTIFFS' INDIVIDUAL CLAIMS; (2) DISMISSING CLASS CLAIMS; AND (3) DISMISSING PLAINTIFFS' INDIVIDUAL CLAIMS OR, IN THE ALTERNATIVE, STAYING PROCEEDINGS AS TO PLAINTIFFS' INDIVIDUAL CLAIMS**

**2.  DECLARATION OF BARRY ILOVITCH IN SUPPORT OF DEFENDANTS' MOTION FOR ORDER: (1) COMPELLING ARBITRATION OF PLAINTIFFS' INDIVIDUAL CLAIMS; (2) DISMISSING CLASS CLAIMS; AND (3) DISMISSING PLAINTIFFS' INDIVIDUAL CLAIMS OR, IN THE ALTERNATIVE, STAYING PROCEEDINGS AS TO PLAINTIFFS' INDIVIDUAL CLAIMS**

**3.  [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR ORDER: (1) COMPELLING ARBITRATION OF PLAINTIFFS' INDIVIDUAL CLAIMS; (2) DISMISSING CLASS CLAIMS; AND (3) DISMISSING PLAINTIFFS' INDIVIDUAL CLAIMS OR, IN THE ALTERNATIVE, STAYING PROCEEDINGS AS TO PLAINTIFFS' INDIVIDUAL CLAIMS**

**[X]  (VIA HAND DELIVERY)** in a sealed envelope I caused each such document to be delivered by hand to the offices of each interested party as set forth below, or on the attached service list.

**[X]  (VIA CASE ANYWHERE)** I caused a true and correct copy of the documents listed above to be electronically served on counsel of record by transmission to CASE ANYWHERE.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2319189.1
013565-00030

2
PROOF OF SERVICE

Exhibit B, Page 193

1  **Law Offices of Matthew J. Matern**          **Attorneys For Plaintiff:**
2  **Matthew J. Matern, Esq.**                    **Bernadette Pauley, on behalf of**
   **Tagore O. Subramaniam, Esq.**                **herself and all others similarly**
3  **3655 Torrance Boulevard, Suite 315**         **situated**
   **Torrance, California 90503**
4  **Tel: (424) 247-1172**
5  **Fax: (424) 247-1173**
   **Email: tagore.subramaniam@gmail.com**
6

7       I certify that I am employed in the office of a member of the bar of this court at
8  whose direction the service was made.
9       I am readily familiar with Loeb & Loeb LLP's practice for collecting and processing
10 correspondence for mailing with the United States Postal Service and Overnight Delivery
11 Service.  That practice includes the deposit of all correspondence with the United States
12 Postal Service and/or Overnight Delivery Service the same day it is collected and
13 processed.
14      I declare under penalty of perjury under the laws of the State of California that the
15 foregoing is true and correct.
16      Executed on September 10, 2013, at Los Angeles, California.
17
18                              Martha Ortiz
19
20
21
22
23
24
25
26
27
28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2319189.1
013565-00030

3
PROOF OF SERVICE

Exhibit B, Page 194

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

COPY

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Bernadette Pauley, an individual, on behalf of herself and all others similarly situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Screen Actors Guild-American Federation of Television and Radio Artists, et al.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
Matthew J. Matern (424) 247-1172
Law Offices of Matthew J. Matern
3655 Torrance Boulevard, Suite 315
Torrance, CA 90503

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
Ira Gottlieb (818) 973-3200
Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickinson
500 N. Central Avenue, Suite 800
Glendale, CA 91203

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1. Original Proceeding

☒ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

*Breach of Duty Affair Representation*

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property |  | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** |  | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation |  | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV |  | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts |  | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other |  |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** |  |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act |  |
|  | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations |  |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act |  |
|  | ☐ 220 Foreclosure |  | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act |  |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☒ 790 Other Labor Litigation |  |
|  |  |  | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act |  |

**FOR OFFICE USE ONLY:** Case Number: **CV13-08011**

CV-71 (09/13)

CIVIL COVER SHEET

Page 1 of 3

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☒ Yes   ☐ No | ☒ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? | A DEFENDANT? | |
| ☐ Yes   ☒ No | Then check the box below for the county in which the majority of DEFENDANTS reside. | Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
**SOUTHERN DIVISION.**
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡️

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
**EASTERN DIVISION.**
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇️

Your case will initially be assigned to the
**WESTERN DIVISION.**
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡️ | Western |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _[signature]_  DATE: October 29, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |